UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FINJAN, INC.,

            Plaintiff,

    v.

SOPHOS, INC.,

            Defendant.

Case No.  14-cv-01197-WHO

**CLAIM CONSTRUCTION ORDER**

Re: Dkt. No. 58

**INTRODUCTION**

Plaintiff Finjan, Inc. alleges that defendant Sophos, Inc. has infringed eight of its patents relating to antivirus software. The parties have requested that I construe five claim terms or elements in four of the patents at issue: the 8,677,494 patent, the 7,613,926 patent, the 7,613,918 patent, and the 6,154,844 patent. Based on the parties' briefs and oral argument of counsel, I construe the disputed terms as set forth below.

**LEGAL STANDARD**

Claim construction is required only when there is a disagreement as to the meaning or scope of technical terms and words of art, which the court must resolve in order to determine the issues before it. *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1360 (Fed. Cir. 2004). When the parties raise a dispute regarding the proper scope of patent claims, the court and not the jury must resolve that dispute. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996) (holding that claim construction is a matter of law).

Terms of a claim are generally given their ordinary and customary meaning. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). "In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning

1   of commonly understood words." *Id.* at 1360.  Words that are not technical terms of art may not

2   need construction at all.  *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).  "In such

3   circumstances, general purpose dictionaries may be helpful."  *Phillips v. AWH Corp.*, 415 F.3d

4   1303, 1314 (Fed. Cir. 2005).

5          The "ordinary and customary meaning" is "the meaning a term would have to a person of

6   ordinary skill in the art after reviewing the intrinsic record at the time of the invention."  *O2*

7   *Micro*, 521 F.3d at 1360.  This includes "not only in the context of the particular claim in which

8   the disputed term appears, but in the context of the entire patent, including the specification."

9   *Phillips*, 415 F.3d at 1313.  Intrinsic evidence "is the most significant source of the legally

10  operative meaning of disputed claim language."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

11  1576, 1582 (Fed. Cir. 1996).

12          "However, in many cases, the meaning of a claim term as understood by persons of skill

13  in the art is not readily apparent."  *O2 Micro*, 521 F.3d at 1360.  Courts look to "sources available

14  to the public that show what a person of skill in the art would have understood disputed claim

15  language to mean."  *Phillips*, 415 F.3d at 1314 (internal citations and quotations omitted).  In

16  addition to the particular claim and the rest of the patent, these sources include "the prosecution

17  history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical

18  terms, and the state of the art."  *Id.*  However, extrinsic evidence should be considered only after

19  consideration of intrinsic evidence, as it is less reliable and persuasive than intrinsic evidence.

20  *Vitronics*, 90 F.3d at 1582-84.  In addition, "[c]ases about patent validity are authoritative on the

21  issue of claim construction."   *Markman*, 52 F.3d at 996 n.7.

22          Courts depart from the "ordinary and customary meaning" of a term in two circumstances.

23  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  First, the

24  court will disregard the ordinary and customary meaning of a term where "a patentee sets out a

25  definition and acts as his own lexicographer."  *Id.*  Second, the court will alter its interpretation of

26  a term "when the patentee disavows the full scope of a claim term either in the specification or

27  during prosecution."  *Id.*  Embodiments from the specification generally should not be imported

28  into the claims in order to limit the claims.  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369

United States District Court
Northern District of California

2

(Fed. Cir. 2012).

**DISCUSSION**

In addition to the claims discussed, the parties also initially disputed the construction of the terms "security context" in the '918 patent, "certificate creator" in the '580 patent, and "protocol appender" in the '580 patent. The parties now agree that "certificate creator" and "protocol appender" do not require construction, *see* Dkt. No. 60 at 17, and that "security context" should be construed as "an environment in which a software application is run, which may limit resources that the application is permitted to access or operations that the application is permitted to perform." *See id.* at 14; Dkt. No. 62 at 14. I discuss the remaining terms at issue in turn.

## I. CONSTRUCTION OF TERMS IN THE '926 AND '494 PATENTS

The '494 and the '926 patents are largely identical, as '494 is a continuation of '926. *See* '494 patent at 1:7-15 (Dkt. No. 58-9). The '494 patent provides for "malicious mobile code runtime monitoring system and methods" and the '926 patent protects a "method and system for protecting a computer and a network from hostile Downloadables." *Id.* at 1; '926 patent 1 (Dkt. No. 58-5). Both patents provide "[p]rotection systems and methods [] for protecting one or more personal computers ("PCs") and/or other intermittently or persistently network accessible devices or processes from undesirable or otherwise malicious operations . . ." '494 patent at 1; '926 patent 1.

