# EXHIBIT 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FINJAN, INC.,<br><br>          Plaintiff,<br><br>      v.<br><br>PROOFPOINT, INC., et al.,<br><br>          Defendants. | Case No. 13-cv-05808-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO STRIKE INVALIDITY CONTENTIONS**<br><br>Re: Dkt. No. 195 |

Plaintiff Finjan, Inc. filed this patent infringement action against Defendants Proofpoint, Inc. and Armorize Technologies, Inc, alleging infringement of eight patents: Patent Nos. 6,154,844 ("the '844 Patent"), 7,058,822 ("the '822 Patent"), 7,647,633 ("the '633 Patent"), 7,975,305 ("the '305 Patent"), 8,141,154 ("the '154 Patent"), 7,613,918 ("the '918 Patent"), 8,079,086 ("the '086 Patent"), and 8,225,408 ("the '408 Patent").

Pending before the Court is Plaintiff's motion to strike twenty invalidity theories in Defendants final election of prior art on the basis that these theories were not in Defendants' preliminary election. Dkt. No. 195. Having read and considered the parties' arguments and evidence, Plaintiff's motion is **GRANTED IN PART AND DENIED IN PART**.

## I.  BACKGROUND

Pursuant to Patent Local Rules 3-1 and 3-3, Plaintiff served its disclosure of asserted claims and infringement contentions on April 17, 2014 and Defendants served their invalidity contentions on June 9, 2014.

On November 14, 2014, the Court's scheduling ordered identified dates for narrowing of the issues. Dkt. No. 98. As required by that order, Plaintiff timely filed its preliminary election of asserted claims, identifying forty claims from the subset of claims it had previously identified in

United States District Court
Northern District of California

its infringement contentions. In response, Defendants timely served their preliminary election of asserted prior art, identifying anticipation and obviousness combination theories. The order also required Defendants to serve a final election of asserted prior art, identifying the references it would present at trial from the subset of references previously identified in the preliminary election. *Id.*

On February 5, 2015, Defendants filed a motion to strike Plaintiff's infringement contentions as deficient under the local rules. Dkt. No. 118. The Court granted the motion in part and gave Plaintiff leave to amend its infringement contentions by April 23, 2015. Dkt. No. 138. The Court noted that "[t]o the extent Finjan wishes to amend its contentions to add products beyond those specifically identified in its initial infringement contentions, or if it wishes to re-allege claims under the doctrine of equivalents or for willful infringement, it must comply with Patent Local Rule 3-6." Dkt. No. 138 at 20. The Court also granted the stipulated request for Defendants to supplement their invalidity contentions by June 8, 2015 to the extent Plaintiff's amended infringement contentions provided new or different interpretations of the asserted claims. Dkt. No. 141. On April 23, Plaintiff timely served its amended infringement contentions, Dkt. No. 199, and on June 8, Defendants served supplemental invalidity contentions. Dkt. No. 199-6, Ex. E.

On June 30, 2015, Defendants served an amended preliminary election of asserted prior art. Dkt. No. 195-1, Ex 4. Plaintiff served its final election of asserted claims, reducing the number of claims from forty to twenty-four claims on September 9, 2015, Dkt. No. 195-1, Ex. 7, and Defendants served their final election of prior art on September 23, 2015. Dkt. No. 195-1, Ex. 9.

Plaintiff has moved to strike twenty invalidity theories in Defendants' final election on grounds that they were not included in Defendants' preliminary election. Dkt. No. 195.

## II.        LEGAL STANDARD

The Northern District of California's Patent Local Rules require both parties to provide early identification of their infringement and invalidity theories. *See* Patent L.R. 3-1, 3-3. Once served, the contentions constitute the universe of the parties' respective theories, and those

2

United States District Court
Northern District of California

contentions may be amended only by court order and upon a showing of good cause. Patent L.R. 3-6; *see MediaTek Inc. v. Freescale Semiconductor, Inc*., No. 11-CV-5341 YGR, 2014 WL 690161, at *1 (N.D. Cal. Feb. 21, 2014) ("Any invalidity theories not disclosed pursuant to Local Rule 3-3 are barred, accordingly, from presentation at trial (whether through expert opinion testimony or otherwise)."). The purpose of these disclosures is "to require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed," *Atmel Corp. v. Info. Storage Devices Inc.*, No. C 95-1987 FMS, 1998 WL 775115, at *2 (N.D. Cal. Nov. 5, 1998), so as to "further the goal of full, timely discovery and provide all parties with adequate notice of and information with which to litigate their cases," *Genentech, Inc. v. Trustees of Univ. of Pa.*, No. C 10-2037 LHK PSG, 2012 WL 424985, at *2 (N.D. Cal. Feb. 9, 2012) (citation and internal quotation marks omitted). A district court has wide discretion in enforcing the Patent Local Rules. *SanDisk Corp. v. Memorex Prods., Inc.,* 415 F.3d 1278, 1292 (Fed. Cir. 2005).

## III.  DISCUSSION

Plaintiff argues that Defendants improperly served an amended preliminary election with new references and different obviousness combinations more than six months after the Court's deadline to serve its preliminary election. Dkt. No. 195 at 3. It contends that the amended election was improper because Defendants failed to seek leave from the Court and because the stipulated order permitting Defendants to supplement their invalidity contentions did not include permission to amend their preliminary election.

The Court agrees. Defendants violated the Court's scheduling order and Patent Local Rule 3-6. Before amending invalidity contentions, a party must make a timely showing of good cause and seek permission from the Court. Patent L.R. 3-6. Defendants did not seek permission from the Court before amending their preliminary election; notwithstanding Defendants' disregard for the rules, they also have failed to belatedly establish good cause. Instead, Defendants argue that the stipulated order allowing Defendants to amend their invalidity contentions naturally incorporated the right to amend their preliminary election. This contention is unavailing. The stipulated order was narrowly tailored and explicitly permitted amendment of the invalidity

United States District Court
Northern District of California

contentions "to the extent that Finjan's amended infringement contentions provide[d] new or different interpretations of the asserted claims." Dkt. No. 141. The order did not mention Defendants' preliminary election and did not include implied or explicit permission to amend the preliminary election of prior art. Defendants also have failed to establish how the new references of prior art are justified given the Plaintiff's amended infringement contentions. Defendants broadly contend that because Plaintiff's supplemental infringement contentions expanded Plaintiff's infringement theories, Defendants were "forced" to reexamine their preliminary election. Dkt. No. 199 at 4-5. Even if Defendants' contentions are correct, this would not excuse Defendants' failure to seek leave from the Court. Accordingly, Defendants amended preliminary election was improper; in evaluating Plaintiff's motion to strike, the Court only considers Defendants' preliminary election as compared to the final election of asserted prior art.

Defendants cite several cases supporting their contention that they were not required to identify the exact obviousness combinations leading up to the final election. *See Avago Techs. Gen. IP PTE Ltd. v. Elan Microelectronics Corp.*, No. C04 05385 JW HRL, 2007 WL 951818, at *4 (N.D. Cal. Mar. 28, 2007) (affirming defendant's obviousness combinations, although defendant had not identified specific combinations and the disclosed prior art references could result in billions of possible combinations); *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-CV-03587-WHO, 2015 WL 757575, at *28 (N.D. Cal. Feb. 20, 2015) ("Courts in this district have held that Rule 3-3(b) does not always require the accused infringer to spell out in exact detail every particular combination it intends to assert."); *see also Keithley v. The Homestore.com, Inc.*, 553 F. Supp. 2d 1148, 1150 (N.D. Cal. 2008).

On the one hand, these decisions do not specifically address the facts of the present case. The invalidity contentions in *Avago* and *Keithley* were displayed as a list of several references that could be combined to show billions of possible obviousness combinations. The decisions found that the grouping methods were permissible under the local rules, because the "theory of obviousness [was] the same for each and every possible combinations of the two groups." *Avago*, 2007 WL 951818, at *4; *see Keithley*, 553 F. Supp. 2d at 1150. Moreover, the plaintiff in each case disputed the adequacy of the invalidity contentions and whether the contentions complied

4

with Patent Local Rule 3-3. In contrast, here, Defendants did not allege a long list of references, but rather limited their invalidity contentions to specific combinations. There also is no indication, and Defendants do not argue, that each of Defendants' obviousness combinations relies on the same theory of obviousness. Moreover, Plaintiff does not appear to contest Defendants' compliance with the local rule; Plaintiff's brief is narrowly focused on whether Defendants followed the scheduling order.

As for *Fujifilm*, that decision concerned the expert's use of obviousness combinations that, while not identified in the supplemental invalidity contentions, were included in the defendant's court-ordered reduction of its invalidity contentions. The court held that it was "reasonable to infer [from defendant's reduction] that [defendant] intended to assert obviousness on the basis of the same previously disclosed combinations, just without Hollenberg." *Fujifilm*, 2015 WL 757575, at *29. In other words, the exact obviousness combination possibilities were still clear to the plaintiff, even if no longer explicit. *See id.* The same cannot be said about Defendant's obviousness combinations. For example, Defendants' dropped two previously-listed references (Chu and Necula Publication) for the '086 Patent to arrive at the combination in its final election: "Abadi, Isaak, Ji, Necula, ThunderBYTE."

On the other hand, Plaintiff does not cite any cases to show that the obviousness combination between the preliminary election and the final election must be exactly the same. The local rules merely require a defendant to include "an identification of any combinations of prior art showing obviousness," but do not speak to the possibility of changes between a preliminary and final election. Plaintiff's attempt to distinguish Defendants' cases and to argue that the exact obviousness combinations are required is unpersuasive. Plaintiff relies on the scheduling order, arguing it requires "greater specificity" in this case. *See* Dkt. Nos. 98, 195 at 9 & n.3, 203 at 7-8. But, the order's plain language merely requires that Defendants' final election include prior art from the "subset of *references* previously identified" in the preliminary election. Dkt. No. 98 (emphasis added). It does not speak to the obviousness combinations. Moreover, the Court does not read the scheduling order's footnote two as requiring exact obviousness combinations. Rather, per the order's plain language, Defendants only were required to choose

5

United States District Court
Northern District of California

from the prior art references previously identified. Given the case law presented and that the local rule does not require a defendant to identify the same obviousness combinations from its preliminary election to its final election, the Court does not strike obviousness combinations on the basis that the specific combinations in the final election were not exactly the same as those in the preliminary election.

That being said, Defendants have largely failed to follow the scheduling order's requirement that Defendants final election use previously identified prior art references. For instance, the '822 and '633 Patents list prior art 'Jensen' in the final election, even though 'Jensen' was not identified in the preliminary election. It is insufficient that Defendants identified 'Jensen' as relevant prior art for other patents. *See* Patent L.R. 3-3(c) (requiring "chart[s] identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found"); *see also Verinata Health, Inc. v. Sequenom, Inc.*, No. C 12-00865 SI, 2014 WL 4100638, at *5 (N.D. Cal. Aug. 20, 2014) (striking invalidity theories on the basis that defendant's reference to prior art was a new invalidity theory where defendant had only listed the reference as relevant to a different patent); *Life Techs. Corp. v. Biosearch Techs., Inc.*, No. C 12-00852 WHA, 2012 WL 4097740, at *3 (N.D. Cal. Sept. 17, 2012); *MediaTek*, 2014 WL 690161, at *4. Accordingly, the Court strikes all anticipation and obviousness combination theories in Defendants' final election that include prior art references not previously identified in the preliminary election.

For the aforementioned reasons, the Court strikes the following theories in Defendants' final election[1]:

| Patent | Anticipation | Obviousness Combination |
|--------|--------------|-------------------------|
| '305 patent | ▪ Kolawa | ▪ Chandani, Li, Kolawa, Huang, Viega |
| '633 patent | -- | ▪ Ji, Golan, Rubin, Jensen, Liu<br>▪ Trend Micro, Golan, Rubin, Jensen, Liu |

---

[1] To the extent Plaintiff requests sanctions beyond striking of the invalidity contentions, the request is denied for failure to comply with Civil Local Rule 7-8.

| '408 patent | ▪ Chandnani<br>▪ Li | ▪ Chandani, Li, Kolawa, Huang, Viega |
|---|---|---|
| '086 patent | ▪ Islam | ▪ Islam, Ji, Necula, ThunderBYTE |
| '844 patent | ▪ Islam | ▪ Islam, Ji, Necula, ThunderBYTE |
| '822 Patent | -- | ▪ Ji, Golan, Rubin, Jensen, Liu<br>▪ Trend Micro, Golan, Rubin, Jensen, Liu |
| '154 Patent | ▪ Chess | ▪ Chess, Kennedy, Lalonde, Pham<br>▪ Ross, Kennedy, Lalonde, Pham |

**IT IS SO ORDERED.**

Dated: 12/04/2015

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

7

# EXHIBIT 31

# Internet Component Download

DRAFT

January 1996

Microsoft Corporation

Download Microsoft Word (.DOC) format of this document (zipped, 28.6K).

**Note:** This document is an early release of the final specification. It is meant to specify and accompany software that is still in development. Some of the information in this documentation may be inaccurate or may not be an accurate representation of the functionality of the final specification or software. Microsoft assumes no responsibility for any damages that might occur either directly or indirectly from these inaccuracies. Microsoft may have trademarks, copyrights, patents or pending patent applications, or other intellectual property rights covering subject matter in this document. The furnishing of this document does not give you a license to these trademarks, copyrights, patents, or other intellectual property rights.

**Contents**

Overview
Executive Summary
Introduction
Packaging Component Code for Automatic Download
The Internet Component Download Interface
Storing/Caching Downloaded Code
Future Directions
Needs That Aren't Met by Internet Component Download
Appendix--Registry Details

## Overview

This document provides a description of the mechanism for downloading and installing code for ActiveX™ objects (components) using the Microsoft® ActiveX technologies. This mechanism is used internally by the Microsoft Internet Explorer for downloading ActiveX controls inserted into HTML pages.

## Executive Summary

- Internet Component Download is a system-level mechanism for downloading and installing code for ActiveX objects.
- Details are presented for how ActiveX control authors should package their object implementation code so it can be downloaded and installed automatically.
- A new system API, **CoGetClassObjectFromURL**, is presented for downloading ActiveX components. Other "safe code-download" needs can be met using the lower-level **WinVerifyTrust** service, or possibly using a high-level "Setup" ActiveX control. Future releases may expose a more sophisticated component download interface.
- Internet Component Download installs code in a permanent store. This document details a migration strategy for future releases to convert this store into a cache that discards unpopular components.

Note: Internet Component Download as specified will *not* download anything other than ActiveX objects. This document does not list steps needed to download/certify other entities. For other code downloading information, see the documentation on the WinVerifyTrust API.

## Introduction

Internet Component Download is a system service for downloading, certificate checking, and installing ActiveX component code from the Internet. This service is used by applications (such as Web browsers) to automatically download and install ActiveX objects from code repositories on the Internet. This document explains how code authors should prepare their components for automatic download. It then describes the interface for the component download mechanism, and finally provides some additional implementation details.

Internet Component Download is used within Microsoft Internet Explorer to automatically download ActiveX controls inserted into HTML pages using the <OBJECT> element in HTML. (In future releases, code for Document Object components will likewise be

downloaded and installed automatically.) The mechanism for downloading components is exposed in an API that may be used in various other ActiveX containers. ActiveX control developers should follow the guidelines outlined below to package their controls so that they can be downloaded automatically by any container that uses the Internet Component Download mechanism.

## Packaging Component Code for Automatic Download

Independent software vendors (ISVs) and authors of ActiveX objects for the Internet should package their implementations so that they may be downloaded automatically by Web browsers such as the Microsoft Internet Explorer. Such objects will be downloaded, for instance, when parsing the OBJECT tag in HTML. (The <OBJECT> tag used to be called the <INSERT> tag. This change was decided on by the World Wide Web Consortium [W3C] on 2/13.) For details, see the OBJECT tag specification. (See the ActiveX Development Kit, included in preliminary form on this Web site.)

### Interpreting the "CODE" URL

The **CODE** attribute in an OBJECT tag contains a uniform resource locator (URL) pointing to the implementation of a given ActiveX object. This URL is of critical importance for component download, because it must specify all files necessary to implement a particular ActiveX object. HTML authors can author **CODE** URL to point to one of three file types. Component developers should choose one of the packaging schemes below for their ActiveX objects:

1. **A single PE** (portable executable, such as an .OCX or a .DLL): This single executable file is downloaded, installed, and registered in one fell swoop. This is the simplest way to package a single-file ActiveX control, but it will not use file compression, and it will not be platform-independent except with HTTP.
2. **A .CAB** (cabinet) file: This file contains one or more files, all of which are downloaded together in a compressed cabinet. (Care must be taken so that the cabinet file contains only those files that must *necessarily* be downloaded [such as the OCX executable itself]. Any additional helper DLLs [such as MFC] may have already been installed and, if so, should not be bundled into the cabinet.) Exactly one file in the cabinet is an .INF file providing further installation information. This .INF file may refer to files in the .CAB as well as to files at other URLs. This mechanism requires authoring of an .INF and packaging of a .CAB file, but in return it provides file compression. It will not be platform-independent, however, except with HTTP format negotiation.
3. **A stand-alone .INF** file: This file specifies various files that need to be downloaded and set up for the OCX to run. The syntax of the .INF file allows URLs pointing to files to download, and platform independence (by enumerating files for various platforms). This mechanism provides platform independence for non-HTTP servers.

### Including version number in the CODE URL

Besides the actual address of code, the **CODE** URL may also include an optional version number using the following syntax:

```
CODE=http://www.foo.com/bar.ocx#Version=a,b,c,d
```

The Internet Component Download mechanism will download and install the file only if the specified version number is more recent than any existing version of the same file currently installed in the system (see the Appendix for more information). If a version number is not specified with a file, it is assumed that any version installed on the system is recent enough.

### Platform independence and HTTP

When code to be downloaded is on an HTTP server, the HTTP header MIME request type may be used to specify which platform the code is to run on, thus allowing platform independence of the **CODE** URL.

The following multipurpose Internet mail extensions (MIME) types will be used to describe PEs (portable executables such as an .EXE, .DLL, or .OCX), cabinet files (.CAB), and setup scripts (.INF):

**Note:** The MIME scheme described here is *temporary*. Obviously this scheme results in too many MIME types. Eventually, MIME attributes will be used for the purpose of describing platform-dependent code (such as **application/x-cabinet; os=win32 cpu=x86**). Until more HTTP servers support such requests, the temporary scheme described above should suffice.

| File description | MIME Type |
|---|---|
| PE (portable executable) - .EXE, .DLL, .OCX | **application/x-pe_%opersys%_%cpu%** |
| Cabinet files - .CAB | **application/x-cabinet_%opersys%_%cpu%** |
| Setup scripts - .INF (platform independent) | **application/x-setupscript** |

**%opersys%** and **%cpu%** above will specify the operating system and CPU for the desired platform on which the downloaded components will be executed. For example, the MIME type for a Win32® cabinet file running on an Intel® x86-architecture processor would be **application/x-cabinet_win32_x86**.

The following are valid values for **%opersys%** and **%cpu%**:

| Valid values for %opersys% | Meaning |
|---|---|
| win32 | 32-bit Windows® operating systems (Windows 95 or Windows NT) |
| mac | Macintosh® operating system |
| <other> | Will be defined as necessary |

| Valid values for %cpu% | Meaning |
|---|---|
| x86 | Intel® x86 family of processors |
| ppc | Motorola® PowerPC architecture |
| mips | MIPS® architecture processors |
| alpha | DEC® Alpha architecture |

When the code is on a non-HTTP server (for example, at a local LAN location), an .INF file can be used to achieve platform independence by specifying different URLs for files to be downloaded for different platforms. (See the section below on platform independence in .INF files.)

**.CAB format**

The .CAB format used for Internet Component Download is a non-proprietary format based on Lempel-Ziv compression. The Microsoft Internet SDK includes a free tool called DIANTZ.EXE that will package cabinet files into this non-proprietary format. There no specification of this .CAB format publicly available, although such a specification will be distributed as soon as possible.

**Use of the DIANTZ.EXE tool for creating .CAB cabinet files**

The DIANTZ.EXE tool uses a .DDF "directive file" that specifies which files to combine into a cabinet. The syntax for using this tool from a command line is:

```
DIANTZ.EXE /f <directive file.ddf>
```

The example directive file below, CIRC3Z.DDF, would be used for creating a cabinet file containing two files: CIRC3.INF and CIRC3.OCX. It should be a straightforward process to add to this list of files.

```
; DIAMOND directive file for CIRC3.OCX+CIRC3.INF
.OPTION EXPLICIT             ; Generate errors on variable typos
.Set CabinetNameTemplate=CIRC3Z.CAB
;** The files specified below are stored, compressed, in cabinet files
.Set Cabinet=on
.Set Compress=on
circ3.INF
circ3.OCX
```

**.INF setup script format**

Here is a sample .INF file that demonstrates the syntax understood by the Internet Component Download service. Only the .INF syntax below may be used to write setup scripts for Internet Component Download.

```
;Sample INF file for CIRC3.OCX
[Add.Code]
circ3.ocx=circ3.ocx
random.dll=random.dll
mfc40.dll=mfc40.dll
foo.ocx=foo.ocx
```

```
[circ3.ocx]
; lines below specify that the specified circ3.ocx (clsid, version) needs to be installed on
; the system. If doesn't exist already, can be downloaded from the given location (a .CAB)
file=http://www.code.com/circ3/circ3.cab
clsid={9DBAFCCF-592F-101B-85CE-00608CEC297B}
FileVersion=1,0,0,143

[random.dll]
; lines below specify that the random.dll needs to be installed in the system
; if this doesn't exist already, it can be downloaded from the given location.
file=http:// www.code.com/circ3/random.dll
FileVersion=
DestDir=10
; DestDir can be set to 10 or 11 ( LDID_WIN or LDID_SYS by INF convention)
; this places files in \windows or \windows\system, respectively
; if no dest dir specified (typical case), code is installed in the fixed occache directory.

[mfc40.dll]
; leaving the file location empty specifies that the installation
; needs mfc40 (version 4,0,0,5), but it should not be downloaded.
; if this file is not already present on the client machine, component download fails
file=
FileVersion=4,0,0,5

[foo.ocx]
; leaving the file location empty specifies that the installation
; needs the specified foo.ocx (clsid, version), but it should not be downloaded.
; if this file is not already present on the client machine, component download fails
file=
clsid={DEADBEEF-592F-101B-85CE-00608CEC297B}
FileVersion=1,0,0,143
```

**Platform independence in .INF files**

It is possible to create platform-independent setup scripts that pull files from different locations depending on the desired platform. Internet Component Download .INF files will use a scheme similar to the one described above under <u>Platform independence and HTTP</u>. Specifically, a sample platform-independent .INF file would include a text such as the following:

```
[circ3.ocx]
; lines below specify that the specified circ3.ocx (clsid, version) needs to be installed on
; the system. If doesn't exist already, can be downloaded from the given location (a .CAB)
file_win32_x86=file://products/release/circ3/x86/circ3.cab
file_win32_mips=file://products/release/circ3/mips/circ3.cab
file_mac_ppc=file://products/release/circ3/macppc/circ3.cab

clsid={9DBAFCCF-592F-101B-85CE-00608CEC297B}
FileVersion=1,0,0,143
```

Thus the **file=** syntax used in the .INF file is expanded to **file_%opersys%_%cpu =**, allowing the .INF file to specify multiple locations where various platform-dependent modules can be found and downloaded. See the section above for valid values for **%opersys%** and **%cpu%**.

**The Internet Component Download Interface**

The Internet Component Download service is exposed via a single function, **CoGetClassObjectFromURL()**. This system function is called by an application that wishes to download, verify, and install code for an ActiveX component. The function is used in the implementation of Microsoft® Internet Explorer. The implementation uses URL monikers to asynchronously download code, and it uses the <u>WinVerifyTrust service</u> to verify validity of the code.

Related Documents:

- URL Moniker specification: Included in the <u>ActiveX Development Kit</u>, available in preliminary form on this Web site.
- Asynchronous Moniker specification: Included in the <u>ActiveX Development Kit</u>, available in preliminary form on this Web site.
- <u>Windows Trust Verification Services specification</u> (describes the **WinVerifyTrust** service mentioned above).

**Architecture**

The diagram below shows the implementation architecture for the Internet Component Download mechanism and its relation to other system services:

[COD2086B  3982 bytes ]



**Technical Details**

This section describes technical details of the Internet Component Download API used by applications (such as Web browsers) to download and install ActiveX object code.

**CoGetClassObjectFromURL**

```
STDAPI CoGetClassObjectFromURL ( [in] REFCLSID rclsid, [in] LPCWSTR szCodeURL,
    [in] DWORD dwFileVersionMS, [in] DWORD dwFileVersionLS,
    [in] LPCWSTR szContentTYPE, [in] LPBINDCTX pBindCtx,
    [in] DWORD dwClsContext, [in] LPVOID pvReserved, [in] REFIID riid,
    [out] VOID **ppv );
```

This function will return a factory object for a given *rclsid*. If no **CLSID** is specified (**CLSID_NULL**), this function will choose the appropriate **CLSID** for interpreting the Internet MIME type specified in *szContentType*. If the desired object is installed on the system, it is instantiated. Otherwise, the necessary code is downloaded and installed from the location specified in *szCodeURL*.

This "download and install" process involves the following steps:

1. Download the necessary file(s) (.CAB, .INF, or executable) using URL moniker(s).
2. Call **WinVerifyTrust** to ensure that all downloaded files are safe to install.
3. Complete self-registration of all ActiveX components. (Internet Component Download accomplishes self-registration using the **/regserver** command-line argument for .EXE files, and **DLLRegisterServer()** for other executables [such as .DLL and .OCX].)
4. Add registry entries to keep track of downloaded code (see the <span style="color:red">Appendix</span>).
5. Call **CoGetClassObject** for the desired *rclsid*.

**CoGetClassObjectFromURL** accepts the following arguments:

| Argument | Type | Description |
|---|---|---|
| *rclsid* | **REFCLSID** | **CLSID** of the ActiveX object that needs to be installed. If value is CLSID_NULL, then *szContentType* is used to determine the **CLSID**. |
| *szCodeURL* | **LPCWSTR** | URL pointing to the code for the ActiveX object. This may point to an executable, to an .INF file, or to a .CAB file (see below for details). |
| *dwFileVersionMS* | **DWORD** | Major version number for the object that needs to be installed. |
| *dwFileVersionLS* | **DWORD** | Minor version number for the object that needs to be installed. |
| *szContentType* | **LPCWSTR** | MIME type that needs to be understood by the installed ActiveX object. If *rclsid* is CLSID_NULL, this string is used to determine the **CLSID** of the object that must be installed. |

| pBindCtx | **LPBINDCTX** | A bind context to use for downloading/installing component code. The client should register its **IBindStatusCallback** in this bind context to receive callbacks during the download and installation process. (See the Asynchronous Monikers specification for details: It's included in the <span style="color:red">ActiveX Development Kit</span>, available in preliminary form on this Web site. ) |
| dwClsContext | **DWORD** | Values taken from the **CLSCTX** enumeration specifying the execution context for the class object. |
| pvReserved | **LPVOID** | Reserved value, must be set to NULL. |
| riid | **REFIID** | The interface to obtain on the factory object (typically **IClassFactory**). |
| ppv | **VOID \*\*** | Pointer in which to store the interface pointer upon return if the call is synchronous. |
| **Returns** | S_OK | Success. The **ppv** contains the requested interface pointer. |
| | E_PENDING | Component code will be downloaded and installed asynchronously. The client will receive notifications through the **IBindStatusCallback** interface it has registered on pBindCtx. |
| | E_NOINTERFACE | The desired interface pointer is not available. Other **CoGetClassObject** error return values are also possible here. |

In the common Web-browser scenario, the values for parameters passed to this function are read directly from an HTML OBJECT tag. For example, the *szCodeURL*, *dwFileVersionMS*, and *dwFileVersionLS* are specified inside an <OBJECT> tag as:

```
CODE=http://www.foo.com/bar.ocx#Version=a,b,c,d
```

where: *szCodeURL* is HTTP://WWW.FOO.COM/BAR.OCX, *dwFileVersionMS* is MAKEDWORD(A, B), and *dwFileVersionLS* is MAKEDWORD(C, D).

Because the downloading and installation of code occurs asynchronously, **CoGetClassObjectFromURL** will often return immediately with a return value of E_PENDING. At this point, the **IBindStatusCallBack** mechanism is used to communicate the status of the download operation to the client. (See the Asynchronous Monikers specification for details: It's included in the <span style="color:red">ActiveX Development Kit</span>, available in preliminary form on this Web site. ) To participate in this communication, the client *must* implement **IBindStatusCallback** and register this interface in the *pBindCtx* passed into **CoGetClassObjectFromURL** using **RegisterBindStatusCallback**. The client can expect to be called with callback notifications for **OnStartBinding** (providing an **IBinding** for controlling the download), **OnProgress** (reporting progress), **OnObjectAvailable** (which returns the desired object interface pointer), and **OnStopBinding** (which returns error codes in case of an error). For further negotiations, the client *must* also implement **ICodeInstall** as described below.

**Note:** The initial (beta) implementation of **CoGetClassObjectFromURL** will not handle system-wide simultaneous downloads of the same code. Similarly, it will not handle cases where different simultaneous downloads refer to the same piece of dependent code.

**IBindStatusCallback::OnProgress**

The client of **CoGetClassObjectFromURL** will receive notification about the download/install process via the provided **IBindStatusCallback** interface. During the download process, the following additional values (from the BINDSTATUS enumeration) may be passed back as the *uIStatusCode* parameter for **IBindStatusCallback::OnProgress**.

| Value | Description |
| --- | --- |
| BINDSTATUS_BEGINDOWNLOADCOMPONENTS | The download operation has begun downloading code for ActiveX components that will be installed before the object may be instantiated. The *szStatusText* accompanying **IBindStatusCallback::OnProgress()** provides the display name of the component being downloaded. |

| BINDSTATUS_INSTALLINGCOMPONENTS | The download operation has downloaded code and is installing it. The *szStatusText* accompanying **IBindStatusCallback::OnProgress()** provides the display name of the component being installed. |
|---|---|
| BINDSTATUS_ENDDOWNLOADCOMPONENTS | The download operation has finished downloading and installing all necessary code. The *szStatusText* accompanying **OnProgress()** provides the display name of the newly installed component. |

## ICodeInstall

A code installation operation requires additional services from the client in order to complete the negotiation necessary for a download operation. Such services are requested using **IBindStatusCallback::QueryInterface**. The specific interface requested in **IBindStatusCallback::QueryInterface** is **ICodeInstall**. This interface must be implemented by a client of Internet Component Download.

```
interface ICodeInstall : IUnknown {
    HRESULT    NeedVerificationUI( [out] HWND* phwnd);
    HRESULT    OnCodeInstallProblem( [in] ULONG ulStatusCode,
                                     [in] LPCWSTR szDestination,
                                     [in] LPCWSTR szSource,
                                     [in] DWORD dwReserved);
    };
```

### ICodeInstall::NeedVerificationUI

This function is called when Internet Component Download needs to display a user interface (UI) message for verification of downloaded code. (Actually, this UI is displayed by the **WinVerifyTrust** mechanism that is used within Component Download.) When a client is called with this function, it has the opportunity to clear the message queue of its parent window before allowing a UI message to be displayed. If the client does not wish to display the UI message, code verification may continue, but components may fail to be installed.

| Argument | Type | Description |
|---|---|---|
| *phwnd* | **HWND \*** | Client-provided HWND of the parent window for displaying code verification UI. If this parameter is NULL, the desktop window is used. If the value is INVALID_HANDLE_VALUE, then no code verification UI will be displayed, and certain necessary components may not be installed. |
| **Returns** | S_OK | Success. |
| | E_INVALIDARG | The argument is invalid. |

### ICodeInstall::OnCodeInstallProblem

This function is called when there is a problem with code installation. This notification gives the client a chance to resolve the problem, often by displaying a UI message, or by aborting the code installation process. If the client does not understand the problem, it should return E_ABORT by default to abort the code installation process, because returning S_OK would imply retrying the operation.

| Argument | Type | Description |
|---|---|---|
| *ulStatusCode* | **ULONG** | Status code describing what problem occurred. A member of CIP_STATUS. |
| *szDestination* | **LPCWSTR** | The name of the existing file that was causing a problem. This may be the name of an existing file that needs to be overwritten, the name of a directory causing access problems, or the name of a drive that is full. |
| *szSource* | **LPCWSTR** | Name of the new file to replace the existing file (if applicable). |
| *dwReserved* | **DWORD** | Reserved for future use. |

| Returns | S_OK | Continue the installation process. If there was an "access denied" or full-disk problem, retry the installation. If there was an existing file (newer or older version), overwrite it. |
|---------|------|--------------------------------------------------------------------------|
|  | S_FALSE | Skip this particular file, but continue with the rest of the code installation process. Note that this is the typical response for the CIP_NEWER_VERSION_EXISTS case. |
|  | E_ABORT | Abort the code installation process. |
|  | E_INVALIDARG | The given arguments are invalid. |

The *ulStatusCode* parameter above is one of the following values:

```
typedef enum {
    CIP_DISK_FULL,
    CIP_ACCESS_DENIED,
    CIP_OLDER_VERSION_EXISTS,
    CIP_NEWER_VERSION_EXISTS,
    CIP_NAME_CONFLICT,
    CIP_TRUST_VERIFICATION_COMPONENT_MISSING
} CIP_STATUS;
```

| Value | Description |
|-------|-------------|
| CIP_DRIVE_FULL | The drive specified in *szDestination* is full. |
| CIP_ACCESS_DENIED | Access to the file specified in *szDestination* is denied. |
| CIP_OLDER_VERSION_EXISTS | An existing file (older version) specified in *szDestination* needs to be overwritten by the file specified in *szSource*. |
| CIP_NEWER_VERSION_EXISTS | A file exists (specified in *szDestination*) that is a newer version of a file to be installed (specified in *szSource*). |
| CIP_NAME_CONFLICT | A file exists (specified in *szDestination*) that has a naming conflict with a file to be installed (specified in *szSource*). The existing file is neither a newer nor an older version of the new filebethey are mismatched but have the same filename. |
| CIP_TRUST_VERIFICATION_COMPONENT_MISSING | The code installation process cannot find the necessary component (**WinVerifyTrust**) for verifying trust in downloaded code. *szSource* specifies the name of the file that cannot be certified. The client should display a UI message asking the user whether or not to install the untrusted code, and should then return E_ABORT to abort the download, S_OK to continue anyway, or S_FALSE to skip this file but continue (usually dangerous). |

## Storing/Caching Downloaded Code

The Code Download installs most new code in a permanent store in windows\system\occache. (This directory location is hard-coded for initial releases. In future releases users may use a registry setting or a Control Panel applet to choose this directory. Component code will be installed in this directory unless a previous version exist. In such cases, the Component Download mechanism will attempt to replace the previous version and invoke **ICodeInstall::OnCodeInstallProblem**.) Some components (helper DLLs that need to be on the system path but currently are not) will also be installed in \windows and \windows\system. All downloaded code is registered using a new Registry "Module Usage" section that keeps track of such code. Downloaded code is *not* removed automatically, but it is possible in the future to add a UI message to the Control Panel (or elsewhere) allowing a user to clean up this directory.

For future releases, it is also possible to convert this "permanent store" into a code cache that retains only popular downloaded code and deletes old unused code automatically. This migration plan justifies use of a permanent store for the first version. See the Appendix for information on how downloaded code is listed in the Registry and how a code cache could function in future releases.

## Future Directions

### Internet search path

The Internet Component Download service will provide for an Internet "search path" stored in the Registry. This path is a list of Web servers that will be queried every time components are downloaded using **CoGetClassObjectFromURL**. This way, even if an <OBJECT> tag in an HTML document does not specify a location to download code for an embedded ActiveX control, the Internet Component Download will still use the Internet "search path" to find the necessary component.

Further specification of the Internet search path is still under development.

### "Pluggable" setup-script handlers

Although Internet Component Download currently supports a limited .INF setup-script syntax, future releases will take into consideration the need to support "hooks" that allow custom setup handlers to interact with the component download and installation process. No further details are available at this time.

## Needs That Aren't Met by Internet Component Download

There are situations in which code needs to be downloaded with trust verification but the code is not an ActiveX object. Such cases are not addressed by the current specification of the Internet Component Download mechanism. Solutions for these cases need to use the **WinVerifyTrust** mechanism directly, as detailed below:

- **<A HREF> tag in HTML:** It is possible in HTML to download and run .EXE files directly using the <A HREF> tag. The HTML parser uses a URL moniker to download this code, and it calls **WinVerifyTrust** to check validity.
- **Scripts:** Scripting languages will need to define a mechanism for inserting certificates in the script (perhaps in special comments). Given such a mechanism, the **WinVerifyTrust** service will provide trust verification of any such scripts that are downloaded from the Internet.
- **Full applications, other:** The existing Internet Component Download mechanism will not handle extremely complex download situations (such as downloading/installing *DOOM*, registering device drivers, or rebooting the machine). Future releases will aim to allow hooking into the Internet Component Download mechanism to provide more complicated setup routines.

## Appendix--Registry Details

The Internet Component Download service will keep Registry entries for every new downloaded component. These Registry entries will be useful for writing a utility for cleaning up the code storage, or migrating the Internet Component Download service to use a code cache rather than a permanent store. (Either of these would be intelligent about uninstalling and de-registering component code using its existing self-registration mechanism.)

### Why the existing SharedDLL mechanism is inadequate

To do correct code caching, the existing SharedDLL reference counting scheme will not suffice, because reference counts are easily inflated. Specifically, any application that is reinstalled increases the reference count on a shared DLL even though that DLL already has a reference count belonging to the particular application. (This is already broken for current reference counting, but it will most certainly fail for the Code Download, in which OCXes are used by multiple pages quite regularly, and there is no way of knowing which OCXes need reference counts.

### The new ModuleUsage mechanism in the registry for tracking usage of shared components

To do reference counting correctly, Internet Component Download will maintain a **ModuleUsage** section in the Registry that holds a list of "owners" and "clients" for each shared module. Thus the Registry can keep track of *who* is using a shared module, not just *how many clients* that module has. The Registry entries would use the following syntax:

```
[ModuleUsage]
    [Fully Qualified Path&File Name]
```

```
FileVersion=a,b,c,d
Owner = Friendly Name/ID of Owner
[Clients]
     ID of Client1 = <peculiar to this client>
```

A **ModuleUsage** section in a sample Registry would look something like the following:

```
Under My Computer\HKEY_LOCAL_MACHINE\Software\Microsoft\Windows\CurrentVersion:

[ModuleUsage]
     [c:\windows/system/mfc40.dll]
     FileVersion=0,4,0,0
     Owner = MSCodeDownloaderID
     [Clients}
     MSCodeDownloaderID= <any info, or default>
     AnotherAppID= <any info, or default>
```

| Key name | Description |
|---|---|
| Fully Qualified Path&Filename | This is the full path of the shared module. This name has to use "/"s instead of "\"s because the "\" is an invalid character in a key name. |
| Owner | The application that installs the shared module and creates the original **ModuleUsage** section will put an identifier in the owner key section. If the DLL already existed on the system and this Module Usage key did not exist, the owner key should be set to "Unknown" and the DLL should not be removed on uninstallation. The owner should also enlist itself as a client. |
| File Version | The version number for the shared module. |
| Clients | IDs of various clients who are using the shared module. |

Every client of this module is expected to increment and decrement the existing **SharedDLL** section in the Registry as well (a client only increments this value once when it adds itself as a client under **ModuleUsage**). This allows a migration path for apps currently implementing onlya **SharedDLL** scheme.

This Registry information complements the reference counts in the **SharedDLL** section by tracking which clients are actually using a shared module. This counting scheme will work correctly and allow caching of downloaded code. Furthermore, when downloading files, Internet Component Download can use this Registry information as an efficient shortcut for verifying whether a file needs to be overwritten because it is an out-of-date version.

---

Return to the Code Signing home page

© 1996 Microsoft Corporation

# EXHIBIT 32



**DLA Piper LLP (US)**
401 B Street, Suite 1700
San Diego, California  92101-4297
www.dlapiper.com

Kathryn Riley Grasso
kathryn.riley@dlapiper.com
**T**  619.699.2842
**F**  619.764.6692

March 19, 2015
*VIA EMAIL*

Aakash Jariwala
Kramer Levin Naftalis & Frankel LLP
990 Marsh Road
Menlo Park, CA 94025

Re:     *Finjan v. Sophos*, Case No. 14-CV-1197-WHO

Dear Aakash:

This letter responds to your February 27, 2015 email.

First, you contend that Sophos's SWEEP/InterCheck Product & Software ("SWEEP/InterCheck") is "actually two separate prior art references."  This contention is merely a recycled argument that Finjan made in the prior Delaware case.  The Delaware court soundly rejected that argument, both at trial and in post-trial motions.  *Finjan, Inc. v. Symantec Corp.*, No. 10-cv-591 (GMS), Dkt. No. 840 at 29-36.  Finjan also made that argument on appeal, and the Federal Circuit summarily affirmed the jury verdict.  *Finjan, Inc. v. Symantec Corp.*, No. 2013-1682, Dkt. No. 29 at 33-35.  Because Finjan fully and fairly litigated this issue in the Delaware case and lost, Finjan is collaterally estopped from re-litigating the issue in this case.  *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013) ("Collateral estoppel protects a party from having to litigate issues that have been fully and fairly tried in a previous action and adversely resolved against a party-opponent.").  What is more, Finjan has already conceded in this case that SWEEP/InterCheck is a single prior art reference.  *See, e.g.*, June 18, 2014 Tr. at 9-10 ("And so far, what we've been hearing in our discussion regarding (inaudible) limit and prior art, they've – I think they've listed limitations of 40 prior art references.  And the case in Delaware, they relied on one.  It was just their own product.").  Please confirm in writing that Finjan will not continue to make the argument that SWEEP/InterCheck is not a single prior art reference.

Second, you request that we identify the "version" of SWEEP/InterCheck that Sophos will rely upon to invalidate Finjan's patents.  We are happy to discuss with you Sophos's reliance on representative "versions" of SWEEP/InterCheck.  However, having such a discussion now is premature.  As my letter of March 18 explained, Finjan's infringement contentions are deficient, and Sophos is still not able to understand the scope of Finjan's infringement allegations.  Also, such a discussion is inappropriate without the benefit of expert analysis and opinion.

* * *



Aakash Jariwala
March 19, 2015
Page Two


Finally, with regard to your request that Sophos produce third-party software for the product prior art identified in Sophos's invalidity contentions, we have already explained on multiple occasions that Sophos has produced the documents on which Sophos relies in its invalidity contentions.  Additionally, Finjan has been in possession of these references either from the trial in Delaware or through productions made by the defendants in Finjan's other pending lawsuits in this District.  In any event, as a courtesy, Dr. Solomon's AV toolkit software was made available for Finjan to download on March 13, 2015 per Kori Kempton's letter to you.


Very truly yours,

**DLA Piper LLP (US)**

Kathryn Riley Grasso
Partner
Admitted in California, District of Columbia

WEST\255598102.2

# EXHIBIT 33

1
2
3
4                            UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7   FINJAN, INC.,                              Case No.  13-cv-05808-HSG

8            Plaintiff,                        **ORDER GRANTING PLAINTIFF'S**
                                               **MOTION TO REQUIRE DEFENDANTS**
9        v.                                    **TO CONFORM TO COURT'S 11/14/2014**
                                               **CASE MANAGEMENT ORDER AND**
10  PROOFPOINT, INC., et al.,                  **STRIKE THEORIES NOT DISCLOSED**
                                               **IN INVALIDITY CONTENTIONS**
11           Defendants.
                                               Re: Dkt. No. 236
12
            Pending before the Court is Plaintiff's Motion to Require Defendants to Conform to the

13  Court's November 14, 2014 Case Management Order and Strike Theories Not Disclosed in the

14  Invalidity Contentions, Dkt. No. 236.

15          Given that the parties are familiar with the factual and procedural background of this

16  action, the Court refers the unfamiliar reader to the Court's earlier orders, *see* Dkt. Nos. 138, 271,

17  and repeats facts here only as necessary.

18  **I.      LEGAL STANDARD**

19          "The Northern District of California's Patent Local Rules exist to further the goal of full

20  and timely discovery and provide all parties with adequate notice and information with which to

21  litigate their cases." *Verinata Health, Inc. v. Sequenom, Inc.*, No. C 12-00865 SI, 2014 WL

22  4100638, at *1 (N.D. Cal. Aug. 20, 2014) (internal quotation marks omitted).  "The rules are

23  designed to require parties to crystallize their theories of the case early in the litigation and to

24  adhere to those theories once they have been disclosed." *Id.*

25          Patent Local Rule 3-3 requires that a defendant serve invalidity contentions that contain:

26              (a)  The identity of each item of prior art that allegedly anticipates
                each asserted claim or renders it obvious. . . .

27
                (b)  Whether each item of prior art anticipates each asserted claim or

28

renders it obvious. If obviousness is alleged, an explanation of why the prior art renders the asserted claim obvious, including an identification of any combinations of prior art showing obviousness;

(c)   A chart identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each limitation that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function; and

(d)   Any grounds of invalidity based on 35 U.S.C. § 101, indefiniteness under 35 U.S.C. § 112(2) or enablement or written description under 35 U.S.C. § 112(1) of any of the asserted claim

A district court has wide discretion in enforcing the Patent Local Rules.  *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005).

## II.   ANALYSIS

Plaintiff makes two arguments.  First, it contends that Defendants exceeded the permitted number of theories in their expert report, construing the Court's scheduling order, Dkt. No. 98, as limiting Defendants' obviousness combinations to the specific combinations per patent that Defendants explicitly identified in their Preliminary and Final Election.  The Court agrees and provides the following guidance.

1. The Court's scheduling order, Dkt. No. 98, governs the references Defendants present at trial as well as the references and theories that Defendants' experts present.  This specifically includes the scheduling order's limitation on the *number* of asserted references.

2. The Court concludes that a subset of an obviousness combination constitutes a different combination.  That is to say, obviousness combination A+B+C+D is not the same as the combination A+B.  At this late stage in the litigation, Defendants are limited to the *exact* combinations of references identified in their *final* election:

| Patent | Obviousness Combinations |
|---|---|
| '844 Patent | Abadi, Ji, Necula, ThunderBYTE, and Isaak |
| '086 Patent | Abadi, Isaak, Ji, Necula, ThunderBTYE |
| '918 Patent | Kramer, Satish, Joshi, Jensen, Erlingsson, Trend Micro |
| '918 Patent | Miller, Satish, Joshi, Kramer, Jensen, Erlingsson, Trend Micro |

Mixing and matching references from a broad "menu," as Defendants suggest they seek to do, would not advance the scheduling order's goal of narrowing the issues before trial to a manageable number of specific obviousness combinations of which both parties have explicit

2

United States District Court
Northern District of California

notice.  *Cf.* Defendants' Opposition, Dkt. No. 273, at 2 (criticizing Plaintiff's position because it "would limit [Defendants' expert] from . . . relying on references in the alternative (for instance, A + B + C or D)").  Nor would it advance the Patent Local Rules' purpose of increasing efficiency and streamlining the litigation process.  *See generally Thought, Inc. v. Oracle Corp.*, No. 12-CV-05601-WHO, 2013 WL 5587559, at *4 (N.D. Cal. Oct. 10, 2013) (rejecting defendant's prior art references limitation proposal as "not limited enough," after plaintiff contended the proposed limit was "effectively meaningless for purposes of streamlining the litigation").  Defendants' generic assertion that precluding them from relying on some number of as-yet-unidentified permutations would "unduly constrain [the expert's] role as an expert in providing independent opinions on validity," Dkt. No. 273. at 1, is not well taken:  there is no prejudice, let alone undue prejudice, that results from providing fair notice in advance of trial regarding the theories Defendants *actually plan to present*.  *See In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1310-13 (Fed. Cir. 2011) (upholding district court's claim limitation procedure where plaintiff had initially asserted 1,975 claims and "merely asserted 'the generalized notion that 64 was too few [claims]'" (alteration in original); "[t]hat sort of global claim of impropriety is unpersuasive").  No purpose other than obfuscation would be served by a refusal at this late date to identify and be limited to specific theories as required by the Court's scheduling order.

      The Court has broad discretion to limit the scope of trial in a patent case in order to keep a complex case manageable for the jury.  *Id.* at 1313; *see also Stamps.com Inc. v. Endicia, Inc.*, 437 F. App'x 897, 900 (Fed. Cir. 2011) (unpublished) (affirming district court's reduction of 629 claims in 11 patents to 15 claims total).  If Defendants claim they would be prejudiced at trial if they are precluded from asserting some additional subset of the references identified in the final election, Defendants must identify, and seek leave to assert, those *specific* subsets.  The Court will closely evaluate the reasonableness of any such request with regard to whether it is consistent with the goal of narrowing the parties' trial preparation and presentation to a reasonable number of clearly-delineated, clearly-noticed theories that present unique issues of invalidity.  The Court emphasizes that any request to add a specific subset of a remaining obviousness combination must be supported by good cause and a detailed explanation for its need.  *See In re Katz*, 639 F.3d at

1312-13; *Thought*, 2013 WL 5587559, at *4 (ordering defendants to file a narrowed final election of prior art and permitting defendants to seek relief from these limits upon a showing of good cause). Such identification, if any, must be filed by January 4, 2016 and not exceed 10 pages.

Second, Plaintiff contends that Defendants' expert report includes patent eligibility and indefiniteness theories that were not included in Defendants' supplemental invalidity contentions submitted on June 8, 2015. Dkt. No. 273-2, Ex. A. It requests that the Court preclude Defendants' expert from asserting new theories under 35 U.S.C. §§ 101, 112(1), 112(2). Dkt. No. 236 at 6-7.

Defendants contend that its use of exemplary claims should not limit Defendants to only those claims. Dkt. No. 273 at 3. It contends that it "generally reserved its right to assert claims as invalid under Section 101."[1] *Id.* The Court disagrees. The efficacy of the Patent Local Rule 3-3(d) —requiring invalidity contentions to identify "[a]ny grounds of invalidity based on 35 U.S.C. § 101, indefiniteness under 35 U.S.C. § 112(2) or enablement or written description under 35 U.S.C. § 112(1) of any of the asserted claims"—would be a nullity if parties could address it with a broad reservation. Such a general disclaimer would be contrary to the local rule's requirement that parties crystallize their theories early in the litigation.

The Court agrees that Defendants' supplemental invalidity contentions did not identify the following theories:

**35 U.S.C. § 101, Patentable Subject Matter:**

| | |
|---|---|
| The '305 Patent | Claims 2 and 5 |
| The '086 Patent | Claims 17 and 24 |
| The '408 Patent | Claims 9 and 21 |

**35 U.S.C. § 112(2), Indefiniteness:**

| | |
|---|---|
| The '844 Patent | "first rule set" (Claims 15 and 16) |

---

[1] *See* Dkt. No. 273, Ex. A at 5-6 ("Defendants also reserve the right to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description, not enabled, or fail to disclose the best mode contemplated by the inventor(s). Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. §§ 101, 102, and 112.").

United States District Court
Northern District of California

4

| The '086 Patent | "suspicious computer operations" (Claims 17 and 24) |
|---|---|

**35 U.S.C. § 112(2), Written Enablement:**

| | |
|---|---|
| The '305 Patent | "a rule-based content scanner that communicates with said database of parser and analyzer rules, operatively coupled with said network interface, for scanning incoming content received by said network interface to recognize the presence of potential computer exploits therewithin" (Claim 1)<br><br>"a network traffic probe, operatively coupled to said network interface and to said rule-based content scanner, for selectively diverting incoming content from its intended destination to said rule-based content scanner" (Claim 1) |
| The '086 Patent | "a Downloadable scanner coupled with said received for deriving security profile data for the Downloadable, including a list of suspicious computer operations that may be attempted by the Downloadable" (Claim 24)<br><br>"a transmitter coupled with said receiver and with said Downloadable scanner, for transmitting the Downloadable and a representation of the Downloadable security profile data to a destination computer" (Claim 24) |

Defendants' arguments to the contrary are unavailing. Defendants argue that Plaintiff "cannot show the differences in scope between claims 17 and 35 of the ['086 Patent] are such that it was (as admits) on notice for Section 101 purposes on the latter but not the former." Dkt. No. 273 at 3. But regardless of any alleged similarity between Claims 17 and 35, Defendants may not at this late stage assert a previously undisclosed claim on the basis of its similarity to a disclosed claim. Likewise, it is not enough that Defendants identified "first rule set" under elements for written description or that they identified "suspicious computer operations" as parts of larger phrases. Finally, that Defendants disclosed theories under § 112(6) does not constitute a disclosure under § 112(2).

Per the local rules, Defendants have the burden to list any grounds for invalidity on the basis of §§ 101, 112(1), or 112(2) early in the litigation so as to provide structure to discovery and to allow the parties to move efficiently toward the eventual resolution of their dispute. Because

United States District Court
Northern District of California

Defendants failed to previously disclose these theories, the Court strikes them from the expert report and precludes the expert from relying on them in trial.

**IT IS SO ORDERED.**

Dated: 12/23/2015

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

6

# EXHIBIT 34

1   SEAN CUNNINGHAM (Bar No. 174931)      TODD S. PATTERSON, pro hac vice pending
    sean.cunningham@dlapiper.com           todd.patterson@dlapiper.com
2   KATHRYN RILEY GRASSO (Bar No.          DLA PIPER LLP (US)
    211187)                                401 Congress Avenue, Suite 2500
3   kathryn.riley@dlapiper.com             Austin, Texas 78701-3799
    DLA PIPER LLP (US)                     Telephone:    512.457.7000
4   401 B Street, Suite 1700               Facsimile:    512.457.7001
    San Diego, CA  92101-4297
5   Tel:  (619) 699-2700                   ANDREW N. STEIN, pro hac vice pending
    Fax:  (619) 699-2701                   andrew.stein@dlapiper.com
6                                          DLA PIPER LLP (US)
    RYAN W. COBB (Bar No. 277608)          500 Eighth Street, NW
7   ryan.cobb@dlapiper.com                 Washington, DC  20004
    SUMMER KRAUSE (Bar No. 264858)         Tel:  202.799.4000
8   summer.krause@dlapiper.com             Fax:  202.799.5000
    DLA PIPER LLP (US)
9   2000 University Avenue
    East Palo Alto, CA  94303-2215
10  Tel:  650.833.2000
    Fax:  650.833.2001

11

12  Attorneys for Defendant
    SOPHOS INC.

13

14                      UNITED STATES DISTRICT COURT

15                   NORTHERN DISTRICT OF CALIFORNIA

16                       SAN FRANCISCO DIVISION

17  FINJAN, INC., a Delaware Corporation,      CASE NO.  14-CV-01197-WHO

18              Plaintiff,                      **DEFENDANT SOPHOS INC.'S**
                                               **PRELIMINARY CLAIM**
19          v.                                 **CONSTRUCTIONS AND EXTRINSIC**
                                               **EVIDENCE**
20  SOPHOS INC., a Massachusetts
    Corporation,

21              Defendant.

22

23          Pursuant to Patent L.R. 4-2, Defendant Sophos Inc. ("Sophos") serves its Preliminary

24  Claim Constructions and Extrinsic Evidence.  These preliminary claim constructions are based on

25  information currently available to Sophos.  Sophos reserves the right to amend or supplement its

26  preliminary claim constructions as additional information becomes available through discovery

27  and disclosures pursuant to the Patent Local Rules.  Sophos also reserves the right to amend and

28  supplement its preliminary claim constructions after it has an opportunity to review Finjan, Inc.'s

1  Proposed Preliminary Claim Constructions and Extrinsic Evidence.  Sophos also reserves the

2  right to add to, amend, or otherwise supplement its identification of extrinsic evidence for the

3  proposed terms.  Sophos also may provide descriptions of the substance of proposed testimony of

4  any supporting witness that may be rendered in connection with claim construction.

5       Pursuant to Patent L.R. 4-2 and subject to the above reservations, Sophos's preliminary

6  constructions of the terms identified by the parties are included in the attached Exhibits A and B.

7  Exhibit A provides Sophos's preliminary constructions for terms not governed by 35 U.S.C. §

8  112(6), while Exhibit B provides Sophos's preliminary constructions for any terms that either

9  party contends are governed by 35 U.S.C. § 112(6), and includes Sophos's preliminary

10  identifications of the function and corresponding structure of each such term.

11       In addition, Sophos provides the following brief description of the substance of proposed

12  fact, percipient and/or expert witness testimony it contends supports its claim constructions.

13  Sophos may present live testimony or a declaration from expert witness Dr. Paul Clark.  Dr. Clark

14  may testify as to the background of the purported inventions and the meaning of the disputed

15  claim terms to one of ordinary skill in the art, based on the specifications, file histories, prior art

16  references, extrinsic evidence and his industry knowledge.  In accordance with Patent Local Rule

17  4-3(e), on the due date for its Patent Local Rule 4-3 disclosures, Sophos will provide a summary

18  of each opinion to be offered by Dr. Clark.

19  Dated:  September 26, 2014

20            DLA PIPER LLP (US)

21         /s/ *Sean Cunningham*

22          Sean Cunningham
        Kathryn Riley Grasso

23          Ryan W. Cobb
        Summer Krause

24          Attorneys for Defendant
        SOPHOS INC.

25

26

27

28

1

<u>**PROOF OF SERVICE**</u>

2

   I am a citizen of the United States and employed in San Diego, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is DLA Piper LLP (US), 401 B Street, Suite 1700, San Diego, CA 92101.  On September 26, 2014, I served a copy of the within document(s):

3

4

5

   **DEFENDANT SOPHOS INC.'S PRELIMINARY CLAIM CONSTRUCTIONS AND EXTRINSIC EVIDENCE**

6

☐   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, the United States mail at East Palo Alto, California addressed as set forth below.

7

8

☐   by causing to be picked up for <u>overnight hand-delivery</u> to the office of the person at the address set forth below, via United Parcel Service (U.P.S.)

9

10

☐   by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

11

☒   by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

12

13

Paul J. Andre
pandre@kramerlevin.com
Lisa Kobialka
lkobialka@kramerlevin.com
James Hannah
jhannah@kramerlevin.com
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
Telephone: 650.752.1700
Facsimile: 650.752.1800

14

15

16

17

18

Benu Mehra Wells
bwells@kramerlevin.com
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: 212.715.7590
Facsimile: 212.715.8000

*Attorney for Plaintiff Finjan, Inc.*

19

*Attorneys for Plaintiff Finjan, Inc.*

20

21

   I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

22

23

24

   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

25

   Executed on September 26, 2014, at San Diego, California.

26

27

   */s/ Kori Kempton*
   KORI KEMPTON

28

-3-
SOPHOS'S PRELIMINARY CLAIM CONSTRUCTIONS AND EXTRINSIC EVIDENCE
CASE NO. 14-CV-01197-WHO

# EXHIBIT A

**EXHIBIT A**

**Sophos's Preliminary Constructions (Terms Not Governed by 35 U.S.C. § 112(6))**

| | Term | Patent: Claim(s) | Sophos's Preliminary Construction | Intrinsic Evidence | Extrinsic Evidence |
|---|---|---|---|---|---|
| 1. | "Downloadable" | '844:<br><br>1, 7, 15, 16, 21, 22, 43 | an executable application program, which is downloaded from a source computer and run on the destination computer | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation:<br><br>'844 patent at 1:44-59.<br><br>'780 patent at 1:50-6. | 12/11/2007 Order Construing the terms of U.S. Patent Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, *Finjan Software Ltd. v. Secure Computing Corporation, et al.*, U.S. District of Delaware, No. 06-cv-369-GMS (Dkt. No. 142) at 2 (FINJAN-SOP 041564); 12/18/12 Order Construing the terms of U.S. Patent Nos. 6,092,194 & 6,480,962, *Finjan Inc. v. McAfee et al.*, U.S. District Court of Delaware, No. 10-cv-593-GMS (Dkt No. 326) at 3 (FINJAN-SOP 061044). |
| 2. | "suspicious operations" | '844:<br><br>16 | plain and ordinary meaning | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation:<br><br>'844 patent at 4:20-34, 5:19-24, 8:55-60.<br><br>'844 File History: 9/2/99 First Office Action at 6-7.<br><br>'194 patent at 9:24-29. | Order Construing the terms of U.S. Patent Nos. 6,092,194 & 6,480,962, *Finjan Inc. v. McAfee et al.*, U.S. District Court of Delaware, No. 10-cv-593-GMS (Dkt No. 326) at 2 (FINJAN-SOP 061043). |
| 3. | "receiving…and comparing…" | '844:<br><br>22 | The steps of the method should be construed to be required to be performed in | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed | Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in |

| | Term | Patent: Claim(s) | Sophos's Preliminary Construction | Intrinsic Evidence | Extrinsic Evidence |
|---|---|---|---|---|---|
| | | | the order recited. | construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: <br><br> '844 patent at claims 23, 42, 2:53-60, Figs. 5-7 and related text. | light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |
| 4. | "security policy" | '844: <br><br> 22 | Plain and ordinary meaning | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: <br><br> '844 patent at 2:49-60. | Order Construing the terms of U.S. Patent Nos. 6,092,194 & 6,480,962, *Finjan Inc. v. McAfee et al.*, U.S. District Court of Delaware, No. 10-cv-593-GMS (Dkt No. 326) at 2, fn. 2 (FINJAN-SOP 061043). |
| 5. | "obtaining…; fetching…; and performing…" | '780: <br><br> 1, 8, 18 | The steps of the method should be construed to be required to be performed in the order recited | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: <br><br> '780 patent at Abstract, claims 1, 18, col. 4:50-58, 7:62-67, 9:60-67, Figs. 6A, 8 and related text. | |
| 6. | "Downloadable" | '780: <br><br> 1, 8, 9, 12, 18 | an executable application program, which is downloaded from a source computer and run on the destination computer | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: <br><br> '780 patent at 1:50-6. <br><br> '844 patent at 1:44-59. | 12/11/2007 Order Construing the terms of U.S. Patent Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, *Finjan Software Ltd. v. Secure Computing Corporation, et al.*, U.S. District of Delaware, No. 06-cv-369-GMS (Dkt. No. 142) at 2 (FINJAN-SOP 041564); 12/18/12 Order Construing the terms of U.S. Patent Nos. 6,092,194 & 6,480,962, *Finjan Inc. v. McAfee et al.*, U.S. District Court of Delaware, No. 10-cv-593-GMS (Dkt No. |

| | Term | Patent: Claim(s) | Sophos's Preliminary Construction | Intrinsic Evidence | Extrinsic Evidence |
|---|---|---|---|---|---|
| | | | | | 326) at 3 (FINJAN-SOP 061044). |
| 7. | "executable wrapper code" | '918: 12 | Indefinite, or if it can be construed, "executable object code encapsulating other object code with the aim of altering its behavior or interface" | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: '918 patent at Abstract, Claims 1, 12, 21, 31, 34-36; 4:10-62; 5:36-6:8. | Microsoft Computer Dictionary, 5th Ed., 2002, definition of "wrapper" at 575 (1197SOPHOS_00169726). Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |
| 8. | "wrapper executable code" | '918: 22 | Indefinite, or if it can be construed, executable code that encapsulates and delegates to other code with the aim of altering its behavior or interface | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: '918 patent at Claims 22, 28, 33; 4:63-5:35; 7:58-8:3. | Microsoft Computer Dictionary, 5th Ed., 2002, definition of "wrapper" at 575 (1197SOPHOS_00169726). Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |
| 9. | "security context" | '918: 12, 22 | an environment in which a software application is run, which may limit resources that the application is permitted to access or operations that the application is permitted to perform | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: '918 patent at 6:24-27. | |
| 10. | "CODE-A" | '918: 12, 22 | potentially malicious executable code | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution | Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |

|  | Term | Patent: Claim(s) | Sophos's Preliminary Construction | Intrinsic Evidence | Extrinsic Evidence |
|---|---|---|---|---|---|
|  |  |  |  | histories, including without limitation:<br><br>'918 patent at 4:12-13; 4:29-30; 4:50-51; 4:67-5:1; 5:13; 5:29-30; 5:38-39; 5:51-52; 5:66-67; Claims 1, 12, 21, 22, 28. 33-36. |  |
| 11. | "CODE-B" | '918:<br><br>12, 22 | Indefinite, or if it can be construed:<br><br>For claim 12: executable object code encapsulating other object code with the aim of altering its behavior or interface<br><br>For claim 22: executable code that encapsulates and delegates to other code with the aim of altering its behavior or interface | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation:<br><br>'918 patent at Abstract, Claims 1, 12, 21, 22, 28, 31, 33-36; 4:10-6:8; 7:58-8:3. | Microsoft Computer Dictionary, 5th Ed., 2002, definition of "wrapper" at 575 (1197SOPHOS_00169726).<br><br>Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |
| 12. | "CODE-C" | '918:<br><br>12, 22 | code created at the gateway computer by embedding CODE-A within CODE-B | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation:<br><br>'918 patent at 1:34-42; 2:14-31; 8:4-13; Figs. 2, 3, 7.<br><br>'918 File History: 12/23/08 Applicant Arguments/Remarks Made in Amendment at pp. 20-21. | Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |
| 13. | "Downloadable" | '926:<br><br>18, 19, 22 | An executable application program, which is downloaded from a source computer and run on the destination computer | Without admitting to any claims to the validity of priority to U.S. Patents Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, Sophos identifies the following references from the specification | Without admitting to any claims to the validity of priority to U.S. Patents Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, Sophos cites to 12/11/2007 Order Construing the |

|  | Term | Patent: Claim(s) | Sophos's Preliminary Construction | Intrinsic Evidence | Extrinsic Evidence |
|---|---|---|---|---|---|
|  |  |  |  | and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation:<br><br>'780 patent at 1:50-6.<br><br>'844 patent at 1:44-59. | terms of U.S. Patent Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, *Finjan Software Ltd. v. Secure Computing Corporation, et al.*, U.S. District of Delaware, No. 06-cv-369-GMS (Dkt. No. 142) at 2 (FINJAN-SOP 041564); 12/18/12 Order Construing the terms of U.S. Patent Nos. 6,092,194 & 6,480,962, *Finjan Inc. v. McAfee et al.*, U.S. District Court of Delaware, No. 10-cv-593-GMS (Dkt No. 326) at 3 (FINJAN-SOP 061044). |
| 14. | "Downloadable ID" | '926:<br><br>18, 19, 22 | Plain and ordinary meaning |  | Without admitting to any claims to the validity of priority to U.S. Patents Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, Sophos cites to 12/11/2007 Order Construing the terms of U.S. Patent Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361 at 2 (FINJAN-SOP 041564). |
| 15. | "security profile data" | '926:<br><br>18, 19, 22 | Plain and ordinary meaning |  | Without admitting to any claims to the validity of priority to U.S. Patents Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, *Finjan Inc. v. McAfee et al.*, U.S. District Court of Delaware, No. 10-cv-593-GMS (Dkt No. 326) at 2 (FINJAN-SOP 061043). |
| 16. | "suspicious computer operations" | '926:<br><br>18, 19, 22 | Plain and ordinary meaning |  | Without admitting to any claims to the validity of priority to U.S. Patents Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, *Finjan Inc. v. McAfee et al.*, U.S. District Court of Delaware, No. 10-cv-593-GMS (Dkt No. 326) at 2 (FINJAN-SOP 061043). |
| 17. | "a representation of the retrieved Downloadable security profile | '926:<br><br>18, 19, 22 | plain and ordinary meaning |  | Without admitting to any claims to the validity of priority to U.S. Patents Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, *Finjan Inc. v. |

| | Term | Patent: Claim(s) | Sophos's Preliminary Construction | Intrinsic Evidence | Extrinsic Evidence |
|---|---|---|---|---|---|
| | data" | | | | *McAfee et al.*, U.S. District Court of Delaware, No. 10-cv-593-GMS (Dkt No. 326) at 2 (FINJAN-SOP 061043). |
| 18. | "destination computer" | '926: 18, 19, 22 | client device attached to a network | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: '926 patent at 2:57-64; 3:6-11; 3:29-4:18; 6:60-7:27; 7:41-67; 8:32-51; 11:4-40; 17:22-32; Figs. 1a-1c; 3; 7a. | Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |
| 19. | "performing a hashing function" | '926: 18, 19, 22 | Plain and ordinary meaning | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: '926 patent at Claims 1, 8, 15, 22, 29-30. | Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |
| 20. | "database" | '926: 18, 19, 22 | Plain and ordinary meaning | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: '926 patent at 9:49-62; 16:22-55. | Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |
| 21. | "second original function" | '289: 10, 17, 19, 22 | second function originally designated by the same input as the original function | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: '580 patent at Claims 1, 10, 19, 22, 25, 30. | |

| | Term | Patent: Claim(s) | Sophos's Preliminary Construction | Intrinsic Evidence | Extrinsic Evidence |
|---|---|---|---|---|---|
| 22. | "second substitute function" | '289: 10, 17, 19, 22 | second function replacing the second original function | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: <br><br> '580 patent at Claims 1, 10, 19, 22, 25, 30. | |
| 23. | "certificate creator" | '580: 1, 3 | security gateway component that creates a signed certificate for attributes of a server certificate | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: <br><br> '580 patent at 6:56-7:3; Fig. 5. | Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |
| 24. | "protocol appender" | '580: 1, 3 | an apparatus that appends certificate attributes within a protocol request | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: <br><br> '580 patent at 2:16-34; 7:4-27. | |
| 25. | "disassembler" | '494: 18 | a program that converts machine code to assembly language source code | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: <br><br> '194 patent at 9:20-42, Figs. 3, 6A and 7 and related text. | Microsoft Press Computer Dictionary, 2nd Ed., 1994, definition of "disassembler" at 124-125 (1197SOPHOS_00169718 – 1197SOPHOS_00169719). <br><br> Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |

| | Term | Patent: Claim(s) | Sophos's Preliminary Construction | Intrinsic Evidence | Extrinsic Evidence |
|---|---|---|---|---|---|
| 26. | "Downloadable" | '494: 1, 6, 10, 14, 18 | An executable application program, which is downloaded from a source computer and run on the destination computer | Without admitting to any claims to the validity of priority to U.S. Patents Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation:<br><br>'780 patent at 1:50-6.<br><br>'844 patent at 1:44-59. | Without admitting to any claims to the validity of priority to U.S. Patents Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, Sophos cites to 12/11/2007 Order Construing the terms of U.S. Patent Nos. 6,092,194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, *Finjan Software Ltd. v. Secure Computing Corporation, et al.*, U.S. District of Delaware, No. 06-cv-369-GMS (Dkt. No. 142) at 2 (FINJAN-SOP 041564); 12/18/12 Order Construing the terms of U.S. Patent Nos. 6,092,194 & 6,480,962, *Finjan Inc. v. McAfee et al.*, U.S. District Court of Delaware, No. 10-cv-593-GMS (Dkt No. 326) at 3 (FINJAN-SOP 061044). |
| 27. | "Downloadable security profile" | '494: 1, 6, 10, 14, 18 | Plain and ordinary meaning | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation:<br><br>'494 patent at claims 1-18. | Without admitting to any claims of priority to U.S. Patents Nos. 6,092194; 6,804,780; 7,058,822; 6,357,010; and 7,185,361, Sophos cites to Order Construing the terms of U.S. Patent Nos. 6,092,194 & 6,480,962, *Finjan Inc. v. McAfee et al.*, U.S. District Court of Delaware, No. 10-cv-593-GMS (Dkt No. 326) at 2 (FINJAN-SOP 061043). |
| 28. | "database" | '494: 1, 6, 10, 14, 18 | Plain and ordinary meaning | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation:<br><br>'494 patent at 10:5-19; 17:1-14; Figs. 3, 6a. | Sophos may rely on Paul Clark to provide testimony that this term should be construed as proposed by Sophos in light of intrinsic evidence, extrinsic evidence, and/or the meaning of the term to one of ordinary skill in the art. |

# EXHIBIT B

**EXHIBIT B**

**Sophos's Preliminary Constructions (Terms Governed by 35 U.S.C. § 112(6)**

| | Term | Patent: Claim(s) | Sophos's Preliminary Construction | Intrinsic Evidence | Extrinsic Evidence |
|---|---|---|---|---|---|
| 1. | "means for receiving a Downloadable" | '844: 43 | Governed by 35 U.S.C. § 112(6): **Function**: receiving a Downloadable **Structure**: Downloadable file interceptor 505 | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: '844 patent at Abstract, 3:66-67, 9:63, 4:35-36, Figs. 1, 4, 5 and related text. | |
| 2. | "means for generating a first Downloadable security profile that identifies suspicious code in the received Downloadable" | '844: 43 | Indefinite Alternate Construction: Governed by 35 U.S.C. § 112(6): **Function**: generating a first Downloadable security profile that identifies suspicious code in the received Downloadable **Structure**: content inspection engine 160 or content inspection engine 525 | Sophos identifies the following references from the specification and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation: '844 patent at Abstract, 3:66-67, 9:63, 4:35-36, Figs. 1, 4, 5 and related text. | |
| 3. | "means for linking the first Downloadable security profile to | '844: | Indefinite | Sophos identifies the following references from the specification | |

1

| | Term | Patent: Claim(s) | Sophos's Preliminary Construction | Intrinsic Evidence | Extrinsic Evidence |
|---|---|---|---|---|---|
| | the Downloadable before a web server makes the Downloadable available to web clients" | **43** | Alternate Construction:<br><br>Governed by 35 U.S.C. § 112(6):<br><br>**Function**: linking the first Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients<br><br>**Structure**: content inspection engine 160 | and the prosecution history that support the preliminary proposed construction: the asserted patents and related patents and their corresponding prosecution histories, including without limitation:<br><br>'844 patent at Abstract, 2:5-7, 3:66-4:4, 4:35-36, 8:65-67, Figs. 1, 4, 5 and related text. | |

WEST\250550526.1

# EXHIBIT 35

## UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

SOPHOS, INC.

Petitioner

v.

FINJAN, INC.

Patent Owner

CASE IPR <u>Unassigned</u>

Patent No. 8,677,494

## PETITION FOR
## *INTER PARTES* REVIEW OF U.S. PATENT NO. 8,677,494

**Mail Stop "PATENT BOARD"**
Patent Trial & Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA  22313-1450

i

# TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................1

II.     COMPLIANCE WITH FORMAL REQUIREMENTS ...................................1

        A.      Mandatory Notices Under 37 C.F.R. §§ 42.8(b)(1)-(4) .....................1

                1.      Real Parties-In-Interest ..........................................1

                2.      Related Matters ....................................................1

                3.      Lead and Back-up Counsel ...........................................2

                4.      Powers of Attorney and Service Information ...........................2

        B.      Proof of Service on the Patent Owner ...................................3

        C.      Fee ...................................................................3

III.    GROUNDS FOR STANDING.........................................................3

IV.     STATEMENT OF PRECISE RELIEF REQUESTED ..................................3

V.      IDENTIFICATION OF CHALLENGE..............................................3

VI.     LEVEL OF ORDINARY SKILL IN THE ART...........................................4

VII.    SUMMARY OF THE '494 PATENT .................................................4

        A.      Effective Filing Date .................................................4

        B.      Overview of the Prosecution History....................................6

        C.      Patent Specification and Claims.......................................7

VIII.   CLAIM CONSTRUCTION ..........................................................12

IX.     STATE OF THE ART PRIOR TO THE '494PATENT ...........................15

X.      THERE IS A REASONABLE LIKELIHOOD THAT PETITIONER
        WILL PREVAIL WITH RESPECT TO AT LEAST ONE CLAIM OF
        THE '494PATENT .................................................................17

XI.     DETAILED EXPLANATION OF THE GROUNDS FOR
        REJECTION .........................................................................17

        A.      Challenge to Claims 1, 10, and 18 based on ThunderBYTE
                Anti-Virus Utilities User Manual in view of Ji.................................17

        B.      Challenge to Claim 14 based on ThunderBYTE Anti-Virus
                Utilities User Manual in view of Ji and Chen...................................29

C.  Challenge to Claims 1, 10, 14, and 18 based on Arnold in view of Chen and Ji ................................................................... 36

D.  Challenge to Claims 1, 10, 14, and 18 based on Chen in view of Arnold and Ji ................................................................ 44

XII.  THE CHALLENGES ARE NOT REDUNDANT ..................................... 50

XIII.  CONCLUSION ............................................................................. 51

## **TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1001 | U.S. Patent No. 8,677,494 to Edery et al. |
| 1002 | Expert Declaration of Paul Clark |
| 1003 | Curriculum Vitae of Paul Clark |
| 1004 | File History for U.S. Patent No. 8,677,494 |
| 1005 | U.S. Provisional Patent Application No. 60/030,639 to Touboul et al. |
| 1006 | *ThunderBYTE Anti-Virus Utilities User Manual*, ThunderBYTE B.V. (1995) |
| 1007 | Information Disclosure Statement filed in U.S. Patent Application No. 08/605,285 on October 25, 1996 |
| 1008 | U.S. Patent No. 5,440,723 to Arnold et al. |
| 1009 | U.S. Patent No. 5,623,600 to Ji et al. |
| 1010 | U.S. Patent No. 5,951,698 to Chen et al. |
| 1011 | *Finjan, Inc. v. Sophos Inc.*, 14-cv-1197 – Finjan Opening Claim Construction Brief |
| 1012 | File History for U.S. Patent Application No. 11/370,114 |
| 1013 | File History for U.S. Patent Application No. 09/861,229 |
| 1014 | U.S. Patent No. 6,804,780 |
| 1015 | U.S. Patent No. 6,092,194 |

| 1016 | U.S. Patent No. 6,480,962 |
| --- | --- |
| 1017 | Excerpts of *Finjan v. McAfee et al.*, Trial Transcripts |
| 1018 | Information Disclosure Statement filed in U.S. Patent Application No. 08/684,580 on October 25, 1996 |
| 1019 | Excerpts of *Microsoft Press Computer Dictionary, Second Edition*, Microsoft Press (1994) |
| 1020 | *Mangosoft, Inc. v. Oracle Corp.*, 1:02-cv-545-SM – Claim Construction Order |

## I.    INTRODUCTION

It is hereby requested that the United States Patent and Trademark Office proceed with an *inter partes* review of claims 1, 10, 14, and 18 of U.S. Patent No. 8,677,494 (Exhibit 1001) (hereinafter "the '494 patent").

The '494 patent relates generally to detecting suspicious computer operations in downloaded files. The claims are directed to receiving an incoming Downloadable, deriving security profile data for the Downloadable, and storing the security profile data in a database. The security profile data includes a list of suspicious computer operations that may be attempted by the Downloadable. As explained below, the claimed systems had been developed and were well known in the virus detection and computer security field long before the application for the '494 patent had been filed. Specifically, it was well known to receive downloaded files that could be infected with malware, examine the files to identify suspicious computer operations that may be attempted by the files, and store the identified data in a database. All of the claims of the '494 patent are therefore invalid over the prior art identified below, each of which was cited during prosecution of the '494 patent.

1

## II.   COMPLIANCE WITH FORMAL REQUIREMENTS

### A.   Mandatory Notices Under 37 C.F.R. §§ 42.8(b)(1)-(4)

#### 1.   Real Parties-In-Interest

Sophos Limited and wholly owned subsidiary, Sophos Inc., are the real parties-in-interest.

#### 2.   Related Matters

To the knowledge of Petitioner, a decision in this proceeding would affect or be affected by the following matters where Finjan is asserting the '494 patent: (1) Finjan, Inc. v. Sophos Inc., 3:14-1197 (N.D. Cal.), (2) Finjan, Inc. v. Websense, Inc., Case No. 3:14-cv-1353 (N.D. Cal.), and (3) Finjan, Inc. v. Palo Alto Networks, Inc., Case No. 3:14-cv-4908 (N.D. Cal.).

#### 3.   Lead and Back-up Counsel

Lead Counsel for Petitioner is James M. Heintz, DLA Piper LLP (US), Reg. No. 41,828, who can be reached by email at Sophos-Finjan-494IPR@dlapiper.com, by phone at 703-773-4148, by fax at 703-773-5200, and by mail at 11911 Freedom Drive, Suite 300, Reston, VA  20190. Backup counsel for Petitioner is Nicholas Panno of DLA Piper LLP (US), Reg. No. 68,513, who can be reached by email at Sophos-Finjan-494IPR@dlapiper.com, by phone at 703-773-4157, by fax at 703-773-5157, and by mail at 11911 Freedom Drive, Suite 300, Reston, VA  20190.

#### 4.   Powers of Attorney and Service Information

Powers of attorney are being filed with the designation of counsel in accordance with 37 C.F.R. § 42.10(b). Service information for lead and back-up counsel is provided in the designation of lead and back-up counsel above. Service of any documents via hand delivery may be made at the postal mailing address of the respective lead and back-up counsel designated above.

### B.   Proof of Service on the Patent Owner

As identified in the attached Certificate of Service, a copy of this Petition in its entirety is being served on the Patent Owner's attorney of record at the address listed in the USPTO's records by overnight courier pursuant to 37 C.F.R. § 42.6.

### C.   Fee

The undersigned authorizes the Director to charge the fee specified by 37 C.F.R. § 42.15(a) and any additional fees that might be due in connection with this Petition to Deposit Account No. 50-1442.

## III.  GROUNDS FOR STANDING

In accordance with 37 C.F.R. § 42.104(a), the Petitioner certifies that the '494 patent is available for *inter partes* review and that the Petitioner is not barred or estopped from requesting an *inter partes* review challenging the patent claims on the grounds identified in this Petition.

3

## IV.   STATEMENT OF PRECISE RELIEF REQUESTED

In accordance with 37 C.F.R. § 42.22, the Petitioner respectfully requests that claims 1, 10, 14, and 18 of the '494 patent be invalidated for the reasons set forth below.

## V.   IDENTIFICATION OF CHALLENGE

In accordance with 35 U.S.C. § 311 and 37 C.F.R. § 42.104(b), *inter partes* review of claims 1, 10, 14, and 18 of the '494 patent is requested in view of the following grounds:

A.   Claims 1, 10, and 18 are invalid under 35 U.S.C. § 103 (pre-AIA) as being obvious over ThunderBYTE Anti-Virus Utilities User Manual ("TBAV") in view of U.S. Patent No. 5,623,600 to Ji et al. ("Ji").

B.   Claim 14 is invalid under 35 U.S.C. § 103 (pre-AIA) as being obvious over TBAV in view of Ji and U.S. Patent No. 5,951,698 to Chen et al. ("Chen").

C.   Claims 1, 10, 14, and 18 are invalid under 35 U.S.C. § 103 (pre-AIA) as being obvious over U.S. Patent No. 5,440,723 to Arnold et al. ("Arnold") in view of Chen and Ji.

D.   Claims 1, 10, 14, and 18 are invalid under 35 U.S.C. § 103 (pre-AIA) as being obvious over Chen in view of Arnold and Ji.

## VI.   LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art at the time of the alleged invention of the '494 patent would generally have a bachelor's degree or the equivalent in

4

computer science, computer engineering, or a related degree, and three to four years of experience in the fields of network software and security, or equivalent work experience. This person would have been aware of the computer security technology discussed herein and would have been capable of understanding and applying the prior art references discussed herein, alone or in combination. Ex. 1003 ¶ 52.

## VII.   SUMMARY OF THE '494 PATENT

### A.   Effective Filing Date

The '494 patent, entitled "Malicious Mobile Code Runtime Monitoring System and Methods," issued on March 18, 2014, and arises from U.S. patent application No. 13/290,708 ("the '708 application"), which was filed on November 7, 2011. The patent was assigned upon issuance to Finjan, Inc. According to USPTO records, this patent is currently assigned to Patent Owner.

The '494 patent claims the benefit of provisional applications No. 60/205,591 (filed May 17, 200) and No. 60/030,639 (filed November 8, 1996). Thus, assuming the '494 patent correctly claims the benefit of the '639 application, the earliest possible effective filing date of the '494 patent is November 8, 1996. Ex. 1003 ¶¶ 47-51. Several other patents claiming the benefit of the same provisional application (U.S. Patent Nos. 6,092,194; 6,167,520; 6,480,962; and

7,058,822) have been invalidated as a result of Federal Court or PTAB proceedings.

### B.     Overview of the Prosecution History

The '708 application was filed on November 7, 2011. A non-final rejection was mailed on July 23, 2012, which rejected the claims of the '708 application for double patenting and under 35 U.S.C. § 102(e) as being anticipated by U.S. Patent No. 5,983,348 to Ji. Ex. 1004, pp. 757-766. Applicants addressed the rejections by filing a terminal disclaimer and a petition to accept unintentionally delayed claim of priority to the '639 application. Ex. 1004, pp. 721-256. This petition was dismissed on Novmber 27, 2012 because it was not accompanied by a copy of the'639 application. Ex. 1004, pp. 719-720. A final rejection was mailed on January 7, 2013, accepting the terminal disclaimer and citing the same U.S. Patent No. 5,983,348 to Ji. Ex. 1004, pp. 711-717. On May 7, 2013, Applicants filed a declaration by inventor Shlomo Touboul purporting to establish an invention date prior to the filing date of the Ji patent. Ex. 1004, pp. 182-190. Specifically, Touboul declares that his "sole invention was in [his] mind and developed by at least November 18, 1996," which is after the filing date of the '639 application. Ex. 1004, p. 189. A notice of allowance was mailed on August 29, 2013. Ex. 1004, pp. 118-124. Applicants subsequently filed a petition to withdraw from issue, a new petition to accept unintentionally delayed claim of priority to the '639 application,

6

and a request for continued examination on October 1, 2013, and a corrected petition on December 6, 2013. Ex. 1004, ppp. 65-77, 94-102. The USPTO granted the petition for acceptance of a claim for late priority to the '639 application on December 24, 2013, and the patent issued on March 18, 2014. Ex. 1001, p.1; Ex. 1004, pp. 53-54.

## C.    Patent Specification and Claims

The '494 patent relates generally to protecting personal computers (PCs) or other devices from malicious software obtained over a network. The '494 patent refers to executable files and software obtained over a network as "Downloadables" and focuses on identifying malicious Downloadables. The specification of the '494 patent itself has little specific teaching of the claimed subject matter beyond providing descriptions that are broadly in the same field as the claims. Ex. 1002 ¶39.

The disclosure of the '639 application most closely resembles the subject matter claimed by the '494 patent. The '639 application relates generally to a system and method for protecting computers from hostile Downloadables. Ex. 1005, p. 1, ll. 6-8; Ex. 1002 ¶40. A Downloadable is described as "an executable application program which is automatically downloaded from a source computer and run on the destination computer." Ex. 1005, p. 2, ll. 1-4; Ex. 1002 ¶40. Examples of Downloadables include executables as well as applets for Java and

7

Active X. Ex. 1005, p. 2, ll. 4-7; Ex. 1002 ¶40. According to the '639 application, viruses may be attached to Downloadables. Ex. 1005, p. 1, ll. 20-22; p. 2, ll. 7-9; Ex. 1002 ¶40.

The method taught by the '639 application includes receiving a Downloadable, and, when the Downloadable does not get identified as a previously identified hostile Downloadable, deriving Downloadable security profile data from the received Downloadable. Ex. 1005, p. 3, ll. 13-21; Ex. 1002 ¶41.

Specifically, an internal network security system 110 examines Downloadables, determines whether they are hostile, and prevents hostile Downloadables from reaching an internal computer network 115 (e.g., a corporate local area network (LAN)). Ex. 1005, p. 6, ll. 2-17; Ex. 1002 ¶42. The internal network security system 110 is shown in FIG. 2 and includes a central processing unit (CPU) 205, communications interfaces 210, 225, input/output (I/O) interfaces 215, a data storage device 230, memory 235, and a signal bus 220. Ex. 1005, p. 6, l. 19 – p. 8, l. 4; Ex. 1002 ¶42. The security program 255 in memory 235 controls the operations of the internal network security system 110. Ex. 1005, p. 8, ll. 1-4; Ex. 1002 ¶42. The security database 240 in the data storage device 230 stores Downloadable security profiles (DSPs). Ex. 1005, p. 8, ll. 14-19; Ex. 1002 ¶42.

8



FIG. 2

FIG. 3 illustrates security program 255 details. An ID generator 315 of the security program 255 receives a Downloadable from external computer network 105. Ex. 1005, p. 9, ll. 14-16; Ex. 1002 ¶43.

9



FIG. 3

A first comparator 320 of the security program 255 determines if the Downloadable is identical to a known non-hostile or hostile Downloadable 307 and discards the Downloadable if it is identical to a known hostile Downloadable. Ex. 1005, p. 9, l. 20 – p. 10, l. 5; Ex. 1002 ¶44. Known Downloadables 307 (hostile and non-hostile) along with corresponding DSP data 310 are stored in the data storage device 230. Ex. 1005, p. 8, ll. 13-19; Ex. 1002 ¶44. DSP data 310 includes the fundamental computer operations included in the known hostile Downloadables 307 (e.g., read, write, file management operations, system management operations, memory management operations, CPU allocation operations). Ex. 1005, p. 9, ll. 9-13; Ex. 1002 ¶44.

10

In the event that the Downloadable is unknown (either not identical to a known hostile Downloadable or not identical to a known non-hostile downloadable), a code scanner 325 of the security program 255 decomposes the code of the unknown Downloadable into DSP data and sends the Downloadable and DSP data to a second comparator 330 of the security program 255. Ex. 1005, p. 10, ll. 9-20; Ex. 1002 ¶45. Decomposing the code includes disassembling the machine code of the Downloadable, resolving a command in the machine code, and determining whether the resolved command is a suspect command (e.g., a memory allocation command or loop command). Ex. 1005, p. 15, l. 15 – p. 16, l. 2; Ex. 1002 ¶45. Code containing suspect commands is decoded, and the command and command parameters are registered as DSP data that can be stored in the data storage device 230; Ex. 1002 ¶45.

The second comparator 330 compares the DSP data against stored security policies 305 to determine whether the Downloadable includes a hostile operation. Ex. 1005, p. 10, l. 21 – p. 11, l. 5; Ex. 1002 ¶46. The known Downloadables 307 stored in the data storage device 230 include Downloadables that the second comparator 330 determines to be hostile. The DSP data 310 associated with these hostile Downloadables includes the fundamental operations performed by the Downloadables (i.e., the hostile operations). Ex. 1005, p. 9, ll. 3-13; Ex. 1002 ¶46.

## VIII.  CLAIM CONSTRUCTION

In accordance with 37 C.F.R. § 42.104(b)(3), Petitioner provides the following statement regarding construction of the '494 patent claims.

### A.     Legal Standard

Claims in an *inter partes* review of an unexpired patent are to be given their "broadest reasonable interpretation in light of the specification." 37 C.F.R. 42.100(b). This standard is often referred to as "BRI".

### B.     Construction of the Terms Used in the Claims

Because the claim construction standard in this proceeding differs from that used in U.S. district court litigation, Petitioner expressly reserves the right to assert different claim construction positions under the standard applicable in district court for any term of the '494 patent in any district court litigation. Claim construction is further discussed in Ex. 1002 ¶¶ 53-66.

1.     **"Downloadable"** (claims 1, 10, 14, and 18): Under the BRI, this limitation should be understood to mean "an executable application program which is downloaded from a source computer and can be run on the destination computer", as defined in the '639 application. Ex. 1005, p. 2, ll. 1-4; Ex. 1002 ¶60. This construction is also consistent with the '494 patent, which describes a Downloadable as "information including executable code." This definition is what one of ordinary skill in the art would understand from the specification of the '494

12

patent. Ex. 1001, col. 9, ll. 46-52; Ex. 1002 ¶60. This construction is also consistent with what was agreed upon by Petitoner and Patent Owner in related proceedings cited above. Ex. 1011, p. 4.

2. **"suspicious computer operations"** (claims 1 and 10): Under the BRI, this limitation should be understood to mean "computer instructions that are deemed to be potentially hostile". This construction is consistent with the disclosure in the '639 application regarding "potentially hostile operations" and "suspect commands." Ex. 1005, p. 8, l. 19 – p. 9, l. 3; p. 15, l. 19 – p. 16, l. 2; Ex. 1002 ¶62. This construction is also consistent with the '494 patent, which describes "harmful, undesirable, suspicious or other 'malicious' operations that might otherwise be effectuated by remotely operable code." Ex. 1001, col. 2, ll. 54-56; Ex. 1002 ¶62.

3. **"database"** (claims 1 and 10): Under the BRI, this limitation should be understood to mean "any structured store of data". The '639 application does not define "database", but one of ordinary skill in the art would understand the term "database" to have this meaning. See, e.g., Ex. 1020, p. 29 (wherein database files are given as examples of structured stores of data). This construction is consistent with the disclosure in the '639 application of a data storage device 230 that stores a security database 240. Ex. 1005, p. 7, ll. 16-20; Ex. 1002 ¶64. This construction is also consistent with the '494 patent, which teaches "[a]ny

13

suitable explicit or referencing list, database or other storage structure(s) or storage structure configuration(s) can also be utilized to implement a suitable user/device based protection scheme" Ex. 1001, col. 17, ll. 10-14; Ex. 1002 ¶64.

   **4.** **"program script"** (claim 14): Under the BRI, this limitation should be understood to mean "a set of instructions that can be executed by a computer through an interpreter or some other program with a computer.". The '639 application does not define "program script", but one of ordinary skill in the art would understand the term "program script" to have this meaning. See, e.g., Ex. 1019, p. 350. This construction is consistent with the disclosure in the '639 application regarding Downloadables containing Java applets or ActiveX applets. Ex. 1005, p. 2, ll. 1-7; Ex. 1002 ¶66. This construction is also consistent with the '494 patent, which describes "downloadable application programs, Trojan horses and program code groupings, as well as software 'components', such as JavaTM applets, ActiveXTM controls, JavaScript/Visual Basic scripts, add-ins, etc." Ex. 1001, col. 2, ll. 59-64; Ex. 1002 ¶66. Those of ordinary skill in the art would understand that JavaTM applets, ActiveXTM controls, JavaScript/Visual Basic scripts contain instructions that can be executed by a computer through an interpreter or some other program. Ex. 1002 ¶66.

WEST\255519617.1

## IX.   STATE OF THE ART PRIOR TO THE '494 PATENT

The state of the art prior to the '494 patent is discussed generally in Ex. 1002 ¶¶35-38. By the time of the filing of the '494 patent, malware downloaded from a network was a well-known threat. Companies like Norton, McAfee, and Trend Micro were known to offer established products available to detect and prevent hostile downloadable software from being installed through the use of local and firewall resident scanners. In particular, these commercially available solutions generally included data files intended to assist an executable scanner in the identification of malware.

These companies and others continuously monitored developments in malware to identify new malware and update their product data files to enable identification of the new malware. Data file updates were distributed to end users periodically to keep their systems up to date.

However, it was widely known that new malware could appear on an end user system faster than it could be detected and incorporated into the data files by scanner software distributors. For example, it was widely known at the time in 1996 that files could be downloaded onto computers from networks. FTP, HTTP, and other network protocols were in general use, and computers used these protocols to interface with networks to download files, including executable files and files containing program script. See, e.g., Ex. 1009, col. 1, ll. 15-42; col. 2, l. 39 – col.

15

3, l. 16. Such files were known to be potentially contain suspicious computer instructions, such as malware. Often, malware was distributed to computers via networks in executable or script files before it could be detected by the distributors of malware protection software. See, e.g., Ex. 1006, p. 165.

To that end, it was well known by the time of the filing of the '494 patent to include modules for end user systems and other network-deployed systems to allow them to detect and respond to programs that contained suspicious instructions, and therefore potentially hostile software, in the absence of a signature in the scanner's data file.

As discussed below, all of the elements of claims 1, 10, 14, and 18 of the '494 patent are known in the prior art, and it would have been obvious to combine the prior art in the manner recited in those claims.

## X.   THERE IS A REASONABLE LIKELIHOOD THAT PETITIONER WILL PREVAIL WITH RESPECT TO AT LEAST ONE CLAIM OF THE '494 PATENT

A petition for *inter partes* review must demonstrate "a reasonable likelihood that the Petitioner would prevail with respect to at least one of the claims challenged in the petition." 35 U.S.C. § 314(a). This Petition meets that threshold. There is a reasonable likelihood that Petitioner will prevail in establishing that at least one of claims 1, 10, 14, and 18 of the '494 patent is invalid under 35 U.S.C. § 103 as explained below.

16

## XI.    DETAILED EXPLANATION OF THE GROUNDS FOR REJECTION

A detailed explanation of the pertinence and manner of applying the prior art references to claims 1, 10, 14, and 18 of the '494 patent is provided below in accordance with 37 C.F.R. §§ 42.104(b)(4) and 42.104(b)(5). Except as noted, the detailed explanation set forth below assumes that the claims of the '494 patent are construed consistent with the claim constructions set forth above.

### A.    Challenge to Claims 1, 10, and 18 based on TBAV in view of Ji

TBAV qualifies as prior art to the '494 patent under 35 U.S.C. § 102(a) because TBAV has a copyright date of 1995 and was publicly available by at least October 25, 1996, as evidenced by the fact that it was disclosed by a patent applicant in an Information Disclosure Statement which was filed in U.S. Patent Application No. 08/605,285 on October 25, 1996 and an Information Disclosure Statement which was filed in U.S. Patent Application No. 08/684,580 on October 25, 1996. See Ex. 1007, pp. 2 and 6; Ex. 1018, pp. 2 and 65. October 25, 1996 is prior to the earliest possible effective filing date of the application of the '494 patent on November 8, 1996. Ex. 1006, cover page; Ex. 1007, pp. 2 and 6. Ji qualifies as prior art to the '494 patent under 35 U.S.C. § 102(e) because Ji was granted on an application filed in the U.S. on September 26, 1995, which is prior to the earliest possible '494 patent effective filing date.

17

**TBAV:** TBAV is a user manual for the ThunderBYTE anti-virus software. TBAV describes a software program that protects computer systems against both known and unknown viruses. The TBAV software includes TbScan, a virus scanner, and TbScanX, a memory resident version of TbScan. Ex. 1006, pp. 1-2; Ex. 1002 ¶ 70.

TbScan is run upon user request or automatically (e.g., on startup via the AUTOEXEC.BAT file), and can be used to scan some or all files that have been downloaded or that have otherwise been stored on disks, fixed drives, and/or network drives. Ex. 1006, pp. 48-51; Ex. 1002 ¶ 71. TbScan includes a signature scanner and a heuristic scanner. The signature scanner detects known viruses whose signatures are stored in a signature file. The heuristic scanner disassembles files using a built-in disassembler and searches for suspicious instruction sequences within the files using a built-in code analyzer. Ex. 1006, pp. 1-2, 153-155; Ex. 1002 ¶ 71. The heuristic scanner disassembles files and interprets their instructions. The heuristic scanner disassembles the files to allow scanning to be restricted to an area of a file where a virus might reside, to make it possible to use algorithmic detection methods on encrypted viruses, and to make it possible to detect suspicious instruction sequences. Ex. 1006, p. 154; Ex. 1002 ¶ 71.

TbScan looks into a file's contents and interprets the file's instructions to detect their purpose (e.g., formatting a disk or infecting a file). Heuristic flags are

assigned to suspicious instructions, such as instructions that are common to viruses but uncommon to normal programs. TBAV discloses that a heuristic flag is a character indicating a specific type of suspicious instruction. Ex. 1006, pp. 155, 180-185; Ex. 1002 ¶ 72. For example, the flags include "# - Decryptor code found" (indicating that the file contains instructions that perform self-decryption operations), "A – Suspicious Memory Allocation" (indicating the program contains instructions that perform non-standard memory search and/or allocation operations), "B – Back to entry" (indicating the program contains instructions that perform endless loop operations), "D – Direct disk access" (indicating the program contains instructions that perform a write operation to a disk directly), "L – program load trap" (indicating the program contains instructions that perform an operation to trap the execution of other software), "S – Search for executables" (indicating the program contains instructions that perform a search operation for executable files), and "U – Undocumented system call" (indicating the program contains instructions that perform unknown DOS call or interrupt operations), among others. Ex. 1006, pp. 180-185; Ex. 1002 ¶ 72.

The heuristic flags are associated with scores, so that if the total score (i.e., the sum of heuristic flag scores) for a file exceeds a predefined limit, the file is assumed to contain a virus. Ex. 1006, pp. 153-155. Multiple predefined limits can be established, so that a file having a score above a sensitive limit "might" be

19

infected, and a file having a score above a higher limit is assumed to include a virus. Ex. 1006, p. 155; Ex. 1002 ¶ 73.

TbScan provides the option to output scan results to a log file. The results in the log file include the heuristic flags assigned to each file. Ex. 1006, p. 60; Ex. 1002 ¶ 74. If suspicious instructions are found in a file during a scan, the heuristic flags in the log file indicate their presence and describe the nature of the suspicious instructions. In addition to these flags, if a detailed log level is selected for the log, TbScan adds a description to the log file. Ex. 1006, pp. 76-77; Ex. 1002 ¶ 74.

TbScan scans files with filename extensions that indicate the file is a program file (e.g., .EXE, .COM, .BIN, .SYS, .OV?). TbScan can be configured to also scan files with filename extensions that suggest the file can be infected by viruses (e.g., .DLL, .SCR, .MOD, .CPL, .00?, and .APP). Ex. 1006, p. 57; Ex. 1002 ¶75. Files such as .DLLs contain executable code that is executed by other programs, so these files can be infected by malware, as those of ordinary skill in the art would understand. Ex. 1002 ¶75.

TBAV also includes a TbGenSig program that can be called by TbScan to define signature records for suspicious files. Ex. 1006, pp. 4, 57; Ex. 1002 ¶76. TbScan is used to extract instructions from files that are being examined, such as files that are believed to be infected with viruses. The signature comprises suspicious instructions form a signature for of the potential virus infecting the file.

20

Ex. 1006, pp. 166-168; Ex. 1002 ¶76. A virus name, one or more keywords, and the instructions are added to a file (e.g., USERSIG.DAT). Ex. 1006, p. 168; Ex. 1002 ¶76. Note that TBAV explicitly uses *.DAT files as databases (see also, ANTI-VIR.DAT). Ex. 1006, pp. 4, 36; Ex. 1002 ¶76. TbGenSig further adds the virus name, the keywords, and the suspicious instructions to the TBSCAN.SIG file. Ex. 1006, p.165; Ex. 1002 ¶76. Note that the signature instructions include suspicious instructions. TBAV shows an example signature for the Haifa.Mozkin virus wherein suspicious instructions are labeled (e.g., "?2*2" is a skip instruction to make it harder to define a signature, "4l" and "4h" are counter incrementation and decrementation, "75f1" is a jump instruction). Thus, TbGenSig identifies suspicious instructions and saves them, along with other identifying data, in the TBSCAN.SIG file. Ex. 1006, pp. 165, 173-174; Ex. 1002 ¶76.

TbScanX is a memory resident version of TbScan that automatically scans files that are being executed, copied, de-archived, or downloaded. Ex. 1006, p. 2; Ex. 1002 ¶ 77. TbScanX is "virtually identical to TbScan" with the only difference being that it is memory-resident. Ex. 1006, p. 84; Ex. 1002 ¶ 77. TbScanX tracks all file operations and automatically scans executed files and executable files that are copied, created, downloaded, modified, or unarchived. Ex. 1006, p. 84; Ex. 1002 ¶ 77.

21

**Ji:** Ji is directed to a system for detecting and eliminating viruses on a computer network. An FTP proxy server scans all incoming and outgoing files for viruses and transfers the files if they do not contain viruses. Ex. 1009, p. 1 (57); Ex. 1002 ¶ 78.

Ji teaches a gateway node 33 comprising a CPU 42, memory 44, and other computer components. Ex. 1009, col. 3, l. 64 – col. 4, l. 16; Ex. 1002 ¶ 79. The memory 44 includes an FTP proxy server 60, which controls file transfers to and from the gateway node 33, thereby controlling file transfers to and from a network. Ex. 1009, col. 4, l. 56 – col. 5, l. 2; Ex. 1002 ¶ 79. When a client node sends a connection request 600, an instance of the FTP proxy server 60 is created 602. The FTP proxy server 60 receives the data transfer request and file name associated with the request 606. Ex. 1009, col. 6, l. 55 – col. 7, l. 28; Ex. 1002 ¶ 79.

FIG. 6C of Ji shows what happens when the request is an inbound request (e.g., a download). FTP proxy server 60 receives an inbound file from FTP daemon 78 and analyzes it. Ex. 1009, col. 8, l. 57 – col. 9, l. 2; Ex. 1002 ¶ 80. Specifically, a connection is established over the network 642, and the file is sent from a server to the FTP daemon and from the FTP daemon to the FTP proxy server 644. Ex. 1009, col. 8, ll. 40-58; Ex. 1002 ¶ 80. If the file is a type that can contain viruses (e.g., an executable), the file is analyzed. Ex. 1009, col. 7, ll. 33-40; col. 8, l. 58 – col. 9, l. 2; Ex. 1002 ¶ 80.

WEST\255519617.1



*FIG. 6C*

In light of the above, TBAV, either alone or in combination with Ji, would

have rendered systems and methods that receive Downloadables, derive security

23

profile data for the Downloadables (including suspicious computer operations), and store the security profile data in a database obvious to one of ordinary skill in the art. Ex. 1002 ¶ 81. This combination renders each of claims 1, 10, 14, and 18 obvious as shown in the following charts. See Ex. 1002 ¶¶ 82-103.

| Claim 1(pre) | TBAV and Ji |
|---|---|
| A computer-based method, comprising the steps of: | TBAV discloses a computer-based method of running software utilities on a computer system to provide virus protection. Ex. 1006, pp. 1-5; Ex. 1002 ¶ 82. |
| **Claim 1(a)** | **TBAV and Ji** |
| receiving an incoming Downloadable; | TBAV includes TbScan, which scans the files on a computer system. Ex. 1006, pp.47-48; Ex. 1002 ¶ 83. TBAV includes TbScanX, which automatically scans a file when it is downloaded. Ex. 1006, p. 2, 84; Ex. 1002 ¶ 84. |

To the extent claim 1 requires immediate scanning after downloading, TBAV includes TbScanX. Ex. 1006, p. 2, 84; Ex. 1002 ¶ 84.

| Claim 1(b) | TBAV and Ji |
|---|---|
| deriving security profile data for the Downloadable, including a list of suspicious computer operations that may be attempted by the Downloadable; and | TBAV includes TbScan, which performs heuristic analysis of files. Heuristic analysis includes detecting suspicious instruction sequences within a file and applying heuristic flags to the file. The heuristic flags indicate the suspicious instructions. Ex. 1006, pp. 153-155, 180-185. TbScan performs scans of files, including files that have been downloaded, whenever TbScan is run. Ex. 1006, pp.47-48. Additionally, TbScanX (a memory resident version of TbScan) automatically scans a file when it is downloaded. Ex. 1006, pp. 1-2, 76-77, 84, 153-155, 180-185; Ex. 1002 ¶ 85. |

Because the heuristic flags indicate the suspicious instructions, the list of heuristic flags in the file is a list of suspicious instructions. Additionally, it would

24

have been obvious to one of ordinary skill in the art to provide more details about the suspicious instructions in the file. TBAV teaches that if a detailed log level is selected for the log, TbScan adds a description to the log file. Ex. 1006, pp. 76-77; Ex. 1002 ¶ 86. Also, TBAV teaches specific suspicious instructions in a signature definition, and it would have been obvious to one of ordinary skill in the art that this level of detail could be included in the log file as well. Ex. 1006, pp. 173-174; Ex. 1002 ¶ 86.

To the extent TBAV does not explicitly describe TbScanX performing heuristic analysis, TbScanX is described as "virtually identical to TbScan" except that it is memory-resident. Ex. 1006, p. 84; Ex. 1002 ¶ 87. Thus, at minimum, it would have been obvious to one of ordinary skill in the art to provide any features of TbScan in the memory-resident version of TbScanX, including heuristic analysis. Ex. 1002 ¶ 87.

| Claim 1(c) | TBAV and Ji |
|---|---|
| storing the Downloadable security profile data in a database. | TBAV teaches that heuristic analysis results, including the heuristic flags describing the suspicious instructions, can be output to a file. Ex. 1006, p. 60; Ex. 1002 ¶ 88. TBAV also teaches using TbScan to extract instructions from files that are believed to be infected with viruses. The instructions form a signature for the virus infecting the file. TbGenSig adds the signature to the TBSCAN.SIG file. Ex. 1006, p.165-168; Ex. 1002 ¶ 89. |

TBAV teaches outputting heuristic analysis results to a file and storing signatures in a file. Ex. 1002 ¶ 90. A person of ordinary skill in the art would

25

understand either or both of these files could be is a database containing that contains one or more data entries. In either case, the data in the file is made available for review by a user or use by TbScan at a later time. Ex. 1006, pp. 60, 165; Ex. 1002 ¶ 90. Thus, at minimum, it would have been obvious to one of ordinary skill in the art in view of TBAV to store suspicious computer operations in a database. Ex. 1002 ¶ 90.

| Claim 10(pre) | TBAV and Ji |
|---|---|
| A system for managing Downloadables, comprising: | TBAV discloses software utilities running on a computer system that provide virus protection against downloaded viruses. The utilities manage infected downloaded files (e.g., the TbDel utility of TBAV deletes infected files). Ex. 1006, pp. 1-5, 84; Ex. 1002 ¶ 91. |
| Claim 10(a) | TBAV and Ji |
| a receiver for receiving an incoming Downloadable; | TBAV includes TbScan, which scans the files on a computer system. Ex. 1006, pp.47-48; Ex. 1002 ¶ 92. TBAV includes TbScanX, which automatically scans a file when it is downloaded. Ex. 1006, p. 2, 84; Ex. 1002 ¶ 93. Ji teaches an FTP proxy server 60 that receives an inbound file from FTP daemon 78 and analyzes it. Ex. 1009,col. 8, l. 57 – col. 9, l. 2; Ex. 1002 ¶ 94. |

To the extent claim 1 requires immediate scanning after downloading, TBAV includes TbScanX. Ex. 1006, p. 2, 84; Ex. 1002 ¶ 93.

TBAV teaches receiving downloaded files, which one of ordinary skill in the art would understand can be done by a receiver. It was well known when TBAV was published that in order to receive data from a network, a system requires hardware and software that interfaces with the network. Such hardware and software constitutes a receiver. Ex. 1002 ¶ 95. Therefore, the receiver is at least

26

implicitly taught by TBAV, since a person of ordinary skill in the art would understand the computer receiving downloaded files would have the necessary hardware and software to receive them. Ex. 1002 ¶ 95. Indeed, TBAV explicitly teaches use in a networked environment. Ex. 1009, pp. 8, 11, 21-24, 33, 42, 51, 84-85, 150; Ex. 1002 ¶ 95.

To the extent TBAV does not explicitly describe a receiver, Ji teaches an FTP proxy server 60 that receives an inbound file that a client is trying to download so the file can be scanned for viruses before being passed on to the client. Ex. 1009,col. 8, l. 57 – col. 9, l. 2; Ex. 1002 ¶ 96. TBAV and Ji are both directed to virus scanning software that can scan incoming downloaded files. Thus, at minimum, it would have been obvious to one of ordinary skill in the art to apply the teachings of a receiver in Ji to the system of TBAV. Ex. 1002 ¶ 96.

| Claim 10(b) | TBAV and Ji |
|---|---|
| a Downloadable scanner coupled with said receiver, for deriving security profile data for the Downloadable, including a list of suspicious computer operations that may be attempted by the Downloadable; and | TBAV includes TbScan, which performs heuristic analysis of files. Heuristic analysis includes detecting suspicious instruction sequences within a file and applying heuristic flags to the file. The heuristic flags indicate the suspicious instructions. performs scans of files, including files that have been downloaded, whenever TbScan is run. Ex. 1006, pp.47-48. Additionally, TbScanX (a memory resident version of TbScan) automatically scans a file when it is downloaded. Ex. 1006, pp. 1-2, 76-77, 84, 153-155, 180-185; Ex. 1002 ¶ 97. |

Because the heuristic flags indicate the suspicious instructions, the list of heuristic flags in the file is a list of suspicious instructions. Additionally, it would

have been obvious to one of ordinary skill in the art to provide more details about the suspicious instructions in the file. TBAV teaches that if a detailed log level is selected for the log, TbScan adds a description to the log file. Ex. 1006, pp. 76-77; Ex. 1002 ¶ 98. Also, TBAV teaches specific suspicious instructions in a signature definition, and it would have been obvious to one of ordinary skill in the art that this level of detail could be included in the log file as well. Ex. 1006, pp. 173-174; Ex. 1002 ¶ 98.

To the extent TBAV does not explicitly describe TbScanX performing heuristic analysis, TbScanX is described as "virtually identical to TbScan" except that it is memory-resident. Ex. 1006, p. 84; Ex. 1002 ¶ 99. Thus, at minimum, it would have been obvious to one of ordinary skill in the art to provide any features of TbScan in the memory-resident TbScanX variant, including heuristic analysis. Ex. 1002 ¶ 99.

| Claim 10(c) | TBAV and Ji |
|---|---|
| a database manager coupled with said Downloadable scanner, for storing the Downloadable security profile data in a database. | TBAV teaches that heuristic analysis results, including the heuristic flags describing the suspicious instructions, can be output to a file. Ex. 1006, p. 60; Ex. 1002 ¶ 100.<br>TBAV also teaches using TbScan to extract instructions from files that are believed to be infected with viruses. The instructions form a signature for the virus infecting the file. TbGenSig adds the signature to the TBSCAN.SIG file. Ex. 1006, p.165-168; Ex. 1002 ¶ 101. |

TBAV teaches outputting heuristic analysis results to a file and storing signatures in a file. A person of ordinary skill in the art would understand either or

both of these files could be a flat file or database containing one or more data entries. In either case, the data in the file is made available for review by a user or use by TbScan at a later time. Ex. 1006, pp. 60, 165; Ex. 1002 ¶ 102. Thus, at minimum, it would have been obvious to one of ordinary skill in the art in view of TBAV to store suspicious computer operations in a database. Ex. 1002 ¶ 1020

| Claim 18 | TBAV and Ji |
|---|---|
| The system of Claim 10 wherein said Downloadable scanner comprises a disassembler for disassembling the incoming Downloadable. | TBAV's TbScan includes a disassembler that disassembles files so they can be scanned for suspicious instructions. Ex. 1006, pp. 2, 153-155; Ex. 1002 ¶ 103. |

## B.   Challenge to Claims 1, 10, 14, and 18 based on Arnold in view of Chen and Ji

Chen qualifies as prior art to the '494 patent under 35 U.S.C. § 102(e) because Chen was granted on an application filed in the U.S. on October 2, 1996, which is prior to the earliest possible '494 patent effective filing date.

Chen is directed to a system for detecting and removing viruses from macros that determines whether a targeted file contains a macro and, if so, decodes the macro and scans it for viruses. Ex. 1010, p. 1 (57); Ex. 1002 ¶ 105.

Macros are combinations of instructions that are recorded and made available for future use, e.g. through a user pressing an assigned key. Macros may be embedded within application data files. These macros can be executed automatically and can contain viruses. Ex. 1010, col. 1, ll. 37-52; Ex. 1002 ¶ 106.

29

A person of ordinary skill in the art would understand a macro to be a sequence of instructions executed through an interpreter (e.g., at the application level by a program configured to accept the combinations of instructions) and not directly executable by the operating system. Ex. 1002 ¶ 106.

Chen teaches a computer system 100 comprising a CPU 104, a memory 106, a communications unit 112 for communicating with other computers, and other computer components. Ex. 1010, col. 4, ll. 42-59; Ex. 1002 ¶ 107. The CPU 104 executes instructions received from the memory 106 to access computer files, determine whether they include macros, locate the macros, scan the macros to determine whether viruses are present in the macros (including unknown viruses), and take action against the viruses. Ex. 1010, col. 5, ll. 3-9; Ex. 1002 ¶ 107. Specifically, the memory 106 includes a macro virus detection module 206. Ex. 1010, col. 5, ll. 10-14; Ex. 1002 ¶ 107. The macro virus detection module 206 includes a macro locating and decoding module 302, a macro virus scanning module 304, a macro treating module 306, a virus information module 308, a file correcting module 310, and a data buffer 312. Ex. 1010, col. 5, l. 64 – col. 6, l. 9; Ex. 1002 ¶ 107.



FIG. 3

Files are targeted for access by user selection or upon events taking place (e.g., on system boot, whenever certain files are opened, at periodic intervals), preferably prior to launch of an application program that may run macros in the files. Ex. 1010, col. 6, ll. 10-30; Ex. 1002 ¶ 108. The macro locating and decoding module 302 selects targeted files to be scanned for viruses by first determining whether a file in question is a type of tile that may include a macro. If the file may include a macro, the macro locating and decoding module 302 examines the file to determine whether a macro is actually present. If a macro is present, the macro is located and decoded into binary code and stored so it can be scanned for viruses. Ex. 1010, col. 12, ll. 4-65; Ex. 1002 ¶ 108.

The macro virus scanning module 304 detects combinations of suspicious instructions, which are macro instruction combinations that are likely to be used by

31

macro viruses. Example suspicious instructions include macro enablement instructions, which allow formatting of a file to indicate that the file includes a macro for execution, and macro reproduction instructions, which allow a macro virus to be replicated. The macro virus scanning module 304 identifies suspicious instructions based on instruction identifiers (e.g., binary strings) by scanning decoded macros for the instruction identifiers. If suspicious instructions are found, the macro virus scanning module 304 determines that the file is infected by an unknown virus, flags the decoded macro as infected, and stores information associating the decoded macro to the instruction identifiers that triggered the virus detection. Ex. 1010, col. 8, l. 40 – col. 9, l. 15; Ex. 1002 ¶ 109.

Specifically, as shown in FIG. 6, a decoded macro is scanned for known viruses using signature scanning and, if no known viruses are present, is then scanned for unknown viruses. To identify unknown viruses, the macro virus scanning module 304 obtains a set of instruction identifiers useful to detect suspect instructions that are likely to be used by macro viruses. Ex. 1010, col. 13, ll. 7-32; Ex. 1002 ¶ 110.



FIG. 6

33

The macro instructions, which have been decoded into binary code, are analyzed to identify the suspect instructions. For example, unique binary code portions are known to correspond to suspect instructions, and the instruction identifiers include the unique binary code portions. Ex. 1010, col. 14, ll. 24-64; Ex. 1002 ¶ 111. The macro virus scanning module 304 compares the decoded binary code with the instruction identifiers to reveal the presence of the unique binary code portions, and thus the suspicious instructions, within the macro. Ex. 1010, col. 14, ll. 13-31; Ex. 1002 ¶ 111. The macro virus scanning module 304 can scan for multiple suspicious instructions to confirm the likely presence of a macro virus. If multiple suspicious instructions are found, the macro is flagged as infected by an unknown virus. Information associating the decoded macro to the instruction identifiers that resulted in positive detection is stored in the data buffer 312 for use by other modules such as the macro treating module 306. Ex. 1010, col. 15, ll. 43-54; Ex. 1002 ¶ 111.

In light of the above, TBAV, either alone or in combination with Ji and/or Chen, would have rendered systems and methods that receive Downloadables, derive security profile data for the Downloadables (including suspicious computer operations), and store the security profile data in a database, wherein the Downloadables include program script, obvious to one of ordinary skill in the art.

Ex. 1002 ¶ 112. This combination renders claim 14 obvious as described in the following chart. See Ex. 1002 ¶¶ 113-115.

| Claim 14 | TBAV, Ji, and Chen |
|---|---|
| The system of Claim 10 wherein the Downloadable includes program script. | TBAV teaches scanning files that do not have filename extensions that indicate the files are program files, including .DLLs. Ex. 1006, p. 57; Ex. 1002 ¶ 113. Chen teaches files containing macros that are scanned by a macro virus detection module 206. Ex. 1010, col. 1, ll. 37-52, col. 5, ll. 48-52; Ex. 1002 ¶ 114. |

TBAV describes Downloadables including .DLLs and other files that can contain executable code but are not program files. The code in a .DLL can be executed by another program. Ex. 1002 ¶ 115. To the extent TBAV does not describe Downloadables including program script, Chen teaches scanning macros for viruses. Ex. 1010, col. 1, ll. 37-52, col. 5, ll. 48-52; Ex. 1002 ¶ 115. TBAV and Chen are both directed to virus scanning software. As discussed above, a person of ordinary skill in the art would understand program script to be a set of instructions that can be executed through an interpreter or some other program with a computer. Ex. 1002 ¶ 115. A person of ordinary skill in the art would further understand that higher level script languages, like any other computer language, can contain malicious instructions. A macro is an example of program script often executed automatically without the user's knowledge and thus poses high potential threat. Thus, at minimum, it would have been obvious to one of ordinary skill in

35

the art to apply the teachings of Chen to the system of TBAV to allow the system of TBAV to scan for viruses in both executable files and files containing program script. Ex. 1002 ¶ 115.

## C.    Challenge to Claims 1, 10, 14, and 18 based on Arnold in view of Chen and Ji

**Arnold:** Arnold qualifies as prior art to the '494 patent under 35 U.S.C. § 102(b) because Arnold was granted on August 8, 1995, which is more than one year prior to the earliest possible '494 patent effective filing date.

Arnold is directed to a method wherein an undesired software entity is detected within a data processing system. An identifying signature is extracted for the undesired software entity and added to a database so it may be used by a scanner to prevent subsequent infections of the system and a network of systems. Ex. 1008, p. 1 (57); Ex. 1002 ¶ 117.

The method of Arnold is performed by a computer system 10 that can be connected to a network via network adapter 31. Ex. 1008, col. 3, l. 49 – col. 4, l. 28; Ex. 1002 ¶ 118. The method includes the steps of (A) monitoring for anomalous behavior that may be caused by a virus, (B) scanning for and removal of known viruses, (C) deploying decoy programs to capture virus samples, (D) segregating a captured virus sample into portions that likely vary among instances and portions that are likely invariant, (E) extracting a viral signature from the

36

invariant portions and storing the signature in a database, (F) informing other network computers of the viral infection, and (G) generating a distress signal. Ex. 1008, col. 4, ll. 29-56; Ex. 1002 ¶ 118.

When an anomaly is detected, and no known viruses are found, the anomaly may be due to an unknown virus. A decoy program is used to obtain a sample of the unknown virus. Ex. 1008, col. 6, ll. 3-7; Ex. 1002 ¶ 119. The sample is filtered to generate invariant portions of code that are unlikely to vary between instances of the virus. Ex. 1008, col. 7, ll. 11-21; Ex. 1002 ¶ 119. The invariant portions are machine language "code" portions of a program, which are less likely to vary than non-executable "data" portions of the program. Code-data segregation is performed to separate the code from the data, for example by using static disassembly techniques. Ex. 1008, col. 7, l. 59 – col. 8, l. 27; Ex. 1002 ¶ 119.

A viral signature is extracted from the likely invariant code portions. Ex. 1008, col. 9, ll. 13-16; Ex. 1002 ¶ 120. Specifically, input files (IFs 32) containing invariant portions of viral code are supplied. Ex. 1008, col. 10, ll. 13-21; Ex. 1002 ¶ 120. A list of n-grams (instances of n consecutive bytes) contained in an IF 32 containing previously identified invariant portions of virus machine code is formed. Probabilities for n-grams are estimated by comparing the n-grams to a corpus of programs, and probabilities for exact and fuzzy matches for candidate signatures are generated and combined to obtain an overall evaluation of each

37

candidate signature. Finally, the outcome for at least some of the candidate signatures is reported and stored in a file. Ex. 1008, col. 10, l. 63 – col. 11, l. 20; Ex. 1002 ¶ 120. For each virus, one or more candidate signatures having the best score(s) is selected to represent the virus. Ex. 1008, col. 19, ll. 15-20; Ex. 1002 ¶ 120. As these signatures are generated from previously identified invariant portions of code that caused anomalous behavior, they represent known suspicious instructions. Ex. 1002 ¶ 120.

A specific embodiment of a computer system 10 is shown in the block diagram of FIG. 8. An anomaly detector 72 detectes anomalous behavior of the CPU 14. Upon detection of anomalous behavior, a scanner 74 compares valid signatures from a signature database (SDB 74a) to programs stored in the memory to identify known viruses. Ex. 1008, col. 28, ll. 43-62; Ex. 1002 ¶ 121.

If no known virus is found, a decoy program unit 76 deploys a decoy program and, if a modification to the decoy program is detected, the undesirable software entity is isolated and supplied to the invariant code identifier 38. The invariant code identifier 38 identifies candidate signatures and provides them to the n-gram processor 40. The n-gram processor 40 processes the candidate signatures and, if a valid signature for the unknown undesirable software identity is found, the valid signature is stored in the SDB 74a. Ex. 1008, col. 29, ll. 1-23; Ex. 1002 ¶ 122.



FIG. 8

Chen and Ji are described above in section IX(A) and qualify as prior art to the '494 patent as explained therein. In light of the above, Arnold, either alone or in combination with Chen and Ji, would have rendered systems and methods that receive Downloadables, derive security profile data for the Downloadables (including suspicious computer operations), and store the security profile data in a database obvious to one of ordinary skill in the art. Ex. 1002 ¶ 123. This combination renders each of claims 1, 10, 14, and 18 obvious as shown in the following charts. See Ex. 1002 ¶¶ 124-141.

| Claim 1(pre) | Arnold, Chen, and Ji |
|---|---|
| A computer-based method, comprising the steps of: | Arnold teaches a data processing system 10 that is suitable for practicing the teaching of the invention. Ex. 1008, col. 3, l. 49 – col. 4, l. 28; col. 27, ll. 16-20; Ex. 1002 ¶ 124. |
| Claim 1(a) | Arnold, Chen, and Ji |
| receiving an | Arnold teaches a data processing system 10 that is |

| incoming Downloadable; | connected to a network via a network adapter 31. Ex. 1008, col. 4, ll. 1-2 and 23-28; Ex. 1002 ¶ 125. Ji teaches an FTP proxy server 60 that receives an inbound file from FTP daemon 78 and analyzes it. Ex. 1009, col. 8, l. 57 – col. 9, l. 2; Ex. 1002 ¶ 126. |
|---|---|

Arnold teaches scanning files on a network-connected computer, and one of ordinary skill in the art would recognize that these files can be incoming downloaded files. To the extent Arnold does not explicitly describe receiving an incoming Downloadable, Ji teaches an FTP proxy server 60 that receives an inbound file that a client is trying to download so the file can be scanned for viruses before being passed on to the client. Ex. 1009, col. 8, l. 57 – col. 9, l. 2; Ex. 1002 ¶ 127. Arnold and Ji are both directed to virus scanning software that can scan files on a network-connected computer. Thus, at minimum, it would have been obvious to one of ordinary skill in the art to apply the teachings of Ji of receiving a Downloadable to the system of Arnold. Ex. 1002 ¶ 127.

| Claim 1(b) | Arnold, Chen, and Ji |
|---|---|
| deriving security profile data for the Downloadable, including a list of suspicious computer operations that may be attempted by the Downloadable; and | Arnold teaches deriving a signature for a virus by analyzing an invariant section of code from a program. Ex. 1008, col. 10, l. 63 – col. 11, l. 20; col. 19, ll. 15-20; Ex. 1002 ¶ 128. Chen teaches comparing decoded binary code with instruction identifiers to reveal the presence of code portions corresponding to the instructions of the instruction identifiers. Ex. 1010, col. 14, ll. 13-64; Ex. 1002 ¶ 129. |

To the extent Arnold does not explicitly describe deriving a list of suspicious computer operations, it would have been obvious to one of ordinary skill in the art

40

that the signature generated by Arnold is indicative of a sequence of suspicious computer operations because it represents an invariant portion of code that caused observed anomalous behavior. Ex. 1008, col. 6, ll. 3-7; col. 7, ll. 11-21; Ex. 1002 ¶ 130. Furthermore, Chen teaches comparing instruction identifers to decoded binary code. The instruction identifers include unique binary code portions known to correspond to suspect instructions. The presence of the unique binary code portions within the decoded binary code reveals the presence of the suspicious instructions within the file. Ex. 1010, col. 14, ll. 13-31; Ex. 1002 ¶ 130. Arnold and Chen are both directed to virus scanning software that can detect unidentified viruses within a file. Thus, at minimum, it would have been obvious to one of ordinary skill in the art to apply the teachings of Chen of identifying suspicious computer operations in a file to the system of Arnold. Ex. 1002 ¶ 130.

| Claim 1(c) | Arnold, Chen, and Ji |
|---|---|
| storing the Downloadable security profile data in a database. | Arnold teaches identifying valid signatures from among candidate signatures using an invariant code identifier 38 and storing them in a database using an n-gram processor 40. Ex. 1008, col. 29, ll. 14-23; Ex. 1002 ¶ 131. |
| **Claim 10(pre)** | **Arnold, Chen, and Ji** |
| A system for managing Downloadables, comprising: | Arnold teaches a data processing system 10 that is suitable for practicing the teaching of the invention. Ex. 1008, col. 3, l. 49 – col. 4, l. 28; col. 27, ll. 16-20; Ex. 1002 ¶ 132. |
| **Claim 10(a)** | **Arnold, Chen, and Ji** |
| a receiver for receiving an incoming Downloadable; | Arnold teaches a data processing system 10 that is connected to a network via a network adapter 31. Ex. 1008, col. 4, ll. 1-2 and 23-28; Ex. 1002 ¶ 132. Ji teaches an FTP proxy server 60 that receives an |

| | inbound file from FTP daemon 78 and analyzes it. Ex. 1009,col. 8, l. 57 – col. 9, l. 2; Ex. 1002 ¶ 133. |
|---|---|

Arnold teaches scanning files on a network-connected computer comprising a network adapter, and one of ordinary skill in the art would recognize that these files can be incoming downloaded files received via the network adapter. To the extent Arnold does not explicitly describe receiving an incoming Downloadable, Ji teaches an FTP proxy server 60 that receives an inbound file that a client is trying to download so the file can be scanned for viruses before being passed on to the client. Ex. 1009,col. 8, l. 57 – col. 9, l. 2; Ex. 1002 ¶ 134. Arnold and Ji are both directed to virus scanning software that can scan files on a network-connected computer. Thus, at minimum, it would have been obvious to one of ordinary skill in the art to apply the teachings of Ji to the system of Arnold to use the network adapter to receive a Downloadable. Ex. 1002 ¶ 134.

| Claim 10(b) | Arnold, Chen, and Ji |
|---|---|
| a Downloadable scanner coupled with said receiver, for deriving security profile data for the Downloadable, including a list of suspicious computer operations that may be attempted by the Downloadable; and | Arnold teaches deriving a signature for a virus by analyzing an invariant section of code from a program. Ex. 1008, col. 10, l. 63 – col. 11, l. 20; col. 19, ll. 15-20; Ex. 1002 ¶ 135.<br>Chen teaches a macro virus scanning module 304 for comparing decoded binary code with instruction identifiers to reveal the presence of code portions corresponding to the instructions of the instruction identifiers. Ex. 1010, col. 14, ll. 13-64; Ex. 1002 ¶ 136. |

To the extent Arnold does not explicitly describe deriving a list of suspicious computer operations, it would have been obvious to one of ordinary skill in the art

42

that the signature generated by Arnold is indicative of suspicious computer operations because it represents an invariant portion of code that caused observed anomalous behavior. Ex. 1008, col. 6, ll. 3-7; col. 7, ll. 11-21; Ex. 1002 ¶ 137. Furthermore, Chen teaches a macro virus scanning module 304 for comparing instruction identifers to decoded binary code. The instruction identifers include unique binary code portions known to correspond to suspect instructions. The presence of the unique binary code portions within the decoded binary code reveals the presence of the suspicious instructions within the file. Ex. 1010, col. 14, ll. 13-31; Ex. 1002 ¶ 137. Arnold and Chen are both directed to virus scanning software that can detect unidentified viruses within a file. Thus, at minimum, it would have been obvious to one of ordinary skill in the art to apply the teachings of Chen of identifying suspicious computer operations in a file to the system of Arnold. Ex. 1002 ¶ 137.

| Claim 10(c) | Arnold, Chen, and Ji |
|---|---|
| a database manager coupled with said Downloadable scanner, for storing the Downloadable security profile data in a database. | Arnold teaches identifying valid signatures from among candidate signatures using an invariant code identifier 38 and storing them in a database using an n-gram processor 40. Ex. 1008, col. 29, ll. 14-23; Ex. 1002 ¶ 138. |
| Claim 14 | Arnold, Chen, and Ji |
| The system of Claim 10 wherein the Downloadable includes program script. | Chen teaches files containing macros that are scanned by a macro virus detection module 206. Ex. 1010, col. 1, ll. 37-52, col. 5, ll. 48-52; Ex. 1002 ¶ 139. |

43

To the extent Arnold does not describe Downloadables including program script, Chen teaches scanning macros for viruses. Ex. 1010, col. 1, ll. 37-52, col. 5, ll. 48-52; Ex. 1002 ¶ 140. Arnold and Chen are both directed to virus scanning software. A person of ordinary skill in the art would understand "program script" to be a sequence of instructions executed through an interpreter and not directly executable by the operating system. A macro is one example of program script. Ex. 1002 ¶ 140. Thus, at minimum, it would have been obvious to one of ordinary skill in the art to apply the teachings of Chen to the system of Arnold to allow the system of Arnold to scan for viruses in both executable files and files containing program script. Ex. 1002 ¶ 140.

| Claim 18 | Arnold, Chen, and Ji |
|---|---|
| The system of Claim 10 wherein said Downloadable scanner comprises a disassembler for disassembling the incoming Downloadable. | Arnold teaches an invariant code identifier 38 that separates machine language "code" portions of a program from non-executable "data" portions of the program using static disassembly techniques. Ex. 1008, col. 7, l. 59 – col. 8, l. 27; col. 29, ll. 10-17; Ex. 1002 ¶ 141. |

### D.   Challenge to Claims 1, 10, 14, and 18 based on Chen in view of Arnold and Ji

Chen, Arnold, and Ji are described above in section IX(A) and qualify as prior art to the '494 patent as explained therein. In light of the above, Chen, either alone or in combination with Arnold and Ji, would have rendered systems and methods that receive Downloadables, derive security profile data for the

WEST\255519617.1

Downloadables (including suspicious computer operations), and store the security profile data in a database obvious to one of ordinary skill in the art. Ex. 1002 ¶ 142. This combination renders each of claims 1, 10, 14, and 18 obvious as shown in the following charts. See Ex. 1002 ¶¶ 143-165.

| Claim 1(pre) | Chen, Arnold, and Ji |
|---|---|
| A computer-based method, comprising the steps of: | Chen teaches a computer system 100 comprising a CPU 104, a memory 106, and other computer components. The memory 106 includes a macro virus detection module 206. Ex. 1010, col. 4, ll. 42-59; col. 5, ll. 10-14; Ex. 1002 ¶ 143. |
| Claim 1(a) | Chen, Arnold, and Ji |
| receiving an incoming Downloadable; | Chen teaches a computer system 100 comprising a communications unit for communicating with other computers. Ex. 1010, col. 4, ll. 42-59; Ex. 1002 ¶ 144. Chen teaches targeting files for virus scanning. Ex. 1010, col. 6, ll. 10-30; Ex. 1002 ¶ 145. Ji teaches an FTP proxy server 60 that receives an inbound file from FTP daemon 78 and analyzes it. Ex. 1009,col. 8, l. 57 – col. 9, l. 2; Ex. 1002 ¶ 146. |

Chen teaches scanning files on a computer that can communicate with other computers, and one of ordinary skill in the art would recognize that these files can be incoming downloaded files. To the extent Chen does not explicitly describe receiving an incoming Downloadable, Ji teaches an FTP proxy server 60 that receives an inbound file that a client is trying to download so the file can be scanned for viruses before being passed on to the client. Ex. 1009,col. 8, l. 57 – col. 9, l. 2; Ex. 1002 ¶ 147. Chen and Ji are both directed to virus scanning software that can scan files on a computer that communicates with other computers. Thus, at minimum, it would have been obvious to one of ordinary skill

WEST\255519617.1

in the art to apply the teachings of Ji of receiving a Downloadable to the system of

Chen. Ex. 1002 ¶ 147.

| Claim 1(b) | Chen, Arnold, and Ji |
|---|---|
| deriving security profile data for the Downloadable, including a list of suspicious computer operations that may be attempted by the Downloadable; and | Chen teaches comparing decoded binary code with instruction identifiers to reveal the presence of code portions corresponding to the instructions of the instruction identifiers. Ex. 1010, col. 14, ll. 13-64; Ex. 1002 ¶ 148. |
| Claim 1(c) | Chen, Arnold, and Ji |
| storing the Downloadable security profile data in a database. | Chen teaches that information associating the decoded macro to the instruction identifiers that resulted in positive detection is stored in the data buffer 312. Ex. 1010, col. 15, ll. 43-54; Ex. 1002 ¶ 149. Arnold teaches identifying valid signatures from among candidate signatures and storing them in a database. Ex. 1008, col. 29, ll. 14-23; Ex. 1002 ¶ 150. |

Chen teaches storing information associating a decoded macro to instruction

identifiers in a data buffer, and a person of ordinary skill in the art would

understand that the same data may also be stored in a database. To the extent Chen

does not explicitly describe storing the information in a database, Arnold teaches

storing candidate signatures in a database. Ex. 1008, col. 29, ll. 14-23; Ex. 1002 ¶

151. Chen and Arnold are both directed to virus scanning software wherein data

about detected malicious files is stored. Thus, at minimum, it would have been

obvious to one of ordinary skill in the art to apply the teachings of Arnold of a

WEST\255519617.1

database manager (n-gram processor 40) storing virus scan analysis data in a database to the system of Chen. Ex. 1002 ¶ 151.

| Claim 10(pre) | Chen, Arnold, and Ji |
|---|---|
| A system for managing Downloadables, comprising: | Chen teaches a computer system 100 comprising a CPU 104, a memory 106, and other computer components. The memory 106 includes a macro virus detection module 206. Ex. 1010, col. 4, ll. 42-59; col. 5, ll. 10-14; Ex. 1002 ¶ 152. |
| Claim 10(a) | Chen, Arnold, and Ji |
| a receiver for receiving an incoming Downloadable; | Chen teaches a computer system 100 comprising a communications unit for communicating with other computers. Ex. 1010, col. 4, ll. 42-59; Ex. 1002 ¶ 153. Chen teaches targeting files for virus scanning. Ex. 1010, col. 6, ll. 10-30; Ex. 1002 ¶ 154. Ji teaches an FTP proxy server 60 that receives an inbound file from FTP daemon 78 and analyzes it. Ex. 1009,col. 8, l. 57 – col. 9, l. 2; Ex. 1002 ¶ 155. |

Chen teaches scanning files on a computer comprising a communications unit for communicating with other computers, and one of ordinary skill in the art would recognize that these files can be incoming downloaded files received via the communications unit. To the extent Chen does not explicitly describe receiving an incoming Downloadable, Ji teaches an FTP proxy server 60 that receives an inbound file that a client is trying to download so the file can be scanned for viruses before being passed on to the client. Ex. 1009,col. 8, l. 57 – col. 9, l. 2; Ex. 1002 ¶ 156. Chen and Ji are both directed to virus scanning software that can scan files on a computer that communicates with other computers. Thus, at minimum, it would have been obvious to one of ordinary skill in the art to apply the teachings

47

of Ji to the system of Chen to use the communications unit to receive a Downloadable. Ex. 1002 ¶ 156.

| Claim 10(b) | Chen, Arnold, and Ji |
|---|---|
| a Downloadable scanner coupled with said receiver, for deriving security profile data for the Downloadable, including a list of suspicious computer operations that may be attempted by the Downloadable; and | Chen teaches a macro virus scanning module 304 that compares decoded binary code with instruction identifiers to reveal the presence of code portions corresponding to the instructions of the instruction identifiers. Ex. 1010, col. 14, ll. 13-64; Ex. 1002 ¶ 157. |
| Claim 10(c) | Chen, Arnold, and Ji |
| a database manager coupled with said Downloadable scanner, for storing the Downloadable security profile data in a database. | Chen teaches that information associating the decoded macro to the instruction identifiers that resulted in positive detection is stored in the data buffer 312. Ex. 1010, col. 15, ll. 43-54; Ex. 1002 ¶ 158.<br>Arnold teaches identifying valid signatures from among candidate signatures using an invariant code identifier 38 and storing them in a database using an n-gram processor 40. Ex. 1008, col. 29, ll. 14-23; Ex. 1002 ¶ 159. |

Chen teaches storing information associating a decoded macro to instruction identifiers in a data buffer, and a person of ordinary skill in the art would understand that the same data may also be stored in a database by a database manager. To the extent Chen does not explicitly describe a database manager for storing the log file in a database, Arnold teaches storing candidate signatures in a database using an n-gram processor 40. Ex. 1008, col. 29, ll. 14-23; Ex. 1002 ¶ 160. Chen and Arnold are both directed to virus scanning software wherein data

48

about detected malicious files is stored. Thus, at minimum, it would have been obvious to one of ordinary skill in the art to apply the teachings of Arnold of a database manager (n-gram processor 40) storing virus scan analysis data in a database to the system of Chen. Ex. 1002 ¶ 160.

| Claim 14 | Chen, Arnold, and Ji |
|---|---|
| The system of Claim 10 wherein the Downloadable includes program script. | Chen teaches files containing macros that are scanned by a macro virus detection module 206. Ex. 1010, col. 1, ll. 37-52, col. 5, ll. 48-52; Ex. 1002 ¶ 161. |

To the extent Chen does not explicitly use the term "program script", a person of ordinary skill in the art would understand "program script" to be a sequence of instructions executed through an interpreter and not directly executable by the operating system. A macro is one example of program script. Ex. 1002 ¶ 162.

| Claim 18 | Chen, Arnold, and Ji |
|---|---|
| The system of Claim 10 wherein said Downloadable scanner comprises a disassembler for disassembling the incoming Downloadable. | Chen teaches decoding macros into binary code. Ex. 1010, col. 14, ll. 24-64; Ex. 1002 ¶ 163.<br>Arnold teaches an invariant code identifier 38 that separates machine language "code" portions of a program from non-executable "data" portions of the program using static disassembly techniques. Ex. 1008, col. 7, l. 59 – col. 8, l. 27; col. 29, ll. 10-17; Ex. 1002 ¶ 164. |

Chen teaches decoding macros into binary code. Additionally, Arnold teaches an invariant code identifier 38 that separates machine language "code" portions of a program from non-executable "data" portions of the program using

49

static disassembly techniques. Ex. 1008, col. 7, l. 59 – col. 8, l. 27; col. 29, ll. 10-17; Ex. 1002 ¶ 165. Chen and Arnold are both directed to identifying suspicious code within code strings, with Chen examining macros and Arnold examining executable files. Thus, at minimum, it would have been obvious to one of ordinary skill in the art to apply the teachings of Arnold of an invariant code identifier using static disassembly techniques to the system of Chen to allow the system of Chen to work with both macros and executable files. Ex. 1002 ¶ 165.

## XII.   THE CHALLENGES ARE NOT REDUNDANT

Challenge A is stronger than Challenges B, C, and D in that Challenge A features a single primary reference TBAV that largely teaches the entire method of claim 1 and system of claims 10 and 18, with secondary references largely providing clarification or secondary features. Challenge B is stronger than Challenges A, C, and D in that challenge B combines the primary reference of TBAV with Chen to teach the system of claim 14. Challenge C is stronger than challenges A, B, and D in that the primary reference Arnold provides great detail about how security profile data can be derived and stored. Challenge D is stronger than Challenges A, B, and C in that the primary reference Chen strongly correlates suspicious computer operations with the results of its scan and deals largely with program script. For at least the foregoing reasons, none of the challenges are redundant.

WEST\255519617.1

## XIII.  CONCLUSION

For the foregoing reasons, Petitioner requests that Trial be instituted and claims 1, 10, 14, and 18 be cancelled.

Respectfully Submitted,

  /James M. Heintz/
James M. Heintz
Registration Number 41,828
**DLA Piper LLP (US)**
11911 Freedom Drive, Suite 300
Reston, VA  20190
(703) 773-4148

Nicholas J. Panno
Registration Number 68,513
**DLA Piper LLP (US)**
11911 Freedom Drive, Suite 300
Reston, VA  20190
(703) 773-4149
*Attorneys for Petitioner*

51

Patent No. 6,249,868
Petition for *Inter Partes* Review

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing petition for

*inter partes* review and all Exhibits and other documents filed together with the

petition were served on April 8, 2015, via courier, directed to patent owner and

patent owner correspondent at the following addresses:

| | |
|---|---|
| Bey & Cotropia Pllc<br>Attn: Dawn-Marie Bey<br>213 Bayly Ct<br>Richmond, VA 23229-7343<br>804.404.2637<br>dbey@beycotropia.com<br><br>Paul J. Andre<br>KRAMER LEVIN NAFTALIS &<br>FRANKEL LLP<br>990 Marsh Road<br>Menlo Park, CA 94025<br>Telephone: (650) 752-1700<br>Facsimile: (650) 752-1800<br>pandre@kramerlevin.com | FINJAN, INC.<br>1313 N. Market Street<br>Suite 5100<br>Wilmington, DE 19801<br><br>FINJAN, INC.<br>2000 University Ave<br>Suite 600<br>East Palo Alto, CA 94303 |

By:    /James M. Heintz/
James M. Heintz
Reg. No. 41828
Counsel for Petitioner

1

# EXHIBIT 36

Trials@uspto.gov
571-272-7822

Paper No. 9
Entered:  January 28, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SOPHOS, INC.,
Petitioner,

v.

FINJAN, INC.,
Patent Owner.

_____

Case IPR2015-01022
Patent 8,677,494 B2

_____

Before JAMES B. ARPIN, ZHENYU YANG, and
CHARLES J. BOUDREAU, *Administrative Patent Judges*.

BOUDREAU, *Administrative Patent Judge*.

DECISION
Denying Request for Rehearing
*37 C.F.R. § 42.71(d)*

IPR2015-01022
Patent 8,677,494 B2

# I. INTRODUCTION

Sophos, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1, 10, 14, and 18 of U.S. Patent No. 8,677,494 B2 (Ex. 1001, "the '494 patent"). Finjan, Inc. (Patent Owner") filed a Preliminary Response. Paper 6 ("Prelim. Resp."). Pursuant to 35 U.S.C. § 314, we denied institution of *inter partes* review. Paper 7 ("Dec."). Pursuant to 37 C.F.R. § 42.71(d), Petitioner filed a Request for Rehearing (Paper 8, "Reh'g Req."), seeking reconsideration of our Decision Denying Institution with respect to two of the four grounds asserted in the Petition. For the reasons set forth below, Petitioner's Request for Rehearing is *denied*.

# II. BACKGROUND

Petitioner challenged the patentability of claims 1, 10, 14, and 18 of the '494 patent on the following four grounds:

| # | References | Basis | Claim(s) Challenged |
|---|---|---|---|
| 1 | TBAV[1] and Ji[2] | § 103(a) | 1, 10, 18 |
| 2 | TBAV, Ji, and Chen[3] | § 103(a) | 14 |
| 3 | Arnold[4], Chen, and Ji | § 103(a) | 1, 10, 14, 18 |
| 4 | Chen, Arnold, and Ji | § 103(a) | 1, 10, 14, 18 |

Pet. 4. In our Decision Denying Institution, we concluded that the Petition did not establish a reasonable likelihood that Petitioner would prevail in

---

[1] ThunderBYTE Anti-Virus Utilities User Manual (Ex. 1006)
[2] U.S. Patent No. 5,623,600 (Ex. 1009)
[3] U.S. Patent No. 5,951,698 (Ex. 1010)
[4] U.S. Patent No. 5,440,723 (Ex. 1008)

IPR2015-01022
Patent 8,677,494 B2

challenging the patentability of any of the challenged claims on the asserted grounds, and we, accordingly, denied Petitioner's request to institute *inter partes* review. Dec. 11–25. In its Request for Rehearing, Petitioner seeks reconsideration of our Decision Denying Institution with respect to the first two of the asserted grounds set forth above, namely, obviousness of claims 1, 10, and 18 of the '494 patent over TBAV and Ji, and obviousness of claim 14 of the '494 patent over TBAV, Ji, and Chen. Req. Reh'g 1.

## III. DISCUSSION

*1. Standard for Reconsideration*

Under 37 C.F.R. § 42.71(d),

> A party dissatisfied with a decision may file a request for rehearing, without prior authorization from the Board. The burden of showing a decision should be modified lies with the party challenging the decision. *The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, or a reply.*

(emphasis added). When reconsidering a decision on institution, the Board reviews the decision for an abuse of discretion. 37 C.F.R. § 42.71(c). An abuse of discretion occurs when a "decision [i]s based on an erroneous conclusion of law or clearly erroneous factual findings, or . . . a clear error of judgment." *PPG Indus. Inc. v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1567 (Fed. Cir. 1988). A request for rehearing is not an opportunity merely to disagree with the panel's assessment of the arguments or weighing of the evidence, or to present new arguments or evidence. It is not an abuse of discretion to have performed an analysis or reached a conclusion with

3

IPR2015-01022
Patent 8,677,494 B2

which Petitioner disagrees, and mere disagreement with the Board's analysis or conclusion is not a proper basis for rehearing.

### 2. *Overview*

Petitioner asserts two bases for its Request for Rehearing. First, Petitioner argues, "the Board abused its discretion by finding that the Petition failed to establish that TBAV discloses deriving a 'list of suspicious computer operations' through its identification in TBAV of suspicious instructions that perform suspicious operations." Reh'g Req. 1. Second, Petitioner argues, the Board's "construction of 'database' . . . is legal error because it is not the broadest reasonable construction," and "[u]nder the correct broadest reasonable construction, TBAV discloses the storage of security profile data in a 'database.'" *Id.* at 1–2. For the reasons set forth below, we are not persuaded by Petitioner's arguments.

### 3. *"List of Suspicious Computer Operations"*

Each of claims 1 and 10, the two independent claims among the challenged claims, recites, *inter alia*, "deriving security profile data for [a] Downloadable, including a list of suspicious computer operations that may be attempted by the Downloadable." Ex. 1001, 21:21–23, 22:11–13. In our Decision Denying Institution, we determined that TBAV discloses "detecting suspicious instruction sequences within a file and applying heuristic flags to the file," and that heuristic flags could be termed "security profile data for [a] Downloadable." Dec. 13. We explained, however, that "a suspicious computer operation might result from the execution of instructions deemed to be potentially hostile," but that "instructions are not operations." *Id.* at 8 (emphasis omitted). Petitioner argues in the Request for Rehearing that "[t]his is a distinction without a difference, as no

4

IPR2015-01022
Patent 8,677,494 B2

operation can take place without execution of instructions, and the instructions dictate the operations that take place when the instructions are executed." Reh'g Req. 5. According to Petitioner, "the Board misapprehended or overlooked Petitioner's arguments that establish TBAV's heuristic flags indicate suspicious <u>operations</u> and that TBAV <u>lists</u> heuristic flags in a log file." *Id.* at 4–5.

Petitioner's arguments are not persuasive. Notwithstanding Petitioner's current assertions, Petition argued in the Petition that TBAV's heuristic flags are assigned to suspicious *instructions*. *See, e.g.*, Pet. 18–19 (stating that "[TBAV's] heuristic scanner . . . searches for suspicious *instruction sequences*" and that "[h]euristic flags are assigned to suspicious *instructions*, such as *instructions* that are common to viruses but uncommon to normal programs" (emphases added)). Notably missing from the Petition is any argument that TBAV's heuristic flags derive a list of suspicious *operations*. We cannot have misapprehended or overlooked an argument not raised. Although the Petition did use the word "operations" in several parenthetical statements paraphrasing TBAV's descriptions of certain heuristic flags, those references also are provided in the context of illustrating that the heuristic flags indicate suspicious *instructions*, and no argument is provided that the flags instead indicate *operations*:

> TBAV discloses that a heuristic flag is a character indicating a specific type of suspicious *instruction*. For example, the flags include "# - Decryptor code found" (indicating that the file contains *instructions* that perform self-decryption operations", "A – Suspicious Memory Allocation" ("indicating the program contains *instructions* that perform non-standard memory search and/or allocation operations), "B – Back to entry" (indicating the program contains *instructions* that perform endless loop operations), . . . among others.

IPR2015-01022
Patent 8,677,494 B2

Pet. 19 (emphases added) (citations omitted).

Accordingly, we are not persuaded that Petitioner has shown that we misapprehended or overlooked argument or supporting evidence, or both, presented in the Petition, such that it amounted to an abuse of discretion.

*4. "Storing the Downloadable Security Profile Data in a Database"*

Each of independent claims 1 and 10 recites, *inter alia*, "storing the Downloadable security profile data in a database." Ex. 1001, 21:24–25, 22:15–16. In our Decision Denying Institution, we agreed with Patent Owner that the broadest reasonable construction of "database" on the existing record and for purposes of our Decision is "a collection of interrelated data organized according to a database schema to serve one or more applications," which is also the construction adopted by the district court in related litigation between the parties. Dec. 9–10; *Finjan, Inc. v. Sophos, Inc.*, No. 14-cv-01197 (N.D. Cal.), Claim Construction Order at 7 (Ex. 2003, 7); *see Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326–27 (Fed. Cir. 2015).

In its Request for Rehearing, Petitioner asserts that "the Board misapprehended or overlooked Petitioner's arguments that establish not only why the Board's construction is too narrow, but also how the log file is a database storing Downloadable security profile data." Reh'g Req. 8. According to Petitioner, "[w]hile the '494 patent may not explicitly define 'database,' it clearly evidences that a 'database' is broader than 'a collection of interrelated data organized according to a database schema to serve one or more applications.'" *Id.* at 9. Petitioner points, in particular, to portions of the Petition referring to U.S. Provisional Patent Application No. 60/030,639 (Ex. 1005, "the '639 application"), one of several applications from which

6

IPR2015-01022
Patent 8,677,494 B2

the '494 patent purports to claim priority (Ex. 1001, [60]), and argues as
follows:

> As shown in the Petition (Petition at 8 and 10–11), the
> '639 application discloses a security database 240 that "stores
> security policies 305 in a first data storage device 230 portion,
> known Downloadables 307 in a second data storage device 230
> portion and Downloadable Security Profiles (DSPs) data
> corresponding to the known Downloadables 310 in a third-data
> storage device 230 portion." Ex. 1005 at p. 8, ll. 14–19. Storage
> device 230 is described as a device such as a read only memory
> (ROM) or magnetic disk. Ex. 1005 at p. 7, ll. 14–15. The
> intrinsic evidence thus contemplates a database that is simply
> several separate portions of a storage device, each containing
> different types of data. The plain language of the '639
> application suggests <u>nothing more</u> than arranging the data in the
> database 240 into separate <u>portions</u> of the ROM or magnetic disc,
> and does not require or suggest a database schema or any type of
> organization.

Reh'g Req. 9–10.

We disagree. The fact that a database can be *stored in* ROM or on a
magnetic disc does not mean that a database is "simply several separate
portions of a storage device, each containing different types of data."
Moreover, despite Petitioner's assertions, we do not find any such argument
in the Petition. Pages 8 and 10–11 of the Petition, cited by Petitioner, do not
advance any argument concerning construction of the term "database," but
are instead directed to a discussion of a process taught by the
'639 application for examining Downloadables, determining whether they
are hostile (including determining whether they are known, and, if not,
disassembling them to look for code containing suspect commands), and
preventing hostile Downloadables from reaching an inner computer network.
Pet. 8, 10–11. Indeed, apart from a single statement that "[t]he security

IPR2015-01022
Patent 8,677,494 B2

database 240 in the data storage device 230 stores Downloadable security profiles (DSPs)"—regarding the location, rather than the construction, of security database 230 of the '639 patent—the word "database" does not even appear on the cited pages of the Petition.  The discussion of the construction of "database" appears at pages 13–14 of the Petition and states, in its totality, the following:

> **3. "database"** (claims 1 and 10):  Under the BRI, this limitation should be understood to mean "any structured store of data". The '639 application does not define "database", but one of ordinary skill in the art would understand the term "database" to have this meaning. See, e.g., Ex. 1020, p. 29 (wherein database files are given as examples of structured stores of data). This construction is consistent with the disclosure in the '639 application of a data storage device 230 that stores a security database 240.  Ex. 1005, p. 7, ll. 16-20; Ex. 1002 ¶64.  This construction is also consistent with the '494 patent, which teaches "[a]ny suitable explicit or referencing list, database or other storage structure(s) or storage structure configuration(s) can also be utilized to implement a suitable user/device based protection scheme" Ex. 1001, col. 17, ll. 10-14; Ex. 1002 ¶64.

Pet. 13–14.

In our Decision Denying Institution, we addressed and disagreed with Petitioner's unreasonably broad interpretation of "database" as "any structured store of data."  Dec. 9–10.  As we explained, Petitioner cited as evidence that one of ordinary skill in the art would understand "database" to have that meaning a claim construction order from an unrelated district court action, concerning claims of an unrelated patent, which did not construe the term "database" at all.  *Id.*; *see also Mangosoft, Inc. v. Oracle Corp.*, No. 02-545-SM (D.N.H.), Claim Construction Order at 29 (Ex. 1020, 29) (construing the phrase "structured store of data").  Although that claim

IPR2015-01022
Patent 8,677,494 B2

construction order provided database files "as examples of structured stores of data," as Petitioner contends (Pet. 13), we discern no basis in Petitioner's cited evidence to conclude that all structured stores of data are, therefore, databases.  Indeed, the cited claim construction order construed "structured store of data" as "data that are organized in some recognized fashion (e.g., database files, word processing document files, or Web pages) and stored in the volatile and/or non-volatile memory of the various nodes participating in the shared memory system."  Ex. 1020, 29.  Thus, if we were to adopt Petitioner's interpretation of database as "any structured store of data," that would lead to the conclusion in view of Petitioner's cited evidence that a database is "any [data that are organized in some recognized fashion (e.g., database files, word processing document files, or Web pages) and stored in the volatile and/or non-volatile memory of the various nodes participating in the shared memory system]."  We are not persuaded that "word processing document files" and "Web pages" are databases, although they presumably may be "organized in some recognized fashion" and "stored in volatile and/or non-volatile memory"; nor would it be helpful to interpret database circularly as "any . . . database files."

Petitioner's arguments that its proposed construction is consistent with the disclosure in the '639 application and the '424 patent are also unpersuasive.  First, the fact that security database 240 of the '639 application is stored in data storage device 230 does not broaden the scope of the term "database" beyond its ordinary and customary meaning.  Second, the reference to "database or other storage structure(s)" in the passage of the '494 patent cited by Petitioner does not imply that "*any* structured store of data" is a database.

9

IPR2015-01022
Patent 8,677,494 B2

In its Request for Rehearing, Petitioner contends that "Patent Owner's own evidence provides additional reasonable definitions for 'database' that are broader than the Board's construction." Reh'g Req. 10 (citing Ex. 2002, 3). According to Petitioner, one such definition, "a collection of data fundamental to a system," is the broadest reasonable definition of "database." *Id.* Petitioner asserts that, by construing "database" as "a collection of interrelated data organized according to a database schema to serve one or more applications," the Board misapprehended or overlooked the Petitioner's evidence as laid out in the Petition. Reh'g Req. 13. As explained above, however, we could not have misapprehended or overlooked evidence that was not presented in the Petition.

Having considered Petitioner's Request for Rehearing in its entirety, we remain unpersuaded by the evidence cited in the Petition for Petitioner's assertions that TBAV and the combination of TBAV and Ji teach or suggest storing security profile data in a database.

For the foregoing reasons, Petitioner has not demonstrated that we abused our discretion by not instituting *inter partes* review of claims 1, 10, 14, and 18 of the '494 patent.

## IV. ORDER

For the reasons given, it is

ORDERED that Petitioner's Request for Rehearing is *denied.*

IPR2015-01022
Patent 8,677,494 B2

For PETITIONER:

James Heintz
Nicholas J. Panno
DLA PIPER (US) LLP
Sophos-Finjan-494IPR@dlapiper.com


For PATENT OWNER:

James Hannah
Michael H. Lee
Paul J. Andre
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jhannah@kramerlevin.com
mhlee@kramerlevin.com
pandre@kramerlevin.com

# EXHIBIT 37

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

SOPHOS INC.,

Petitioner
v.

FINJAN, INC.,

Patent Owner

---

CASE IPR Unassigned

Patent No. 7,613,926

---

## PETITION FOR
## *INTER PARTES* REVIEW OF U.S. PATENT NO. 7,613,926

**Mail Stop "PATENT BOARD"**
Patent Trial & Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA  22313-1450

# TABLE OF CONTENTS

**Page**

I.    Introduction...................................................................................................1

II.   Formalities ...................................................................................................1

    A.    Mandatory notices (37 C.F.R. § 42.8)..............................................1

III.  Relief Requested and identification of the challenge.....................................3

IV.   Summary of the '926 Patent .........................................................................4

    A.    Specification and Challenged Claims of the '926 Patent...................4

    B.    Prosecution History of the '926 Patent .............................................7

    C.    The priority date for the Challenged Claims is May 17, 2000............8

        1.    Applicable Law ......................................................................9

        2.    The related '962 patent does not describe or enable the "transmitting the incoming Downloadable and a representation of the retrieved Downloadable security profile data to a destination computer, via a transport protocol transmission." .........................................................10

        3.    Neither the '780 patent nor the '194 patent disclose or enable under 35 U.S.C. §112 the transmitting limitations of Challenged Claims 15 and 22.............................................12

        4.    The USPTO has denied the '822 patent ('926 patent's parent) priority beyond May 17, 2000, for exactly the same reasons ..........................................................................15

V.    Level of Ordinary Skill in the Art ...............................................................16

    A.    Person of ordinary skill in the art ("POSITA").................................16

        1.    A POSITA would have been aware of and had experience using databases indexed by the result of a hash function, which was notoriously well-known ................16

        2.    A POSITA would have been aware of and had experience with Downloadables that include program script.......................................................................................21

# TABLE OF CONTENTS
(continued)

Page

3.    A POSITA would have been aware of and had experience with executable code that includes suspicious computer operations includes calls made to an operating system, a file system, a network system, and to memory ........ 22

VI.   Claim Construction ........................................................................ 24

1.    "database" (claims 15 and 22) .................................................. 24

2.    "Downloadable" (claims 15, 18, 19, and 22) ........................... 25

3.    "Downloadable security profile data" (claims 15 and 22) ....... 26

4.    "a representation of the retrieved Downloadable security profile data" (claims 15 and 22) ................................................ 26

5.    "receiver," "Downloadable identifier," "database manager," and "transmitter coupled with said receiver" (claim 22) ............................................................................... 27

VII.  State of the Art Prior to the '926 Patent ........................................ 28

VIII. Detailed Explanation of the Grounds for Rejection ...................... 29

A.   Reasonable Likelihood that Petitioner will Prevail ............................ 29

B.   Ground One: Ji in view of Knuth and Hruska Renders the Challenged Claims obvious under 35 U.S.C. § 103 .......................... 29

C.   Ground Two:  Mueller in View of Ji, Knuth, and Hruska Renders the Challenged Claims Obvious Under 35 U.S.C. § 103 ............................................................................................... 40

IX.   The Grounds for Challenge are Not Redundant ........................................ 53

X.    Conclusion ................................................................................... 53

-ii-

# TABLE OF AUTHORITIES

**Page**

## CASES

*Boston Scientific Corp. v. Johnson & Johnson*,
  647 F.3d 1353 (Fed. Cir. 2011) ..........................................................................21

*Chiron Corp. v. Genentech, Inc.*,
  363 F.3d 1247 (Fed. Cir. 2004) ..............................................................9, 11, 14

*Cordance Corp. v. Amazon.com, Inc.*,
  658 F. 3d 1330 (Fed. Cir. 2011) ..............................................................9, 11, 14

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*,
  807 F.2d 955 (Fed. Cir. 1986) ..........................................................................16

*Finjan, Inc. v. Palo Alto Networks, Inc.*,
  Case No. 3:14-cv-4908 (N.D. Cal.) ....................................................................2

*Finjan, Inc. v. Sophos Inc.*,
  3:14-1197 (N.D. Cal.) ........................................................................................1

*Finjan, Inc. v. Symantec Corp.*,
  Case No. 3:14-cv-2998 (N.D. Cal.), and (3)....................................................1, 2

*In Motorola Mobility LLC v. Michael Arnouse*,
  IPR2013-00010, Notice 20 (PTAB Jan. 30, 2013)..............................................3

*In re NTP, Inc.*,
  654 F.3d 1268 (Fed. Cir. 2011) ..............................................................9, 11, 14

*Lizardtech, Inc. v. Earth Resource Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005) ..........................................................................9

*SAP America, Inc. v. Pi-Net Int'l, Inc.*,
  IPR204-00414 (Paper 11, Aug. 18, 2014) ........................................................10

# TABLE OF AUTHORITIES
## (continued)

**Page**

### STATUTES

35 U.S.C. § 102(a) ...........................................................................................29

35 U.S.C. § 102(e) ...................................................................................7, 29, 40

35 U.S.C. § 103................................................................................................passim

35 U.S.C. § 112.................................................................................9, 10, 12, 20

35 U.S.C. § 311................................................................................................3

35 U.S.C. §§ 311-19.........................................................................................1

35 U.S.C. § 314(a) ..........................................................................................29

35 U.S.C. § 315(b) ..........................................................................................3

### OTHER AUTHORITIES

37 C.F.R. 42.100(b) .........................................................................................24

37 C.F.R. § 41.39(a)(1).....................................................................................15

37 C.F.R. § 42.1 et seq.....................................................................................1

37 C.F.R. § 42.8 .............................................................................................1

37 C.F.R. § 42.15(a) .......................................................................................2

37 C.F.R. §§ 42.22 ..........................................................................................3

37 C.F.R. § 42.104 ...........................................................................................3

37 C.F.R. §§ 42.104(b) ...................................................................................29

37 C.F.R. § 42.104(b)(3)...................................................................................24

## Table of Exhibits

| Exhibit | Description | Short Name |
|---------|-------------|------------|
| 1001 | U.S. Pat. No. 7,613,926 | '926 patent |
| 1002 | File History for U.S. Pat. No. 7,613,926 | |
| 1003 | Declaration of Charles Sauer | Sauer Decl. |
| 1004 | U.S. Pat. No. 5,983,348 | '348 patent or Ji |
| 1005 | U.S. Pat. No. 6,263,442 | '442 patent or Mueller |
| 1006 | CV of Charles Sauer, Ph.D. | Sauer CV |
| 1007 | *Finjan v. McAfee et al.*, 10-cv-593-GMS (Dkt. No. 840) (Sep. 19, 2013) | Finjan I Order |
| 1008 | Complaint of Patent Infringement, *Finjan, Inc. v. Sophos Inc.*, 14-cv-1197, ECF No. 1 (N.D. Cal. March 14, 2014) | Complaint |
| 1009 | Proof of Service of Summons on March 19, 2014, *Finjan, Inc. v. Sophos Inc.*, 14-cv-1197, ECF No. 11(N.D. Cal. March 31, 2014) | Summons |
| 1010 | U.S. Patent No. 7,058,822 | '822 patent |
| 1011 | U.S. Application No. 09/861,229 | '229 application |
| 1012 | U.S. Patent No. 6,804,780 | '780 patent |
| 1013 | U.S. Patent No. 6,092,194 | '194 patent |
| 1014 | U.S. Patent No. 6,480,962 | '962 patent or the "related '962 patent" |
| 1015 | *Finjan v. McAfee et al.* Verdict Form | Jury Verdict Form |
| 1016 | *Finjan v. McAfee et al.* Judgment | District Court Judgment |
| 1017 | *Finjan v. McAfee et al.* Affirmance | Fed. Cir. Affirmance |
| 1018 | September 8, 2014 Final Rejection of US Patent No. 7,058,822 in *ex parte* Reexamination No. 90/013,017 | 9/8/14 Rejection |
| 1019 | Decision on Petition for Priority Claim in | Ex Parte Petition |

| Exhibit | Description | Short Name |
|---------|-------------|------------|
| | *ex parte* Reexamination No. 90/013,017 | |
| 1020 | *Finjan, Inc. v. Sophos Inc.*, 14-cv-1197 – Finjan Infringement Contentions Cover Pleading | Patent Owner's Infringement Contentions |
| 1021 | October 8, 2014 Petition in Response to Final Rejection in *ex parte* Reexamination No. 90/013,017 | 10/8/14 Petition |
| 1022 | December 8, 2014 Notice of Appeal in *ex parte* Reexamination No. 90/013,017 | 12/8/14 Notice of Appeal |
| 1023 | February 2, 2015 Denial of 10/8/14 Petition in *ex parte* Reexamination No. 90/013,017 | 2/2/15 Denial |
| 1024 | February 9, 2015 Finjan Appeal Brief in *ex parte* Reexamination No. 90/013,017 | Patent Owner Appeal Brief |
| 1025 | Donald E. Knuth, *The Art of Computer Programming*, Vol. 3 (1st Ed., 1973) | Knuth 1973 (collectively with Knuth 1998, "Knuth") |
| 1026 | Donald E. Knuth, *The Art of Computer Programming*, Vol. 3 (2nd Ed., 1998) | Knuth 1998 (collectively with Knuth 1973, "Knuth") |
| 1027 | Jan Hruska, *Computer Viruses and Anti-Virus Warfare*, vol. 2 (1992) | Hruska |
| 1028 | J. Steven Fritzinger, Marianne Mueller, *Java Security*, 1996 | Fritzinger *Java Security* |
| 1029 | Correction of Inventorship U.S. Patent 7,058,822 | '822 Inventorship Correction |
| 1030 | *Finjan v. McAfee et al.*, 10-cv-593-GMS (Dkt. No. 144) (Nov. 21, 2011) | Finjan I Opening Claim Construction Brief |
| 1031 | Prov. App. No. 60/205,591 | '591 Provisional |
| 1032 | Graphic of Priority Claims of U.S. Patent No. 7,613,926 | '926 Patent Family |
| 1033 | *Finjan, Inc. v. Sophos Inc.*, 14-1197-WHO (Dkt. No. 73) (March 2, 2015) | Finjan II Claim Construction Order |
| 1034 | "100 or so Books that Shaped a Century of Science," American Scientist, Vol. 87, No. 6, pp. 542-544, 546, 549-550, 553 (Nov.-Dec. 1999) | |

| Exhibit | Description | Short Name |
|---------|-------------|------------|
| 1035 | Obituary of Frances E. Holberton, 84, "Early Computer Programmer," published December 17, 2001 | |
| 1036 | Definition of "database" from IEEE Std 100-1996 | |
| 1037 | Gary McGraw and Edward W. Felton, "Java Security—Hostile Applets, Holes, and Antidotes," | McGraw/Felten *Java Security* |

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

## I.      INTRODUCTION

Pursuant to 35 U.S.C. §§ 311-19 and 37 C.F.R. § 42.1 et seq., Sophos Inc. ("Petitioner") hereby requests that the United States Patent and Trademark Office ("USPTO") Patent Trial and Appeal Board institute an *inter partes* review of claims 15, 18, 19 and 22 (the "Challenged Claims") of U.S. Pat. No. 7,613,926 patent (Ex. 1001) ("'926 patent") and find those claims unpatentable on each of the grounds identified in this petition.  As will be explained in further detail herein, the examiner allowed the Challenged Claims over one prior art reference cited in this Petition – the Ji patent - solely on the basis of a "hashing limitation" requiring the use of a hash function to form an index for retrieving data.  However, the use of hash functions to form indices for data retrieval was well-known in the art long before the '926 patent.  When prior art disclosing such use of hash functions is considered in combination with the Ji patent, the Challenged Claims are obvious.

## II.      FORMALITIES

### A.      Mandatory notices (37 C.F.R. § 42.8)

***Real party-in-interest***. Sophos Inc. and its parent which wholly owns Sophos Inc., Sophos Limited, are the only real parties-in-interest.

***Related matters***. A decision in this proceeding would affect or be affected by the following matters where Finjan is asserting the '926 patent: (1) *Finjan, Inc. v. Sophos Inc.*, 3:14-1197 (N.D. Cal.), (2) *Finjan, Inc. v. Symantec Corp.*, Case No.

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

3:14-cv-2998 (N.D. Cal.), and (3) *Finjan, Inc. v. Palo Alto Networks, Inc.*, Case No. 3:14-cv-4908 (N.D. Cal.).

**_Lead and back-up counsel_**. Lead counsel is Jim Heintz, Reg. No. 41,828. Back-up counsel is Jeffrey R. Cole, Reg. No. 56,052 and Ryan W. Cobb, Reg. No. 64,598.

**_Power of attorney and service information_**. Petitioner submitted a power of attorney with this petition. Both lead and back-up counsel (1) agree to accept electronic service at the address, "Sophos-Finjan-926IPR@dlapiper.com" and (2) may be served hardcopies at the mailing address: DLA Piper (US) LLP, 11911 Freedom Drive, Suite 300 Reston, VA  20190.  Lead counsel may be reached at (703) 773-4148 (phone) and (703) 773-5200 (fax); back-up counsel at DLA Piper (US) LLP 401 Congress Ave., Suite 2500 Austin, TX 78701-3799  (512) 457-7000 (phone) and (512) 457-7001 (fax), and back-up counsel at DLA Piper (US) LLP, 2000 University Ave., East Palo Alto, CA 94303-2215, (650) 833-2235 (phone) and (650) 687-1167 (fax).  As the Certificate of Service indicates, Petitioner served a copy of this petition and its exhibits by overnight carrier to Patent Owner and the Patent Owner's attorney of record at the address listed in the USPTO's records.

**_Fee_**. The undersigned authorized the Director to charge the fee specified by 37 C.F.R. § 42.15(a) and any additional fees that might be due in connection with this Petition to Deposit Account No. 50-1442.

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

**_Grounds for standing_**. In accordance with 35 U.S.C. § 315(b) and 37 C.F.R. § 42.104, Petitioner certifies that the '926 patent is available for *inter partes* review and that Petition is neither barred nor estopped from requesting an *inter partes* review challenging the claims on grounds below.  Petitioner has not filed a civil action challenging the validity of a claim of the '926 patent.  Neither Petitioner nor any privy, including all real parties in interest, was served with a complaint alleging infringement of the '926 patent more than one year before Petitioner filed this petition.  *See* Exs. 1008 and 1009; *see also In Motorola Mobility LLC v. Michael Arnouse*, IPR2013-00010, Notice 20 (PTAB Jan. 30, 2013).

## III.   RELIEF REQUESTED AND IDENTIFICATION OF THE CHALLENGE

In accordance with 35 U.S.C. § 311 and 37 C.F.R. §§ 42.22 and 42.104(b), Petitioner requests the Patent Trial and Appeal Board institute an *inter partes* review of the Challenged Claims on the following grounds:

**_Ground #1_**. The Challenged Claims are unpatentable under 35 U.S.C. § 103 (pre-AIA) as being rendered obvious by U.S. Patent No. 5,983,348  (Ex. 1004, "Ji") in view of Donald E. Knuth, *The Art of Computer Programming*, Vol. 3 (1973) (Ex. 1025, "Knuth") and Jan Hruska, *Computer Viruses and Anti-Virus Warfare*, vol. 2 (1992) (Ex. 1027, "Hruska").

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

**<u>Ground #2</u>**. The Challenged Claims are unpatentable under 35 U.S.C. § 103 (pre-AIA) as being rendered obvious by U.S. Patent No. 6,263,442 to Mueller, et al. (Ex. 1005, "Mueller") in view of Ji, Knuth, and Hruska.

## IV.  SUMMARY OF THE '926 PATENT

### A.    Specification and Challenged Claims of the '926 Patent

The '926 patent, entitled "Method and System for Protecting a Computer and a Network From Hostile Downloadables," issued on November 3, 2009, from App. No. 11/370,114. Ex. 1001 at 1. The Challenged Claims are independent claims 15 (a method claim) and 22 (a system claim version of claim 15) and dependent claims 18 and 19 (both of which depend from 15). Claim 15 is representative:

> 15.[pre] A computer-based method, comprising the steps of:
>
> [a] receiving an incoming Downloadable; [the "**receiving limitation**"]
>
> [b] performing a hashing function on the incoming Downloadable to compute an incoming Downloadable ID; [the "**hashing limitation**"]
>
> [c] retrieving security profile data for the incoming Downloadable from a database of Downloadable security profiles indexed according to Downloadable IDs, based on the incoming Downloadable ID, the security profile data including a list of suspicious computer operations that may be attempted by the Downloadable; [the "**retrieving limitation**] and

- 4 -

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

[d] transmitting the incoming Downloadable and a representation
of the retrieved Downloadable security profile data to a
destination computer, via a transport protocol transmission. [the
"**transmitting limitation**"]

The first paragraph of the Detailed Description provides the context for
claim 15 in unnecessarily convoluted terms. Ex. 1001 at 5:38-63. The disclosed
"downloadable-information," "detected-Downloadable," and "Downloadable" are
all the claimed "Downloadable;" the disclosed "Downloadable-destination" and
"information-destination" are both the claimed "destination computer;" and the
disclosed "mobile protection code ("MPC") and downloadable protection policies"
are the claimed "representation of the retrieved Downloadable security profile
data." Ex. 1001 at 2:27-4:49; Ex. 1003 at ¶¶ 38-40.

Figures 1B and 1C illustrate what happens in claims 15 and 22:



FIG. 1b            FIG. 1c

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

Ex. 1003 at ¶ 41.  The figures clarify the scope of the Challenged Claims:

1.  A server ("ISP-Server 140a" or "Corporate Server 140b") receives an incoming Downloadable ("D"); *see, e.g.,* Ex. 1001 at Figs. 1b & 1c and claim limitation 15[a]; *see also* Ex. 1003 at ¶ 42;

2.  A protection engine ("Protection Engine (PE) 142a" or "PE 142b") running on the server performs a hashing function on the Downloadable to compute a Downloadable ID (note that the word "hash" does not appear in the specification); *see, e.g.,* Ex. 1001 at Figs. 1b & 1c and claim limitation 15[b]; *see also* Ex. 1003 at ¶ 43;

3.  The protection engine uses the Downloadable ID to retrieve a security profile that determines how the destination computer should handle any suspicious computer operations that the Downloadable might attempt; *see, e.g.,* Ex. 1001 at Figs. 1b & 1c and claim limitations 15[c]; *see also* Ex. 1003 at ¶ 44; and,

4.  The protection engine then transmits the Downloadable with a representation of the retrieved security profile ("MPC, D") to a destination computer ("User Device-n 145"); *see, e.g.,* Ex. 1001 at Figs. 1b & 1c and claim limitation 15[c]; *see also* Ex. 1003 at ¶ 45.

In other words, a server receives a Downloadable, retrieves the appropriate security profile for that Downloadable by performing a hash on the Downloadable, and then

sends to the destination computer both the Downloadable, and then sends to the destination computer both the Downloadable and a representation of the security profile for the Downloadable.  Ex. 1003 at ¶¶ 38-46.

### B.    Prosecution History of the '926 Patent

The application for the '926 patent, U.S. App. No. 11/370,114 ("'114 application"), was filed on March 7, 2006.

In the first and only Office Action on the '114 application, dated February 25, 2009, the examiner rejected all but two of the originally filed claims as anticipated by Ji under 35 U.S.C. § 102(e). *See* Ex. 1002 at 123 and 127-30. The two claims not rejected as anticipated by Ji were dependent claims including a limitation requiring hashing—a limitation that ultimately appears in the Challenged Claims.  *Id.*  In its May 26, 2009, Amendment and Response, the applicant did not traverse in any way any of the examiner's rejections based on Ji.  *Id.* at 143-64. Rather, the applicants simply amended all of the claims to include the "hashing" limitation. *Id.*  The examiner issued a Notice of Allowance and Fee(s) Due on Aug. 6, 2009, and an Issue Notification on Nov. 3, 2009.  Ex. 1002 at 219 and 248.

Therefore, according to the examiner, the "hashing" limitation is the only point of novelty in the Challenged Claims and the only distinction between those claims and Ji. As Petitioner demonstrates in the grounds below, the examiner was correct that Ji anticipated the receiving, retrieving, and transmitting limitations as

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

well as the "program script" and "suspicious operations" limitations.  However, the examiner failed to recognize that the use of "hashing" in searching and sorting was notoriously well-known to one of ordinary skill in the art at the time of the alleged invention of the '926 patent.  Ex. 1003 at ¶¶ 47-49.  Thus, as shown below, the Challenged Claims should not have been allowed.

### C.     The priority date for the Challenged Claims is May 17, 2000.

The '926 patent is a continuation of U.S. App. No. 09/861,229 ("'229 application"), which issued as U.S. 7,058,822 ("'822 patent").  Ex. 1010 at page 1. The '926 patent further claims priority to an extended lineage of patents and applications that includes provisional application no. 60/205,591 (the "Provisional Application"), the '780 patent, and the '194 and related '962 patents (Ex. 1001 at page 1 and 1:5-32; Ex. 1013 at page 1 and 1:5-12; and, Ex. 1014 at page 1 and 1:5-17), both of which were invalidated in litigation involving an infringement suit brought by Finjan against Sophos (among other defendants) in the District of Delaware, which was affirmed by the Federal Circuit without comment. Exs. 1007, 1015-17.  The '926 patent's priority claims are graphically illustrated in Exhibit 1032. *See* Ex. 1032.

Despite these extensive priority claims, the Challenged Claims cannot claim priority earlier than the May 17, 2000 filing date of provisional app. no. 60/205,591 because none of the related '962, '780, or '194 patents describe or

enable the transmitting limitations of the Challenged Claims. *See* Ex. 1001 at 22:1-4, 22:32-35.  Ex. 1003 at ¶¶ 47, 50-51.

### 1.    **Applicable Law**

To comply with the written description requirement of 35 U.S.C. §112, the specification must "describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, *i.e.*, that the patentee invented what is claimed."  *Lizardtech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005). Where the priority claim involves continuations and continuations-in-part, any claims in the new application not supported by the specification and claims of the parent application have the effective filing date of the new application. *See Cordance Corp. v. Amazon. com, Inc.*, 658 F. 3d 1330, 1334-35 (Fed. Cir. 2011) (holding that a patent could not claim priority back to an application that did not disclose all of the patent's claimed elements); *see also Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1253-55 (Fed. Cir. 2004) (concluding a patent cannot claim priority to an application that does not meet the requirements of 35 U.S.C. §112) and *In re NTP, Inc.*, 654 F.3d 1268, 1277 (Fed. Cir. 2011) ("[u]nder § 120, a patent is entitled to the priority date of an earlier filed application if (1) the written description of the earlier filed application discloses the invention claimed in the

later filed application sufficient to satisfy the requirements of § 112 . . ."). Ex. 1003 at ¶¶ 52-53.

A challenge to the priority date of the '926 patent in an AIA proceeding is not an impermissible challenge the patentability of the '926 patent under 35 U.S.C. §112.  Indeed, the Board has previously found that such a challenge to a priority date is properly raised in a petition for *inter partes* review.  *See* IPR2014-00414 – *SAP America, Inc. v. Pi-Net Int'l, Inc.*, (Paper 11, Aug. 18, 2014) at 13-14;  Ex. 1003 at ¶ 52-54.

> ## 2. The related '962 patent does not describe or enable the "transmitting the incoming Downloadable and a representation of the retrieved Downloadable security profile data to a destination computer, via a transport protocol transmission."

The Challenged Claims are not entitled to the priority date of the related '962 patent because the related '962 patent does not describe or enable the transmitting limitations of Challenged Claims 15 and 22 in accordance with 35 U.S.C. § 112.

The related '962 patent discloses a security system that (1) runs on the destination computer itself (rather than a server); (2) maintains the system's security rules and policies; (3) receives a Downloadable; (4) applies those rules and policies to the Downloadable by monitoring its execution; interrupts any suspicious requests made to the operating system; and (4) responds to those

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

suspicious requests based on the applicable rules and policies. *See, e.g.,* Ex. 1014 at Abstract ("The system includes an interface for receiving incoming Downloadable …"); Figs. 1, 3, 4, 5 & 7; 2:24-35 ("The [invention's] method includes the steps of recognizing a request made by a Downloadable during runtime, interrupting processing of the request, comparing information pertaining to the Downloadable against a predetermined security policy, recording all rule violations in a log, and performing a predetermined responsive action based on the comparison."); 5:3-13 (describing that a user on the destination computer can use "GUI 324 … to add or modify the rules 330 of the security database 326, the policies 332 of the security database 326 and the suspicious applets of the suspicious Downloadables database 328."); and claims 1, 12, 22, 33, 48 and 50; *see also* Ex. 1003 at ¶ 56.

Nothing disclosed in the related '962 patent ever transmits "a representation of the retrieved Downloadable security profile data to a destination computer, via a transport protocol transmission" because the destination computer does everything—receives the downloadable and applies the security rules (which are resident on the destination computer). Ex. 1003 at ¶ 57. Thus, the related '962 does not disclose or enable the transmitting limitation. *Id.*

Because nothing in the related '962 patent discloses or enables the transmitting limitation, the Challenged Claims are not entitled to the priority date

of the related '962 patent.  *See e.g.*, *Chiron Corp.*, 363 F.3d at 1253-55; *see also*, *Cordance Corp.*, 658 F.3d at 1334; *In re NTP, Inc.*, 654 F.3d at 1277; Ex. 1003 at ¶¶ 55-58.

>  **3.     Neither the '780 patent nor the '194 patent disclose or enable under 35 U.S.C. §112 the transmitting limitations of Challenged Claims 15 and 22**

The '780 patent claims to be a continuation of the '194 patent (*see, e.g.,* Ex. 1012 at 1:5-15) and their figures and specifications are substantively identical. *See, generally,* Exs. 1012-13; *see also* Ex. 1003 at ¶ 59.  The specifications generally disclose using an internal network security system (*e.g.*, a server or gateway) that sits between an external network and an internal network and that runs a security program that enforces security policies on Downloadables it receives from the external network. *See* Ex. 1012 at 2:29-35 [Ex. 1013 at 2:21-27] (including, "The method comprises the steps of receiving a Downloadable, comparing the Downloadable against a security policy to determine if the security policy has been violated, and discarding the Downloadable if the security policy has been violated."); Exs. 1012 and 1013 at Figs. 1, 2, and 3; Ex. 1012 at 3:8-31 [Ex. 1013 at 2:66-3:22] (describing Fig. 1 including, "The internal network security system 110 examines Downloadables received from external computer network 105, and prevents Downloadables deemed suspicious from reaching the internal computer network 115."); Ex. 1012 at 3:32-4:3 [Ex. 1013 at 3:23-61] (describing Fig. 2); and

Ex. 1012 at 4:4-33 [Ex. 1013 at 3:62-4:24] (describing Fig. 3); *see also* Ex. 1003 at ¶ 60.

The '780 patent and '194 patent disclose that (1) if the Downloadable conforms with the security policies, then the security program sends the Downloadable to the destination computer; and, (2) if the Downloadable does not conform, then the security program blocks the incoming Downloadable and sends a substitute Downloadable to the destination computer. *See* Exs. 1012 and 1013 at Figs. 3 and 6C; Ex. 1012 at 4:4-33 [Ex. 1013 at 3:62-4:24] (describing Fig. 3); Ex. 1012 at 9:11-34 [Ex. 1013 at 8:63-9:19] (describing Fig. 6C); and, Ex. 1012 at 7:9-16 [Ex. 1013 at 6:62-7:2] ("If the policy selector 405 indicates that the Downloadable may pass, then the logical engine 333 passes the Download able to its intended recipient. Otherwise, if the policy selector 405 indicates that the Downloadable should be blocked, then the logical engine 333 forwards a non-hostile Downloadable to the intended recipient to inform the user that internal network security system 110 discarded the original Downloadable."); *see also* Ex. 1003 at ¶ 61.

If the Downloadable conforms with the policies, then the security program transmits only the Downloadable but never transmits "a representation of the retrieved Downloadable security profile data;" and, if the Downloadable does not

conform, then the security program transmits only the substitute Downloadable but never transmits the Downloadable. *See* Ex. 1003 at ¶ 62.

Just as with the specification, none of the claims in the '780 and '194 patent describe or enable the transmitting limitations. Ex. 1003 at ¶ 63. The claims of the '780 patent are all directed to various systems, methods, and apparatus for generating a Downloadable ID by obtaining a Downloadable, fetching at least one software component of the Downloadable, and then performing a hashing function on the Downloadable and fetched components to generate a Downloadable ID. *See* Ex. 1012 at claims 1-18; *see also* Ex. 1003 at ¶ 64. The claims of the '194 patent are generally directed to systems, methods, and apparatus in which an internal network security system (*i.e.* a server) receives and incoming Downloadable, compares the Downloadable to a security profile, and prevents execution of the Downloadable if it violates the security policy. *See* Ex. 1013 at claims 1-68; *See* Ex. 1003 at ¶ 65. None of the claims of either patent describe or enable "transmitting [an] incoming Downloadable and a representation of [a] retrieved Downloadable security profile data to a destination computer, via a transport protocol transmission." *See* Ex. 1003 at ¶¶ 63-66.

Because nothing in either the '780 or '194 patents describes or enables the transmitting limitation, the Challenged Claims are not entitled to the priority date

of either patent. *See e.g.*, *Chiron Corp.*, 363 F.3d at 1253-55; *see also*, *Cordance Corp.*, 658 F.3d at 1334; *In re NTP, Inc.*, 654 F.3d at 1277; Ex. 1003 at ¶¶ 63-67.

**4.     The USPTO has denied the '822 patent ('926 patent's parent) priority beyond May 17, 2000, for exactly the same reasons**

In the *ex parte* reexamination of the '822 patent, the USPTO determined that certain claims of the '822 patent at issue had an earliest effective filing date of May 17, 2000, and could not obtain any earlier priority because the claims required "causing mobile protection code to be communicated to at least one information-destination of the downloadable-information" and that requirement is not described or enabled in the related '962, '780, or '194 patents.  Ex. 1018 at 5-7.  The patent owner has conceded the issue of the '822 patent's priority date by failing to raise it in its brief in that reexamination.  *See* Ex. 1022 at 10 (fn. 8) and 12; *see generally* Ex. 1024 (never seeking to appeal the priority date issue) at 8 (fn. 6); *see also* MPEP 1205.02 ("If a ground of rejection stated by the examiner is not addressed in the appellant's brief, appellant has waived any challenge to that ground of rejection and the Board may summarily sustain it, unless the examiner subsequently withdrew the rejection in the examiner's answer. *See* 37 C.F.R. § 41.39(a)(1).").

Applying this same reasoning here, the Challenged Claims have an earliest effective filing date of May 17, 2000.  *See* Section IV.A., above (the "MPC" in

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

Figs. 1b and 1c is the "mobile protection code" that the related '962, '780, and '194 patents neither describe nor enable); *see also* Ex. 1003 at ¶ 68.

For all of the reasons set forth above, May 17, 2000, is the earliest effective filing date of the Challenged Claims. Ex. 1003 at ¶¶ 50-68.

## V.     LEVEL OF ORDINARY SKILL IN THE ART

### A.     Person of ordinary skill in the art ("POSITA")

A person of ordinary skill in the art ("POSITA") is a hypothetical person who is presumed to have known the relevant art at the time of the invention. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986) ("The person of ordinary skill is a hypothetical person who is presumed to be aware of all the pertinent prior art.")  A POSITA at the time of the alleged invention of the '926 patent would generally have a bachelor's degree or the equivalent in computer science, computer engineering, or a related degree, and three to four years of experience in the fields of Internet software and (including anti-virus and other malware), or equivalent work experience. Ex. 1003 at ¶ 69. This person would have been capable of understanding and applying the prior art references discussed herein. Ex. 1003 at ¶ 70.

### 1.     A POSITA would have been aware of and had experience using databases indexed by the result of a hash function, which was notoriously well-known

Donald E. Knuth's *The Art of Computer Programming, Vols. 1-4*, with Volume Three published as early as 1973, is a comprehensive treatise on the

subject of computer programming. Ex. 1025 at 5-6; Ex. 1003 at ¶ 71.  In 1999, *American Scientist* included the treatise in its list of "100 or so Books that Shaped a Century of Science." Ex. 1034 (American Scientist, Vol. 87, No. 6, pp. 542-544, 546, 549-550, 553 [Nov.-Dec. 1999].)  It is undeniable that a POSITA would have been aware of the teaching of Knuth's treatise. *See* Ex. 1035 at 1 (quoting Donald Knuth and referring to his treatise as "the profession's defining treatise"); *see also* Ex. 1003 at ¶¶ 71-72, 74-75.

In the introduction to the 1973 edition's Chapter 6, "Searching," Knuth writes:

> This chapter might have been given the more pretentious title, "Storage and Retrieval of Information"; on the other hand, it might simply have been called "Table Look-Up." We are concerned with the process of collecting information in a computer's memory, and with the subsequent recovery of that information as quickly as possible. Sometimes we are confronted with more data than we can really use, and it may be wisest to forget and to destroy most of it; but at other times it is important to retain and organize the given facts in such a way that fast retrieval is possible.

Ex. 1025 at 9. The 1998 edition is the same. Ex. 1026 at 11. Knuth continues:

> In general, we shall suppose that a set of $N$ records has been stored, and the problem is to locate the appropriate one. As in the case of sorting, we assume that each record includes a special field called its *key* . . . We generally require the $N$ keys to be distinct, so that each

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

key uniquely identifies its record. The collection of all records is called a table or a file, where the word 'table' is usually used to indicate a small file, and 'file' is usually used to indicate a large table. A large file or a group of files is frequently called a *data base*.

Algorithms for searching are presented with a so-called *argument*, $K$, and the problem is to find which record has $K$ as its key. After the search is complete, two possibilities can arise: Either the search was *successful*, having located the unique record containing $K$, or it was *unsuccessful*, having determined that $K$ is nowhere to be found. After an unsuccessful search it is sometimes desirable to enter a new record, containing $K$, into the table; a method which does this is called a "search and insertion" algorithm. . . . [W]e shall study techniques for searching on a conventional general-purpose digital computer.

Ex. 1025 at 9.  The 1998 edition is the same. Ex. 1026 at 11.

Section 6.4 of the Knuth treatise describes in detail the theory and application of hashing functions to searching and table look-up.  Ex. 1003 at ¶ 72. Knuth describes that "[t]he verb 'to hash' means to chop something up or to make a mess out of it; the idea in hashing is to chop off some aspects of the key and to use this partial information as the basis for searching." Ex. 1025 at 40. Knuth also describes how hashing appears to have originated in 1953 and was first described in the open literature in 1956.  *Id.* at 73-74. Knuth notes a classic paper (1957) and comprehensive survey (1963). *Id.* According to Knuth, "[d]uring the next few years hashing became very widely used, but hardly anything more was published

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

about it." *Id.* Then, in 1968, "Robert Morris wrote a very influential survey of the subject," which "touched off a flurry of activity which culminated in Algorithm D and its refinements." *Id.* Knuth underscores how well-known hashing was:

> It is interesting to note the word "hashing" apparently never appeared in print, with its present meaning, until Morris's article was published in 1968, although it had already become -common jargon in several parts of the world by that time. … Somehow the verb "to hash" magically became standard terminology for key transformation during the mid-1960's, yet nobody was rash enough to use such an undignified word publicly until 1968!

*Id.* at 74-75.  The 1998 edition describes that "[m]any advances in the theory and practice of hashing have been made since the author first prepared this chapter in 1972, although the basic ideas discussed above still remain useful for ordinary applications." Ex. 1026 at 72; Ex. 1003 at ¶ 72.

Dr. Jan Hruska's 1992 book, *Computer Viruses and Anti-Virus Warfare*, confirms that hashing was well-known and widely-used in the field of computer security (including anti-virus and other malware). Ex 1027 at 138 (defining "Hash function" as "[a] function which maps a set of variable size data into objects of a single size. Widely used for fast searching.").  Moreover, Hruska additionally discloses the use of hashing for this purpose in in the software security field at least as early as 1992.  *Id*. at 83-84, 89; Ex. 1003 at ¶ 73.

Knuth's treatise and Hruska's book establish that a POSITA would have been aware of and had experience using hashing for table look-ups because such hashing was notoriously well-known not only generally in computer science, but also in the application of computer science to the field of computer security (including anti-virus and malware). Ex. 1003 at ¶¶ 71-74.

Using hash function to index entries in a database must have been well-known in the art because if it was not, the Challenged Claims would not be described or enabled under 35 U.S.C. § 112.  Ex. 1003 at ¶ 75.  No form of the word "hash" occurs in the '926 patent other than the in independent claims 1, 8, 15, 22, 29, and 30. *See, generally*, Ex. 1001. In those claims, it is always in the context of "perform[ing] a hashing function on the incoming Downloadable to compute an incoming Downloadable ID." *Id.* at claims. Nothing in the specification further describes or enables hashing.  Ex. 1003 at ¶¶ 75-76. No form of the word "hash" occurs in the '822 patent or the related '962 patent, including the claims. *See, generally*, Exs. 1010 & 1014. Forms of the word "hash" do occur in the '194 and '780 patents' specifications and claims, but they do not teach anything more than the '926 claims: they occur only in the context of "perform[ing] a hashing function," "generating a digital hash," "includ[ing] a digital hash," and "comput[ing] the digital hash." *See, generally*, Exs. 1012 & 1013; Ex. 1003 at ¶¶ 75-76.

Because nothing in the '926 patent, or its related patents, describes or enables "hashing" beyond simply reciting its use, such hashing for table look-up must have been well-known to a POSITA; otherwise, the claims would not be described or enabled. *Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) ("Because the specification is viewed from the perspective of one of skill, in some circumstances, a patentee may rely on information that is 'well-known in the art' for purposes of meeting the written description requirement."); *see also* Ex. 1003 at ¶¶ 71-79.

### 2. A POSITA would have been aware of and had experience with Downloadables that include program script

In its "Background of the Invention" section, the '926 patent admits that executable code (*i.e.*, a Downloadable) that includes "program script" was well-known in the art. Ex. 1001 at 1:66-2:3 ("It is observed by this inventor, for example, that Downloadable information comprising program code can include distributable components (e.g. Java™ applets and JavaScript scripts, ActiveX™ controls, Visual Basic, add-ins and/or others)."); *see also infra*; Ex. 1003 at ¶ 80. Gary McGraw and Edward W. Felten's book, "Java Security, Hostile Applets, Holes, and Antidotes," (Wiley computer Publishing 1997) confirms admission. Ex. 1037 at 15 (fn*, "Java has some competition as an environment for creating executable content. Other languages with a similar bent are: JavaScript, Safe-Tcl, Telescript,Word macros, Excel macros, ActiveX, and Postscript. Many of the

security lessons in this book apply to those languages as well."), 23 ("Java is by far

the most popular implementation of Web-based executable content concept.

Lesser-known competitors include JavaScript, Safe-Tcl, Telescript, Word macros,

Excel macros, ActiveX, and Postscript. Any document-embedded scripting

language that can be transferred around the Net and run on different machines falls

under the classification of executable content."), 110 (showing buttons to

enable/disable both Java and JavaScript), and 111 (showing buttons to

enable/disable ActiveX controls and scripts).  Therefore, a POSITA at the time of

the invention would have understood that executable code (*i.e.*, a Downloadable)

could include program script and would have been aware of and had experience

with Downloadables that include program script. Ex. 1003 at ¶¶ 80-82.

### 3.    A POSITA would have been aware of and had experience with executable code that includes suspicious computer operations includes calls made to an operating system, a file system, a network system, and to memory

McGraw/Felten's *Java Security*  and Fritzinger's *Java Security* both disclose

executable code that includes suspicious computer operations include calls made to

an operating system, a file system, a network system, and to memory.  Ex. 1037 at

34 ("Java presents a three-tiered approach to security.  At a general level, the three

tiers are: [1] restricted access to file systems and the network [2] restricted access

to browser internals [3] a set of load time and runtime checks to verify that byte

code is following the rules.") and Ex. 1028 at 5 ("The security manager will not

allow an untrusted applet to read or write to a file, delete a file, get any information about a file, execute operating system commands or native code, load a library, or establish a network connection to any machine other than the applet's home server. This list is not exhaustive but does give a representative sample of the restrictions place on applets."); *see also* Ex. 1003 at ¶ 83. Ji also discloses the security risks associated with giving untrusted code access to system resources, which a POSITA would have understood to include calls made to an operating system, a file system, a network system, and to memory.  Ex. 1004 at Fig. 1 ("Local Resources 30"); 1:13-20 (warning about "[c]ode (software) from unknown origin" that is "given access to local resources such as the hard disk drive in a user's computer."); 1:27-28; 4:3-29 (disclosing that "[b]ecause Java byte code is platform independent, applets have to use some of the standard library functions to access operating system resources" and describing the "two opportunities in accordance with the invention to detect attempts to use operating system resources.") 4:47-51 ("A security policy defines what functions an applet needs to perform to be considered a security risk. Examples of security policies include preventing(1) applets from any file access, or (2) file access in a certain directory, or (3) creating certain Java objects."); and, 5:29-32; *see also* Ex. 1003 at ¶¶ 83-84.

Therefore, a POSITA would have been aware of and had experience with suspicious executable code that includes suspicious computer operations include

calls made to an operating system, a file system, a network system, and to memory. Ex. 1003 at ¶¶ 83-85.

## VI. CLAIM CONSTRUCTION

Claims in an *inter partes* review of an unexpired patent are to be given their "broadest reasonable interpretation in light of the specification" ("BRI"). 37 C.F.R. 42.100(b). Because the claim construction standard in this proceeding differs from that used in U.S. district court litigation, Petitioner expressly reserves the right to assert different claim construction positions under the standard applicable in district court for any term of the '926 patent in any district court litigation. In accordance with 37 C.F.R. § 42.104(b)(3), Petitioner proposes the following constructions of terms from the Challenged Claims.

### 1. "database" (claims 15 and 22)

"Database" means "a collection of logically related data stored together in one or more computerized files and indexed by one or more indices." *See* Ex. 1036 at 3 ("database (1) (A) (data management) (software) A collection of logically related data stored together in one or more computerized files. *Note:* Each data item is identified by one or more keys. *See also*: database management system." and "database management system (DBMS) (1) A computer system involving hardware, software, or both that provides a systematic approach to creating, storing, retrieving and processing information stored in a database. A DBMS acts

as an interface between computers' programs and data files as well as between users and the database. It may include backup/recovery, checkpoint processing, and ad-hoc query capability.") and Section V.A.1., above; *see also* Ex. 1001 at 9:49-55 and 16:51-55; and, Ex. 1003 at ¶¶ 87-89.  The Northern District of California recently construed "database" in the '926 patent to mean "a collection of interrelated data organized according to a database schema to serve one or more applications." Ex. 1033 at 3; Ex. 1003 at ¶ 88.  However, this construction is too narrow to be the BRI because the '926 patent uses the term in a broad manner (without definition or limitation) throughout the specification, including comparing a database to a reference list.  *See* Ex. 1001 at 16:51-55; Ex. 1003 at ¶¶ 87-89.

### 2.    "Downloadable" (claims 15, 18, 19, and 22)

"Downloadable" means "information received over a network that can include executable code (*e.g.* Java applets, JavaScript and Visual Basic scripts, ActiveX controls, Visual Basic, and other add-ins)." *See* Ex. 1001 at 2:46-51 ("In one aspect, embodiments of the invention provide for determining, within one or more network 'servers' … whether received information includes executable code (and is a 'Downloadable')."); 2:35-40 ("For example, remotely operable code that is protectable against can include downloadable application programs, Trojan horses and program code groupings, as well as software 'components', such as Java™ applets, ActiveX™ controls, JavaScript™/Visual Basic scripts, add-ins,

etc., among others."); and 1:66-2:3 ("It is observed by this inventor, for example, that Downloadable information comprising program code can include distributable components (e.g. Java™ applets and JavaScript scripts, ActiveX™ controls, Visual Basic, add-ins and/or others)."); *see also* Ex. 1003 at ¶ 90.

### 3. "Downloadable security profile data" (claims 15 and 22)

Because various claims of the '926 patent require that "Downloadable security profile data" include, among other things, "a list of suspicious computer operations that may be attempted by the Downloadable," "a URL from where the Downloadable originated," and "a digital certificate," (Ex. 1001 at 20:67-21:3 and 21:14-22), and the specification of the '926 patent further describes "protection policies" as being transmitted to the destination device (Ex. 1001 at Fig. 9, 3:6-11), "Downloadable security profile data" must be interpreted broadly to encompass at least these and other types of data useful in connection with security functions for the Downloadable under the BRI.  Ex. 1003 at ¶¶ 91-93.  Therefore, "Downloadable security profile data" means "security information relating to the Downloadable."  *Id.*

### 4. "a representation of the retrieved Downloadable security profile data" (claims 15 and 22)

A "representation of the retrieved Downloadable security profile data" means "information sufficient for the destination computer to apply the Downloadable security profile to the Downloadable."  *See* Ex. 1001 at 3:6-11

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

("The protection engine also includes a packaging engine for causing a sandboxed package, typically including mobile protection code and downloadable protection policies to be sent to a Downloadable-destination in conjunction with the received information, if the received information is determined to be a Downloadable."), 3:12-4:49 (describing various embodiments), and 10:10-15 (the representation is not limited to executable code: "(One or more 'checked', tag, source, destination, type, detection or other security result indicators, which are not shown, can also be provided as corresponding to determined non-Downloadables or Downloadables, e.g. for testing, logging, further processing, further identification tagging or other purposes in accordance with a particular application.)"); *see also* Ex. 1003 at ¶ 94. The word "representation" appears only in the independent claims and does not appear in the specification.

### 5.   **"receiver," "Downloadable identifier," "database manager," and "transmitter coupled with said receiver" (claim 22)**

Claim 22 claims a system that practices the method of claim 15. So, claim 22 merely inserts "a [noun or noun phrase] for . . ." before each of claim 15's limitations.  Petitioner construes each "a [noun or noun phrase] for" as they are used in Challenged Claim 22 to mean "the hardware and software necessary." *See* Ex. 1003 at ¶¶ 95-97. For example, "a receiver for receiving an incoming

Downloadable" means "the hardware and software necessary for receiving an incoming Downloadable." *See* Ex. 1003 at ¶¶ 95-97.

## VII.   STATE OF THE ART PRIOR TO THE '926 PATENT

The state of the art prior to the '926 patent is discussed generally in Ex. 1003 at ¶¶ 98-101. The techniques claimed in the '926 patent for protecting one or more personal computers and/or other network accessible devices or processes from undesirable or otherwise malicious operations were well known in the network security art well before the earliest effective filing date of the '926 patent. *See generally* Ex. 1003 at ¶ 98.

For example, receiving an incoming Downloadable and retrieving security profile data for the incoming Downloadable are disclosed in the Ji patent (Ex. 1004) and the Mueller patent (Ex. 1005). *See* Ex. 1003 at ¶ 99. The transmission of the Downloadable and a representation of the Downloadable to a destination device are similarly found in these same references. *Id*. at ¶ 100. Finally, the performance of a hashing function on the incoming downloadable was well known in the art as evidenced by Knuth (Ex. 1025), Hruska (Ex. 1027), and the Mueller patent (Ex. 1005). *See* Ex. 1003 at ¶ 101. Thus, all of the techniques of the Challenged Claims of the '926 patent are in the prior art, and, as discussed below, it would have been obvious to combine them in the manner recited in those claims. *See* Ex. 1003 at ¶¶ 98-101.

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

## VIII.  DETAILED EXPLANATION OF THE GROUNDS FOR REJECTION

### A.    Reasonable likelihood that Petitioner will prevail

A petition for *inter partes* review must demonstrate "a reasonable likelihood that the Petitioner would prevail with respect to at least one of the claims challenged in the petition." 35 U.S.C. § 314(a). Each of the grounds described below in accordance with 37 C.F.R. §§ 42.104(b) meets that standard for every claim challenged in the ground. These grounds construe the claims as described in Section VI, above.  *See* Ex. 1003 at ¶ 102.

### B.    Ground One: Ji in view of Knuth and Hruska renders the Challenged Claims obvious under 35 U.S.C. § 103

The Ji patent was filed on Sep. 10, 1997, and issued on Nov. 9, 1999.  It is prior art under pre-AIA 35 U.S.C. § 102(a) & (e) if May 17, 2000 is the earliest effective filing date for the Challenged Claims and is prior art under pre-AIA 35 U.S.C. § 102(e), if Nov. 6, 1997, is the earliest effective filing date. Ex. 1020 at 20.

As discussed above, Ji was cited in the original prosecution as disclosing all of the originally filed claim limitations except for the hashing limitation, and the applicants only overcame the anticipation rejection over Ji by amending all of the claims to include the hashing limitation.  Ex. 1002 at 127-32; *see also supra* at IV.B.

Ji relates to determining whether a downloadable contains executable code and malware, including teaching communicating mobile protection code from the

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

server to the client. Ex.1004 at Abstract, Fig. 1, 3:32-44, 4:66-5:43, 6:38-42, 7:8-28; Ex. 1003 at ¶ 105.  The "BACKGROUND" section of Ji discusses the state of the art and discloses that "[w]ith the rapid development of the Internet, Intranet, and network computing, applications (application programs) are distributed more and more via such networks, instead of via physical storage media." Ex. 1001 at 1:9-12. The section goes on to describe the security risks associated with downloading and running such applications, or "applets," and concludes: "Hence scanning programs with the ability to analyze and monitor applets are in need to protect users." *Id.* at 1:9-63. Ex. 1003 at ¶ 108.

To those ends, Ji teaches creating a sandboxed package including mobile protection code, the downloadable-information and the security policies, where that sandboxed package is subsequently communicated to the intended client destination. Ex.1004 at Abstract, Fig. 1, 3:32-44, 4:66-5:43, 6:38-42, 7:8-28; Ex. 1003 at ¶ 106. Figure 1 from Ji lays out the basic premise of the invention:

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*



*FIG. 1*

Ex. 1004 at Fig. 1; Ex. 1003 at ¶ 107.  Ji does not explicitly disclose using a hash of the Downloadable as an index.  Ex. 1003 at ¶¶ 107-08.

Knuth is a comprehensive treatise on the subject of computer programming. Ex. 1025 at 5-6; Ex. 1003 at ¶ 109. In the referenced Section 6.4 of Knuth, the author sets forth a history and explanation of hashing functions in computer programming in 1973, which did not significantly change in the 1998 edition of the treatise. *Compare* Ex. 1025 at 39-75 *with* Ex. 1026 at 37-73; Ex. 1003 at ¶ 110.

- 31 -

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

Knuth therefore discloses the well-known nature of hashing functions in computer programming and security. Ex. 1003 at ¶ 110.

Hruska is a book providing a framework for describing the principles of network security, particularly anti-virus warfare. Ex. 1027 at 12-13. Dr. Hruska's analysis of the state of the art of anti-virus principles in 1992 discloses the use of various computer programming techniques in protecting computers, including using a hash function to index entries in a database, and further discloses the use of a hash function in the anti-virus environment. Ex. 1003 at ¶¶ 111-12.

The following claims charts and explanation describe in detail how it would have been obvious to a POSITA to modify the disclosure in the Ji patent to use a hash of an applet (*i.e.*, a "Downloadable" in the language of the '926 patent claims) to retrieve Ji's security policies in view of disclosure in the Knuth and Hruska references of the use of a hash function to form an index for data retrieval. Ex. 1003 at ¶¶ 103-75.

| '926 Patent | Ji, Knuth, and Hruska Disclosures |
|---|---|
| 15.[pre] A computer-based method, comprising the steps of: | Ji discloses this element. *See* **Ex. 1002 at 127-30** (2/25/2009 non-final office action finding that Ji anticipates the preamble) (citing **Ex. 1004 at 3:16-56, 4:66-5:27, 6:39-51**) and **143-157** (5/26/2009 amendment in which patent owner did not traverse the finding); *see also* **Ex. 1003 at ¶¶113-19**. |
|  | Ji discloses a computer-based method. *See, e.g.*, **Ex. 1004 at 3:7-56** (beginning, "This disclosure is directed to an applet scanner that runs e.g. as an HTTP proxy server and does not require any client-side modification."); **Fig. 1**, **4:55-5:15**, and, the preamble to **Claim 1** ("method of detecting and preventing execution of |

| | |
|---|---|
| | instructions in an application program provided from a computer network, comprising:"); *see also* **Ex. 1003 at ¶¶115-19**. |
| [a] receiving an incoming Downloadable; | Ji discloses this element.  *See* **Ex. 1002 at 127-30** (2/25/2009 non-final office action finding that Ji anticipates this limitation) (citing **Ex. 1004 at 3:16-56, 4:66-5:27, 6:39-51**) and **143-157** (5/26/2009 amendment in which patent owner did not traverse the finding); *see also* **Ex. 1003 at ¶¶120-25**.

Ji discloses a server ("HTTP Proxy Server") that receives an incoming "Applet" (the Applet is the "Downloadable"). *See, e.g.*, **Ex. 1004 at Abstract**; **Fig. 1**; **3:7-56** (including, "The applets or controls (hereinafter collectively referred to as applets) are conventionally received from e.g. the Internet or an Intranet at a conventional server."); and, **4:55-5:15**; *see also* **Ex. 1003 at ¶¶120-25**. |
| [b] performing a hashing function on the incoming Downloadable to compute an incoming Downloadable ID; | Ji, in combination with Knuth and Hruska, discloses this element.

Ji discloses that a security policy may be imposed based on the entire applet. *See* **Ex. 1004 at 3:7-56**; **4:51-54** ("An applet scanner in accordance with the invention may allow different security policies for different clients, for different users, and for applets from different origins."); and **7:50-64** (beginning, "The security policy generator component 54 generates the security checker code included in the monitor package, from a set of predefined security policies."); and **Ex. 1003 at ¶¶ 127-30**.

Knuth and Hruska discloses using a hash function to index entries in a database, which comprises the performance of a hashing function on the incoming data to compute an ID for the incoming data. *See* Section V.A.1., above; **Ex. 1025 at 39** ("So far we have considered search methods based on comparing the given argument K to the keys in the table, or using its digits to govern a branching process. A third possibility is to avoid all this rummaging around by doing some arithmetical calculation on K, computing a function f(K) which is the location of K and the associated data in the table." [K is the claimed "Downloadable," f(K) is a hashing function, and the result from the hashing function, f(K), is the claimed "Downloadable ID"]); Ex. 1027 at 138 (defining "hash function" as "A function which  maps a set of variable size data into objects of a single size.  Widely used for |

|  | fast searching.") and 83-84 (discussing hashing for this purpose in used in the computer security industry); and **Ex. 1003 at ¶¶ 131-35**.<br><br>*See* **Ex. 1002 at 127-30** (2/25/2009 non-final office action finding a "hashing" dependent claim would be allowable if written in independent form) and **143-157** (5/26/2009 amendment in which patent owner amended what would issue as claims 15 and 22 to include the hashing limitation). **Ex. 1003 at ¶¶ 126-35.** |
|---|---|

Ji in combination with Knuth and Hruska renders limitation 15.[b] obvious under § 103 because it would have been obvious to a POSITA to combine the database and hashing teachings of Knuth and Hruska with Ji's "scanner 26" and/or the "security policy generator 54" to facilitate the retrieval of the predefined security policies for an applet as disclosed by Ji.  Ex. 1003 at ¶ 135.  In particular, it would have been obvious to a POSITA to utilize a hash function as disclosed in Knuth and Hruska on an applet to form an index, and to use that index to retrieve the predefined security policies applicable to the applet from a database of predefined security policies.  *See* Section V.A.1., above; and Ex. 1003 at ¶ 135. Knuth discloses that performing hashing functions to create an index as required by claim element 15[b] was well known in the art, and Hruska further describes the use of hashing for this purpose in the software security field at least as early as 1992.  Ex. 1025 at 39; Ex. 1027 at 83-84, 89; Ex. 1003 at ¶¶ 126-35.  A POSITA would have been motivated to use the technique of using a hashing function on an applet to create an index for one or more predetermined security policies because

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

hashing functions were an effective technique for indexed data retrieval, and a POSITA would have been motivated to perform the hashing function on an entire applet because Ji discloses that a security policy may be imposed based on the entire applet. *See* Ex. 1004 at 3:7-56; 4:51-54;  Ex. 1003 at ¶¶ 126-35.

| | |
|---|---|
| [c] retrieving security profile data for the incoming Downloadable from a database of Downloadable security profiles indexed according to Downloadable IDs, based on the incoming Downloadable ID, the security profile data including a list of suspicious computer operations that may be attempted by the Downloadable; and | Ji, in combination with Knuth and Hruska, discloses this element.  *See* **Ex. 1002 at 127-30** (2/25/2009 non-final office action finding that Ji anticipates this limitation) (citing **Ex. 1004 at 3:16-56, 4:66-5:27, 6:39-51**) and **143-157** (5/26/2009 amendment in which patent owner did not traverse the finding); *see also* **Ex. 1003 at ¶¶ 136-43**. |
| | Knuth and Hruska disclose using a hash function to index entries in a database. *See* limitation 15.[b]; *see also* **Ex. 1003 at ¶¶ 126-35; 137**. |
| | Ji discloses that the security profile includes a list of suspicious operations that may be attempted by the applet (claimed "Downloadable"). *See* **Ex. 1004 at 3:7-56** (suspicious operations are "instrumented" either by inserting special code before and after each suspicious operation or by replacing the suspicious operations with replacement code (the special or replacement code calls the monitoring package.")); **4:47-51** ("A security policy defines what functions an applet needs to perform to be considered a security risk. Examples of security policies include preventing(1) applets from any file access, or (2) file access in a certain directory, or (3) creating certain Java objects."); *see also* **Ex. 1003 at ¶¶ 138-42**. |

Ji in combination with Knuth and Hruska renders this limitation obvious under § 103 because it would have been obvious to a POSITA to use a database to store the "predefined security policies" and to index the database using a hash value based on the applet to determine security policy that applies to a given applet

(the disclosed "policies" are the claimed "profiles"). *See* 15.[b], above. Ex. 1003 at ¶¶ 136-43. Additionally, Ji, in combination with Knuth and Hruska, discloses this element under Patent Owner's previously argued and narrower construction of the term "Downloadable security profile data" as including "a list of suspicious computer operations that may be attempted by the Downloadable."

| | |
|---|---|
| [d] transmitting the incoming Downloadable and a representation of the retrieved Downloadable security profile data to a destination computer, via a transport protocol transmission. | Ji discloses this element. *See* **Ex. 1002 at 127-30** (2/25/2009 non-final office action finding that Ji anticipates this limitation) (citing **Ex. 1004 at 3:16-56, 4:66-5:27, 6:39-51**) and **143-157** (5/26/2009 amendment in which patent owner did not traverse the finding); *see also* **Ex. 1003 at ¶¶ 144-56**. |
| | Ji discloses "instrumenting" the suspicious operations in the received applet (claimed "Downloadable"). *See* **Ex. 1004 at Abstract**; **3:7-56**; **4:66-6:37** (describing the "instrumentation" process in prose and pseudo-code); and **7:37-40**; *see also* **Ex. 1003 at ¶¶ 145-48**. |
| | Ji also discloses a "monitoring package" that includes "security policy functions" and is combined with the "instrumented" applet in a single Java archive, which is then transmitted from the server to the browser running on the client machine. *See* **Ex. 1004 at Abstract**; **Fig. 2**; **3:7-56**; **4:66-5:27**; **6:38-51** (including, "The pre and post filter and monitoring package [(]security policy functions) are combined with the instrumented applet code in a single JAR (Java archive) file format at the server 32, and downloaded to the web browser 22 in client machine 14. … All the monitoring and applet code is executed in the web browser 22 in the client machine 14."); **7:41-64**; and *see also* **Ex. 1003 at ¶¶ 146-52**. |

The "monitoring package" and "monitoring instructions" are the claimed "representation of the retrieved Downloadable security profile" and the single Java archive that includes both the instrumented applet and the monitoring package is

- 36 -

the claimed "Downloadable and a representation of the retrieved Downloadable security profile data." Ex. 1003 at ¶ 153.

The disclosed distribution of applications over a network discloses transmission via a transport protocol (*e.g.* as part of the TCP/IP stack). *See* Abstract; 1:5-7; and 1:9-16 (including, "With the rapid development of the Internet, Intranet, and network computing, applications (application programs) are distributed more and more via such networks, instead of via physical storage media."); *see also* Ex. 1003 at ¶¶ 154-55.

Ji in combination with Knuth and Hruska renders claim 15 obvious under § 103because Ji discloses all of the limitations except the hashing limitation and it would have been obvious to a POSITA to apply the teachings of Knuth and Hruska as described for limitations 15[b] & [c]. *See* 15.[pre]-[d], above; Section V.A.2., above; *see also* Ex. 1003 at ¶¶ 144-56 (for limitation 15[d]); ¶¶ 113-56 (for claim 15).

| | |
|---|---|
| 18. The computer-based method of claim 15 wherein the Downloadable includes program script. | Ji discloses this element.  *See* **Ex. 1002 at 127** (2/25/2009 non-final office action finding that Ji anticipates this claim) (citing **Ex. 1004 at 3:16-23**) and **143-157** (5/26/2009 amendment in which patent owner did not traverse the finding); **Ex. 1003 at ¶ 157-59**; **Ex. 1004 at 3:16-23** ("Thereby in accordance with the invention a scanner (for a virus or other malicious code) provides both static and dynamic scanning for application programs, e.g. Java applets or ActiveX controls. The applets or controls (hereinafter collectively referred to as applets) are conventionally received from e.g. the Internet or an Intranet at a conventional server."); **Ex. 1003 at ¶ 157**. |

To the extent not anticipated by Ji, Ji in combination with Knuth and Hruska and the knowledge of one or ordinary skill in the art renders this claim obvious under § 103because it would have been obvious to a POSITA to apply the teachings of Ji to Downloadables containing program script. *See* 15.[pre]-[d], above; Section V.A.2., above; *see also* Ex. 1003 at ¶¶ 113-59. A POSITA would have understood that ActiveX controls disclosed in Ji could include program script, such as Visual Basic. Ex. 1004 at 3:16-23; Ex. 1003 at ¶¶ 157-59. The capability of Downloadables to include program script was well known in the art, as further evidenced by the disclosures in McGraw/Felten's *Java Security* described in Section V.A.2. above. Ex. 1037; Ex. 1003 at ¶¶ 157-59.

| | |
|---|---|
| 19. The computer-based method of claim 15 wherein suspicious computer operations include calls made to an operating system, a file system, a network system, and to memory. | Ji discloses this element. *See* **Ex. 1002 at 128** (2/25/2009 non-final office action finding that Ji anticipates this claim) (citing **Ex. 1004 at 5:16-27**) and **143-157** (5/26/2009 amendment in which patent owner did not traverse the finding); **Ex. 1003 at ¶¶ 160-66**.<br><br>Ji discloses suspicious computer operations include calls made to an operating system, a file system, a network system, and to memory. **Ex. 1004 at Fig. 1** ("Local Resources 30"); **1:13-20** (warning about "[c]ode (software) from unknown origin" that is "given access to local resources such as the hard disk drive in a user's computer."); **4:3-29** (disclosing that "[b]ecause Java byte code is platform independent, applets have to use some of the standard library functions to access operating system resources" and describing the "two opportunities in accordance with the invention to detect attempts to use operating system resources."); **4:60-62**; and, **4:47-51** ("A security policy defines what functions an applet needs to perform to be considered a security risk. Examples of security policies include preventing(1) applets from any file access, or (2) file access in a certain directory, or (3) |

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

| | |
|---|---|
| | creating certain Java objects."); *see also* **Ex. 1003 at ¶¶ 160-66**. |

| **'926 Patent** | **Ji, Knuth, and Hruska Disclosures** |
|---|---|
| 22.[pre] A system for managing Downloadables, comprising: | Ji discloses this element.  See the information cited for claim 15.[pre]-[d], above. *See* **Ex. 1003 at ¶ 167.** |
| [a] a receiver for receiving an incoming Downloadable; | Ji discloses this element.  See the information cited for limitation 15.[a], above. The "receiver" is inherent in Ji and is the hardware, firmware, and software necessary for "HTTP Proxy Server 32" to receive the "Applet" from "Internet 10." *See* **Ex. 1003 at ¶¶ 168-69**. |
| [b] a Downloadable identifier for performing a hashing function on the incoming Downloadable to compute an incoming Downloadable ID; | Ji, in combination with Knuth and Hruska, discloses this element.  See the information cited for limitation 15.[b], above. The Downloadable identifier is inherent in Ji and is the hardware, firmware, and software necessary for "Scanner 26" or "Security Policy Generator 54" to identify a security policy based on an applet. *See* **Ex. 1003 at ¶¶ 170-71**. |
| [c] a database manager for retrieving security profile data for the incoming Downloadable from a database of Downloadable security profiles indexed according to Downloadable IDs, based on the incoming Downloadable ID, the security profile data including a list of suspicious computer operations that may be attempted by the Downloadable; and | Ji, in combination with Knuth and Hruska, discloses this element.  See the information cited for limitation 15.[c], above. The database manager is inherent in Ji and is the hardware, firmware, and software necessary for "Scanner 26" or "Security Policy Generator 54" to retrieve the security policy from the database. *See* **Ex. 1003 at ¶ 172**. |
| [d] a transmitter coupled with said receiver, for transmitting the incoming Downloadable and a representation of the | Ji discloses this element.  See the information cited for limitation 15.[d], above. The transmitter coupled with said receiver is inherent in Ji and is the hardware, firmware, and software |

| retrieved Downloadable security profile data to a destination computer, via a transport protocol transmission. | necessary for "HTTP Proxy Server 32" to transmit the single Java archive (containing the instrumented applet and monitoring package) to "Web Browser 22."  *See* **Ex. 1003 at ¶¶ 173-75**. |
|---|---|

Accordingly, Ji in view of Knuth and Hruska renders the Challenged Claims unpatentable as obvious under 35 U.S.C. §103.  Ex. 1003 at ¶¶ 103-175.

### C.   Ground Two:  Mueller in View of Ji, Knuth, and Hruska Renders the Challenged Claims Obvious Under 35 U.S.C. § 103

The Mueller patent was filed on May 30, 1996, and issued on Jul.17, 2001. Ex. 1005 at 1.  It is prior art under pre-AIA 35 U.S.C. § 102(e) because Nov. 6, 1997 is the earliest priority date claimed by Patent Owner (Petitioner maintains, however, the earliest priority date is May 17, 2000 as set forth above).  Ex. 1005 at 1; Ex. 1001 at 1; Ex. 1020 at 20.  Mueller was neither cited or referenced in the examination of the '926 patent nor was it cited in any of the patents to which it claims priority.  *See generally* Exs. 1001-02, 1010-14.  Sun Microsystems, the assignee of the Mueller patent created the Java programming environment.  Ex. 1005 at 1; Ex. 1028 at 1; Ex. 1003 at ¶¶ 176-77.

Mueller describes a system and a method for securing a program's execution in a network environment is presented. Ex. 1005 at Abstract; Ex. 1003 at ¶ 178. This system and method disclosed by Mueller reviews information and requests received by a computing device and determines whether to permit the information or requests to proceed through analyzing the information and requests, which

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

includes performing a hashing function on them. Ex. 1005 at Abstract, 2:7-10, Table 1; Ex. 1003 at ¶ 178. Mueller then takes this material and packages it together prior to sending to another device for use. Ex. 1005 at Abstract, 1:34-44, 1:52-56, 3:58-66, 4:63-65; Ex. 1003 at ¶ 178.

As set forth in the introduction to the Ji chart above, Knuth discloses that hashing is a very well-known concept in software and network security and Hruska, in particular, discloses applying the hashing concept to this field. Ex. 1025; Ex. 1003 at ¶¶ 109-112, 179. It would have been obvious to combine Mueller with  Knuth and Hruska to provide such claim elements that may not be disclosed by Mueller on its own, among other elements discussed below, a hashing functionality specific to provide a security analysis of downloaded information. Ex. 1025 at 39-75; Ex. 1027 at 138; Ex. 1003 at ¶ 180.   For example, Knuth discloses that performing hashing functions to create a unique identifier as required by claim element 15[b] was well known in the art, and Hruska further describes the use of hashing for this purpose in for this purpose in the software security field at least as early as 1992. Ex. 1025 at 39; Ex. 1027 at 83-84, 89; Ex. 1003 at ¶ 180. The Challenged Claims are therefore obvious over Mueller in view of Knuth and Hruska. Ex. 1003 at ¶¶ 176-246.

| '926 Patent | Mueller, Ji, Knuth, and Hruska Disclosures |
|---|---|
| 15.[pre] A computer- | Mueller discloses a computer based-method. For example, Ex. 1005 at **5:38-41** ("In a client-server environment having a first |

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

| based method, comprising the steps of: | server coupled to receive a program from a second server, a computer-implemented method for securing the execution of the program on said first server, said method comprising …"); *see also* **Ex. 1003 at ¶¶ 182-83**. |
|---|---|
| [a] receiving an incoming Downloadable; | Mueller discloses receiving an incoming Downloadable. Ex. 1005 at **2:28-30** ("Loosely described here, a servlet is application code transferred from a first server to a second for execution on the second server."); *see also* Ex. 1003 at ¶¶ 184-86. |
| | The disclosed "servlet" is the claimed "Downloadable." Ex. 1003 at ¶ 186. |
| [b] performing a hashing function on the incoming Downloadable to compute an incoming Downloadable ID; | Mueller discloses performing a hashing function on the incoming Downloadable to compute an incoming Downloadable ID. Ex. 1005 at cols. 3-4, **Table I,** and 3:64-66 (describing the steps from Table I: "In one embodiment, the authentication of the source of a servlet, particularly by digital signature, is the responsibility of the class loader."); *see also* Ex. 1003 at ¶¶ 187-89. From Table I: |
| | Verifying signed servlet, within server classloader<br>1. If (SignedJarFile)<br>    1. extract JarFile, sign, cert, alq from SignedJarFile<br>    2. c = JarFile.hash (algorithm) /* compute hash */<br>    3. pk = cert.getPublicKey ()<br>    4. h = sig.decrypt (algorithm)<br>    5. if (c == h) then /* signature is valid */<br>        is sig.ID on my list of trusted signatures?<br>        if yes, load servlet |
| | To the extent Mueller does not disclose this element, Knuth and Hruska discloses using a hash function to index entries in a database. *See* Section V.A.1., above; Ex. 1025 at 39 ("So far we have considered search methods based on comparing the given argument K to the keys in the table, or using its digits to govern a branching process. A third possibility is to avoid all this rummaging around by doing some arithmetical calculation on K, computing a function f(K) which is the location of K and the associated data in the table." [K is the claimed "Downloadable" and the result from the hash function, f(K), is the claimed "Downloadable ID"]); Ex. 1027 at 138 (defining "hash function" as "A function which  maps a set of variable size data into objects of a single size.  Widely used for fast searching."); and Ex. 1003 at ¶¶ 190-93.  *See also* Ex. 1003 at ¶¶ 187-95. |

Mueller creates a Downloadable ID as evidenced by the creation of sig.ID referenced in Table I.  Ex. 1005 at Table 1;  Ex. 1003 at ¶ 194. Mueller describes how the incoming Downloadable, the SignedJarFile, *i.e.*, the servlet, undergoes a hashing function, which includes extracting information from the SignedJarFile. Ex. 1005 at Table 1;  Ex. 1003 at ¶ 194.  After extracting the information from SignedJarFile, Mueller describes computing a hash from the SignedJarFile's extracted information (here, JarFile.hash).  Ex. 1005 at Table 1;  Ex. 1003 at ¶ 194. This hash is then compared against a previously determined hash value to determine the veracity of the signature in the SignedJarFile , *i.e.*, the servlet (Downloadable).  Ex. 1005 at Table 1;  Ex. 1003 at ¶ 194. Once the signature is determined to be valid (the signature is referenced as sig), Mueller then discloses comparing the sig.ID against a list of trusted signatures.  Ex. 1005 at Table 1;  Ex. 1003 at ¶ 194.  Through this disclosure, it is evident that the sig.ID is the Downloadable ID of the SignedJarFile , *i.e.*, the servlet (the Downloadable).  Ex. 1003 at ¶ 194.

To the extent Mueller does not disclose this element, a POSITA would have found it obvious to perform a hashing function on the incoming Downloadable to compute an incoming Downloadable ID.  *See*  Section V.A.1. *supra*; Ex. 1003 at ¶¶ 187-95.  Knuth discloses that performing hashing functions to create a unique identifier as required by claim element 15[b] was well known in the art, and

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

Hruska further describes the use of hashing for this purpose in for this purpose in

the software security field at least as early as 1992.  Ex. 1025 at 39; Ex. 1027 at 83-

84, 89; Ex. 1003 at ¶¶ 187-95.

| | |
|---|---|
| [c] retrieving security profile data for the incoming Downloadable from a database of Downloadable security profiles indexed according to Downloadable IDs, based on the incoming Downloadable ID, the security profile data including a list of suspicious computer operations that may be attempted by the Downloadable; and | Mueller discloses retrieving security profile data for the incoming Downloadable from a database of Downloadable security profiles indexed according to Downloadable IDs, based on the incoming Downloadable ID, the security profile data including a list of suspicious computer operations that may be attempted by the Downloadable. Ex. 1005 at cols. 3-4, **Table 1,** and **3:62-66** (describing the steps from Table I: "For example, the server's security manager may allow (or disallow) the execution of any servlet from a predetermined list of network sources. (In one embodiment, the authentication of the source of a servlet, particularly by digital signature, is the responsibility of the class loader.)") (emphasis added); *see also* Ex. 1003 at ¶¶ 196-98.<br><br>Verifying signed servlet, within server classloader<br>1. If (SignedJarFile)<br>  1. extract JarFile, sign, cert, alq from SignedJarFile<br>  2. c = JarFile.hash (algorithm) /* compute hash */<br>  3. pk = cert.getPublicKey ()<br>  4. h = sig.decrypt (algorithm)<br>  5. if (c == h) then /* signature is valid */<br>    is sig.ID on my list of trusted signatures?<br>    if yes, load servlet<br><br>The "list of trusted signatures" (the claimed "database") is indexed by "sig.ID" (the claimed "Downloadable ID"). *See* limitation 15.[b], above; *see also* Ex. 1003 at ¶¶ 187-195, 199.<br><br>Mueller discloses that "the server's security manager may allow (or disallow) the execution of any signed servlet." Ex. 1005 at 4:3-5. "More generally, the server's security manager may decide whether to execute a servlet based on some other characteristic of the applet." *Id.* at 4:42-44. "For such servlets as the server allows to execute, the server must also decide what server resources the servlet may access. The Java environment provides a default level of service. However, the server can decide to enlarge or even shrink the default set of resources to which the servlet has access." *Id.* at 4:45-62. "The server maintains a list of configurable resources, a list of the configurable accesses possible for each |

| | resource and a cross-list of servers (or groups of servers) and the accesses they may have. Table II illustrates one such configurable security policy wherein server 120*a* is not trusted at all and all security checks are applied to any servlet having server 120*a* as its source, while server 120*n* (sic) is sufficiently trusted not to need access authorization for read( )'s. Servlets from server 120 b are completely trusted." *Id.* at 4:65-5:6; *see also* Ex. 1003 at ¶ 200. *See also* Ex. 1003 at ¶¶ 196-202. |
|---|---|

Briefly, the "list of configurable resources," "list of configurable accesses possible for each resource," and "cross list of servers" constitute the claimed "security profile" and includes a "list of suspicious computer operations that may be attempted" by the servlet (the claimed "Downloadable") and which the server will disallow or allow based on the security profile. Ex. 1003 at ¶ 201. In one embodiment, the database of "Downloadable security profiles indexed according to Downloadable IDs" is the "list of trusted signatures," indexed by "sig.ID," as disclosed in Mueller at step 5 of the "verifying" procedure from Table I. *See* Ex. 1001 at Table 1; Ex. 1003 at ¶ 202. Mueller discloses retrieving the security profile data for the incoming servlet based on the Downloadable ID created through the hashing function disclosed above in element 15[b]. Ex. 1003 at ¶ 202. The list of suspicious computer operations that may be attempted by the Downloadable is disclosed by Mueller through the determination of whether the servlet can be executed based on a determination made by the security policies, for

example seen in Table II. Ex. 1001 at 3:2-10, 4:42-5:17, Table II; Ex. 1003 at

¶ 202.

| [d] transmitting the incoming Downloadable and a representation of the retrieved Downloadable security profile data to a destination computer, via a transport protocol transmission. | Mueller discloses transmitting the incoming Downloadable and a representation of the retrieved Downloadable security profile data to a destination computer, via a transport protocol transmission. *See* **Ex. 1003 at ¶¶ 203-21**. For example, **Ex. 1005 at Abstract** ("A system and method for securing a program's execution in a network environment is presented. A first server is configured to permit execution of a program from a second server based on a configurable security characteristic of the program. The first server receives the program transferred from the second server. Subsequently, the program is checked for the configurable security characteristic. The program is executed on the first server if permitted by the configurable security characteristic."); **1:66-2:2** ("While a security policy may suffice for the transfer of code from a server to a client, the transfer of code for execution from one server to another server presents greater security risks and requires a more stringent security policy."); **2:7-10** ("Herein is disclosed, in a network environment, a security manager residing on a server and deciding whether to permit the execution of a servlet based on a characteristic of the servlet); **2:27-29** ("Loosely described here, a servlet is application code transferred from a first server to a second for execution on the second server."); and *see **also** Ex. 1003 at ¶¶ 204-07*.<br><br>To the extent Mueller does not disclose this element, Ji discloses this element.  For example, Ji discloses "instrumenting" the suspicious operations in the received applet (claimed "Downloadable"). *See* **Ex. 1004 at Abstract**; **3:7-56**; **4:66-6:37** (describing the "instrumentation" process in prose and pseudo-code); and **7:37-40**; *see also* **Ex. 1003 at ¶¶ 208-11**.<br><br>Ji also discloses a "monitoring package" that includes "security policy functions" and is combined with the "instrumented" applet in a single Java archive, which is then transmitted from the server to the browser running on the client machine. *See* **Ex. 1004 at Abstract**; **Fig. 2**; **3:7-56**; **4:66-5:27**; **6:38-51** (including, "The pre and post filter and monitoring package [(]security policy functions) are combined with the instrumented applet code in a |

| | |
|---|---|
| | single JAR (Java archive) file format at the server 32, and downloaded to the web browser 22 in client machine 14. … All the monitoring and applet code is executed in the web browser 22 in the client machine 14."); **7:41-64**; and *see also* **Ex. 1003 at ¶¶ 209-10, 212-15**. |
| | The "monitoring package" and "monitoring instructions" are the claimed "representation of the retrieved Downloadable security profile" and the single Java archive that includes both the instrumented applet and the monitoring package is the claimed "Downloadable and a representation of the retrieved Downloadable security profile data." **Ex. 1003 at ¶ 216**. |
| | The disclosed distribution of applications over a network discloses transmission via a transport protocol (*e.g.* as part of the TCP/IP stack). *See* **Ex. 1004 at Abstract**; **1:5-7**; and **1:9-16** (including, "With the rapid development of the Internet, Intranet, and network computing, applications (application programs) are distributed more and more via such networks, instead of via physical storage media."); *see also* **Ex. 1003 at ¶¶ 217-18**. |

Mueller discloses that the transmission of the programs (which include the Downloadable and a representation of the Downloadable security profile set forth in the chart above) between servers would be transmitted over a transport protocol transmission.  Ex. 1003 at ¶ 219.

To the extent Mueller does not disclose this element, it is disclosed in combination with Ji, and a POSITA would have found Ji particularly relevant and been motivated to use the disclosures of Ji because both Mueller and Ji are directed to Java security.  *See* Ex. 1005 at 1:44-2:3; Ex. 1004 at Abstract; Ex. 1003 at ¶ 220. It therefore would have been obvious to a POSITA to implement the disclosure of Ji to transport the SignedJarFile, *i.e.*, the servlet (the Downloadable) and the

representation of the retrieved security profile described in 15[c] above to a destination computer via a transport protocol transmission.  Ex. 1003 at ¶ 220.  A POSITA would have implemented this system because of Mueller's described warning that "the transfer of code for execution from one server to another server presents greater security risks and requires a more stringent security policy."  Ex. 1005 at 1:67-2:2; Ex. 1003 at ¶ 220.  A POSITA would have understood that Ji's disclosure of distributing applications over a network would have provided these security protections to a destination computer because Ji discloses sending a Downloadable and a representation of the retrieved Downloadable security profile in a package to the destination computer.  Ex. 1004 at Abstract, Fig 2, 3:7-56, 4:66-5:27, 6:38-51; Ex. 1003 at ¶ 220.  Mueller in combination with Ji further discloses this element through Ji's disclosure of the distribution of applications over a network discloses transmission via a transport protocol (*e.g.* as part of the TCP/IP stack). *See* Ex, 1004 at Abstract; 1:5-7; and 1:9-16 (including, "With the rapid development of the Internet, Intranet, and network computing, applications (application programs) are distributed more and more via such networks, instead of via physical storage media."); *see also* Ex. 1003 at ¶ 220.

Accordingly, as shown in the charts above, Mueller in view of Ji, Knuth, and Hruska discloses all elements claimed by claim 15.  Ex. 1003 at ¶¶ 203-21.

| 18. The | Mueller discloses the Downloadable includes program script. *See* |
|---------|---------|

| computer-based method of claim 15 wherein the Downloadable includes program script. | Ex. 1003 at ¶¶ 222-26. For example, **Ex. 1005 at 1:34-44** ("In addition to text and static images for display on the user's workstation 150 via the user's browser 110, a web page can also include an applet. An applet is a program included in an HTML page, whose execution a user can observe via a browser 110 enabled to recognize, download and execute the applet and to display the results of the applet's execution. The HotJava™ browser, available from the assignee of the instant invention, is the preferred browser 110, and the Java™ environment, also available from the assignee of the instant invention, is the preferred environment for encoding and executing applets."); **3:7-10** ("The Java compiler leaves memory management for the Java interpreter, and the latter provides the former with no information on how it accomplishes the memory management."). **Ex. 1003 at ¶¶** 223-24. To the extent not explicitly disclosed in Mueller, a POSITA would have found it obvious to apply Mueller to program script such as Javascript or Visual Basic program script. *See* **Ex. 1003 at ¶ 225**. |

A POSITA would have understood that the citations set forth above, such as the HTML, Java, and related content from a Web page, disclosed Downloadables including program scripts. Ex. 1003 at ¶ 226. Accordingly, as shown in the charts above, Mueller, in combination with Knuth and Hruska, discloses all elements claimed by claim 18. *Id.* Moreover, as discussed in Section V.A.2. above, this element was well known to those of skill in the art. *See supra* at V.A.2.; Ex. 1003 at ¶¶ 222-26.

| 19. The computer-based method of claim 15 wherein suspicious computer operations include calls made to an operating system, a file system, a network | Mueller discloses a security profile in which the list of suspicious operations include calls made to an operating system, a file system, a network system, and to memory. **Ex. 1003 at ¶¶ 227-33** Ex. 1005 at **5:20-24** ("Unsigned servers, however, are blocked from executing HTTP requests and responses and inter-servlet communications. Unsigned servlets do not have access to the server's file |

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

| | |
|---|---|
| system, and to memory. | system, properties files, dynamic configuration files, or memory management facilities."); and *see also* **Ex. 1003 at ¶ 228**. |

A POSITA would have found it obvious that the claimed suspicious operations are disclosed by Ji. Ex. 1003 at ¶¶ 229-33.  For example, a POSITA would understand that recited suspicious operations correspond to the operations restricted by the original design of Java (calls to memory) and the security manager for the Java sandbox.  *Id.*  Further, Fritzinger describes how suspicious computer operations include calls made to an operating system, a file system, a network system, and to memory.  Ex. 1028 at 5 ("The security manager enforces the boundaries around the sandbox. Whenever an applet tries to perform an action which could corrupt the local machine or access information, the Java Virtual Machine first asks the security manager if this action can be performed safely. If the security manager approves the action — for example, a trusted applet from the local disk may be trying to read the disk, or an imported untrusted applet may be trying to connect back to its home server — the virtual machine will then perform the action. Otherwise, the virtual machine raises a security exception and writes an error to the Java console. **The security manager will not allow an untrusted applet to read or write to a file, delete a file, get any information about a file, execute operating system commands or native code, load a library, or establish a network connection to any machine other than the applet's home**

**server. This list is not exhaustive but does give a representative sample of the restrictions place on applets**.") (emphasis added); Ex. 1003 at ¶ 231. A POSITA would have understood that the disclosures in Fritzinger apply to Mueller in particular because of the disclosure of Java security in Mueller and that the Marianne Mueller who is listed as co-author of Fritzinger is apparently the same Marianne Mueller listed as co-inventor on the Mueller patent. Ex. 1005 at 1, 1:44-51; Ex. 1028; Ex. 1003 at ¶ 232. Accordingly, as shown in the charts above, Mueller, in combination with Knuth, discloses all elements claimed by claim 19. Ex. 1003 at ¶ 232.  Moreover, as discussed in Section V.A.3. above, this element was well known to those of skill in the art.  *See supra* at V.A.3.; Ex. 1003 at ¶¶ 227-33.

| | |
|---|---|
| 22.[pre] A system for managing Downloadables, comprising: | Mueller discloses a system for managing Downloadables. For example, **Ex. 1005 at Abstract** ("A system and method for securing a program's execution in a network environment is presented. A first server is configured to permit execution of a program from a second server based on a configurable security characteristic of the program. The first server receives the program transferred from the second server. Subsequently, the program is checked for the configurable security characteristic. The program is executed on the first server if permitted by the configurable security characteristic."); **2:7-10** ("Herein is disclosed, in a network environment, a security manager residing on a server and deciding whether to permit the execution of a servlet based on a characteristic of the servlet."); *see also* the information cited for claim 15.[pre]-[d], above including the text outside the chart. **Ex. 1003 at ¶¶ 234-36**. |
| [a] a receiver for receiving an incoming Downloadable; | See the information cited for limitation 15.[a], above including the text outside the chart. **Ex. 1003** |

| | |
|---|---|
| **at ¶¶ 237-38**. | |
| [b] a Downloadable identifier for performing a hashing function on the incoming Downloadable to compute an incoming Downloadable ID; | See the information cited for limitation 15.[b], above including the text outside the chart. **Ex. 1003 at ¶¶ 239-40**. |
| [c] a database manager for retrieving security profile data for the incoming Downloadable from a database of Downloadable security profiles indexed according to Downloadable IDs, based on the incoming Downloadable ID, the security profile data including a list of suspicious computer operations that may be attempted by the Downloadable; and | See the information cited for limitation 15.[c], above including the text outside the chart. **Ex. 1003 at ¶¶ 241-42**. |
| [d] a transmitter coupled with said receiver, for transmitting the incoming Downloadable and a representation of the retrieved Downloadable security profile data to a destination computer, via a transport protocol transmission. | See the information cited for limitation 15.[d], above including the text outside the chart. **Ex. 1003 at ¶¶ 243-46**. |

To the extent not explicitly disclosed, Mueller inherently discloses this element performing the transmission via a transport protocol transmission. Ex. 1003 at ¶ 245. Additionally, as discussed above with reference to element 15[d], Mueller in view of Ji discloses this element. *See supra* at element 15[d]. Ex. 1003 at ¶¶ 203-21. Finally, to the extent Mueller does not disclose the receiver from element 22[a], Downloadable identifier from element 22[b], a database manager from element 22[c], or a transmitter from element 22[d], a POSITA would understand that Mueller discloses a receiver because the act of receiving disclosed in Mueller would inherently require a receiver. Ex. 1003 at ¶ 245. Accordingly, as shown in the charts above, Mueller, in combination with Knuth, discloses all

- 52 -

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

elements claimed by claim 22. *Id*. at ¶ 246.  Thus, Mueller in view of Ji, Knuth, and Hruska renders the Challenged Claims unpatentable as obvious under 35 U.S.C. §103.  Ex. 1003 at ¶¶176-246.

## IX.   THE GROUNDS FOR CHALLENGE ARE NOT REDUNDANT

The challenges to the Challenged Claims set forth above are not redundant. For example, Ground 1 relates to the Ji patent that was previously examined by the examiner, but not in light of the Knuth and Hruska references.  In Ground 2 Petitioner presents Mueller as rendering the '926 patent obvious in light of Ji, Knuth and Hruska.  Mueller was never cited in the prosecution history of the '926 patent and therefore presents a ground never before seen by the Patent Office. Therefore, because the grounds are not alike, they are not redundant.

## X.   CONCLUSION

The grounds establish a reasonable likelihood that Petitioner will prevail in rendering unpatentable at least one of claims 15, 18, 19, and 22 as made obvious by the references or combinations of references described in the grounds.  Ex. 1003 at ¶ 247. Because of that likelihood, Petitioner requests that the United States Patent and Trademark Office (1) institute an *inter partes* review of claims 15, 18, 19 and 22 of U.S. Pat. No. 7,613,926 patent and (2) find those claims unpatentable on each of the grounds identified in this petition.

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

Respectfully Submitted,

*/s/ James M. Heintz*
James M. Heintz
Reg. No. 41,828
**DLA Piper LLP (US)**
11911 Freedom Drive, Suite 300
Reston, VA  20190

Jeff R. Cole
Registration Number 56,052
**DLA Piper LLP (US)**
401 Congress Ave., Suite 2500
Austin, TX 78701-3799
(512) 457-7000

Ryan W. Cobb
Registration Number 64,598
**DLA Piper LLP (US)**
2000 University Avenue
East Palo Alto, CA 94303-2215
(650) 833-2235
*Attorneys for Petitioner*

*Petition for* Inter Partes *Review of U.S. Pat. No. 7,613,926*

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing petition for

*inter partes* review and all Exhibits and other documents filed together with the

petition were served on March 19, 2015, via overnight delivery, directed to patent

owner and patent owner correspondent at the following addresses:

| | |
|---|---|
| Finjan, Inc.<br>2025 Gateway Pl. Suite 180<br>San Jose, CA 95110<br>408.452.9700 | Bey & Cotropia Pllc<br>Attn: Dawn-Marie Bey<br>213 Bayly Ct<br>Richmond, VA 23229-7343<br>804.404.2637<br>dbey@beycotropia.com |

By:  */s/ James M. Heintz*
       James M. Heintz
       Reg. No. 41,828
       Counsel for Petitioner

# EXHIBIT 38

Trials@uspto.gov                                                          Paper 8
571-272-7822                                      Entered:  September 24, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SOPHOS, INC.,
Petitioner,

v.

FINJAN, INC.,
Patent Owner.
_____

Case IPR2015-00907
Patent 7,613,926 B2
_____

Before JAMES B. ARPIN, ZHENYU YANG, and
CHARLES J. BOUDREAU, *Administrative Patent Judges*.

ARPIN, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

# I. INTRODUCTION

Sophos, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review pursuant to 35 U.S.C. § 311 of claims 15, 18, 19, and 22 of Patent No. US 7,613,926 B2 to Edery *et al.* (Ex. 1001, "the '926 patent"). Pet. 4. Finjan, Inc. ("Patent Owner") filed a Preliminary Response. Paper 7 ("Prelim. Resp."). We review the Petition under 35 U.S.C. § 314, which provides that an *inter partes* review may not be instituted "unless . . . there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a).

For the reasons that follow and on this record, we are not persuaded that Petitioner demonstrates a reasonable likelihood of prevailing in showing the unpatentability of any of the challenged claims on the asserted grounds. Accordingly, we *deny* Petitioner's request to institute an *inter partes* review.

## A. The '926 Patent

The '926 patent issued November 3, 2009, from U.S. Patent Application No. 11/370,114, filed March 7, 2006. The '926 patent also claims priority from six earlier applications, of which the earliest-filed is U.S. Patent Application No. 08/964,388, filed November 6, 1997. Ex. 1001, [60], [63], col. 1, ll. 8–32.

The '926 patent is directed to systems and methods to protect personal computers and other network accessible devices from "harmful, undesirable, suspicious or other 'malicious' operations that might otherwise be effectuated by remotely operable code." Ex. 1001 col. 2, ll. 27–31. The protection paradigm involves hashing an incoming Downloadable to derive an identifier, referred to as a "Downloadable ID," which is used to reference security profile data for the incoming Downloadable in a database indexed

IPR2015-00907
Patent 7,613,926 B2

according to Downloadable IDs.  *Id.* at col. 2, l. 27–col. 4, l. 49; Fig. 1b and 1c.

The Downloadable security profile data for each Downloadable includes "a list of suspicious computer operations that may be attempted by the Downloadable."  *Id.* at col. 21, ll. 66–67.  Thus, security profile data for a Downloadable is derived from that Downloadable.  Patent Owner contends that security profile data are different from "security policies, for example, which include policies specific to particular users and generic policies that determine whether to allow or block an incoming Downloadable."  Paper 7, 4 (citing Ex. 1001, col. 4, ll. 27–37).

The Downloadable and representation of the Downloadable security profile data are sent to a destination computer.  Ex. 1001, col. 22, ll. 1–4.  Because previously generated profiles can be retrieved efficiently, the systems and methods allow accurate security decisions to be made without the need to generate profiles for all incoming Downloadables, and it is not necessary for the Downloadable to be scanned by the device for malicious operations because the Downloadable security profile already lists malicious operations.  *See* Ex. 1001, col. 10, ll. 44–50.

### B. Related Proceedings

The '926 patent is the subject of a district court action between the parties, *Finjan, Inc. v. Sophos, Inc.*, 3:14-cv-01197 (N.D. Cal.), and also has been asserted in two other district court actions, *Finjan, Inc. v. Symantec Corp.*, 3:14-cv-02998 (N.D. Cal.), and *Finjan, Inc. v. Palo Alto Networks, Inc.*, 3:14-cv-04908 (N.D. Cal.).  Pet. 1–2; Paper 6, 1.  Petitioner also has filed a petition seeking *inter partes* review of a related patent, Patent No. US

IPR2015-00907
Patent 7,613,926 B2

8,677,494 B2 to Edery *et al*.  *Sophos, Inc. v. Finjan, Inc.*, Case IPR2015-01022, Paper 1.

   *C.  Illustrative Claim*

   Petitioner challenges claims 15, 18, 19, and 22 of the '926 patent. Claims 15 (method) and 22 (system) are independent.  Each of claims 18 and 19 depends directly from independent claim 15.  Claim 15 is illustrative and is reproduced below:

   15.   A computer-based method, comprising the steps of:
   receiving an incoming Downloadable;

   *performing a hashing function on the incoming Downloadable to compute an incoming Downloadable ID*;

   *retrieving security profile data for the incoming Downloadable from a database of Downloadable security profiles indexed according to Downloadable IDs*, based on the incoming Downloadable ID, the security profile data including a list of suspicious computer operations that may be attempted by the Downloadable; and

   *transmitting the incoming Downloadable and a representation of the retrieved Downloadable security profile data to a destination computer*, via a transport protocol transmission.

Ex. 1001, col. 21, l. 58–col. 22, l. 4 (emphases added).  Disputed limitations are emphasized.

IPR2015-00907
Patent 7,613,926 B2

*D. Applied References and Declaration*

Petitioner relies on the following references and declaration in support of its asserted grounds of unpatentability:

| Exhibit | References and Declaration | Date |
|---------|----------------------------|------|
| 1003 | Declaration of Charles H. Sauer | NA |
| 1004 | Patent No. US 5,983,348 to Ji ("Ji") | Sept. 10, 1997 |
| 1005 | Patent No. US 6,263,442 B1 to Mueller *et al.* ("Mueller") | May 30, 1996 |
| 1025 | Donald E. Knuth, *The Art of Computer Programming*, Vol. 3, Sorting and Searching (Addison Wesley Publishing Co., Inc. 1973) ("Knuth") | 1973 |
| 1027 | Jan Hruska, Computer *Viruses and Anti-Virus Warfare* (Ellis Horwood Ltd, 2nd rev. ed. 1992) ("Hruska") | 1992 |

As noted above, the '926 patent claims the benefit of the November 6, 1997 filing date of U.S. Patent Application No. 08/964,388.  Ex. 1001, col. 1, ll. 22–24; Paper 7, 59–60.  Petitioner argues, however, that the '926 patent is entitled only to priority from U.S. Provisional Patent Application No. 60/205,591, filed May 17, 2000.  Paper 1, 8.  Nevertheless, because each of the applied references has an effective date prior to November 6, 1997, we agree with Patent Owner that we need not determine whether the '926 patent is entitled to a priority date later than its earliest claimed priority date for purposes of this Decision.  Paper 7, 59.

IPR2015-00907
Patent 7,613,926 B2

### E. *Asserted Grounds of Unpatentability*

Petitioner challenges the patentability of each of claims 15, 18, 19, and 22 on the following grounds:[1]

| References | Basis | Claims Challenged |
|---|---|---|
| Ji, Knuth, and Hruska | 35 U.S.C. § 103(a) | 15, 18, 19, and 22 |
| Mueller, Knuth, and Hruska, alone or in combination with Ji | 35 U.S.C. § 103(a) | 15, 18, 19, and 22 |

---

[1] Petitioner asserts that "[u]sing hash function to index entries in a database must have been well-known in the art because if it was not, the Challenged Claims would not be described or enabled under 35 U.S.C. § 112." Pet. 20 (citing Ex. 1003 ¶ 75). Nevertheless, no challenge under 35 U.S.C. § 112 is permitted in a petition for *inter partes* review. 35 U.S.C. § 311(b); *see* Prelim. Resp. 24 n.1.

IPR2015-00907
Patent 7,613,926 B2

## II. DISCUSSION

### A. *Claim Interpretation*

In an *inter partes* review proceeding, claims of an unexpired patent are given their broadest reasonable interpretation in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012); *see also In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278 (Fed. Cir. 2015) ("We conclude that Congress implicitly approved the broadest reasonable interpretation standard in enacting the AIA.").  Under this standard, we presume that claim terms have their ordinary and customary meaning.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question.") (internal quotation marks omitted).  A patentee, however, may rebut this presumption by acting as his own lexicographer, providing a definition of the term in the specification with "reasonable clarity, deliberateness, and precision."  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Petitioner proposes interpretations for various claim terms: "database," "Downloadable," "Downloadable security profile data," "a representation of the retrieved Downloadable security profile data," "receiver," "Downloadable identifier," "database manager," and "transmitter coupled with said receiver."  Pet. 24–28.  Patent Owner responds to each of Petitioner's proposed interpretations, offering interpretations for each term. Prelim. Resp. 7–15.

IPR2015-00907
Patent 7,613,926 B2

*1.   "database"(Claims 15 and 22)*

The term "database" is recited in claims 15 and 22 of the '926 patent. Relying on the definition provided in The IEEE Standard Dictionary of Electrical and Electronics Terms (Ex. 1036), Petitioner argues that the term "database" means "a collection of logically related data stored together in one or more computerized files and indexed by one or more indices."  Pet. 24 (citing Ex. 1036, 3).  Nevertheless, the IEEE definition does not state that the collection of data is "indexed by one or more indices," and Petitioner does not explain adequately the source of this addition to the IEEE definition.  *Id.*  Petitioner also argues that, although the district court in the related action construed "database" in the '926 patent to mean "a collection of interrelated data organized according to a database schema to serve one or more applications" (Ex. 1033, 3), the district court's construction is too narrow to be the broadest reasonable interpretation because the '926 patent uses the term "database" in a broad manner throughout the Specification, including allegedly comparing a database to a reference list.  Pet. 25 (citing Ex. 1001, col. 16, ll. 51–55); *see Facebook, Inc. v. Pragmatus AV, LLC*, 582 Fed. Appx. 864, 869 (Fed. Cir. 2014) (nonprecedential) ("The broadest reasonable interpretation of a claim term may be the same as or broader than the construction of a term under the *Phillips* standard.  But it cannot be narrower.").

Patent Owner contends that the proper construction of "database" is instead "a collection of interrelated data organized according to a database schema to serve one or more applications."  Prelim. Resp. 7.  As Patent Owner points out (*id.*), this construction has been adopted by the district court in the related action between the parties (Ex. 1033, 7).  Patent Owner

IPR2015-00907
Patent 7,613,926 B2

contends that "[t]his construction stays true to the claim language and most naturally aligns with the patent's description of the invention as well as the well-accepted definition of the term."  Prelim. Resp. 7 (citing IBM DICTIONARY OF COMPUTING, 165 (10th ed. 1993) (Ex. 2001, 3)).  Moreover, in response to Petitioner's argument that the district court's construction is too narrow, Patent Owner contends that the portion of the Specification, upon which Petitioner relies, actually differentiates "a referencing list" from "a database" by referring to them separately.  *Id.* at 7–8 (citing Ex. 1001, col. 16, ll. 51–55 (stating that a "referencing list, database *or other* storage structure(s) . . ." can be used to implement a protection scheme; emphasis added).  Further, Patent Owner contends that the district court recognized this distinction in its construction of this term.  *Id.* at 8 (quoting Ex. 1033, 5).

We agree with Patent Owner that the district court's construction in the related action between the parties represents the broadest reasonable interpretation of "database" in light of the claim language and the Specification of the '926 patent.  *See Translogic Tech.*, 504 F.3d at 1257; *see also Power Integrations, Inc. v. Lee*, ___ F.3d ____, 2015 WL 4757642, at *6 (Fed. Cir. Aug. 12, 2015) ("The fact that the board is not generally bound by a previous judicial interpretation of a disputed claim term does not mean . . . that it has no obligation to acknowledge that interpretation or to assess whether it is consistent with the broadest reasonable construction of the term.").  As explained in the Claim Construction Order, the '926 patent does not define the term "database" (Ex. 1033, 5), there is no evidence that Patent Owner disavowed the full scope of that term either in the Specification or during prosecution (*id.*), and Patent Owner's definition appears to reflect

IPR2015-00907
Patent 7,613,926 B2

both the context of the Specification, as well as an accepted definition of the term.  Ex. 1033, 5, 7; *see* Ex. 1036, 3; Ex. 2001, 3.

Accordingly, on this record and for purposes of this Decision, we determine that the broadest reasonable interpretation of the term "database" to be "a collection of interrelated data organized according to a database schema to serve one or more applications."

### 2.    *"Downloadable" (Claims 15, 18, and 22)*

The term "Downloadable" is recited in challenged claims 15, 18, and 22.  According to Petitioner, under the broadest reasonable interpretation, the term "Downloadable" means "information received over a network that can include executable code (e.g. Java applets, JavaScript and Visual Basic scripts, ActiveX controls, Visual Basic, and other add-ins)." Pet. 25 (citing Ex. 1001, col. 2, ll. 46–51); *see* Ex. 1003 ¶ 90; *see also* Ex. 1001, col. 1, l. 66–col. 2, l. 3, col. 2, ll. 35–40 (providing other examples of Downloadables).

In response, Patent Owner contends that the proper construction of the term "Downloadable" is "an executable application program which is downloaded from a source computer and run on the destination computer." Prelim. Resp. 8–9.  Patent Owner points out that this is the definition provided in Patent Nos. US 6,804,780 B2 (Ex. 1012) and US 6,092,194 (Ex. 1013), from which the '926 patent claims priority and which the '926 patent incorporates by reference. *Id.* at 9 (citing Ex. 1001, col. 1, ll. 17–27; Ex. 1012, col. 1, ll. 50–53; Ex. 1013, col. 1, ll. 44–46).  Moreover, it is also the definition agreed to by Patent Owner and Petitioner in the related action. *Id.* (citing Ex. 2002, 2).

10

IPR2015-00907
Patent 7,613,926 B2

Although the broadest reasonable interpretation may differ from a construction agreed upon by the parties to a district court action, where claim construction is determined according to the different standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*); on this record, we see no rationale for Petitioner's alternative interpretation of this term. *Power Integration*, 2015 WL 4757642, at *6. Further, as noted above, the broadest reasonable interpretation of a claim term may be the same as or broader than the construction of that term under the *Phillips* standard, but not narrower. *Facebook*, 582 Fed. Appx. at 869. To the extent that Petitioner seeks to incorporate specific examples of "executable code" into the interpretation of this term, those examples narrow the interpretation of this term. Moreover, as Patent Owner notes, its proposed interpretation is broad enough to encompass those examples. Prelim. Resp. 10.

We agree with and adopt the interpretation of the term "Downloadables" to which the parties agreed in the district court action, as the broadest reasonable interpretation of "Downloadable" consistent with the Specification. Accordingly, on this record and for purposes of this Decision, we construe the term "Downloadable" to mean "an executable application program which is automatically downloaded from a source computer and run on a destination computer."

3.      *"Downloadable security profile data" (Claims 15 and 22)*

The term "Downloadable security profile data" is recited in claims 15 and 22 of the '926 patent. Petitioner argues that the broadest reasonable interpretation of this term is "security information relating to the Downloadable." Pet. 26. According to Petitioner, this term must be construed broadly to encompass the specific examples included in claim 15

IPR2015-00907
Patent 7,613,926 B2

and in other, unchallenged claims; and this construction is consistent with the Specification of the '926 patent. *Id.* (citing Ex. 1001, col. 3, ll. 6–11, col. 20, l. 67–col. 21, l. 3 (claim 1), col. 21, ll. 14–22 (claims 5–7), Fig. 9); *see* Ex. 1003 ¶¶ 91–93. Patent Owner contends that the term needs no express construction and that the plain meaning within the context of claims 15 and 22 should apply. Prelim. Resp. 11–13.

Although the term "Downloadable" is interpreted above, and claim 15 and 22 provide specific language explaining what "Downloadable security profile data" includes, the phrase "security profile data" is not defined in the Specification, and neither party proposes an accepted definition for that phrase. *See* Pet. 26; Prelim. Resp. 11–13. Further, we find Petitioner's proposed interpretation, "security information relating to the Downloadable," to be overly broad, substantially circular, and generally unhelpful.

As noted above, we presume that claim terms have their ordinary and customary meaning. *See Translogic Tech.*, 504 F.3d at 1257. Looking at the individual words comprising the phrase, we note that "security" means "something that gives or assures safety, tranquility, certainty, etc.; protection; safeguard"; "profile" means "a graph, diagram, piece of writing, etc. presenting or summarizing data relevant to a person or thing"; and "data" means "information." WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH, 352, 1074, 1214 (3rd ed. 1988) (Ex. 3001). In addition, as noted by Petitioner, other claims of the patent at issue, both challenged and unchallenged, can be valuable sources of enlightenment as to the meaning of a claim term. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Consistent with the Specification and the

12

IPR2015-00907
Patent 7,613,926 B2

challenged and unchallenged claims of the '926 patent, "Downloadable security profile data" includes "a list of suspicious computer operations that may be attempted by the Downloadable" (Ex. 1001, claims 15 and 22) and may include "calls made to an operating system, a file system, a network system, and to memory" (*id.*, claim 5); "a URL from where the Downloadable originated" (*id.*, claim 6); and "a digital certificate" (*id.*, claim 7). *See* Ex. 1001, col. 2, ll. 51–64.

Accordingly, on this record and for purposes of this Decision, the broadest reasonable interpretation of the term "Downloadable security profile data" is "a presentation or summary of information regarding the protection or safeguarding of an executable application program which is automatically downloaded from a source computer and run on a destination computer."

### 4.  Other Claim Terms

For purposes of this Decision, no other claim terms require express interpretation. *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("claim terms need only be construed 'to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### B. Asserted Grounds of Unpatentability

### 1. Overview

Petitioner argues that claims 15, 18, 19, and 22 of the '926 patent are rendered obvious by the combinations of references described above. *See supra* Sec. I.E.  A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter[,] as a whole[,] would have been obvious at the

13

IPR2015-00907
Patent 7,613,926 B2

time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art[2]; and (4) objective evidence of nonobviousness, i.e., secondary considerations.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  On this record and for the reasons set forth below, we are not persuaded that Petitioner demonstrates a reasonable likelihood of prevailing in the challenges to claims 15, 18, 19, and 22 of the '926 patent.

## 2.  *Obviousness over Ji, Knuth, and Hruska*

Petitioner contends that the combination of the teachings of Ji, Knuth, and Hruska would have rendered obvious the subject matter of claims 15, 18, 19, and 22 of the '926 patent.  Pet. 29–40.  For the reasons that follow, we are not persuaded that Petitioner has established a reasonable likelihood that it would prevail on this ground with respect to any of the challenged claims.

### a.  *Ji*

Ji describes methods and scanners for detecting and preventing execution of instructions in an application program provided from a computer network, in particular, methods and "network scanner for security checking of application programs (e.g. Java applets or Active X controls)

---

[2] Petitioner proposes a definition for a person of ordinary skill in the art. Pet. 16; *see* Ex. 1003 ¶ 69.  Patent Owner does not challenge this definition. For purposes of this Decision and to the extent necessary, we adopt Petitioner's definition.

IPR2015-00907
Patent 7,613,926 B2

received over the Internet or an Intranet [that] has both static (pre-run time) and dynamic (run time) scanning." Ex. 1004, Abstract. Ji teaches creating a sandboxed package including mobile protection code, the downloadable-information and the security policies, where the sandboxed package is communicated subsequently to the intended client destination. *Id.* at col. 3, ll. 32–44, col. 4, l. 66–col. 5, l. 43, col. 6, ll. 38–42, col. 7, ll. 8–28; Pet. 30 (citing Ex. 1003 ¶ 106). Ji's Figure 1 is reproduced below:



*FIG. 1*

Figure 1 depicts a block diagram illustrating client machine 14 connected to the Internet 10 via proxy server machine 20. Ex. 1004, col. 4, ll. 55–60. Proxy server machine 20 receives software from the Internet 10

15

IPR2015-00907
Patent 7,613,926 B2

and transmits that software to client machine 14 via web browser 22, so that the software is installed on client machine 14. *Id.* at col. 4, ll. 60–63. Client machine 14 also includes local resources 30, e.g., files stored on a disk drive. *Id.*

During prosecution of the '926 patent, the Examiner relied on Ji as an anticipatory reference disclosing all of the limitations of originally filed claims, including original claims 141 and 143, which, after amendment, issued as challenged claims 15 and 22. Pet. 7–8; Ex. 1002, 127. During prosecution, however, the Examiner determined that at least two claims, original claims 142 and 144, contained allowable subject matter and would be allowable if rewritten in independent form to include the limitations of their base claims, claims 141 and 143. Ex. 1002, 132.

Claim 142 recited "[t]he computer-based method of claim 141 further comprising *performing a hashing function* on the incoming Downloadable to compute the incoming Downloadable ID"; and claim 144 recited "[t]he system of claim 143 further comprising a Downloadable identifier for *performing a hashing function* on the incoming Downloadable to compute the incoming Downloadable to compute the incoming Downloadable ID." *Id.* at 97 (emphases added). Applicants overcame the anticipation rejections of claims 141 and 143 over Ji by amending claims 141 (claim 15) and 143 (claim 22) to include the limitations of claims 142 and 144, respectively. *Id.* at 148–49.

   *b. Knuth*

Knuth is a treatise on computer programming. Ex. 1025, 5–6; Pet. 31 (citing Ex. 1003 ¶ 109). In Knuth's Section 6.4, Knuth provides a history and explanation of the use of hashing functions in computer programming in

IPR2015-00907
Patent 7,613,926 B2

1973.  Ex. 1025, 39–75; *see* Pet. 31 (citing Ex. 1003 ¶ 110).  Petitioner

argues that Knuth teaches that the use of hashing functions was well-known

in computer programming and computer security applications.  Pet. 32

(citing Ex. 1003 ¶ 110).

### c. Hruska

Hruska provides a framework for describing the principles of network

security, particularly, virus protection.  Ex. 1027, 12–13.  Hruska analyzes

the state of anti-virus principles in 1992 and teaches the use of various

computer programming techniques for protecting computers, including the

use of hashing functions to index entries in a database and the use of hashing

functions for virus protection.  Pet. 32 (citing Ex. 1003 ¶¶ 111–12).

### d. Discussion

Relying, in part, on the analysis performed by the Examiner during

prosecution, Petitioner argues that Ji teaches or suggests all of the limitations

of challenged claims 15 and 22, except for the limitations relating to

performance of the hashing function.  Pet. 32–37 (claim 15), 39–40 (claim

22) (citing Ex. 1002, 127–130).  Further, Petitioner argues that Ji teaches the

additional limitations of claims 18 and 19.  *Id.* at 37–39.  Petitioner

acknowledges, however, that "Ji does not explicitly disclose using a hash of

the Downloadable as an index."  *Id.* at 31 (citing Ex. 1003 ¶¶ 107–108).

Petitioner argues, however, that the combination of the teachings of Ji with

those of Knuth and Hruska teach or suggest "performing a hashing function

on the incoming Downloadable to compute an incoming Downloadable ID,"

as recited in claims 15 and 22 of the '926 patent.  *Id.* at 33–34, 39.

Regarding the "performance" step of claim 15, Petitioner argues that

"Knuth and Hruska disclose[] using a hash function to index entries in a

IPR2015-00907
Patent 7,613,926 B2

database, which comprises the performance of a hashing function on the incoming data to compute an ID for the incoming data." Pet. 33. Although the Specification of the '926 patent does not include a definition of a hashing function, Hruska defines a "hash function" as "[a] function which maps a set of variable size data into objects of a single size. Widely used for fast searching." Ex. 1027, 138. Patent Owner does not propose an alternative definition for "hashing function" for purposes of this Decision. Initially, we note that Petitioner argues that hashing the Downloadables to create the index entries in a database "comprises" hashing the incoming Downloadable to compute a Downloadable ID for the incoming data. Specifically, Petitioner states that "it would have been obvious to a POSITA to utilize a hash function as disclosed in Knuth and Hruska *on an applet to form an index*, and to use *that index to retrieve the predefined security policies* applicable to the applet from a database of predefined security policies." Pet. 34 (citing Pet. 16–21; Ex. 1003 ¶ 135).

We agree with Patent Owner, however, that Petitioner fails to show where Knuth and Hruska teach or suggest performing a hashing function on a Downloadable *to obtain a Downloadable ID* (Prelim. Resp. 21–25 (citing Ex. 1025, 39; Ex. 1027, 83–84, 89)) for later use in "retrieving security profile data for the incoming Downloadable from a database of Downloadable security profiles indexed according to Downloadable IDs" (*id.* at 25–28). Nevertheless, as Petitioner notes, Knuth teaches "search methods based on comparing the given argument K to the keys in the table, or using its digits to govern a branching process." *Id.* at 23 (quoting Ex. 1025, 39); *see* Pet. 33. According to Petitioner, another possibility, which would avoid "rummaging" through a table of data, would be to do "some

18

IPR2015-00907
Patent 7,613,926 B2

arithmetical calculation on K, computing a function f(K) which is the location of K and the associated data in the table."  Prelim. Resp. 23 (quoting Ex. 1025, 39); *see* Pet. 33.  Petitioner explains that "K is the claimed 'Downloadable,' f(K) is a hashing function, and the result from the hashing function, f(K), is the claimed 'Downloadable ID'."  Pet. 33; *see* Ex. 1003 ¶¶ 131–35.  Further, Petitioner argues that a person of ordinary skill in the art "would have been motivated to perform the hashing function on an entire applet[, i.e., a Downloadable,] because Ji discloses that a security policy may be imposed based on the entire applet."  Pet. 35 (citing Ex. 1004, col. 3, ll. 7–56, col. 4, ll. 51–54; Ex. 1003 ¶¶ 126–35).

As Patent Owner notes, however, Knuth states that "K" is an argument for a search algorithm, not an incoming Downloadable.  Prelim. Resp. 23 (citing Ex. 1025, 39 ("the given argument K")).  Patent Owner further contends that "the function, f(K), does not compute a Downloadable ID.  f(K) is simply a function in a program's search algorithm for finding argument K's location in the table."  *Id.* (citing Ex. 1025, 39 ("computing a function f(K) which is the location of K and the associated data in the table.")).  Moreover, even assuming, as Petitioner argues, that a person of ordinary skill in the art "would have been motivated to perform the hashing function on an entire applet" (Pet. 35), Petitioner fails to demonstrate sufficiently that this teaches or suggests computation of a Downloadable ID *or* retrieval of Downloadable security profile data based on a Downloadable ID.  Prelim. Resp. 27–28.  In view of Patent Owner's arguments and our interpretations of the relevant claim terms, we are not persuaded by Petitioner that the combination of the teachings of Ji, Knuth, and Hruska teaches or suggests performing a hashing function on a Downloadable to

19

IPR2015-00907
Patent 7,613,926 B2

compute a Downloadable ID or retrieving Downloadable security profile data from a database of Downloadable security profiles based on the computed Downloadable ID, as recited in claim 15 and 22 of the '926 patent.

In addition, Petitioner argues that Ji teaches or suggests the step of "transmitting *the incoming Downloadable and a representation of the retrieved Downloadable security profile data* to a destination computer, via a transport protocol transmission," as recited in claims 15 and 22 of the '926 patent. Ex. 1001, col. 22, ll. 1–4, 32–35 (emphasis added). Relying, in part, on the Examiner's determination during prosecution (Pet. 36 (citing Ex. 1002, 127–130)), Petitioner argues that Ji teaches a "'monitoring package' that includes 'security policy functions' and is combined with the 'instrumented' applet in a single Java archive, which is transmitted from the server [20] to the browser [22] running on the client machine [14]" (*id.* (citing Ex. 1004, Abstract, col. 3, ll. 7–56, col. 4, l. 66–col. 5, l. 27, col. 6, ll. 38–51, Fig. 1)).

Nevertheless, as Patent Owner notes, Ji discloses "instrumenting" suspicious operations in the received applet, e.g., "the incoming Downloadable," before transmission of the instrumented applet with the "monitoring package." Prelim. Resp. 32–33 (citing Ex. 1005, col. 6, ll. 38–42 ("[t]he pre and post-filter and monitoring package security policy functions are combined with the instrumented applet code in a single JAR (Java archive)")); *see also* Pet. 36 ("Ji discloses 'instrumenting' the suspicious operations in the received applet (claimed 'Downloadable')." (citations omitted)). Patent Owner contends that "Ji's instrumented applet is the output of Ji's applet scanner, which statically scans applets to identify

IPR2015-00907
Patent 7,613,926 B2

problematic instructions and then instruments the identified problematic instructions, by '**altering the applet byte code sequence**' by inserting pre- and post-filters or by replacing the problematic instructions with another instruction." Prelim. Resp. 33 (quoting Ex. 1004, col. 5, ll. 16–18). Because applet code is altered or replaced in the "instrumenting" process, we are not persuaded that Ji's transmission of an "instrumented" applet teaches or suggests the transmission of "the *incoming* Downloadable," as recited in claims 15 and 22 of the '926 patent.

On this record, Petitioner has not identified sufficient evidence that the combination of the teachings of Ji, Knuth, and Hruska teaches or suggests all of the limitations recited in independent claims 15 and 22 and, in particular, either "performing a hashing function on the incoming Downloadable to compute an incoming Downloadable ID" or "transmitting the incoming Downloadable and a representation of the retrieved Downloadable security profile data to a destination computer," or both. Consequently, we are not persuaded that Petitioner demonstrates a reasonable likelihood that it would prevail at trial in showing that the subject matter of either of those claims or of dependent claims 18 or 19 would have been rendered obvious over the asserted combination of these references.

> ### 3. Obviousness over Mueller, Knuth, and Hruska, alone or in combination with Ji

Petitioner contends that the combination of the teachings of Mueller, Knuth, and Hruska, alone or in combination with Ji, would have rendered obvious the subject matter of claims 15, 18, 19, and 22 of the '926 patent. Pet. 40–52; *see* Pet. 46 ("To the extent Mueller does not disclose this element, Ji discloses this element."); Prelim. Resp. 40. For substantially the same reasons as set forth in our discussion of the first asserted ground in

IPR2015-00907
Patent 7,613,926 B2

Section II.B.2, *supra*, we are not persuaded that Petitioner demonstrates a reasonable likelihood that it would prevail on this ground with respect to any of the challenged claims.

### a. Mueller

Mueller describes systems and methods for securing a program's execution in a network environment.  Ex. 1005, Abstract; Ex. 1003 ¶ 178.  The systems and methods taught by Mueller describe reviewing information and requests received by a computing device and determining whether to permit the information or requests to proceed by analyzing the information and requests.  Ex. 1005, Abstract, col. 2, ll. 7–10, Table 1; Ex. 1003 ¶ 178.  Mueller discloses signing a servlet using a "digital signature" on one server and transferring the "signed" servlet to another server where the "digital signature" verifies the source of the signed servlet "particularly by digital signature," referring to a JarFile.hash, on the other server.  Ex. 1005, col. 3, l. 62–col. 4, l. 45, Table 1.  Mueller then takes this information and requests and packages it together prior to sending it to another client device for use.  Ex. 1005, Abstract, col. 1, ll. 34–44 and 52–56, col. 3, ll. 58–66, col. 4, ll. 63–65; Ex. 1003 ¶ 178.

### b. Discussion

As discussed above in Section II.B.2, Petitioner argues that Knuth (Ex. 1025) teaches that hashing is a very well-known concept in software and network security and that Hruska (Ex. 1027) teaches applying the hashing concept to these fields.  *See* Pet. 41 (citing Ex. 1003 ¶¶ 109–112, 179).  Petitioner argues that a person of ordinary skill in the art would have had reason to combine the teachings of Mueller with those of Knuth and

IPR2015-00907
Patent 7,613,926 B2

Hruska to provide such claim limitations that may not be taught by Mueller alone.  *See* Pet. 41.

Among other limitations, Petitioner argues that "a hashing functionality specific to provide a security analysis of downloaded information" would be taught or suggested by Knuth and Hruska.  *Id.* at 41–46; Ex. 1025, 39–75; Ex. 1027, 138; Ex. 1003 ¶ 180.  In particular, Petitioner argues that

> Knuth discloses that performing hashing functions to create a unique identifier as required by [the "hashing function" step] was well known in the art, and Hruska further describes the use of hashing for this purpose in the software security field at least as early as 1992.

Pet. 41 (citing Ex. 1025. 39; Ex. 1027, 83–84, 89; Ex. 1003 ¶ 180).  Consequently, Petitioner asserts that the subject matter of claims 15, 18, 19, and 22 would have been rendered obvious over Mueller, Knuth, and Hruska. *Id.* (citing Ex. 1003 ¶¶ 176–246).

With respect to the "hashing function" step, Petitioner argues that Mueller teaches creation of sig.ID, as referenced in Table I, which teaches creating the recited Downloadable ID of claims 15 and 22.  Pet. 42–43 (citing Ex. 1005, Table 1; Ex. 1003 ¶ 194).  According to Petitioner,

> Mueller describes how the incoming Downloadable, the SignedJarFile, *i.e.*, the servlet, undergoes a hashing function, which includes extracting information from the SignedJarFile.  Ex. 1005 at Table 1; Ex. 1003 at ¶ 194.  *After extracting the information from SignedJarFile, Mueller describes computing a hash from the SignedJarFile's extracted information (here, JarFile.hash).*  Ex. 1005 at Table 1; Ex. 1003 at ¶ 194.  This hash is then compared against a previously determined hash value to determine the veracity of the signature in the SignedJarFile, *i.e.*, the servlet (Downloadable).  Ex. 1005 at Table 1; Ex. 1003 at ¶ 194.  Once the signature is determined to

23

IPR2015-00907
Patent 7,613,926 B2

> be valid (the signature is referenced as sig), Mueller then
> discloses comparing the sig.ID against a list of trusted
> signatures. Ex. 1005 at Table 1; Ex. 1003 at ¶ 194. *Through
> this disclosure, it is evident that the sig.ID is the Downloadable
> ID of the SignedJarFile, i.e., the servlet (the Downloadable).*
> Ex. 1003 at ¶ 194.

Pet. 43 (emphases added).

As Patent Owner points out, however, Petitioner acknowledges that Mueller's hashing function is not used to compute the value that Petitioner equates with the Downloadable ID, namely, Mueller's sig.ID. Prelim. Resp. 40–41 (quoting Pet. 43 ("Through this disclosure, *it is evident that the sig.ID is the Downloadable ID* of the SignedJarFile, i.e., the servlet (the Downloadable)." (emphasis added))). Instead, referring to Mueller's Figure 3, the sig.ID is received with the servlet over the network. *Id.* at 41. Referring to Mueller's Table I, the "signature is detached from .class file; and if servlet has only one .class file, then signed JAR file is just that .class file, plus the necessary signature info." The sig.ID then is compared to a list of trusted signatures. Ex. 1005, Table I. If the signature is listed, the file then is loaded on the server. *Id.* As Patent Owner further contends, "the sig.ID identifies the **source** of the servlet—not the servlet itself." Prelim. Resp. 42 (citing Ex. 1005, col. 3, l. 55–col. 4, l. 5 ("the server's security manager identifies the network source of the servlet and implements a security policy based on the servlet's network source.")). Consequently, after considering Petitioner's and Patent Owner's arguments and evidence, we are not persuaded that Petitioner demonstrates a reasonable likelihood that it would prevail in showing that Mueller's sig.ID teaches a Downloadable ID or performing a hashing function on the incoming servlet, i.e., a Downloadable, to compute an incoming Downloadable ID.

IPR2015-00907
Patent 7,613,926 B2

Alternatively, Petitioner argues that, even if Mueller does not disclose "performing a hashing function on the incoming Downloadable to compute an incoming Downloadable ID," a person of ordinary skill in the art would have reason to perform the "hashing function" in the recited manner, in view of the teachings of Knuth and Hruska.  Pet. 43–44.  Nevertheless, as Patent Owner contends (Prelim. Resp. 42–43) and for the reasons discussed above, Petitioner fails to show where Knuth and Hruska teach or suggest performing a hashing function on a Downloadable to obtain a Downloadable ID (*id.* at 21–25 (citing Ex. 1025, 39; Ex. 1027, 83–84, 89)) for later use in "retrieving security profile data for the incoming Downloadable from a database of Downloadable security profiles indexed according to Downloadable IDs" (*id.* at 25–28).   *See supra* pgs. 17–20.

Petitioner additionally argues that Mueller teaches or suggests the step of "transmitting *the incoming Downloadable and a representation of the retrieved Downloadable security profile data* to a destination computer, via a transport protocol transmission," as recited in claims 15 and 22 of the '926 patent.  Ex. 1001, col. 22, ll. 1–4, 32–35(emphasis added).  Petitioner argues that Mueller teaches

> A first server is configured to permit execution of a program from a second server based on a configurable security characteristic of the program.  The first server receives the program transferred from the second server.  *Subsequently, the program is checked for the configurable security characteristic.* The program is executed on the first server if permitted by the configurable security characteristic.

Pet. 46 (citing Ex. 1005, col. 1, l. 66–col. 2, l. 2 (emphasis added).

Nevertheless, as Patent Owner notes, Mueller only teaches transmitting the program from the second server to the first server.  Prelim.

25

IPR2015-00907
Patent 7,613,926 B2

Resp. 47–48. The program then is "checked for the configurable security characteristic" at the first server. *Id.* at 48 (citing Ex. 1005, Fig. 3). Petitioner, however, fails to show that Mueller teaches transmitting "a representation of the Downloadable security profile" *with the program* from the second server to the first server. Pet. 46–47; Prelim. Resp. 47. Petitioner relies on Dr. Sauer's testimony that "Mueller discloses that the transmission of the programs (which include the Downloadable and a representation of the Downloadable security profile set forth in the chart above) between servers would be transmitted over a transport protocol transmission," as demonstrating that Mueller teaches transmission of "a representation of the Downloadable security profile" with Mueller's program. Pet. 47 (citing Ex. 1003 ¶ 219). Dr. Sauer's testimony is conclusory and unsupported, and, thus, unpersuasive. 37 C.F.R. § 42.65(a). We are not persuaded that Mueller's transmission of a program from a second server to a first server teaches or suggests the transmission of "the incoming Downloadable *and a representation of the Downloadable security profile,*" as recited in claims 15 and 22 of the '926 patent.

To the extent that Mueller does not teach the "transmitting" step, Petitioner argues in the alternative that Ji teaches this limitation. Pet. 46–48. Nevertheless, as Patent Owner contends (Prelim. Resp. 49) and for the reasons discussed above, we are not persuaded that Ji's transmission of an "instrumented" applet teaches or suggests the transmission of "the incoming Downloadable," as recited in claims 15 and 22 of the '926 patent. *See supra* pgs. 20–21.

On this record, Petitioner has not identified sufficient evidence that Mueller, Knuth, and Hruska, alone or in combination with Ji, teach or

IPR2015-00907
Patent 7,613,926 B2

suggest all of the limitations recited in independent claims 15 and 22 and, in particular, either "performing a hashing function on the incoming Downloadable to compute an incoming Downloadable ID" or "transmitting the incoming Downloadable and a representation of the retrieved Downloadable security profile data to a destination computer," or both. Consequently, we are not persuaded that Petitioner demonstrates a reasonable likelihood that it would prevail at trial in showing that the subject matter of either of those claims or of dependent claims 18 or 19 would have been rendered obvious over the asserted combination of these references.

### III. CONCLUSION

On this record, we are not persuaded that Petitioner demonstrates a reasonable likelihood that it would prevail in showing the unpatentability of any of claims 15, 18, 19, and 22 of the '926 patent on the grounds asserted in the Petition.  Consequently, the Petition is *denied* as to each of the asserted grounds.

### IV. ORDER

Accordingly, it is:

ORDERED that the Petitioner is *denied*, and no *inter partes* review is instituted as to any of claims 15, 18, 19, and 22 of the '926 patent.

IPR2015-00907
Patent 7,613,926 B2

For PETITIONER:

James M. Heintz
Jeff R. Cole
Ryan W. Cobb
DLA PIPER (US) LLP
Sophos-Finjan-926IPR@dlapiper.com


For PATENT OWNER:

James Hannah
Michael H. Lee
Paul J. Andre
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jhannah@kramerlevin.com
mhlee@kramerlevin.com
pandre@kramerlevin.com

# EXHIBIT 39

US005983348A

# United States Patent [19]

## Ji

| [11] | Patent Number: | **5,983,348** |
|---|---|---|
| [45] | Date of Patent: | **Nov. 9, 1999** |

[54] **COMPUTER NETWORK MALICIOUS CODE SCANNER**

[75] Inventor: **Shuang Ji**, Santa Clara, Calif.

[73] Assignee: **Trend Micro Incorporated**, Cupertino, Calif.

[21] Appl. No.: **08/926,619**

[22] Filed: **Sep. 10, 1997**

[51] Int. Cl.$^6$ ................................................ **G06F 13/00**
[52] U.S. Cl. ......................................... **713/200**; 714/38
[58] Field of Search ............................... 395/186, 187.01,
395/188.01, 183.14, 183.13, 200.54, 200.55,
200.32; 380/3, 4, 23, 25; 713/200, 201,
202; 714/38, 37

[56]                **References Cited**

U.S. PATENT DOCUMENTS

| 5,257,381 | 10/1993 | Cook | 395/700 |
|---|---|---|---|
| 5,359,659 | 10/1994 | Rosenthal | 380/4 |

| 5,390,232 | 2/1995 | Freeman et al. | 379/15 |
|---|---|---|---|
| 5,623,600 | 4/1997 | Ji et al. | 395/187.01 |
| 5,805,829 | 9/1998 | Cohen et al. | 395/200.32 |

*Primary Examiner*—Norman Michael Wright
*Attorney, Agent, or Firm*—Skjerven, Morrill MacPherson, Franklin & Friel LLP; Norman R. Klivans

[57]                **ABSTRACT**

A network scanner for security checking of application programs (e.g. Java applets or Active X controls) received over the Internet or an Intranet has both static (pre-run time) and dynamic (run time) scanning. Static scanning at the HTTP proxy server identifies suspicious instructions and instruments them e.g. a pre-and-post filter instruction sequence or otherwise. The instrumented applet is then transferred to the client (web browser) together with security monitoring code. During run time at the client, the instrumented instructions are thereby monitored for security policy violations, and execution of an instruction is prevented in the event of such a violation.

**34 Claims, 2 Drawing Sheets**



Case 3:14-cv-01197-WHO   Document 135-22   Filed 03/15/16   Page 211 of 252



*FIG. 1*

1197SOPHOS_00012500



*FIG. 2*

5,983,348

1

# COMPUTER NETWORK MALICIOUS CODE SCANNER

## FIELD OF THE INVENTION

This invention pertains to computer networks and specifically to detecting and preventing operation of computer viruses and other types of malicious computer code.

## BACKGROUND

With the rapid development of the Internet, Intranet, and network computing, applications (application programs) are distributed more and more via such networks, instead of via physical storage media. Many associated distribution technologies are available, such as Java and Active X. Therefore objects with both data and code flow around the network and have seamless integration with local computer resources. However, this also poses a great security risk to users. Code (software) from unknown origin is thereby executed on local computers and given access to local resources such as the hard disk drive in a user's computer. In a world wide web browser environment, such code is often automatically executed and the user might not even have a chance to be forewarned about any security risks (e.g. presence of computer viruses) he bears. Attempts have been made to reduce such risks; see Ji et al., U.S. Pat. No. 5,623,600, incorporated by reference in its entirety.

Active X technology, like Java, distributes code that can access local system resources directly. The web browser cannot monitor or block such accesses. Such an applet (application) can do virtually anything that a conventional program, for instance, a virus, is capable of doing. Microsoft Corp. and others have attempted to address this problem by using digital signature technology, whereby a special algorithm generates a digital profile of the applet. The profile is attached to the applet. When an applet is downloaded from the Internet, a verification algorithm is run on the applet and the digital profile to ensure that the applet code has not been modified after the signing. If an applet is signed by a known signature, it is considered safe.

However, no analysis of the code is done to check the behavior of the applet. It is not difficult to obtain a signature from a reputable source, since the signature can be applied for online. It has occurred that a person has created an Active X applet that was authenticated by Microsoft but contains malicious code. (Malicious code refers to viruses and other problematic software. A virus is a program intended to replicate and damage operation of a computer system without the user's knowledge or permission. In the Internet/Java environment, the replication aspect may not be present, hence the term "malicious code" broadly referring to such damaging software even if it does not replicate.)

Java being an interpreted language, Java code can be monitored at run-time. Most web browsers block attempts to access local resources by Java applets, which protects the local computer to a certain extent. However, as the popularity of Intranets (private Internets) increases, more and more applets need to have access to local computers. Such restrictions posed by the web browsers are becoming rather inconvenient. As a result, web browsers are relaxing their security policies. Netscape Communicator is a web browser that now gives users the ability to selectively run applets with known security risks. Again, decisions are made based on trust, with no code analysis done.

Hence scanning programs with the ability to analyze and monitor applets are in need to protect users.

At least three Java applet scanners are currently available commercially: SurfinShield and SurfinGate, both from

2

Finjan, and Cage from Digitivity, Inc. SurfinShield is a client-side (user) solution. A copy of SurfinShield must be installed on every computer which is running a web browser. SurfinShield replaces some of the Java library functions included in the browser that may pose security risks with its own. This way, it can trap all such calls and block them if necessary.

SurfinShield provides run-time monitoring. It introduces almost no performance overhead on applet startup and execution. It is able to trap all security breach attempts, if a correct set of Java library functions is replaced. However, it is still difficult to keep track of the states of individual applets if a series of actions must be performed by the instances before they can be determined dangerous this way, because the scanner is activated rather passively by the applets.

Since every computer in an organization needs a copy of the SurfinShield software, it is expensive to deploy. Also, installing a new release of the product involves updating on every computer, imposing a significant administrative burden.

Because SurfinShield replaces library functions of browsers, it is also browser-dependent; a minor browser upgrade may prevent operation. SufinGate is a server solution that is installed on an HTTP proxy server. Therefore, one copy of the software can protect all the computers proxied by that server. Unlike SufinShield, SurfinGate only scans the applet code statically. If it detects that one or more insecure functions might be called during the execution of the applet, it blocks the applet. Its scanning algorithm is rather slow. To solve this problem, SurfinGate maintains an applet profile database. Each applet is given an ID which is its URL. Once an applet is scanned, an entry is added to the database with its applet ID and the insecure functions it might try to access. When this applet is downloaded again, the security profile is taken from the database to determine the behavior of the applet. No analysis is redone. This means that if a previously safe applet is modified and still has the same URL, SurfinGate will fail to rescan it and let it pass through. Also, because the size of the database is ever-growing, its maintenance becomes a problem over time.

Cage is also a server solution that is installed on an HTTP proxy server, and provides run-time monitoring and yet avoids client-side installations or changes. It is similar to X Windows. All workstations protected by the server serve as X terminals and only provide graphical presentation functionality. When an applet is downloaded to Cage, it stops at the Cage server and only a GUI (graphical user interface) agent in the form of an applet is passed back to the browser. The applet is then run on the Cage server. GUI requests are passed to the agent on the client, which draws the presentation for the user. Therefore, it appears to users that the applets are actually running locally.

This approach creates a heavy load on the server, since all the applets in the protected domain run on the server and all the potentially powerful computers are used as graphical terminals only. Also, reasonable requests to access local resources (as in Intranet applications) are almost impossible to honor because the server does not have direct access to resources on individual workstations.

These products fail to create any balance between static scanning and run-time monitoring. SurfinShield employs run-time monitoring, SurfinGate uses static scanning, and Cage utilizes emulated run-time monitoring. Since static scanning is usually done on the server and run-time monitoring on the client, this imbalance also causes an imbalance

1197SOPHOS_00012502

5,983,348

**3**

between the load of the server and the client. To distribute the load between the client and the server evenly, the present inventor has determined that a combination of static scanning and run-time monitoring is needed.

### SUMMARY

This disclosure is directed to an applet scanner that runs e.g. as an HTTP proxy server and does not require any client-side modification. The scanner combines static scanning and run-time monitoring and does not cause a heavy load on the server. It also does not introduce significant performance overhead during the execution of applets. The scanner provides configurable security policy functionality, and can be deployed as a client-side solution with appropriate modifications.

Thereby in accordance with the invention a scanner (for a virus or other malicious code) provides both static and dynamic scanning for application programs, e.g. Java applets or ActiveX controls. The applets or controls (hereinafter collectively referred to as applets) are conventionally received from e.g. the Internet or an Intranet at a conventional server. At this point the applets are statically scanned at the server by the scanner looking for particular instructions which may be problematic in a security context. The identified problematic instructions are then each instrumented, e.g. special code is inserted before and after each problematic instruction, where the special code calls respectively a prefilter and a post filter. Alternatively, the instrumentation involves replacing the problematic instruction with another instruction which calls a supplied function.

The instrumented applet is then downloaded from the server to the client (local computer), at which time the applet code is conventionally interpreted by the client web browser and it begins to be executed. As the applet code is executed, each instrumented instruction is monitored by the web browser using a monitor package which is part of the scanner and delivered to the client side. Upon execution, each instrumented instruction is subject to a security check. If the security policy (which has been pre-established) is violated, that particular instruction which violates the security policy is not executed, and instead a report is made and execution continues, if appropriate, with the next instruction.

More broadly, the present invention is directed to delivering what is referred to as a "live agent" (e.g., a security monitoring package) along with e.g. an applet that contains suspicious instructions during a network transfer (e.g. downloading to a client), the monitoring package being intended to prevent execution of the suspicious instructions. The suspicious instructions each may (or may not) be instrumented as described above; the instrumentation involves altering suspicious instructions such as by adding code (such as the pre-and post-filter calls) or altering the suspicious instructions by replacing any suspicious instructions with other instructions.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows diagrammatically use of a scanner in accordance with this invention.

FIG. 2 shows detail of the FIG. 1 scanner.

### DETAILED DESCRIPTION

Several characteristics of the well known Java language and applets are pertinent to the present scanning method and apparatus. Java is an interpreted, dynamic-linking language.

**4**

Only the application modules are distributed, and all the standard library functions are provided by the interpreter, for instance a web browser. Because Java byte code is platform-independent, applets have to use some of the standard library functions to access operating system resources.

This creates two opportunities in accordance with the invention to detect attempts to use operating system resources. First, one can "trick" applets into calling particular functions supplied by the scanner during the dynamic linking stage. This is done by replacing the browser Java library routines with the scanner's monitoring routines of the same name. Second, since invocations of such functions have to be resolved at run-time, symbolic names of these functions are kept in the Java applet module. The scanner can detect possible use of these functions by looking at the static code itself. The first opportunity provides run-time monitoring. It is the most definitive method to determine the security risks posed by an applet.

The second opportunity enables statically scanning an applet, without running it, to detect possible security risks. If a set of insecure functions is properly defined and an applet never calls any function in the set, the applet can be assumed to be safe. However, this static scanning method is not definitive, since an applet might show different behavior given different user input. Under certain conditions, the instruction in the applet that makes the function call may never be executed. If static scanning is used without run-time monitoring, many such "false alarms" of security risks are produced undesirably.

After the code of an applet is downloaded, e.g. via the Internet to a client platform (local computer), an instance of the applet is created in the conventional Java "virtual machine" in the web browser (client) running on that local computer. Different instances of the same applet might produce different results given different inputs. A running instance of an applet is conventionally called a session; sessions are strictly run-time entities. Static scanning cannot analyze sessions because static scanning does not let the applet run. Sessions are important because an instance of an applet will often perform a series of suspicious tasks before it can be determined dangerous (i.e., in violation of the security policy). Such state information needs to be associated with the sessions. The present applet scanner thereby stops sessions instead of blocking execution of the entire applet.

A security policy defines what functions an applet needs to perform to be considered a security risk. Examples of security policies include preventing(1) applets from any file access, or (2) file access in a certain directory, or (3) creating certain Java objects. An applet scanner in accordance with the invention may allow different security policies for different clients, for different users, and for applets from different origins.

FIG. 1 is a high level block diagram illustrating the present scanner in the context of conventional elements. The Internet (or an Intranet) is shown generally at **10**. The client machine or platform (computer) **14**, which is typically a personal computer, is connected to the Internet **10** via a conventional proxy server machine (computer) **20**. Client machine **14** also includes local resources **30**, e.g. files stored on a disk drive. A conventional web browser **22** is software that is installed on the client machine **14**. It is to be understood that each of these elements is complex, but except for the presently disclosed features is conventional.

Upon receipt of a particular Java applet, the HTTP proxy server **32**, which is software running on server machine **20**

5,983,348

## 5

and which has associated scanner software **26**, then scans the applet and instruments it using an instrumenter **28** which is part of the scanner software **26**. (Downloaded non-applets are not scanned.) The instrumented applet is subject to a special digital signer which is an (optional) part of the scanner **26**. The scanned (instrumented) applet, which has been digitally signed is then downloaded to the web browser **22** in the client **14**. The applet is then conventionally interpreted by the web browser **22** and its instructions are executed. The execution is monitored by the monitor package software, also downloaded from scanner **26**, in the web browser **22** in accordance with this invention for security purposes. Thus static scanning is performed by the HTTP proxy server **32** and dynamic scanning by the web browser **22**.

The present applet scanner thus uses applet instrumentation technology, that is, for Java applets it alters the Java applet byte code sequence during downloading of the applet to the server **32**. After the Java applet byte code sequence has been downloaded, the static (pre-run time) scanning is performed on the applet by the scanner **26**. If an instruction (a suspicious instruction) that calls an insecure function (as determined by a predefined set of such functions) is found during this static scanning, a first instruction sequence (pre-filter) is inserted before that instruction and a second instruction sequence (post-filter) after that instruction by the instruments.

An example of such a suspicious Java function is "Java.IO.File.list" which may list the contents of a client (local) directory **30**, e.g. a directory on the client machine **14** hard disk drive. The first instruction sequence generates a call to a pre-filter function provided by the scanner **26**, signaling that an insecure (suspicious) function is to be invoked. The pre-filter checks the security policy associated with the scanner **26** and decides whether this particular instruction ("call") is allowed. The second instruction sequence generates a call to a post-filter function also provided by the scanner. It also reports the result of the call to the post-filter function. Both the pre- and post-filter functions update the session state to be used by the security policy. The static scanning and instrumentation are both performed on the HTTP proxy server **32**.

The following is pseudo-code for the instrumentation process:

```
instrument (JavaClassFile classfile)
{
        extract constant pool from classfile;
        extract functions from classfile;
        for each function
{
        for each function
        if( the instruction is a function call
                AND the target of the call is a pre-defined set
                of suspicious functions)
        {
        output an instruction sequence which generates a
        function call to a pre-monitor function, with the
        name of the suspicious function, parameters to the
        suspicious function, and possibly other
        information about his suspicious function
        invocation as the parameters;
        output the original instruction;
        output an instruction sequence which generates a
        function call to a post-monitor function, with the
        result of the suspicious function invocation and
        possibly other related information as parameters;
}
```

## 6

-continued

```
        else
        {
        output the original instruction;
        }
    }
  }
}
```

Examples of pre- and post-monitor functions are:
(1) to disallow any directory listing access:

```
pre-filter(function_name, parameters)
{
if (function_name == "java.io.File.list")
throw new SecurityException();
}
post-filter(result)
{
}
```

(2) To protect files under c:\temp from directory listing access:

```
pre-filter(function_name, parameters)
{
if
(function_name == "java.io.File.list")
        {
        extract the name of the file to be read from
parameters;
                if the directory to be listed is under c:\temp)
                throw new SecurityException();
{
}
}
post-filter(result)
{
}
```

The pre and post filter and monitoring package security policy functions) are combined with the instrumented applet code in a single JAR (Java archive) file format at the server **32**, and downloaded to the web browser **22** in client machine **14**. From this point on, the server **32** is virtually disconnected from this server-client session. All the monitoring and applet code is executed in the web browser **22** in the client machine **14**. The only time that the server **32** may be again involved during this particular session is when the applet is determined to be dangerous (i.e. including malicious code that violates the security policy) or the applet has completed execution, and a report is sent back to the server **32** by the monitoring code in the scanner **26**. A report is optional in this second case.

This approach minimizes the overhead on both server **32** and browser **14**. The only work performed on the server **32** is to identify suspicious applet instructions and instrument them, which is usually performed by a one time pass over the applet code. To the client web browser **22**, the only overhead is some occasional calls to the scanner monitoring functions, which update session statistics and check security policies. This achieves an optimum distribution of scanning and monitoring between the server **32** and the client web browser **22**. Also, the server **32** maintains no state information about active sessions in the set of host associated with the proxy server instead the session state information is maintained locally at client machine **14** by the downloaded monitoring functions.

This approach may damage the integrity of externally digitally signed (authenticated) applets, since the content of

5,983,348

7

the applets is changed by the instrumentation. However, this can also be used as an advantage because using the present scanner, a new set of authenticated signatures can be set and enforced for the entire domain as further described below.

Operation of scanner **26** and its various (software) components is better understood with reference to FIG. **2**, showing greater detail than FIG. **1**.

An applet pre-fetcher component **38** fetches from the Internet **10** all the dependency files required by a Java class file, if they are not already packed into a JAR file. This is important because the goal is to attach the scanner monitor package to a session only once.

A Java applet may contain more than one code module, or class file. Heretofore this disclosure has assumed that all the class files are packed in one JAR file and downloaded once. One monitoring package is attached to the JAR file and every instantiation of this package on the client web browser **22** marks a unique session. However, if the class files are not packed together and are downloaded on an as-needed basis during applet execution, multiple instrumentation will occur and multiple instances of the monitoring package for the same session are created on the client. This creates a problem of how to maintain information on session states. To solve this problem, the pre-fetcher **38** pre-fetches the dependency class files during the static scanning of the main applet code module. The dependency class files are (see below) instrumented once, packed together, and delivered to the client.

Upon receiving a (signed) applet, the signal verifier component **40** then verifies the signature and its integrity, as conventional, to decide whether to accept this applet.

Next, the unpacker **42** component extracts the class files from the JAR file. JAR uses ZIP (compression) format.

Java class parser component **44** then parses each Java class file. Parser **44** conventionally extracts the instruction sequence of the Java functions.

The Java instrumenter component **48** instruments the Java class files, e.g. by inserting monitoring instructions (e.g. pre and post filter calls) before and after each suspicious instruction, as described above.

The monitor package contains monitoring functions that are delivered from the server **32** to the client web browser **22** with the instrumental applet and are invoked by the instrumentation code in the applet. The monitor package also creates a unique session upon instantiation. It also contains a security policy checker (supplied by security policy generator component **54**) to determine whether the applet being scanned violates the security policy, given the monitoring information.

The security policy generator component **54** generates the security checker code included in the monitor package, from a set of predefined security policies. Different clients, users, and applets may have different security policies. The security policy generator **54** may run on server machine **20** or another computer. In addition, security policies can be configured by an administrator of the system. A simple security policy is to assign different weights to monitored functions and make sure the security weight of a session does not exceed a preset threshold. A more sophisticated security policy checks the file or resource the applet is trying to access at run time and prompts the user whether to allow the access. Hence the security policy broadly is a state machine to detect security policy violations upon attempted instruction execution.

The security policy generator **54** can operate outside the run-time instrumenter component **48** when the security policy is being created. The instrumenter component **48** can

8

then directly use the byte code. Thereby any performance limitations of the security policy generator component **54** become less important.

Next, packer **50** creates a new JAR file (JAR') from the instrumented class files and the monitoring package.

The digital signer component **58** digitally signs the applet (now JAR"), with a digital signature unique to the particular scanner **26**, for authentication in the local domain. The applet JAR" is then transferred to the client machine **14** for execution. Thus the only signature that a client needs to recognize is the digital signature of the signer component **58** in the scanner **26**. This pre-verification simplifies system administration and reduces risks to unsophisticated users who might otherwise accidentally accept applets with unauthorized signatures.

In one embodiment, the components of scanner **26** are each implemented in Java. Some (or all) of the functions ("components") of the scanner **26** described above may be implemented in native (non-Java) code to improve performance. The actual scanner code is not given here; it can be readily written by one of ordinary skill in the art in light of this disclosure.

This disclosure is illustrative and not limiting, further modifications will be apparent to one skilled in the art and are intended to fall within the scope of the appended claims.

I claim:

1. A method of detecting and preventing execution of instructions in an application program provided from a computer network, comprising:

providing the application program over the computer network;

determining whether the provided application program includes any instructions that are members of a particular set of instructions;

executing the application program if it is determined that no members of the set are included in the application program;

if it is determined that an instruction is a member of the set, then altering the application program, thereby allowing monitoring of execution of the instruction, wherein the altering includes inserting a first predefined call before the instruction and a second predefined call after the instruction; and

wherein the first or second predefined call changes a session state of the application program.

2. The method of claim **1**, further comprising associating monitoring code with the application program.

3. The method of claim **1**, wherein the altering includes replacing the instruction with a predefined second instruction.

4. The method of claim **1**, wherein the application program is an applet.

5. The method of claim **4**, wherein the applet is in the Java language.

6. The method of claim **1**, wherein the computer network is an Intranet or the Internet.

7. The method of claim **1** wherein the first predefined call is a call to check a security policy.

8. The method of claim **7**, wherein the security policy is a state machine.

9. The method of claim **1**, wherein the inserting is repeated for each instruction in the application program that is a member of the particular set.

10. The method of claim **1**, wherein the particular set of instructions includes instructions that access a predefined set of files.

1197SOPHOS_00012505

5,983,348

9

**11.** The method of claim **1**, wherein the computer network includes a server and a client coupled to the server, and wherein the altering takes place at the server, wherein the executing the application program takes place at the client.

**12.** The method of claim **1**, wherein the instructions are problematic instructions.

**13.** The method of claim **1**, wherein the application program is altered at the point of the instruction.

**14.** A method of detecting and preventing execution of instructions in an application program provided from a computer network comprising:

   providing the application program over the computer network;

   determining whether the provided application program includes any instructions that are members of a particular set of instructions;

   executing the application program if it is determined that no members of the set are included in the application program;

   if it is determined that an instruction is a member of the set, then altering the application program, thereby allowing monitoring of execution of the instruction;

   determining if the application program includes an authentication;

   verifying the authentication; and

   replacing the verified authentication with a second authentication.

**15.** A method of detecting and preventing execution of instructions in an application program provided from a computer network, comprising:

   providing the application program over the computer network;

   determining whether the provided application program includes any instructions that are members of a particular set of instructions;

   executing the application program if it is determined that no members of the set are included in the application program;

   if it is determined that an instruction is a member of the set, then altering the application program, thereby allowing monitoring of execution of the instruction;

   providing all dependency files associated with the application program;

   providing a single monitoring package performing the step of determining for the application program and its associated dependency files; and

   executing the application program and its associated dependency files.

**16.** A scanner for detecting and preventing execution of instructions in an application program provided from a computer network, wherein the scanner determines whether the provided application program includes any instructions that are members of a particular set of instructions, allowing execution of the application program if it is determined that no members of the set are included in the application program; and comprising:

   an instrumenter which alters the application program at an instruction which is determined to be a member of the set, thereby allowing monitoring of execution of such instructions;

   wherein the instrumenter inserts a first predefined call before the instruction and a second predefined call after the instruction; and

   wherein the first or second predefined call changes a session state of the application program.

10

**17.** The scanner of claim **16**, further comprising a packer which associates monitoring code with the application program.

**18.** The scanner of claim **16**, wherein the instrumenter replaces the instruction with a predefined second instruction.

**19.** The scanner of claim **16**, wherein the application program is an applet.

**20.** The scanner of claim **19**, wherein the applet is in the Java language.

**21.** The scanner of claim **16**, wherein the computer network is an Intranet or the Internet.

**22.** The scanner of claim **16**, wherein the first predefined call is a call to check a security policy.

**23.** The scanner of claim **22**, wherein the security policy is a state machine.

**24.** The scanner of claim **16**, wherein the instrumenter repeats the inserting for each instruction in the application program that is a member of the particular set.

**25.** The scanner of claim **16**, wherein the particular set of instructions includes instructions that access a predefined set of files.

**26.** The scanner of claim **16**, wherein the computer network includes a server and a client coupled to the server, wherein the altering by the instrumenter takes place at the server, and wherein the executing the application program takes place at the client.

**27.** The scanner of claim **16**, wherein the instructions that are members of the particular set are problematic instructions.

**28.** The scanner of claim **16**, wherein the alteration is at the point of the instruction.

**29.** A scanner for detecting and preventing execution of instructions in an application program provided from a computer network, wherein the scanner determines whether the provided application program includes any instructions that are members of a particular set of instructions, allowing execution of the application program if it is determined that no members of the set are included in the application program; and comprising:

   an instrumenter which alters the application program at an instruction which is determined to be a member of the set, thereby allowing monitoring of execution of such instruction;

   a verifier which determines if the application program includes an authentication and verifies the authentication; and

   a signer which replaces the verified authentication with a second authentication.

**30.** A scanner for detecting and preventing execution of instructions in an application program provided from a computer network, wherein the scanner determines whether the provided application program includes any instructions that are members of a particular set of instructions, allowing execution of the application program if it is determined that no members of the set are included in the application program; and comprising:

   an instrumenter which alters the application program at an instruction which is determined to be a member of the set, thereby allowing monitoring of execution of such instruction;

   a prefetcher which fetches all dependency files associated with the application program; and

   a security policy generator which provides a single monitoring package for the application program and its associated dependency files.

**31.** A method of detecting and preventing execution of instructions in an application program provided from a computer network, comprising:

5,983,348

**11**

providing the application program over the computer network;

determining whether the provided application program includes any instructions that are members of a particular set of instructions;

executing the application program if it is determined that no members of the set are included in the application program;

if it is determined that an instruction is a member of the set, then altering the application program, thereby allowing monitoring of execution of the instruction;

wherein the computer network includes a server and a client coupled to the server, and wherein the altering takes place at the server, wherein the executing the application program takes place at the client; and

performing the monitoring at the client.

**32**. A method of detecting and preventing execution of instructions in an application program provided from a computer network, comprising:

providing the application program over the computer network;

determining whether the provided application program includes any instructions that are members of a particular set of instructions;

executing the application program if it is determined that no members of the set are included in the application program;

if it is determined that an instruction is a member of the set, then altering the application program, thereby allowing monitoring of execution of the instruction, and

carrying out the method for each of a plurality of application programs as each application program is provided from the computer network.

**12**

**33**. A scanner for detecting and preventing execution of instructions in an application program provided from a computer network, wherein the scanner determines whether the provided application program includes any instructions that are members of a particular set of instructions, allowing execution of the application program if it is determined that no members of the set are included in the application program; and comprising:

an instrumenter which alters the application program at an instruction which is determined to be a member of the set, thereby allowing monitoring of execution of such instruction;

wherein the computer network includes a server and a client coupled to the server, wherein the altering by the instrumenter takes place at the server, and wherein the executing the application program takes place at the client; and

wherein the monitoring is performed at the client.

**34**. A scanner for detecting and preventing execution of instructions in an application program provided from a computer network, wherein the scanner determines whether the provided application program includes any instructions that are members of a particular set of instructions, allowing execution of the application program if it is determined that no members of the set are included in the application program; and comprising:

an instrumenter which alters the application program at an instruction which is determined to be a member of the set, thereby allowing monitoring of execution of such instruction; and

wherein the instrumenter alters each of a plurality of application programs as each application program is provided from the computer network.

* * * * *

# EXHIBIT 40

US005623600A

# United States Patent [19]

## Ji et al.

[11] Patent Number: 5,623,600

[45] Date of Patent: Apr. 22, 1997

[54] **VIRUS DETECTION AND REMOVAL APPARATUS FOR COMPUTER NETWORKS**

[75] Inventors: **Shuang Ji**, Foster City; **Eva Chen**, Cupertino, both of Calif.

[73] Assignee: **Trend Micro, Incorporated**, Cupertino, Calif.

[21] Appl. No.: **533,706**

[22] Filed: **Sep. 26, 1995**

[51] Int. Cl.⁶ .................................... G06F 11/34

[52] U.S. Cl. ........................... **395/187.01**; 364/286.4; 364/DIG. 1

[58] Field of Search .............................. 395/186, 187.1, 395/200.06; 380/4; 364/285.1, 286.4

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,975,950 | 12/1990 | Lentz | 380/4 |
| 5,319,776 | 6/1994 | Hile et al. | 395/187.01 |
| 5,414,833 | 5/1995 | Hershey et al. | 395/575 |
| 5,440,723 | 8/1995 | Arnold et al. | 395/181 |
| 5,444,850 | 8/1995 | Chang | 395/200 |
| 5,448,668 | 9/1995 | Perelson et al. | 395/182 |
| 5,452,442 | 9/1995 | Kephart | 395/183 |
| 5,485,575 | 1/1996 | Chess et al. | 395/183 |
| 5,491,791 | 2/1996 | Glowny et al. | 395/183 |
| 5,511,163 | 4/1996 | Lerche et al. | 395/183.15 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 666671 | 8/1995 | European Pat. Off. | H04L 29/06 |
| 6350784 | 6/1994 | Japan | H04N 1/00 |
| 9322723 | 11/1993 | WIPO | G06F 11/00 |

*Primary Examiner*—Robert W. Beausoliel, Jr.
*Assistant Examiner*—Albert Decady
*Attorney, Agent, or Firm*—Christopher M. Tobin; Greg T. Sueoka

[57] **ABSTRACT**

A system for detecting and eliminating viruses on a computer network includes a File Transfer Protocol (FTP) proxy server, for controlling the transfer of files and a Simple Mail Transfer Protocol (SMTP) proxy server for controlling the transfer of mail messages through the system. The FTP proxy server and SMTP proxy server run concurrently with the normal operation of the system and operate in a manner such that viruses transmitted to or from the network in files and messages are detected before transfer into or from the system. The FTP proxy server and SMTP proxy server scan all incoming and outgoing files and messages, respectively before transfer for viruses and then transfer the files and messages, only if they do not contain any viruses. A method for processing a file before transmission into or from the network includes the steps of: receiving the data transfer command and file name; transferring the file to a system node; performing virus detection on the file; determining whether the file contains any viruses; transferring the file from the system to a recipient node if the file does not contain a virus; and deleting the file if the file contains a virus.

**22 Claims, 12 Drawing Sheets**





Fig. 1 (Prior Art)

Case 3:14-cv-01197-WHO   Document 135-22   Filed 03/15/16   Page 222 of 252



*Fig. 2*

1197SOPHOS_00012453



*FIG. 3*

OSI Layer                    Protocol  Implementation

| OSI Layer | Protocol Implementation | | | |
|---|---|---|---|---|
| 406<br>Application | 423<br>File  Tranfer | 424<br>Electronic Mail | 425<br>Terminal Emulation | 426<br>Network Management |
| | 421<br>FTP Proxy Server | 422<br>SMTP Proxy server | | |
| 405<br>Presentation<br><br>404<br>Session | 417<br>File Tranfer Protocol (FTP) | 418<br>Simple Mail Tranfer Protocol (SMTP) | 419<br>TELNET Protocol | 420<br>SImple Network Management Protocol (SNMP) |
| 403<br>Transport | 415<br>Transmission  Control Protocol  (TCP) | | 416<br>User Datagram Protocol (UDP) | |
| 402<br>Network | 412<br>Address Resolution | 413<br>Internet Protocol (IP) | 414<br>Internet  Control Message Protocol (ICMP) | |
| 401<br>Data Link | 411<br>Network  Interface  Cards: Ethernet,  StarLAN token Ring | | | |
| 400<br>Physical | 410<br>Transmission media: twisted pair, coax or Fiber Optics | | | |

*FIG. 4*



*FIG. 5A*

1197SOPHOS_00012456



FIG. 5B

Case 3:14-cv-01197-WHO   Document 135-22   Filed 03/15/16   Page 227 of 252



FIG. 6A

1197SOPHOS_00012458



*FIG. 6B*



FIG. 6C

Case 3:14-cv-01197-WHO   Document 135-22   Filed 03/15/16   Page 230 of 252



*FIG. 7*

1197SOPHOS_00012461



FIG. 8A

1197SOPHOS_00012462



*FIG. 8B*

5,623,600

1

# VIRUS DETECTION AND REMOVAL APPARATUS FOR COMPUTER NETWORKS

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to computer systems and computer networks. In particular, the present invention relates to a system and method for detecting and removing computer viruses. Still more particularly, the present invention relates to a System and method for detecting and removing computer viruses from file and message transfers between computer networks.

### 2. Description of the Related Art

During the recent past, the use of computers has become widespread. Moreover, the interconnection of computers into networks has also become prevalent. Referring now to FIG. 1, a block diagram of a portion of a prior art information system 20 is shown. The portion of the information system 20 shown comprises a first network 22, a second network 24 and third network 26. This information system 20 is provided only by way of example, and those skilled in the art will realize that the information system 20 may include any number of networks, each of the networks being its own protected domain and having any number of nodes. As shown in FIG. 1, each of the networks 22, 24, 26 is formed from a plurality of nodes 30, 32. Each of the nodes 30, 32 is preferably a microcomputer. The nodes 30, 32 are coupled together to form a network by a plurality of network connections 36. For example, the nodes 30, 32 may be connected together using a token ring format, ethernet format or any of the various other formats known in the art. Each of the networks 22, 24, 26 includes a node 32 that acts as a gateway to link the respective network 22, 24, 26 to other networks 22, 24, 26. Each of the gateway nodes 32 is preferably coupled by a standard telephone line connection 34 such as POTS (Plain Old Telephone Service) or a T-1 link to the other gateway nodes 32 through a telephone switching network 28. All communication between the networks 22, 24, 26 is preferably performed through one of the gateway nodes 32.

One particular problem that has plagued computers, in particular microcomputers, have been computer viruses and worms. A computer virus is a section of code that is buried or hidden in another program. Once the program is executed, the code is activated and attaches itself to other programs in the system. Infected programs in turn copy the code to other programs. The effect of such viruses can be simple pranks that cause a message to be displayed on the screen or more serious effects such as the destruction of programs and data. Another problem in the prior art is worms. Worms are destructive programs that replicate themselves throughout disk and memory using up all available computer resources eventually causing the computer system to crash. Obviously, because of the destructive nature of worms and viruses, there is a need for eliminating them from computers and networks.

The prior art has attempted to reduce the effects of viruses and prevent their proliferation by using various virus detection programs. One such virus detection method, commonly referred to as behavior interception, monitors the computer or system for important operating system functions such as write, erase, format disk, etc. When such operations occur, the program prompts the user for input as to whether such an operation is expected. If such an operation is not expected (e.g., the user was not operating any program that employed such a function), the user can abort the operation knowing

2

it was being prompted by a virus program. Another virus detection method, known as signature scanning, scans program code that is being copied onto the system. The system searches for known patterns of program code used for viruses. Currently, signature scanning only operates on the floppy disk drives, hard drives or optical drives. Yet another prior art approach to virus detection performs a checksum on all host programs stored on a system and known to be free from viruses. Thus, if a virus later attaches itself to a host program, the checksum value will be different and the presence of a virus can be detected.

Nonetheless, these approaches of the prior art suffer from a number of shortcomings. First, behavior interception is not successful at detecting all viruses because critical operations that may be part of the code for a virus can be placed at locations where such critical operations are likely to occur for the normal operation of programs. Second, most signature scanning is only performed on new inputs from disk drives. With the advent of the Internet and its increased popularity, there are no prior art methods that have been able to successfully scan connections 36 such as those utilized by a gateway node in communicating with other networks. Third, many of the above methods require a significant amount of computing resources, which in turn degrades the overall performance of system. Thus, operating the virus detection programs on every computer becomes impractical. Therefore, the operation of many such virus detection programs is disabled for improved performance of individual machines.

Therefore, there is a need for a system and method for effectively detecting and eliminating viruses without significantly effecting the performance of the computer. Moreover, there is a need for a system and method that can detect and eliminate viruses in networks attached to other information systems by way of gateways or the Internet.

## SUMMARY OF THE INVENTION

The present invention overcomes the limitations and shortcomings of the prior art with an apparatus and method for detecting and eliminating viruses on a computer network. A system including the present invention is a network formed of a plurality of nodes and a gateway node for connection to other networks. The nodes are preferably microcomputers, and the gateway node comprises: a display device, a central processing unit, a memory forming the apparatus of the present invention, an input device, a network link and a communications unit. The memory further comprises an operating system including a kernel, a File Transfer Protocol (FTP) proxy server, and a Simple Mail Transfer Protocol (SMTP) proxy server. The central processing unit, display device, input device, and memory are coupled and operate to execute the application programs stored in the memory. The central processing unit of the gateway node also executes the FTP proxy server for transmitting and receiving files over the communications unit, and executes the SMTP proxy server for transmitting and receiving messages over the communications unit. The FTP proxy server and SMTP proxy server are preferably executed concurrently with the normal operation of the gateway node. The servers advantageously operate in a manner such that viruses transmitted to or from the network in messages and files are detected before the files are transferred into or from the network. The gateway node of the present invention is particularly advantageous because the impact of using the FTP proxy server and SMTP proxy server for the detection of viruses is minimized because only

1197SOPHOS_00012464

5,623,600

3

the files leaving or entering the network are evaluated for the presence of viruses and all other "intra" network traffic is unaffected.

The present invention also comprises a method for processing a file before transmission into the network and a method for processing a file before transmission from the network. The preferred method for processing a file comprises the steps of: receiving the data transfer command and file name; transferring the file to the proxy server; performing virus detection on the file; determining whether the file contains any viruses; transferring the file from the proxy server to a recipient node if the file does not contain a virus; and performing a preset action with the file if it does contain a virus. The present invention also includes methods for processing messages before transmission to or from the network that operate in a similar manner.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a prior art information system with a plurality of networks and a plurality of nodes upon which the present invention operates;

FIG. 2 is a block diagram of a preferred embodiment for a gateway node including the apparatus of the present invention;

FIG. 3 is a block diagram of a preferred embodiment for a memory of the gateway node including the apparatus of the present invention;

FIG. 4 is a block diagram of a preferred embodiment for a protocol layer hierarchy constructed according to the present invention compared to the OSI layer model of the prior art;

FIG. 5A is a functional block diagram showing a preferred system for sending data files according to a preferred embodiment of the present invention;

FIG. 5B is a functional block diagram showing a preferred system for receiving data files according to a preferred embodiment of the present invention;

FIGS. 6A, 6B and 6C are a flowchart of the preferred method for performing file transfer according to the present invention;

FIG. 7 is a functional block diagram showing a preferred system for transmitting mail messages according to a preferred embodiment of the present invention; and

FIGS. 8A and 8B are a flow chart of a preferred method for sending messages to/from a network.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The virus detection system and method of the present invention preferably operates on an information system 20 as has been described above with reference to FIG. 1. The present invention, like the prior art, preferably includes a plurality of node systems 30 and at least one gateway node 33 for each network 22, 24, 26. However, the present invention is different from the prior art because it provides novel gateway node 33 that also performs virus detection for all files being transmitted into or out of a network. Furthermore, the novel gateway node 33 also performs virus detection on all messages being transmitted into or out of an associated network.

Referring now to FIG. 2, a block diagram of a preferred embodiment of the novel gateway node 33 constructed in accordance with the present invention is shown. A preferred embodiment of the gateway node 33 comprises a display

4

device 40, a central processing unit (CPU) 42, a memory 44, a data storage device 46, an input device 50, a network link 52, and a communications unit 54. The CPU 42 is connected by a bus 56 to the display device 40, the memory 44, the data storage device 46, the input device 50, the network link 52, and the communications unit 54 in a von Neumann architecture. The CPU 42, display device 40, input device 50, and memory 44 may be coupled in a conventional manner such as a personal computer. The CPU 42 is preferably a microprocessor such as an Motorola 68040 or Intel Pentium or X86 type processor; the display device 40 is preferably a video monitor; and the input device 50 is preferably a keyboard and mouse type controller. The CPU 42 is also coupled to the data storage device 44 such as a hard disk drive in a conventional manner. Those skilled in the art will realize that the gateway node 33 may also be a minicomputer or a mainframe computer.

The bus 56 is also coupled to the network link 52 to facilitate communication between the gateway node 33 and the other nodes 30 of the network. In the preferred embodiment of the present invention, the network link 52 is preferably a network adapter card including a transceiver that is coupled to a cable or line 36. For example, the network link 52 may be an ethernet card connected to a coaxial line, a twisted pair line or a fiber optic line. Those skilled in the art will realize that a variety of different networking configurations and operating systems including token ring, ethernet, or arcnet may be used and that the present invention is independent of such use. The network link 52 is responsible for sending, receiving, and storing the signals sent over the network or within the protected domain of a given network. The network link 52 is coupled to the bus 56 to provide these signals to the CPU 34 and vice versa.

The bus 56 is also coupled to the communications unit 54 to facilitate communication between the gateway node 33 and the other networks. Specifically, the communications unit 54 is coupled to the CPU 42 for sending data and message to other networks. For example, the communications unit 54 may be a modem, a bridge or a router coupled to the other networks in a conventional manner. In the preferred embodiment of the present invention, the communications unit 54 is preferably a router. The communications unit 54 is in turn coupled to other networks via a media 34 such as a dedicated T-1 phone line, fiber optics, or any one of a number of conventional connecting methods.

The CPU 42, under the guidance and control of instructions received from the memory 44 and from the user through the input device 50, provides signals for sending and receiving data using the communications unit 54. The transfer of data between networks is broken down into the sending and receiving files and messages which in turn are broken down into packets. The methods of the present invention employ a virus detection scheme that is applied to all transfers of messages and files into or out of a network via its gateway node 33.

Referring now to FIG. 3, the preferred embodiment of the memory 44 for the gateway node 33 is shown in more detail. The memory 44 is preferably a random access memory (RAM), but may also include read-only memory (ROM). The memory 44 preferably comprises a File Transfer Protocol (FTP) proxy server 60, a Simple Mail Transfer Protocol (SMTP) proxy server 62, and an operating system 64 including a kernel 66. The routines of the present invention for detecting viruses in file transfers and messages primarily include the FTP proxy server 60 and the SMTP proxy server 62. The FTP proxy server 60 is a routine for controlling file transfers to and from the gateway node 33 via the commu-

5,623,600

5

nications unit 54, and thus controlling file transfers to and from a given network of which the gateway node is a part. The operation of the FTP proxy server 60 is described below in more detail with reference to FIGS. 5A, 5B, 6A, 6B and 6C. Similarly, the SMTP proxy server 62 is a routine for controlling the transfer of messages to and from the gateway node 33, and thus to and from the respective network associated with the gateway node 33. The operation of the SMTP proxy server 62 is described below in more detail with reference to FIG. 7 8A and 8B. The present invention preferably uses a conventional operating system 28 such as Berkeley Software Distribution UNIX. Those skilled in the art will realize how the present invention may be readily adapted for use with other operating systems such as MACINTOSH System Software version 7.1, DOS, WINDOWS or WINDOWS NT. The memory 44 may also include a variety of different application programs 68 including but not limited to computer drawing programs, word processing programs, and spreadsheet programs. The present invention is particularly advantageous over the prior because it minimizes the impact of virus detection and elimination since the FTP proxy server 60 and SMTP proxy server 62 are preferably only included or installed in the memory 44 of the gateway nodes 33. Thus, all data being transferred inside the protected domain of a given network will not be checked because the data packets might not be routed via the gateway node 33.

While the apparatus of the present invention, in particular the FTP proxy server 60 and SMTP proxy server 62, has been described above as being located and preferably is located on the gateway node 33, those skilled in the art will realize that the apparatus of the present invention could also be included on a FTP server or a world wide web server for scanning files and messages as they are downloaded from the web. Furthermore, in an alternate embodiment, the apparatus of the present invention may be included in each node of a network for performing virus detection on all messages received or transmitted from that node.

As best shown in FIG. 4, the CPU 42 also utilizes a protocol layer hierarchy to communicate over the network. The protocol layers of the hierarchy of the present invention are shown in FIG. 4 in comparison to the ISO-OSI reference model, for example. The protocol layers 410–426 of the hierarchy of the present invention are similar to the prior art protocol layers for the lower four layers 400–403 including: (1) a physical layer 400 formed of the transmission media 410; (2) a data link layer 401 formed of the network interface cards 411; (3) a network layer 402 formed of address resolution 412, Internet protocol 413 and Internet control message protocol 414; and (4) a transport layer 403 formed of the transmission control protocol 415 and a user datagram protocol 416. Corresponding to the presentation 405 and session 404 layers, the protocol hierarchy of the present invention provides four methods of communication: a file transfer protocol 417, a simple mail transfer protocol 419, a TELNET protocol 419 and a simple network management protocol 420. There are corresponding components on the application layer 406 to handle file transfer 423, electronic mail 424, terminal emulation 425, and network management 426. The present invention advantageously detects, controls and eliminates viruses by providing an additional layer between the application layer 406 and the presentation layer 405 for the gateway nodes 33. In particular, according to the hierarchy of the present invention, a FTP proxy server layer 421 and a SMTP proxy server layer 422 are provided. These layers 421,422 operate in conjunction with the file transfer layer 423 and file transfer protocol

6

417, and the electronic mail layer 424 and the SMTP protocol layer 418, to process file transfers and messages, respectively. For example, any file transfer requests are generated by the file transfer application 423, first processed by the FTP proxy server layer 421, then processed by the file transfer protocol 417 and other lower layers 415, 413, 411 until the data transfer is actually applied to the transmission media 410. Similarly, any messaging requests are first processed by the SMTP proxy server layer 418, and thereafter processed by the SMTP protocol and other lower layers 415, 413, 411 until the physical layer is reached. The present invention is particularly advantageous because all virus screening is performed below the application level. Therefore, the applications are unaware that such virus detection and elimination is being performed, and these operations are completely transparent to the operation of the application level layers 406. While the FTP proxy server layer 421 and the SMTP proxy server layer 422 have been shown in FIG. 4 as being their own layer to demonstrate the coupling effects they provide between the file transfer layer 423 and file transfer protocol 417, and the electronic mail layer 424 and the SMTP protocol layer 418, those skilled in the art will realize that the FTP proxy server layer 421 and the SMTP proxy server layer 422 can also be correctly viewed as being part of the file transfer protocol 417 and the SMTP protocol layer 418, respectively, because they are invisible or transparent to the application layer 406.

A preferred method of operation and an embodiment for the FTP proxy server 60 will be described focusing on its relationship to and its control of the gateway node 33, and thus, control over access to the medium, line 34, for connections to other networks. The method can best be understood with reference to FIGS. 5A and 5B, that graphically show the functions performed by an Internet daemon 70, the FTP proxy server 60, and an FTP daemon 78, each of which resides on the gateway node 33. In FIGS. 5A and 5B, like reference numbers have been used for like parts and the figures are different only in the direction in which the file is being transferred (either from client task 72 to server task 82 or from server task 82 to client task 72). For the sake of clarity and ease of understanding only the data ports are shown in FIGS. 5A and 5B, and the bi-directional lines represent command or control pathways and are assumed to include a command port although it is not explicitly shown. The operation FTP proxy server 60 will now be described with reference to a file transfer between a client task 72 (requesting machine) and a server task 82 (supplying machine). While it is assumed that the client task 72 (requesting machine) is inside a protected domain and the server task 82 (supplying machine) is outside the protected domain, the invention described below is also used by the gateway node 33 when client task 72 (requesting machine) is outside the protected domain and the server task 82 (supplying machine) is inside the protected domain.

FIGS. 6A–6C are a flowchart of a preferred method for performing file transfers from a controlled domain of a network across a medium 34 to another network (e.g., a file transfer from a node 32 of the second network 24 across the media 34 to a second node 32 of the third network 26). The method begins with step 600 with the client node sending a connection request over the network to the gateway node 33. In step 602, the gateway node 33 preferably has an operating system 64 as described above, and part of the operating system 64 includes a fire wall, or program including routines for authenticating users. The gateway node 33 first tries to authenticate the user and decide whether to allow the connections requested, once the request is received. This is

1197SOPHOS_00012466

5,623,600

**7**

done in a conventional manner typically available as part of UNIX. The Internet daemon **70** creates an instance of the FTP proxy server **60** and passes the connection to the FTP proxy server **60** for servicing in step **602**. The Internet daemon **70** is program that is part of the operating system **64**, and it runs in the background. When being run, one of the functions of the Internet daemon **70** is to bind socket ports for many well-known services, such as TELNET, login, and FTP. When a connect request is detected, the Internet daemon **70** constructed in accordance with the present invention, spawns the FTP proxy server **60**, which is the server that will actually handle the data transfer. Thereafter, the FTP proxy server **60** controls the network traffic passing between the client task **72** and the server task **82**. Then in step **604**, the client node sends a data transfer request and file name, and established a first data port **76** through which the data will be transferred between the FTP proxy server **60** and the client task **72**. In step **606** the data transfer request and file name are received by the FTP proxy server **60**. In step **608**, the FTP proxy server **60** determines whether the data is being transferred in an outbound direction (e.g., the file is being transferred from the client task **72** to the server task **82**). This can be determined by the FTP proxy server **60** by comparing the data transfer request. For example, if the data transfer request is the STOR command then the data is being transferred in an outbound direction; and if the data transfer request is the RETR command then the data is not being transferred in an outbound direction.

If the data is being transferred in an outbound direction, then the method transitions from step **608** to step **610**. Referring now to FIG. **6B** in conjunction with FIG. **5A**, the process for transferring data out of the protected domain of the network is described in more detail. In step **610**, the FTP proxy server **60** determines whether the file to be transferred is of a type that can contain viruses. This step is preferably performed by checking the extension of the file name. For example, .txt, .bmd, .pcx and .gif extension files indicate that the file is not likely to contain viruses while .exe, .zip, and .com extension files are of the type that often contain viruses. If the file to be transferred is not of a type that can contain viruses, then the method continues in step **612**. In step **612**, a second data port **80** is established and the data transfer request & the file are sent from the FTP proxy server **60** to the FTP daemon **78** so that the file can be sent to the server task **82**. The FTP daemon **78** is a program executed by the gateway node **33** that communicates the transfer commands to the server task **82**, establishes a third port **84** for sending the file including binding the server task **82** and FTP daemon **78** to the third port **84**, and transmits the file to the server task **82**. Once transmitted, the method is complete and ends. However, if it is determined in step **610** that the file to be transferred is of a type that can contain viruses, the method proceeds to step **614**. In step **614**, the FTP proxy server **60** transfers the file from the client to the FTP proxy server **60** through the first port **76**, and in step **616**, the file is temporarily stored at the gateway node **33**. Then in step **618**, the temporarily stored file is analyzed to determine if it contains viruses. This is preferably done by invoking a virus-checking program on the temporarily stored file. For example, a program the performs a version of signature scanning virus detection such as PC-Cillin manufactured and sold by Trend Micro Devices Incorporated of Cupertino, Calif. may be used. However, those skilled in the art will realize that various other virus detection methods may also be used in step **618**. In step **620**, output of the virus checking program is preferably echoed to the user/client task **72** by the FTP proxy server **60** as part of a reply message. Next in step

**8**

**622**, the method determines whether any viruses were detected. If no viruses are detected, the method continues in step **612** and transmits the file as has been described above. However, if a virus is detected, the present invention advantageously allows the FTP proxy server **60** to respond in any number of a variety of ways. The response of the FTP proxy server **60** is determined according to user's needs and wants as specified in a configuration file. This configuration file is preferably fully modifiable according to input from the user and stored in memory **44**. For example, some options the user might specify are: 1) to do nothing and transfer the file; 2) to delete or erase the temporary file and do not transfer the file; or 3) to rename the file and store it in a specified directory on the gateway node **33** and notify the user of the new file name and directory path which can used to manually request the file from the system administrator. Those skilled in the art will realize that there are variety of other alternatives that users might specify, and steps **624**, **626**, and **628** are provided only by way of example. Next in step **624**, the configuration file is retrieved to determine the handling of the temporary file. In step **626**, the FTP proxy server **60** determines if it is to ignore the existence of a virus and a continue the transfer. If so, the method continues in step **612** where the file is passed to the FTP daemon **78** and the temporary file is deleted. If not the method continues to step **628** where either the file is deleted and not sent to the server task **82**, and the temporary file is erased from the gateway node **33**; or the file is renamed and stored in a specified directory on the gateway node **33** and the user is notified of the new file name and directory path which can used to manually request the file from the system administrator, and the temporary file is erased the gateway node **33**. The action taken in step **628** depends on the configuration settings as determined in step **624**. After step **628**, the method ends. As can be seen from FIG. **5A**, the path for the file is from client task **72** through the first data port **76** to the FTP proxy server **60**, then to the FTP daemon **78** through the second data port **80** and finally to the server task **82** through the third data port **84**.

Referring back to step **608** of FIG. **6A**, if the data is not being transferred in an outbound direction, then the method transitions from step **608** to step **640**. Referring now to FIG. **6C** in conjunction with FIG. **5B**, the process for transferring data into the protected domain of the network is described in more detail. In step **640**, the FTP proxy server **60** next sends the data transfer request and file name first to the FTP daemon **78** and then on to the server task **82**. In step **642**, a second port **80** is established between the FTP proxy server **60** and the FTP daemon **78**. Then a third data port **84** is established between the FTP daemon **78** and the server task **82**. Both ports **80**, **84** are established similar to the establishment of the first port **76**. The FTP daemon **78** will request and obtain the third port **84** from the Internet daemon **70**, and send a port command to the server task **82** including an address for the third port **84**. The server task **82** will then connect to the third port **84** and begin the data transfer in step **644**. The FTP daemon **78** in turn sends the file to the FTP proxy server **60**. Next in step **646**, the FTP proxy server **60** determines whether the file to be transferred is of a type that can contain viruses. This is done the same was as described above with reference to step **610**. If the file to be transferred is not of a type that can contain viruses, then the method continues in step **648** where the file is transferred from the FTP proxy server **60** through the first port **76** to the client task **72**, then the method is complete and ends. On the other hand, if the file to be transferred is a type that can contain viruses, the method in step **650** temporarily stores the file at

1197SOPHOS_00012467

5,623,600

9

the gateway node. Then in step **652**, the temporarily stored file is analyzed to determine if it contains viruses. The analysis here is the same as step **618**. In step **652**, the output of the virus checking program is preferably echoed to the client task **72** by the FTP proxy server **60** as part of a reply message. Next in step **656**, the method determines whether any viruses were detected. If no viruses are detected, the method continues in step **648** as has been described above. However, if a virus is detected, the present invention retrieves the configuration file to determine the handling of the temporary file. In step **660**, the FTP proxy server **60** determines if it is to ignore the existence of a virus and a continue the. file transfer. If so the method continues in step **648** where the file is passed to the client task **72** and the temporary file is erased. If not the method continues to step **662** where the temporary file is erased, and the file is either deleted and not sent to the client task **72** or the file is renamed, stored on the gateway node **33**, and the client task **72** is notified of new name and path so that the file may be manually retrieved by the system administrator. The method then ends. As can be seen from FIG. 5B, the data transfer request is passed from the client task **72**, to the FTP proxy server **60**, then to the FTP daemon **78**, and to the server task **82** which in response sends the file through the third port to the FTP daemon **78**, and through the second port **80** on to the FTP proxy server **60**, and finally through the first port **76** to the client task **72**.

Referring now to FIGS. **7**, **8A** and **8B**, the operation of the SMTP proxy server **62** will now be described. The SMTP proxy server **62** controls the only other entry channel through which data, and therefore viruses, can enter the protected domain of a given network. The SMTP proxy server **62** is preferably a program that resides on the gateway node **33** and controls and handles all transfers of electronic messages or mail in and out of the network through the communications unit **54** and media **34**. While the SMTP proxy server **62** will now be described with reference to the transfer of a mail message from a client task **92** within the protected domain of the network to a server task **102** at a node on a different network outside the protected domain, those skilled in the art will understand how the SMTP proxy server **62** handles incoming mail messages in the same way. All mail messages are handled by the SMTP proxy server **62** in the same way and only the designation of which node **32** is the server and which is the client change depending on the direction the message is being sent from the perspective of the gateway node **33**. Since mail messages are passed using the command pathways between nodes, only these pathways are shown in FIG. **7**. For ease of understanding, the command ports have not been shown in FIG. **7**, but will be discussed below in the relevant steps of the preferred method.

Referring now to FIG. **8A**, the preferred method of the present invention for sending electronic mail begins in step **802** with the spawning or running the SMTP proxy server **62**. Next in step **804**, a first command port **96** for communication between the client task(s) **92** and the SMTP proxy server **62** is created. The address of the first port **96** along with a port command is provided to the SMTP proxy server **62**. Then in step **806**, the SMTP proxy server **62** is bound to the first port **96** to establish a channel for sending a mail message between any client tasks and the SMTP proxy server **62**. Next in step **808**, the SMTP proxy server **62** spawns a SMTP daemon **98** or SMTP server. The SMTP daemon **98** is preferably the existing program "sendmail" that is part of the BSD UNIX operating system. This is particularly advantageous because it reduces the amount of

10

code that needs to be written and assures compatibility with the lower layers of the OSI reference model. Then in step **810** a second command port is created for communication between the SMTP proxy server **62** and the SMTP daemon **98**. In step **812**, the SMTP daemon **98** is bound to the second command port for communication with the SMTP proxy server **62**. Actually, the present invention binds the SMTP daemon **98** to the appropriate port, namely the second port by redefining the bind function in a shared library that is part of the operating system **64**. The present invention advantageously exploits the fact that the SMTP daemon **98** (send-mail programs on most UNIX systems) are dynamically linked. The present invention utilizes a shared library which redefines the system call bind() and forces sendmail to link with the redefined version of the bind() call when executed. If the redefined version of the bind() call determines the SMTP daemon **98** (sendmail program) is trying to bind to the first command port (the smtp port), it will return to it a socket whose other end is the SMTP proxy server **62** (a socket to the second command port). Next in step **800**, the client task **92** request a connection from the SMTP proxy server and is directed to used the first command port for communication. Then in step **818**, the message is transmitted from the client task **92** through the first command port to the SMTP proxy server **62**.

Referring now to FIG. **8B**, the method continues in step **820** with the SMTP proxy server **62** scanning the message body and checking for any portions that are encoded. The present invention preferably scans the message for portions that have been encoded with an "uuencoded" encoding scheme that encodes binary data to ASCII data. "Uuen-coded" portions of messages usually start with a line like "begin 644 filename," and end with a line like "end." The existence of such encoded portions suggests the possibility that a file may contain viruses. This scanning for "uuen-coded" portions is just one of many scanning techniques that may be used, and those skilled in the art will realize that the present invention could be modified to scan for other encoded portions such as those encoded according to other schemes such as mime. Next in step **822**, the SMTP proxy server **62** determines whether the message includes any encoded portions. If the message does not include any encoded portions, the SMTP proxy server **62** transmits the message through the second command port to the SMTP daemon **98** in step **824**. Next in step **814**, the SMTP daemon **98** creates a third command port for communication between the SMTP daemon **98** and the server task **102**. Then in step **816** the server task **102** is bound to the third command port to establish communication between the server task **102** and the SMTP daemon **98**. Those skilled in the art will realize that if the server task **102** resides on the gateway node **33**, then steps **814** and **816** are not needed and may be omitted since no further transfer of data across the network is needed. Then the SMTP daemon **98** transmits the message through the third command port to the server task **102** in step **826** thereby completing the method.

On the other hand if in step **822** it is determined the message does include encoded portions, the SMTP proxy server **62** stores each of the encoded portions of the message in its own temporary file at the gateway node **33** in step **828**. For example, if a message included three encoded portions, each encoded portion will be stored in a separate file. Then in step **830**, each of the encoded portions stored in its own file is individually decoded using uudecode program, as will be understood by those skilled in the art. Such decoding programs known in the art convert the ASCII files back to their original binary code. Next in step **832**, the SMTP proxy

1197SOPHOS_00012468

5,623,600

**11**

server **62** calls and executes a virus-checking program on each message portion stored in its temporary file(s). Then in step **834**, the SMTP proxy server **62** determines whether any viruses were detected. If no viruses are detected, the method continues to steps **824**, **814**, **816** and **826** as has been described above. However, if a virus is detected, the present invention advantageously allows the SMTP proxy server **62** to respond in any number of a variety of ways, just as the FTP proxy server **60**. The response of the SMTP proxy server **62** is also determined by the according to user's needs and wants as specified in a configuration file. This configuration file is preferably fully modifiable according to input from the user. The configuration for virus handling is determined in step **836**. This could be done by retrieving and reading the configuration file or simply retrieving the configuration data already stored in memory **44**. Then in step **838**, the action to be taken is determined from the configuration settings. For example, some options the user might specify are: 1) to do nothing and transfer the mail message unchanged; 2) to transfer the mail message with the encoded portions that have been determined to have viruses deleted from the mail message; 3) rename the encode portions of the message containing viruses, store the renamed portions as files in a specified directory on the SMTP proxy server **62** and notify the user of the renamed files and directory path which can used to manually request the file from the system administrator; or 4) writing the output of step **832** into the mail message in place of the respective encoded portions and sending that mail message in steps **824** and **826**. Once the action to be performed has been determined from examination of the configuration file, the specified action is taken in step **840**, the transformed message is transmitted, the temporary file is erased, and the method ends. For example, if a message has three encoded portions, two encoded portions contain viruses, and the configuration file indicates that virus containing portions are to be deleted, then the method of the present invention would send a transformed message that was the same as the original message, but with the two encoded portions containing viruses deleted, to the server task **102**.

While the present invention has been described with reference to certain preferred embodiments, those skilled in the art will recognize that various modifications may be provided. For example, the preferred operation of the present invention specifies that the FTP proxy server **60** determine whether the file type is one that can contain a virus (Steps **610** and **646**). However, alternate embodiments can omit these steps and simply temporarily store and scan all files being transferred for viruses. Likewise the SMTP proxy server **60** may, in alternate embodiments, omit the step **822** of determining whether the message is encoded and temporarily store and scan all message being transmitted for viruses. Furthermore, while the invention has been described above as temporarily storing the file or message at the gateway node in a temporary file, this step could be omitted in the determination of whether a file includes a virus were done as the file was being transferred from the client node to the gateway node. These and other variations upon and modifications to the preferred embodiment are provided for by the present invention which is limited only by the following claims.

What is claimed is:

**1**. A system for detecting and selectively removing viruses in data transfers, the system comprising:

a memory for storing data and routines, the memory having inputs and outputs, the memory including a server for scanning data for a virus and specifying data

**12**

handling actions dependent on an existence of the virus;

a communications unit for receiving and sending data in response to control signals, the communications unit having an input and an output;

a processing unit for receiving signals from the memory and the communications unit and for sending signals to the memory and communications unit; the processing unit having inputs and outputs; the inputs of the processing unit coupled to the outputs of memory and the output of the communications unit; the outputs of the processing unit coupled to the inputs of memory, the input of the communications unit, the processor controlling and processing data transmitted through the communications unit to detect viruses and selectively transfer data depending on the existence of viruses in the data being transmitted;

a proxy server for receiving data to be transferred, the proxy server scanning the data to be transferred for viruses and controlling transmission of the data to be transferred according to preset handing instructions and the presence of viruses, the proxy server having a data input a data output and a control output the data input coupled to receive the data to be transferred; and

a daemon for transferring data from the proxy server in response to control signals from the proxy server, the daemon having a control input, a data input and a data output the control input of the daemon coupled to the control output of the proxy server for receiving control signals, and the data input of the daemon coupled to the data output of the proxy server for receiving the data to be transferred.

**2**. The system of claim **1**, wherein the proxy server is a FTP proxy server that handles evaluation and transfer of data files, and the daemon is an FTP daemon that communicates with a recipient node and transfers data files to the recipient node.

**3**. The system of claim **1**, wherein the proxy server is a SMTP proxy server that handles evaluation and transfer of messages, and the daemon is an SMTP daemon that communicates with a recipient node and transfers messages to the recipient node.

**4**. A computer implemented method for detecting viruses in data transfers between a first computer and a second computer, the method comprising the steps of:

receiving at a server a data transfer request including a destination address;

electronically receiving data at the server;

determining whether the data contains a virus at the server;

performing a preset action on the data using the server if the data contains a virus;

sending the data to the destination address if the data does not contain a virus;

determining whether the data is of a type that is likely to contain a virus; and

transmitting the data from the server to the destination without performing the steps of determining whether the data contains a virus and performing a preset action if the data is not of a type that is likely to contain a virus.

**5**. The method of claim **4**, further comprising the steps of storing the data in a temporary file at the server after the step of electronically transmitting; and wherein the step of determining includes scanning the data for a virus using the server.

1197SOPHOS_00012469

5,623,600

13

**6.** The method of claim **5**, wherein the step of scanning is performed using a signature scanning process.

**7.** The method of claim **4**, wherein the step of performing a preset action on the data using the server comprises performing one step from the group of:

transmitting the data unchanged;

not transmitting the data; and

storing the data in a file with a new name and notifying a recipient of the data transfer request of the new file name.

**8.** The method of claim **4**, wherein the step of determining whether the data is of a type that is likely to contain a virus is performed by comparing an extension type of a file name for the data to a group or known extension types.

**9.** The method of claim **4**, further comprising the steps of:

determining whether the data is being transferred into a first network by comparing the destination address to valid addresses for the first network;

wherein the server is a FTP proxy server;

wherein the step of electronically receiving data comprises the steps of transferring the data from a client node to the FTP proxy server, if the data is not being transferred into the first network; and

wherein the step of electronically receiving data comprises the steps of transferring the data from a server task to an FTP daemon, and then from the FTP daemon to the FTP proxy server if the data is being transferred into the first network.

**10.** The method of claim **4**, further comprising the steps of:

determining whether the data is being transferred into a first network by comparing the destination address to valid addresses for the first network;

wherein the server is a FTP proxy server;

wherein the step of sending the data to the destination address comprises transferring the data from the FTP proxy server to a node having the destination address, if the data is being transferred into the first network; and

wherein the step of sending the data to the destination address comprises transferring the data from the FTP proxy server to a FTP daemon, and then from an FTP daemon to a node having the destination address, if the data is not being transferred into the first network.

**11.** A computer implemented method for detecting viruses in a mail message transferred between a first computer and a second computer, the method comprising the steps of:

receiving a mail message request including a destination address;

electronically receiving the mail message at a server;

determining whether the mail message contains a virus, the determination of whether the mail message contains a virus comprising determining whether the mail message includes any encoded portions, storing each encoded portion of the mail message in a separate temporary file, decoding the encoded portions of the mail message to produced decoded portions of the mail message, scanning each of the decoded portions for a virus, and testing whether the scanning step found any viruses;

14

performing a preset action on the mail message if the mail message contains a virus; and

sending the mail message to the destination address if the mail message does not contains a virus.

**12.** The method of claim **11**, wherein the step of determining whether the mail message includes any encoded portions searches for uuencoded portions.

**13.** A computer implemented method for detecting viruses in a mail message transferred between a first computer and a second computer, the method comprising the steps of:

receiving a mail message request including a destination address; electronically receiving the mail message at a server; scanning the mail message for encoded portions; determining whether the mail message contains a virus;

performing a preset action on the mail message if the mail message contains a virus;

sending the mail message to the destination address if the mail message does not contains a virus; and

wherein the step of sending the mail message to the destination address is performed if the mail message does not contain any encoded portions; the server includes a SMTP proxy server and a SMTP daemon; and the step of sending the mail message comprises transferring the mail message from the SMTP proxy server to the SMTP daemon and transferring the mail message from the SMTP daemon to a node having an address matching the destination address.

**14.** The method of claim **11**, wherein the step of determining whether the mail message contains a virus, further comprises the steps of:

storing the message in a temporary file;

scanning the temporary file for viruses; and

testing whether the scanning step found a virus.

**15.** The method of claim **11**, wherein step of scanning is performed using a signature scanning process.

**16.** The method of claim **11**, wherein the step of performing a preset action on the mail message comprises performing one step from the group of:

transferring the mail message unchanged;

not transferring the mail message;

storing the mail message as a file with a new name and notifying a recipient of the mail message request of the new file name; and

creating a modified mail message by writing the output of the determining step into the modified mail message and transferring the mail message to the destination address.

**17.** The method of claim **11**, wherein the step of performing a preset action on the mail message comprises performing one step from the group of:

transferring the mail message unchanged;

transferring the mail message with the encoded portions having a virus deleted; and

renaming the encode portions of the mail message containing a virus, and storing the renamed portions as files in a specified directory on the server and notifying a recipient of the renamed files and directory; and

writing the output of the determining step into the mail message in place of respective encoded portions that

1197SOPHOS_00012470

5,623,600

15

contain a virus to create a modified mail message and sending the modified mail message.

**18**. An apparatus for detecting viruses in data transfers between a first computer and a second computer, the apparatus comprising:

means for receiving a data transfer request including a destination address;

means for electronically receiving data at a server;

means for determining whether the data contains a virus at the server;

means for performing a preset action on the data using the server if the data contains a virus; and

means for sending the data to the destination address if the data does not contain a virus.

**19**. The apparatus of claim **18**, wherein means for determining includes a means for scanning that scans the data using a signature scanning process.

**20**. The apparatus of claim **18**, wherein the means for performing a preset action comprises:

16

means for transmitting the data unchanged;

means for not transmitting the data; and

means for storing the data in a file with a new name and notifying a recipient of the data transfer request of the new file name.

**21**. The apparatus of claim **18**; further comprising:

a second means for determining whether the data is of a type that is likely to contain a virus; and

means for transmitting the data from the server to the destination without performing the steps of scanning, determining, performing and sending, if the data is not of a type that is likely to contain a virus.

**22**. The apparatus of claim **18**, further comprising means for determining whether the data is being transferred into a first network by comparing the destination address to valid addresses for the first network.

*   *   *   *   *

# EXHIBIT 41



MSDN Home    :  Developer Centers  :  Library  :  Downloads  :  Code Center  :  Subscriptions  :  MSDN Worldwide

Search for                          MSDN Home > MSJ

MSDN Magazine
Advanced Search
MSJ Home
Search
Source Code
Back Issues
Subscribe
Reader Services
Write to Us
MSDN Magazine
MIND Archive
Magazine Newsgroup

**July 1996**

MICROSOFT SYSTEMS JOURNAL

# Safe Web Surfing with the Internet Component Download Service

Mary Kirtland

*Mary Kirtland is a member of the Microsoft Premier Developer Support team, working on support planning for new technologies such as ActiveX.*

Everywhere I turn, people are talking about the Internet and the World Wide Web. TV news anchors carefully read off URLs (usually having no clue what they're saying) where you can get more information about community services. Print and broadcast ads display company home page addresses. Retailers display their wares, hoping to attract your business. What makes the Web so attractive? Unlike print media, information on the Web is easy to keep current, but the Web isn't as transient as broadcast media. It's really the best of both worlds—a fixed location where you can find continually updated information on just about anything.

The Web also offers an opportunity that traditional information sources do not. Instead of providing a fixed view of information, content providers can make their pages interactive. You can find out what movies are currently playing in theaters near your home, shop in virtual stores, even get personalized news delivered to your electronic doorstep, and this is just the beginning. Active documents, that is, Web pages that incorporate Microsoft ActiveX controls, make revisiting a Web site compelling. You don't just visit a page once; you go back again and again because the information is always different and always under your control.

Active content doesn't come without a price. The code that activates documents needs to execute on some machine, and code always has the potential to do damage. When a user visits a new active document, how does he or she know it's safe to use? By the time he or she gets to the page, is it too late? This is, after all, an age when people write viruses that format hard drives for fun. As my mom might say, do you know where that code has been?

For many of the active documents you see today, the code resides on the Web server. This is usually safe—the webmaster knows where the code came from—but performance can suffer. Thousands or even millions of people might try to shop in the same virtual store simultaneously (www.microsoft.com got 190 million hits in April), and when they submit orders to the store, the Web server has to process them all. In the meantime, users twiddle their thumbs, waiting for their orders to be processed, and their computers sit idle.

An alternative is to move more of the code onto the client machines. Active documents are more responsive, since the work is performed locally rather than across the net. But there are potential problems. Someone has to put the code on the client machines for it to run, and given that a user visits may need different code for the page to work properly. For the sake of argument, let's say getting the code downloaded to a user's machine isn't a problem. However, when a user visits a new page, can he know it's safe to actually run the code on his machine?

One approach to easing concerns about installing unknown code on a machine is to create an environment where the code can't possibly do any harm and can't access the disk drives, video memory, or anything else that could potentially damage the user's system. Unfortunately, the sandbox approach significantly limits the kinds of interesting things an active document can do.

Another approach is to give the user some indication that the code is safe. Think about your last trip to your favorite software store. Did you consider whether the products you were looking at would harm your machine? Probably not. Why? Because you were looking at shrink-wrapped boxes that identified the manufacturer in a store you trusted.

What you need is a way to bring this same level of trust to code you find on the Internet. Let's say there is an authority everyone trusts. If a software vendor could prove their trustworthiness to the authority, the authority could give them a certificate of approval that the vendor could attach to their code. If you trust the authority, you should be able to trust anyone with a certificate. You would also want proof that the code and certificate had not been tampered with.

Active content is a cornerstone of the Microsoft Internet strategy, so considerable thought has been devoted to these problems. While Microsoft feels that the sandbox approach has its place, there are significant applications that can't be implemented in such a restricted environment. Thus, Microsoft is devising mechanisms that permit code authors to attach digital signatures to their code and permit users to inspect signatures before installing downloaded code. Digital signatures contain information about the vendor that created a file, and their certificates of approval give you some reason to trust them (see **Figure 1**). Digital signatures also contain information that can be used to check that the file has not been tampered with since the signature was attached. Think of digital signatures as shrinkwrap for the Internet.



**Figure 1 A digital signature certificate**

Microsoft's mechanism for inspecting and validating signatures is known as the Windows Trust Verification service. This service looks at the certificates of approval within a digital signature and tells you if it comes from a trusted source. The certificates within a signature form a trust chain: once you find a point on the chain you trust, you can trust all the certificates below it. To keep track of the certificates you trust, a secure database of sources is maintained on your machine. Initially this database contains a limited set of authorities that everyone trusts. Over time, as you indicates that additional sources are trustworthy, a trust hierarchy forms. The main purpose of the Windows Trust Verification service is to compare the contents of a digital signature to the trust hierarchy and indicate the trustworthiness of the code author.

## The Internet Component Download Service

The Internet Component Download service is a mechanism through which applications download, certify, and install ActiveX component code from the Internet. This service uses Windows Trust Verification services internally to perform certificate checking. While the Internet Component Download service can only download ActiveX components, the Windows Trust Verification services are a general-purpose mechanism that you can use to download other types of files.

In this article, I'll describe how Internet Explorer 3.0 uses the Internet Component Download service to safely download and install ActiveX components. I'll also show you how to package your own components for this service. As I write this article, Internet Explorer 3.0 and the ActiveX SDK are still in alpha release, so this material is subject to change. Check the ActiveX SDK documentation listed in Figure 2 for the most up-to-date information.

### Accessing Active Documents with Internet Explorer 3.0

First, let's see what happens when a user jumps to an active document. Figure 3 shows a sample active document. The document uses three different ActiveX controls. If these controls aren't installed on the user's machine, they need to be downloaded from some code server, checked to make sure it is safe to install the code, and installed on the user's machine before the document displays as the author intended.



**Figure 3 An active Web page**

In an active HTML document, the <OBJECT> tag indicates a control. In DWLDTEST.HTM (see Figure 4), which is the source file for the document shown in Figure 3, each <OBJECT> tag corresponds to one of the controls. The CLASSID attribute indicates the type of control and its value is a text representation of the CLSID associated with the control prefixed by "clsid:". The CODEBASE attribute indicates where the control code can be obtained.

Writing active HTML is outside the scope of this article, so I won't spend any more time discussing the <OBJECT> tag. If you want to learn more about this, the latest version of the specification is at:

    http://www.w3.org/pub/WWW/TR/WD-object.html

The important thing to consider is what happens when the browser spots an <OBJECT> tag and needs to create an instance of control. The Internet Component Download service is exposed to the browser through a single function, CoGetClassObjectFromURL.

```
STDAPI CoGetClassObjectFromURL(REFCLSID rclsid,
                   LPCWSTR szCodeURL,
                   DWORD   dwFileVersionMS,
                   DWORD   dwFileVersionLS,
                   LPCWSTR szContentTYPE,
                   LPBINDCTX pbindCtx,
                   DWORD   dwClsContext,
                   LPVOID  pvReserved,
                   REFIID  riid,
                   VOID**  ppv);
```

Figure 5 shows the high-level architecture of the component download mechanism. When the browser detects an <OBJECT> tag, it parses out the CLSID, file URL, and version number. The browser passes these as parameters to CoGetClassObjectFromURL, which downloads, verifies, and installs the component code, if necessary. It checks to see if the component is already installed and checks the local system for the specified CLSID. If a version number is specified in the CODEBASE attribute, the version of the installed component is compared to the version specified. If the component was already installed and the version number checks out, the server is loaded and a class factory is created. Otherwise, the browser starts to download code.

**Figure 5 Internet Component Download Architecture**

### Locating and Downloading Code

URL monikers are used to download the required files asynchronously. The download service uses two pieces of information to locate the files: the szCodeURL parameter passed to CoGetClassObjectFromURL and the Internet search path, which is a list of object store servers specif-
ied in the registry key HKEY_CURRENT_USER\Software\Microsoft\Internet Explorer\CodeBaseSearchPath. The value for this key is a string in the following format:

    CodeBaseSearchPath = <URL1>;<URL2>;...<URLn>/CODEBASE;<URLm+1>;...<URLn>

Each URL is an absolute URL that points to HTTP servers acting as object stores. The download service first tries downloading files from URL1 through URLm, then the

location specified in the szCodeURL parameter, then the locations URL$m$+1 through URL$n$.

The Internet search path mechanism gives the user or system administrator flexibility in determining how files download. By setting up URLs in the path before the CODEBASE keyword, you can install files from local intranet caches of common components. Removing the CODEBASE keyword from the path effectively disables component downloads from the Internet. By setting up URLs in the path after the CODEBASE keyword, you can install files from standard distribution points, even if the server specified in the active document is not available.

If you specify version numbers, the download service tries to download and install the file only if the version number specified is more recent that any version currently installed on the user's system. If the version number specified is -1, -1,-1,-1, the download service will always get the latest version of the file. When digging through the Internet search path, each object store receives an HTTP POST request containing the CLSID or MIME type and, optionally, a version number. The object store parses this information, checks its internal database of available files, and either fails or redirects the HTTP request to the appropriate downloadable file. If the request specifies a version number, the object store fails if it doesn't have a version equal to or later than the requested version. When you use the szCodeURL location, the version resource in the file can be compared with the requested version to determine if the correct file is available.

The download service also adds HTTP Accept and Accept-Language headers to all HTTP requests. This lets HTTP servers redirect requests for code based on the target platform or language. The Internet Component Download specification defines MIME types passed in the Accept header that identify the target operating system and CPU (see the specification for more details).

Once the download service figures out where to obtain the file, it can actually download the bits to a safe location on the user's machine. The URL moniker takes care of the actual data transfer. Remember, this happens asynchronously, so at this point CoGetClassObjectFromURL returns and further communication between the browser and the component download service occurs through the standard IBindStatusCallback mechanism for URL monikers and a new interface the browser must implement, ICodeInstall. ICodeInstall lets the download service display a user interface when it's verifying and installing code. It's documented in the Internet Component Download specification.

## Verifying Files

Once the required files have been downloaded, the Windows Trust Provider Service function WinVerifyTrust is called to ensure that the file is safe to install. WinVerifyTrust searches the file for a signature block (also known as a digest). The signature block contains information about the author of the file, a public key, and an encrypted digest of the file's contents.

If it finds a signature, WinVerifyTrust validates the certificate. The validation process uses the concept of a trust hierarchy; each certificate is inspected for a parent certificate until it reaches the root certificate. WinVerifyTrust looks for the root certificate in the system's list of trusted root certificates. If WinVerifyTrust finds the root certificate, it inspects each certificate in turn to make sure the certificate is trusted by its parent until the original file certificate is tested. If the certificate is invalid for any reason, a message displays indicating that there is reason to be concerned about the contents of the file. However, the user always has the option to install the file anyway.

If the certificate is valid, the trust verification service decrypts the digest with the public key and regenerates the digest on the downloaded file. If the two digests don't match, the file has been tampered with. Again, a warning message displays for the user. The service also displays a warning if it doesn't find any certificate at all.

Even if the certificate is valid, the user or system administrator may elect to display messages before installing files on a system. The Windows Trust Verification Service actually defines two types of certificates: one for commercial developers and one for individual developers. The main differences are in the types of documentation developers must provide to qualify for the certificate and the types of security provided for the developers' private keys. Users can display warning messages for files from all commercial developers, all individual developers, commercial developers not previously encountered, individual developers not previously encountered, and so on. When the warning message displays, you can add the certificate holder to the trust hierarchy so future files from the same source install without warnings. The warning messages tells you the name of the software, the identity of the publisher, and the issuing certificate authority so the user can make an informed decision about installing files.

## Installing the Component

If the files are safe to install or the user elects to install them anyway, they are installed into the component download cache. In the initial release, the cache is a permanent store at the hardcoded location \windows\system\occcache. However, the download service spec does not specify that the cache is permanent and hardcoded, and hence this is subject to change in future versions.

Once installed, the component must register itself. For DLLs, this means loading the DLL and calling DllRegisterServer. For EXEs, it means running the EXE and passing /RegServer on the command line. The download service adds information to the HKEY_LOCAL_MACHINE\Software\Microsoft\Windows\CurrentVersion registry key to keep track of what it has installed into the download cache. A new section, ModuleUsage, holds a list of owners and clients for each shared module. This differs from the shared DLL reference counting mechanism used by Windows because it identifies who is using a shared module. The ModuleUsage section currently determines whether an installed version of a file is out-of-date. In the future, the download service could identify files that can be removed from the cache using this information.

## Creating the Object

After the component is completely registered, the server is loaded and a class factory is created and returned to the browser. Using the class factory, the browser creates an instance of the object and initializes it with any parameters specified in the <OBJECT> tag. The browser repeats this process for every <OBJECT> tag detected in the active document. You can see why it's important for the download and verification to happen asynchronously. There's a lot of work to be done and the actual downloading could take minutes! By running asynchronously, the component download service lets the browser display as much of the document as possible until all components are installed.

Note that this procedure applies to components specified in <OBJECT> tags only. (Microsoft plans to add support for document object components in a future version of the download service.) Browsers must use URL monikers and the trust verification services directly to download and install other types of files like code referenced by an <A HREF> tag, scripts, or fonts.

## Making Components Trustworthy

If you are a component author, you'll want to make sure the user has the best possible experience when visiting active documents that use your components. You need to mark your components so the trust verification service recognizes them and then package your components for downloading from a Web site.

To mark your components you need to sign your code with a digital certificate. Signing code involves the following steps:

1. Running a one-way hash on the code and producing a fixed-length digest.

2. Encrypting the digest with your private key.

3. Combining the encrypted digest, your certificate, and your credentials into a signature block.

4. Embedding the signature block into your file.

The ActiveX SDK contains tools that help you generate test certificates and signatures and embed signatures in a Win32 Portable Executable (PE) format OCX, DLL, or EXE. Figure 6 lists the tools provided with the SDK. At the time this article was written, documentation for these tools was in the file signcode.txt.

To generate a test certificate, run MAKECERT, which generates a random public/private key pair and a certificate file. To generate my certificate, I used this command line:

```
MAKECERT -u:MaryKir -k:marykir.pvk -n:CN=MaryKirtland -
    d:Mary-Kirtland marykir.cer
```

MAKECERT generated the certificate file, marykir.cer, and a file containing the private key, marykir.pvk. Next, I ran CERT2SPC to generate a signature block.

```
CERT2SPC \inetsdk\bin\root.cer marykir.cer marykir.spc
```

The signature block is written into the file marykir.spc. The file root.cer is a fake root certificate provided in the SDK for testing.

To get a real certificate, you'll need to work with a certificate authority (CA), which is an organization like VeriSign that publishes policies for granting certificates and grants certificates to applicants who meet the stated criteria. Over time, Microsoft expects a hierarchy of CAs to develop. Microsoft also expects local registration agencies (LRAs) to emerge. They will verify evidence provided by applicants, but will rely on CAs to grant certificates.

When you apply for a code-signing certificate, you'll be required to provide credentials to the CA or LRA. You'll also need to generate a public/private key pair and include the public key with your credentials. Once your credentials are approved, the CA generates a software publisher certificate containing your public key and credentials. You can use this certificate to sign your code.

Once you have a certificate, run SIGNCODE to actually sign your code. SIGNCODE has a wizard-style interface that guides you through the process of selecting the file you want to sign, the file containing your certificate, and the file containing your private key. After signing the code, you can run the PESIGMGR and CHKTRUST tools to verify everything. Remember, if you change your file, you must re-sign it. CHKTRUST actually calls the WinVerifyTrust function, so you can see exactly what the user sees when your code is downloaded and verified.

## Packaging Your Code

Once you have the files for your control in their final form, you need to package the code for download. There are three ways to do this: as a single PE file, as a cabinet (CAB) file, or as an INF file (uses Figure 7).

If your control is totally self-contained, the PE format is the simplest way to package your control. The first <OBJECT> tag in DWLDTEST.HTM uses this approach.

```
<OBJECT ID = "Image1"
    CLASSID="clsid:bd11a280-2e73-11cf-b6cf-00aa00a74daf"
    CODEBASE="http://bigcompany/littleteam/eng/more/
            marykir/codebase/wimg.ocx"
    HEIGHT=204 WIDTH=312>
    <PARAM NAME="Image" VALUE="winnet24.bmp">
</OBJECT>
```

The <OBJECT> tag specifies that the browser should create an instance of the WebImage sample control from the ActiveX SDK. The CODEBASE attribute specifies where the control can be found if it isn't already installed on the user's system. Note that the URL specifies the OCX file for the control directly.

When you use the PE-format method, you don't do any packaging at all–you just put your control out on a server. This won't work if your control depends on other files that might not be installed on the user's system, and it doesn't work with file compression, so it's not the solution for every situation. However, if your control is small and self-contained, the PE format will work for you.

An alternative is to package your control in a CAB file, which is an archive of files compressed via the Lempel-Ziv method. The second <OBJECT> tag in DWLDTEST.HTM specifies an instance of the Smile sample control from Visual C++ 4.x.

```
<OBJECT  ID="Smile1"
    CLASSID:175CB003-8EED-11CE-9611-00AA004A75CF"
    CODEBASE="http://bigcompany/littleteam/eng/more/
            marykir/codebase/smile.cab"
    HEIGHT=80 WIDTH=80>
</OBJECT>
```

Note that the CODEBASE attribute specifies a CAB file rather than the OCX.

Using a CAB file offers two advantages over the PE-format method. First, CAB files are compressed, which reduces the time required to download your control. Second, you can download multiple files; if your control uses any dependent files, you can put them in the CAB. Be careful to include only those files that must be downloaded in the cabinet or you'll waste the user's time downloading code that's already installed. For example, you might not want to include the MFC run-time DLLs since the odds are pretty good that some other application or component already installed them.

When you package your control in a CAB file, collect all the required files and write an INF file that provides further installation instructions. The INF file refers to files in the CAB and to files at other URLs (which is how you handle files that may be installed already). The INF file syntax understood by the Internet Component Download service is a subset of the standard Setup INF file syntax you may be familiar with (see Figure 8).

The value of the file key indicates where the file can be downloaded from. It can be a URL or the special value thiscab, which indicates that the file is located in the CAB file where the INF file came from. If no value is specified, component download fails if the file is not already installed on the user's machine.

**FileVersion=a,b,c,d**

The FileVersion key specifies the minimum required version of the file specified by the File key. If no value is specified, any version is acceptable.

**File-%opersys%-%cpu%=[url | ignore]**

%opersys% can be one of [win32 | mac] currently. %cpu% can be one of [x86 | ppc | mips | alpha]. A URL can be specified to indicate the correct file for the target operating system and CPU, or the special value "ignore", which indicates the file is not required for the specified platform.

**Clsid={nnnnnnnn-nnnn-nnnn-nnnn-nnnnnnnnnnnn}**

The value of the clsid key is the string representation of the component CLSID, enclosed in {}.

**DestDir=[10 | 11]**

DestDir can be set to 10 to place the file into the \windows directory or to 11 to place the file into the \windows\system directory. If no value is specified, the file is placed in the cache directory.

If you look at SMILE.INF (see Figure 9), you'll see that two files are required. SMILE.OCX is included in the CAB file, so File=thiscab is specified. MFC40.DLL is also required, but may be installed on the user's system already. A URL is provided so MFC40.DLL can be downloaded, if necessary.

Once you've put all your control's files and an INF file, a tool called DIANTZ.EXE, which is provided in the ActiveX SDK, creates the CAB file. To use DIANTZ, write a directive file (DDF) that specifies which files to combine into a cabinet. There doesn't appear to be any documentation about the format of a DDF file other than a brief example in the Internet Component Download specification. You should be able to use the same format for your own controls, just changing the value of CabinetNameTemplate and filling in your own list of files.

```
; DIAMOND directive file for My Component
.OPTION EXPLICIT ; generate errors on variable typos
.Set CabinetNameTemplate=myfile.CAB
; The files specified below are stored, compressed in
; cabinet files
.Set Cabinet=on
.Set Compress=on
myfile1
myfile2
...
```

SMILE.DDF is the directive file used to create SMILE.CAB.

After you create the DDF file, run DIANTZ from the command line

```
DIANTZ.EXE /f myfile.DDF
```

where "myfile" is the name of your DDF file.

The third packaging option is to specify an INF file that contains directions for downloading and installing your control. The third <OBJECT> tag in DWLDTEST.HTM tells the browser to create an instance of the Button sample control from Visual C++ 4.x.

```
<OBJECT  ID="Button1"
    CLASSID:4A0C998F-7713-101B-A5A1-04021C009402"
    CODEBASE="http://bigcompany/littleteam/eng/more/
            marykir/codebase/button.inf"
    HEIGHT=50 WIDTH=80>
</OBJECT>
```

In this case, the CODEBASE attribute specifies an INF file. The primary advantage of specifying an INF file in the <OBJECT> tag is platform-independence. Since the browser downloads the INF file first, you can specify files to download for different target platforms. When the INF file is interpreted, the appropriate set of files is downloaded.

INF files also offer the most flexibility for downloading the minimum amount of code required to get your control working. With this approach, you do not get the compression offered by the CAB method (although an INF file can point to CAB files, which means only the INF file is uncompressed). However, if your control is fairly small and relies on other files that are probably installed on the user's machine, or if platform-independence is important, the INF file method is your best packaging choice. Figure 10 shows an INF file that works for the x86, MIPS, and Macintosh platforms.

## Conclusion

Active documents on the Web add a whole new dimension to the Internet experience. This power is not without a price, however. Active documents require code, and any time new code is installed on a machine there is the potential for disaster. Users need a way to know what code can be trusted to be virus-free and non-malicious.

The code-signing mechanisms introduced by the Windows Trust Provider Service let component authors identify themselves and verify that their code has not been tampered with. The Internet Component Download service provides a straightforward way for browsers to download and verify code signatures before installing new code on a user's machine. Together, these services will bring safe surfing to millions of Web users.

1197SOPHOS_00012644

Case 3:14-cv-01197-WHO   Document 135-22   Filed 03/15/16   Page 246 of 252

*From the July 1996 issue of Microsoft Systems Journal.*

Manage Your Profile | Legal | Contact us | MSDN Flash Newsletter

© 2014 Microsoft Corporation. All rights reserved. Contact Us | Terms of Use | Trademarks | Privacy & Cookies



1197SOPHOS_00012645

# EXHIBIT 42

## Figure 2   ActiveX SDK Documents Related to Internet Component Download

| File | Description |
|------|-------------|
| …\specs\CodeDwld.doc | Internet Component Download spec |
| …\specs\SftPubTP.doc | Software Publishing Trust Provider spec |
| …\specs\WinTrust.doc | Windows Trust Provider Services spec |

## Figure 4   DWLDTEST.HTM

```
<HTML>
<HEAD><TITLE>Code Download Test Page</TITLE></HEAD>

<BODY>
<H1>Code Download Test Page</H1>

<TABLE>
    <TR>
        <TD ROWSPAN=2>
            <H2>Testing Executable</H2>
            <P>
            This section uses the WebImage sample control from the ActiveX SDK.
            If the control is not already installed, code will be downloaded
            from the URL specified in the CODEBASE attribute of the OBJECT tag.
            </P>
            <CENTER>
            <OBJECT ID = "Image1"
                CLASSID="clsid:bd11a280-2e73-11cf-b6cf-00aa00a74daf"
    CODEBASE="http://bigcompany/littleteam/eng/more/marykir/codebase/wimg.ocx"
                HEIGHT=234 WIDTH=312>
                <PARAM NAME="Image" VALUE="winnet24.bmp">
            </OBJECT>
            </CENTER>
        </TD>
        <TD>
            <H2>Testing .CAB File</H2>
            <P>
            This section uses the Smile sample control from Visual C++ 4.x.
            If the control is not already installed, a CAB file will be
            downloaded from the URL specified in the CODEBASE attribute of
            the OBJECT tag, and the control file will be extracted from
            the CAB file so it can be installed.
            </P>
            <OBJECT ID="Smile1"
                CLASSID="CLSID:175CB003-BEED-11CE-9611-00AA004A75CF"
    CODEBASE="http://bigcompany/littleteam/eng/more/marykir/codebase/smile.cab"
                HEIGHT=80 WIDTH=80>
            </OBJECT>
        </TD>
    </TR>
    <TR>
        <TD>
            <H2>Testing .INF File</H2>
            <P>
            This section uses the Button sample control from Visual C++ 4.x.
            If the control is not already installed, an INF file will be
            downloaded from the URL specified in the CODEBASE attribute of
            the OBJECT tag. Information in the INF file will be used to
            determine what other files need to be downloaded and installed.
            </P>
            <OBJECT ID="Button1"
                CLASSID="CLSID:4A8C998F-7713-101B-A5A1-04021C009402"
    CODEBASE="http://bigcompany/littleteam/eng/more/marykir/codebase/ button.inf"
                HEIGHT=50 WIDTH=80>
            </OBJECT>
        </TD>
    </TR>
</TABLE>

</BODY>

</HTML>
```

## Figure 6   ActiveX SDK Tools for Signing Code

| File | Description |
|------|-------------|
| bin\makecert.exe | Issues a test certificate |
| bin\cert2spc.exe | Generates a signature block from your certificate |

| bin\signcode.exe | Inserts the signature block into your code |
|---|---|
| bin\pesigmgr.exe | Manages certificates-can be used to determine whether code includes any certificates |
| bin\chktrust.exe | Checks whether code is successfully signed |

## Figure 7   Characteristics of Code Download Packaging Methods

| | Number of Files | Selective Installation? | Compression? | Platform Independent? |
|---|---|---|---|---|
| PE File | One | No | No | Only via HTTP format negotiation |
| CAB File | One or more | No* | Yes | Only via HTTP format negotiation |
| INF File | Zero or more | Yes | No | Yes |

* The entire CAB file will be downloaded. It is possible to specify additional URLs for optional files in the INF file.

## Figure 8   INF Syntax Understood by Internet Component Download

The Add.Code section lists all the files to be installed, including optional files:

[Add.Code]
*filename1=section-name1*
*filename2=section-name2*

Each file section is identified by the section name in brackets, followed by all the key values, just like in an INI file:

[section-name1]
*key1=value1*
*key2=value2*

The following keys are valid in a file section:

**File=[*url* | thiscab]**

## Figure 9   SMILE.INF

```
; INF file for Smile.ocx
;

[Add.Code]
Smile.OCX=Smile.OCX
MFC40.DLL=MFC40.DLL

[Smile.OCX]
File=thiscab
Clsid={175cb003-beed-11ce-9611-00aa004a75cf}
FileVersion=1,0,0,1

[MFC40.DLL]
File=http://bigcompany/littleteam/eng/more/marykir/codebase/mfc40.dll
FileVersion=4,0,0,5
```

## Figure 10   A Multi-platform INF File

```
[Add.Code]
circ3.ocx=circ3.ocx

[circ3.ocx]
; lines below specify that the specified circ3.ocx (clsid, version) needs to be installed on
; the system. If doesn't exist already, can be downloaded from the given location (a .CAB)
file-win32-x86=file://products/release/circ3/x86/circ3.cab
file-win32-mips=file://products/release/circ3/mips/circ3.cab
file-mac-ppc=ignore
     ; the 'ignore' keyword means that this file is not needed for this platform
clsid={9DBAFCCF-592F-101B-85CE-00608CEC297B}
FileVersion=1,0,0,143
```

# EXHIBIT 43

Case 3:14-cv-01197-WHO   Document 135-22   Filed 03/15/16   Page 251 of 252



**ORACLE®**   Java SE Documentation

| Oracle Technology Network | Software Downloads | Documentation | Search |

# JAR File Overview

## What is JAR?

JAR stands for Java ARchive. It's a file format based on the popular ZIP file format and is used for aggregating many files into one. Although JAR can be used as a general archiving tool, the primary motivation for its development was so that Java applets and their requisite components (.class files, images and sounds) can be downloaded to a browser in a single HTTP transaction, rather than opening a new connection for each piece. This greatly improves the speed with which an applet can be loaded onto a web page and begin functioning. The JAR format also supports compression, which reduces the size of the file and improves download time still further. Additionally, individual entries in a JAR file may be digitally signed by the applet author to authenticate their origin.

JAR is:

- the only archive format that is cross-platform
- the only format that handles audio and image files as well as class files
- backward-compatible with existing applet code
- an open standard, fully extendable, and written in java
- the preferred way to bundle the pieces of a java applet

JAR consists of a zip archive, as defined by PKWARE, containing a manifest file and potentially signature files, as defined in the JAR File Specification.

## The APPLET tag

Changing the APPLET tag in your HTML page to accomodate a JAR file is simple. The JAR file on the server is identified by the **ARCHIVE** parameter, where the directory location of the jar file should be relative to the location of the html page:

```
<applet code=Animator.class
    archive="jars/animator.jar"
    width=460 height=160>
    <param name=foo value="bar">
</applet>
```

Note that the familiar **CODE=myApplet.class** parameter must still be present. The **CODE** parameter, as always, identifies the name of the applet where execution begins. However, the class file for the applet and all of its helper classes are loaded from the JAR file.

Th ARCHIVE attribute describes one or more JAR files containing classes and other resources that will be "preloaded". The classes are loaded using an instance of an AppletClassLoader with the given CODEBASE. It takes the form `archive = archiveList`. The archives in *archiveList* are separated by ",".

Once the archive file is identified, it is downloaded and separated into its components. During the execution of the applet, when a new class, image or audio clip is requested by the applet, it is searched for first in the archives associated with the applet. If the file is not found amongst the archives that were downloaded, it is searched for on the applet's server, relative to the CODEBASE (that is, it is searched for as in JDK1.0.2).

The archive tag may specify multiple JAR files. Each JAR file must be separated by "," (comma). Each file is downloaded in turn:

```
<applet code=Animator.class
    archive="classes.jar , images.jar , sounds.jar"
    width=460 height=160>
    <param name=foo value="bar">
</applet>
```

There can be any amount of white space between entries within the archive parameter. In addition, the archive tag itself is case-insensitive; it can be lower-case, upper-case, or any combination of lower- and upper-case letters, such as ArCHiVe.

## Executable JAR Files

On Microsoft Windows systems, the Java 2 Runtime Environment's installation program will register a default association for JAR files so that double-clicking a JAR file on the desktop will automatically run it with `javaw -jar`. Dependent extensions bundled with the application will also

be loaded automatically. This feature makes the end-user runtime environment easier to use on Microsoft Windows systems.

The Solaris 2.6 kernel has already been extended to recognize the special "magic" number that identifies a JAR file, and to invoke `java -jar` on such a JAR file as if it were a native Solaris executable. A application packaged in a JAR file can thus be executed directly from the command line or by clicking an icon on the CDE desktop.

---



*Java Technology*

Copyright © 1993, 2016, Oracle and/or its affiliates. All rights reserved.

Contact Us

---