### A. "Database" ('926 patent, claim 22;'494 patent, claims 1, 10)

| Finjan's proposed construction | Sophos's proposed construction | Court's construction |
|---|---|---|
| A collection of interrelated data organized according to a database schema to serve one or more applications | No construction necessary | A collection of interrelated data organized according to a database schema to serve one or more applications |

Finjan contends that its proposed construction is in line with the plain and ordinary meaning of the term "database." It takes its language from the IBM Dictionary of Computing, which defines "database" in identical terms as "[a] collection of interrelated data organized according to a database schema to serve one or more applications." *See* Dkt. No. 58 at 10.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Sophos contends that no construction of the term "database" is necessary. Dkt. No. 60 at

2    2. It asserts that the '926 and '494 patents did not define the term or give it any special meaning.

3    *Id.* As an alternative construction, Sophos also cites to the definition of "database" in the IEEE

4    Standard Dictionary of Electrical and Electronic Terms as the plain and ordinary meaning of the

5    term: "a collection of logically related data stored together in one or more computerized files." *Id.*

6    at 3; Tr. 5 (Dkt. No. 72).

7    The parties do not appear to seriously dispute the definition of the term "database."

8    Although Finjan's definition of the term is slightly broader than that of Sophos, requiring that the

9    information in a database "serve one or more applications," both parties agree upon the basic

10    definition. *Compare* Dkt. No. 58 at 10 (Finjan's definition of "database" as taken from the IBM

11    Dictionary of Computing), *with* Dkt. No. 60 at 3 (Sophos's contention that "database" connotes a

12    "*structured* way to store data in a computer" (emphasis added)). During oral argument, counsel

13    for Sophos indicated that it accepted the definition "a collection of interrelated data structures,"

14    which was "almost identical" to Sophos's proposed alternative construction. Tr. 15. Sophos also

15    proposed an alternative construction, taken from the IEEE Standard Dictionary of Electrical and

16    Electronic Terms, of "a collection of logically related data stored together in one or more

17    computerized files." Dkt. No. 60 at 3.

18    Ultimately, the parties' disagreement centers on whether "database" includes "simple files,

19    such as a log file." Dkt No. 58 at 10. While Sophos contends that a log file is included within the

20    definition of database, Finjan claims that it is not. According to Finjan, a log file is unstructured

21    collection of data on a computer. *Id.* at 11. Sophos argues that a log file, such as the "events log"

22    described in the patent, is a collection of logically related data stored together and thus a database.

23    Dkt. No. 60 at 3.

24    The term "database" should be construed because the parties dispute the categorization of

25    "log file" as a "database," and because the term is sufficiently technical in the context of this

26    patent that a construction would aid the jury. Moreover, although at least one court has declined

27    to construe the term "database," *see MOAEC, Inc. v. Pandora Media, Inc.*, No. 07-CV-654-BBC,

28    2008 WL 4500704, at *6 (W.D. Wis. Sept. 30, 2008) ("I conclude that the term "database" . . .

4

United States District Court
Northern District of California

does not need construction because its plain and ordinary meaning is easily discernible from the claim language"), many courts have chosen to construe the term.  *See,* e.g., *Select Retrieval LLC v. Amerimark Direct LLC*, No. 1:11-CV-00812-RGA, 2014 WL 1092387, at *1 (D. Del. Mar. 14, 2014) (rejecting argument that "database" need not be construed); *see also Transcenic, Inc. v. Google Inc.*, 7 F. Supp. 3d 405, 411 (D. Del. 2013); *Clear With Computers, LLC v. Hyundai Motor Am., Inc.*, No. 6:09 CV 479, 2011 WL 43454, at *6 (E.D. Tex. Jan. 5, 2011); *Timeline, Inc. v. Proclarity Corp.*, No. C05-1013JLR, 2006 WL 6143242, at *11 (W.D. Wash. June 29, 2006); *Soverain Software LLC v. Amazon.com, Inc.*, No. 6:04-CV-14, 2005 WL 6225276, at *10 (E.D. Tex. Apr. 7, 2005).

The specifications of the '494 and '926 patents are identical.  Neither patent defines the term "database," and there is no evidence that Finjan "disavow[ed] the full scope of a claim term either in the specification or during prosecution." *Thorner*, 669 F.3d at 1365.  Thus, the plain and ordinary meaning to a person skilled in the art should prevail.

The claims at issue refer to a "database" of "Downloadable security profiles indexed according to Downloadable IDs." '926 patent at 22:26-28.  A database manager uses the database to retrieve security profile data for an incoming Downloadable. *Id.* at 22:25-28.  This language supports Finjan's definition of the term "database."  The database indexes information according to a database schema (Downloadable IDs) and serves an application (a database manager) in the antivirus process.

The specification mentions a "database" twice.  First, it refers to a "protected destination set, such as a protected destinations list, array, *database*, etc." where received information is sent. *Id.* at 9:54-55 (emphasis added).[1]  Second, it mentions "[a]ny suitable explicit or referencing list, *database or other storage structure(s)* or storage structure configuration(s)" that "can [] be utilized

---

[1] Although Sophos asserts that the '926 specification compares a database to a "list or array," indicating that it should be understood broadly enough to encompass simple files such as a log file, *see* Dkt. No. 60 at 3, I find this argument unpersuasive.  The fact that a database is listed along with more simple files does not mean that the database includes or is equated with these types of files.  In fact, one could argue that this list serves to further differentiate a database from simpler files.  Because this argument goes either way, the first reference to "database" in the '926 patent does not provide significant guidance.

1   to implement a suitable user/device based protection scheme . . . or other desired protection

2   schema." *Id.* at 16:51-55 (emphasis added).  These references indicate that a database is used as

3   an information source that serves protection engines when they inspect Downloadables.

4          The '780 patent, of which the '494 and '926 patents are continuations, reflects the same

5   understanding of database in its reference to a "security database."  It states that: "[t]he security

6   program 255 operates in conjunction with the *security database [], which includes security*

7   *policies [], known Downloadables [], known Certificates []and Downloadable Security Profile*

8   *(DSP) data []corresponding to the known Downloadables*."  '780 patent at 4:23-27 (Dkt. No. 58-

9   3) (emphasis added).  Essentially, the security database stores "security information for

10  determining whether a received Downloadable is to be deemed suspicious." *Id.* at 3:57-59.  The

11  '780 patent also refers to an "event log," stating that it "includes determination results for each

12  Downloadable examined and runtime indications of the internal network security system." *Id.* at

13  3:62-64.  Later on, the patent refers several times to the event log as storing status reports for

14  subsequent review. *Id.* at 4:22-9:27.

15         The patent's language and context supports Finjan's definition of a database.  The

16  specifications illustrate that a "database" serves applications, a characteristic that is not included in

17  Sophos's definition.  The fact that a database assists applications also undermines Sophos's

18  argument that a log file is a database, because a log file is more properly understood as a passive

19  record, instead of a storage device that interacts with an application.  The '780 patent also

20  differentiates between log files and "databases" by referring to them separately.

21         In addition, Finjan's expert, Nenad Medvidovic, states that a person of ordinary skill in the

22  art would understand "database" to mean "a collection of interrelated data organized according to

23  a database schema to serve one or more applications."  Dkt. No. 58-12 at 13.  Medvidovic further

24  states that "[a] person would understand a simple log file is not a database because it is not

25  structured like a database . . . A database, on the other hand, is a structured software component

26  that allows user and other software components to store and retrieve data in an efficient manner."

27  *Id.*  Sophos does not present a competing expert opinion.  Medvidovic's definition appears

28  reasonable when compared to the language of the patent and the definitions from computing

United States District Court
Northern District of California

6

United States District Court
Northern District of California

dictionaries such as the IBM Dictionary of Computing and the IEEE Standard Dictionary of Electrical and Electronics Terms.

The practical import of adopting the IEEE definition or the IBM definition cited by the parties is largely the same, as both definitions appear to exclude "log files." The IBM definition requires that a database have a given structure or that it serve one or more applications. The IEEE definition requires that the data be "logically related" or accessible by users or programs via a database management system. By contrast, a log file records information independently of any logic. Similarly, a log file is not used by applications in performing functions, but is reviewed by a user or other program. As suggested by the language of the patents, the term "database" is not broad enough to include a log file.

I am persuaded by Finjan's assertion that "[t]he claim language of the asserted patents all relate to the storage of data within the database in the context of the security profile or the downloadable security profile. The system actively uses these security profiles to detect malware and manage the system, not just for archival storage." Dkt. No. 58 at 11 (citations omitted). Therefore, I find that a log file does not qualify as a database in the context of this patent. Because Finjan's definition appears to reflect both the context of the patent as well as a well-accepted definition of the term, I adopt Finjan's construction of "database."

## II.  CONSTRUCTION OF TERMS IN THE '918 PATENT

The '918 patent describes a "system and method for enforcing a security context on a Downloadable." '918 patent at 1 (Dkt. No. 58-4). It provides a method for computer security, including receiving a Downloadable, deriving a security profile for it, and processing it in accordance with a security context. *Id.*

### A. "CODE-C" ('918 patent, claims 12, 22)

| Finjan's proposed construction | Sophos's proposed construction | Court's construction |
|---|---|---|
| Combined code | Combined code created at the gateway computer | Combined code |

As Finjan points out, "CODE-C is a term coined by Finjan for the '918 Patent and has no

1    readily understood meaning outside the context of the '918 Patent and claims."  Dkt. No. 58 at 8.

2    Sophos seeks to limit the term as imposing a requirement that CODE-C be created at the gateway

3    computer.  Alternatively, Sophos states that it could "accept a construction with appropriately

4    limiting language that is in accord with the intrinsic record, *i.e.*, 'CODE-C means combined code

5    not created by the client computer.'"  Dkt. No. 60 at 14.  In support of its position, it argues that:

6    (i) the purpose of the technology depends upon preventing viruses from entering a computer

7    network to begin with, and that the process cannot take place on a client computer; (ii) the patent

8    does not require that security software be installed on a client computer; and (iii) "every disclosed

9    embodiment requires CODE-C . . . be created at a gateway computer," thus expressing an

10   intention to limit the claim scope.  *Id.* at 11-13.

11        Sophos's first argument regarding the purpose of the technology misstates the language of

12   the patent.  In describing the creation of CODE-C, the patent abstract does not mention a gateway

13   computer.  '918 patent at 1.  Although it anticipates a computer network as opposed to a single

14   computer, it does not strictly require that the patent be executed on a network of multiple

15   computers.

16        Second, Sophos refers to the statement in the patent that "[t]he present invention has

17   several advantages, including . . . [that] [t]he present invention does not require installation of

18   security software on a client computer."  *Id.* at 11:12-19.  But this language does not exclude the

19   possibility of installation on a client computer, and the fact that a patent may have a certain

20   advantage in one area does not require the Court to limit its application to that area.

21        Sophos's third argument, that the patent's description expresses an intent to limit the scope

22   of "CODE-C" to gateway and/or non-client computers, relies upon the principle "[c]laims must be

23   read in view of the specification, of which they are a part."  *SciMed Life Sys., Inc. v. Advanced*

24   *Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001) (internal citations and quotations

25   omitted).   In this case, the embodiments of the patent involve CODE-C being created at a

26   computer separate from the destination or client computer – at a "gateway computer."  By this

27   logic, the specification may limit the scope of the term "CODE-C."

28        At the same time, there is a competing construction principle that provides that "it is

United States District Court
Northern District of California

1   axiomatic that without more the court will not limit claim terms to a preferred embodiment

2   described in the specification." *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1286

3   (Fed. Cir. 2005).  When examining the embodiments in the patent specification, it becomes clear

4   that this case is more akin to cases where courts have declined to limit a patent claim to its

5   embodiment than to the cases cited by Sophos, which find that patent descriptions and

6   embodiments may limit a claim.  In Sophos's cases, the specification did not leave room for other

7   embodiments of the invention or otherwise disavowed a broader construction of the term at issue.

8   For example, in *Toro Co. v. White Consolidated Industries, Inc.*, the court stated that "[t]he claim

9   word . . . is not construed in a lexicographic vacuum, but in the context of the specification and

10  drawings." 199 F.3d 1295, 1301 (Fed. Cir. 1999).  It noted that the specification at issue did "not

11  describe an invention broader than this description [of the claim term]. . . Nowhere in the

12  specification, including its twenty-one drawings, is the [broader definition of the term adopted]."

13  *Id.; see also Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999).

14         In this case, the patent repeatedly refers to a "preferred embodiment" and states that:

15              [T]he invention has been described with reference to specific
               exemplary embodiments thereof . . . various modifications and
16              changes may be made to the specific exemplary embodiments
               without departing from the broader spirit and scope of the invention
17              as set forth in the appended claims.  Accordingly, the specification
               and drawings are to be regarded in an illustrative rather than a
18              restrictive sense.

19  '918 patent at 11:39-46.  The patent description does not contemplate only computer networks

20  with a gateway computer.  There is also no compelling indication that the patent description

21  disavows the construction of the term "CODE-C" as it is defined in the claim.  For these reasons, I

22  disagree with Sophos's argument that the patent exhibits a "clear intention to limit the claim

23  scope."  Dkt. No. 60 at 13.

24         In addition, the patentee may act as his own lexicographer.  *See Thorner*, 669 F.3d at 1365.

25  Claim 12 and the patent specification explicitly define CODE-C as "combined code."  Claim 22

26  describes CODE-C as executable code consisting of "(i) wrapper executable code ("CODE-B"),

27  (ii) potentially malicious executable code ("CODE-A"), and (iii) information about a computer

28  account for CODE-A . . . ."  '918 patent at 13:42-45.  These definitions do not require that CODE-

9

1    C be created at a gateway computer.

2         The language of the claims undermines Sophos's limitation of the term "CODE-C."  Claim

3    22 states that CODE-C is "download[ed], by a computer . . ."  *Id.* at 13:41.  Although the patent

4    drafter could have specified that this computer was a gateway computer or a non-client computer,

5    as it did in Claim 12, it did not.  *See id.* at 12:32 (referring to "[a] computer security system for a

6    gateway computer.").[2]

7         For these reasons, the patent language supports Finjan's and not Sophos's construction of

8    the term "CODE-C."  Nothing about the definition or discussion of CODE-C itself indicates that

9    CODE-C cannot be created on the client computer.  I adopt Finjan's construction in accordance

10   with both the specification and the patent's own definition of the term.

11   **III. MEANS-PLUS-FUNCTION TERMS IN THE '844 PATENT**

12        If a claim uses the word "means," courts apply a presumption that a means-function

13   analysis under section 112 ¶ 6, now 112(f), applies.  *Cross Med. Products, Inc. v. Medtronic*

14   *Sofamor Danek, Inc.*, 424 F.3d 1293, 1303 (Fed. Cir. 2005).  In this case, neither party disputes

15   that section 112(f) applies.  *See* Dkt. No. 58 at 12-13; Dkt. No. 60 at 9.  35 U.S.C. § 112(f) states

16   that: "[a]n element in a claim for a combination may be expressed as a means or step for

17   performing a specified function without the recital of structure, material, or acts in support thereof,

18   and such claim shall be construed to cover the corresponding structure, material, or acts described

19   in the specification and equivalents thereof."  35 U.S.C.A. § 112(f).

20        Claim construction of a means-plus-function limitation includes two steps.  "First, the

21   court must determine the claimed function."  *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448

22   F.3d 1324, 1332 (Fed. Cir. 2006) (internal citations and quotations omitted).  "The second step in

23   the analysis is to look to the specification and identify the corresponding structure for that

24   function.  Under this second step, structure disclosed in the specification is 'corresponding'

25   structure only if the specification or prosecution history clearly links or associates that structure to

26

27   [2] During oral argument, Sophos argued for the first time that the patent's prosecution history
     evinced an intent to limit CODE-C's creation to a non-client computer.  Tr. 7-9.  But the cited
28   language discusses a part of the claim that is distinct from the term CODE-C, and Sophos's last-
     minute argument does not alter my construction.

United States District Court
Northern District of California

United States District Court
Northern District of California

the function recited in the claim." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003) (internal citations and quotations omitted). "The duty of a patentee to clearly link or associate structure with the claimed function is the quid pro quo for allowing the patentee to express the claim in terms of function under section 112, paragraph 6." *Id.* at 1211.

Section 112(f) "was intended to permit the use of means expressions in patent claims" without requiring the patentee to recite all possible structures that could be used as means in the claimed apparatus." *O.I. Corp. v. Tekmar Co.,* 115 F.3d 1576, 1583 (Fed. Cir. 1997). However, "[t]he price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof." *Id.* If the specification does not sufficiently identify the structure that corresponds to the function, then the claim fails for indefiniteness. *Med. Instrumentation & Diagnostics Corp.*, 344 F.3d at 1211. "The requirement that the claims particularly point[] out and distinctly claim[] the invention is met when a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification." *Id.* (internal citations and quotations omitted).

The Federal Circuit has further stated that "[i]n cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *Aristocrat Technologies Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). If the structure involves a computer or a microprocessor, the patent must disclose the algorithm that differentiates the microprocessor from others. *Id.* However, the algorithm need not always be "highly detailed." *Id.* at 1338; *see also Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012).

The '844 patent provides a "system and method for attaching a Downloadable security profile to a Downloadable." '844 patent at 1 (Dkt. No. 58-2). Claim 43 has three limitations that are means-plus-function limitations: (i) "means for receiving a Downloadable;" (ii) "means for generating a first Downloadable security profile that identifies suspicious code in the received

11

Downloadable;" and (iii) "means for generating a first Downloadable security profile that identifies suspicious code in the received Downloadable."

### A.   "Means for receiving a Downloadable" ('844 patent, claim 43)

| Finjan's proposed construction | Sophos's proposed construction | Court's construction |
|---|---|---|
| **Function**: receiving a Downloadable<br>**Structure**: Downloadable file interceptor | Indefinite | **Function**: receiving a Downloadable<br>**Structure**: Downloadable file interceptor |

The parties do not dispute that the claimed function is "receiving a Downloadable." Instead, the issue relates to the corresponding structure that performs the function. In its briefs, Sophos argued that "means for receiving a Downloadable" is indefinite. *See* Dkt. No. 60 at 8. It contended that Finjan's proposed structure, a Downloadable file interceptor, is a general purpose microprocessor "programmed to perform an algorithm to 'receiv[e] a downloadable.'" *Id.* at 6. Sophos asserted that the patent does not disclose any algorithm used by the Downloadable file interceptor to perform its function.

At the *Markman* hearing, Sophos conceded for the first time that there was a structure corresponding to "means for receiving a Downloadable." Tr. 21. However, it did not agree that that structure was a "Downloadable file interceptor." *Id.* Sophos's new argument during the hearing was inappropriate. Sophos itself acknowledged that waiver would apply if it "chang[ed] the scope of [its] argument" instead of simply "citing additional evidence." *Id.* at 19. At the hearing, it apparently abandoned the argument it made in its briefs in favor of an entirely new argument. I will not consider these arguments. *See Fujitsu Ltd. V. Belkin Int'l, Inc.*, No. 10-CV-0392-LHK, 2012 WL 368574, at *6 (N.D. Cal. Feb. 3, 2012 ("Ordinarily, the Court would find that any arguments not made in the claim construction briefing have been waived and may not be raised for the first time at the *Markman* hearing."). However, I note that Sophos's new argument is unpersuasive because the structure for "means for receiving a Downloadable" is unambiguous: the Downloadable file interceptor.

The claim refers to the "means for receiving a Downloadable" as part of an "inspector

system" that examines incoming files.  '844 patent at 14:35-42.  The claim specification describes an inspector that "includes a content inspection engine [] for examining a received Downloadable, e.g., the signed Downloadable received from the developer [], for generating a Downloadable Security Profile (DSP) based on a rules base [] for the Downloadable, and for attaching the DSP to the Downloadable."  *Id.* at 3:66-4:4.  Figure 4 of the specification represents the inspector.  See *id.* at Fig. 4.  This figure does not include a Downloadable file interceptor.  *Id.* at Fig. 4, 6:66-7:40.

"Downloadable file interceptor" is mentioned in the patent specification three times.  Figure 5 labels a "Downloadable file interceptor" in a flow chart.  *Id.* at Fig. 5.  In discussing this figure, the patent specification states that Figure 5 represents "a generic protection engine [], which . . . includes *a Downloadable file interceptor 505 for intercepting incoming Downloadables* (i.e. Downloadable files) for inspection, and a file reader . . . ."  *Id.* at 7:41-58 (emphasis added).  The only other mention of the term "Downloadable file interceptor" is in the patent's discussion of Figure 7, described as "a flowchart illustrating a method 700 for examining a Downloadable (whether or not signed and inspected).  *Id.* at Fig. 7, 9:19-22.  The method 700 "begins with *the Downloadable file interceptor 505 in step 705 receiving a Downloadable file*."  *Id.* (emphasis added).  The clear terms of the patent therefore designate the Downloadable file interceptor as the structure that performs the function "receiving a Downloadable."

Finjan appears to concede that the Downloadable file interceptor is a general purpose microprocessor.  Dkt. No. 62 at 10-11.  Therefore, the structure must either disclose an algorithm by which it performs its function or fall under an exception to this general rule.  *See*, e.g., *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009); *see also Ergo LLC*, 673 F.3d at 1363-64.

Finjan cites *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1316 (Fed. Cir. 2011), which establishes an exception that provides that a patent need not disclose an algorithm for a general purpose microprocessor.  Dkt. No. 62 at 11.  *Katz* states that "[a]bsent a possible narrower construction of the terms 'processing,' 'receiving,' and 'storing,' discussed below, those functions can be achieved by any general purpose computer without special programming.  As such, it [is] not necessary to disclose more structure than the general purpose

processor that performs those functions." *Katz*, 639 F.3d at 1316.

Other courts have followed *Katz* in finding that "means for receiving" functions are not indefinite where they fail to specify an algorithm. *See Freeny v. Murphy USA Inc.*, No. 2:13-CV-791-RSP, 2015 WL 294102, at *37 (E.D. Tex. Jan. 21, 2015) ("means for receiving" data does not need algorithm); *e-LYNXX Corp. v. Innerworkings, Inc.*, No. 1:10-CV-2535, 2012 WL 4484921, at *19 (M.D. Pa. Sept. 27, 2012) ("means for receiving an electronic communication" does not require disclosed algorithm); *but see Porto Tech. Co. v. Cellco P'ship*, No. 3:13CV265-HEH, 2013 WL 6571844, at *6-7 (E.D. Va. Dec. 13, 2013) ("means for receiving" traffic map does not fall under *Katz* exception).

The patent's context demonstrates that no specific computer-implemented functions are necessary to receive a Downloadable. "Receiving a Downloadable" is a simple function that consists of accepting or intercepting downloaded content when it is initially downloaded and before more complex operations process the file. From the descriptions in the patent, it does not appear that the word "receiving" has a narrower reading than the plain and ordinary meaning. Therefore, the patent does not need to specify an algorithm. Under *Katz*, which governs in this case, this element is not indefinite since any general purpose microprocessor could "receive a Downloadable."

**B. "Means for generating a first Downloadable security profile that identifies suspicious code in the received Downloadable" and "means for linking the first Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients"**

| Finjan's proposed construction | Sophos's proposed construction | Court's construction |
|---|---|---|
| Governed by 35 U.S.C. § 112(6):<br>**Function**: generating a first Downloadable security profile that identifies suspicious code in the received Downloadable<br>**Structure**: content inspection engine | Indefinite | Governed by 35 U.S.C. § 112(6):<br>**Function**: generating a first Downloadable security profile that identifies suspicious code in the received Downloadable<br>**Structure**: content inspection engine |
| Governed by 35 U.S.C. § 112(6):<br>**Function**: linking the first | Indefinite | Governed by 35 U.S.C. § 112(6):<br>**Function**: linking the first |

United States District Court
Northern District of California

| Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients **Structure**: content inspection engine | | Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients **Structure**: content inspection engine |
|---|---|---|

Once again, the parties do not dispute that the functions of these claims are respectively (i) "generating a first Downloadable security profile that identifies suspicious code in the received Downloadable," and (ii) "linking the first Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients."   However, they differ on whether the structure for these functions is sufficiently definite.

Sophos contends that Finjan's proposed structure, "content inspection engine," is not described with sufficient specificity in the patent.  Dkt. No. 60 at 8.  It further argues that there is no algorithm that explains how the content inspection engine generates a Downloadable security profile or links the first Downloadable security profile to the Downloadable.  *Id.* at 9-10.  Sophos "submits [that] in the alternative, the Court can construe the corresponding structure of [the second] limitation to be:  processor 405 + signal bus 410 + data storage device 430 + internal storage 435 + and an algorithm . . . ."  Dkt. No. 60 at 9.

Finjan's proposed structure in this case, "content inspection engine," is mentioned many times in the patent specification.  The overall function and structure of the content inspection engine is described in the summary of the invention as follows:

> The inspector includes a content inspection engine that uses a set of rules *to generate a Downloadable security profile corresponding to a Downloadable.   The content inspection engine links the Downloadable security profile to the Downloadable*. The set of rules may include a list of suspicious operations, or a list of suspicious code patterns.  The first content inspection engine may link to the Downloadable a certificate that identifies the content inspection engine which created the Downloadable security profile.   The system may include additional content inspection engines for generating and linking additional Downloadable security profiles to the Downloadable.

'844 patent at 2:3-14 (emphasis added).   This plainly indicates that the content inspection engine performs the function of "generating a first Downloadable security profile that identifies suspicious code in the received Downloadable."  *See id.* at 2:51-52; *see also id.* at 2:3-5 ("a

United States District Court
Northern District of California

content inspection engine . . . uses a set of rules to generate a Downloadable security profile").
Similarly, it is clear that the content inspection engine "links the Downloadable security profile to
the Downloadable." *Id.* at 2:6-7.

In discussing the preferred embodiment, the patent describes with further specificity how
the content inspection engine operates.  This essentially involves running a "digital hash" or
mapping function on the Downloadable's code in order to determine what types of code are
contained in the Downloadable.  *Id.* at 4:35-58.  The patent discusses this hash and the process of
generating a Downloadable ID:

> The content inspection engine 160 preferably prefetches all
> components embodied in or identified by the code for Downloadable
> ID generation. For example, the content inspection engine 160 may
> prefetch all classes embodied in or identified by the Java™ applet
> bytecode, and then may perform a predetermined digital hash on the
> Downloadable code (and the retrieved components) to generate the
> Downloadable ID.  Similarly, the content inspection engine 160 may
> retrieve all components listed in the .INF file for an ActiveX™
> control to compute a Downloadable ID.

*Id.* at 4:42-51.  Here, the proposed structure is described in substantial detail and provides an
algorithm that distinguishes it from other microprocessors or computers.  Finjan's expert,
Medvicovic, states that a person ordinarily skilled in the art would understand with reasonable
certainty that the content inspection engine performs the proffered functions.  Dkt. No. 58-12 at 5,
8.  *See Stamps.com Inc. v. Endicia, Inc.*, 437 F. App'x 897, 911 (Fed. Cir. 2011) ("In software
cases . . . algorithms in the specification need only disclose adequate defining structure to render
the bounds of the claim understandable to one of ordinary skill in the art.").

As above, the fact that the patent clearly designates the "content inspection engine" as the
corresponding structure defeats Sophos's alternative construction.  The patent adequately
designates the structure for the functions of "generating a first Downloadable security profile that
identifies suspicious code in the received Downloadable" and "linking the first Downloadable
security profile to the Downloadable before a web server makes the Downloadable available to
web clients."  This structure is not indefinite, and I adopt Finjan's proposed construction.

## CONCLUSION

For the reasons above, I construe the disputed terms as follows:

United States District Court
Northern District of California

1    "Database" as used in claim 22 of the '926 patent and claims 1 and 10 of the '494 patent is

2    defined as:  "a collection of interrelated data organized according to a database schema to serve

3    one or more applications."

4        "CODE-C" as used in claims 12 and 22 of the '918 patent is defined as:  "combined code."

5        "Means for receiving a Downloadable" in claim 43 of the '844 patent is a means-plus-

6    function limitation, in which the function is "receiving a Downloadable," and the corresponding

7    structure is "Downloadable file interceptor."

8        "Means for generating a first Downloadable security profile that identifies suspicious code

9    in the received Downloadable" is a means-plus-function limitation, in which the function is

10   "generating a first Downloadable security profile that identifies suspicious code in the received

11   Downloadable," and the corresponding structure is "content inspection engine."

12       "Means for linking the first Downloadable security profile to the Downloadable before a

13   web server makes the Downloadable available to web clients" is a means-plus-function limitation,

14   in which the function is "linking the first Downloadable security profile to the Downloadable

15   before a web server makes the Downloadable available to web clients" and the corresponding

16   structure is "content inspection engine."

17       **IT IS SO ORDERED**.

18   Dated: March 2, 2015



19

20                                                    WILLIAM H. ORRICK
                                                     United States District Judge

21

22

23

24

25

26

27

28

United States District Court
Northern District of California